Jaimee Katz Sussner, Esq.
Joshua N. Howley, Esq.
SILLS CUMMIS & GROSS P.C.
Newark, New Jersey 07102
(973) 643-7000
*Attorneys for Court-Appointed Receiver*
*Colliers International NJ, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

-------------------------------------------------------x

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-SB51, *et al.,* <br><br> Plaintiffs, <br><br> vs. <br><br> LENOX TEMPLE LLC; LENOX LIBERTY LLC; LENOX HUDSON LLC; HACKENSACK NORSE LLC; *et al.,* <br><br> Defendants. | : Civil Action No. 19-cv-17865 (MCA)(LDW) <br> : <br> : <br> : <br> : <br> : <br> : **DECLARATION OF RICHARD J.** <br> : **MADISON IN SUPPORT OF RECEIVER'S** <br> : **MOTION TO APPROVE SALE OF** <br> : **PROPERTIES FREE AND CLEAR,** <br> : **AUTHORIZING DISTRIBUTION OF** <br> : **SALES PROCEEDS, AND GRANTING** <br> : **OTHER RELATED RELIEF** <br> : <br> : <br> : <br> : <br> : |

-------------------------------------------------------x -------------------------------------------------------

| | |
|---|---|
| JLS EQUITIES, LLC A NEW YORK LIMITED LIABILITY COMPANY., <br><br> Plaintiff, <br><br> vs. <br><br> LENOX HUDSON, LLC; LENOX TEMPLE, LLC; *et al.,* <br><br> Defendants. | : Civil Action No. 19-cv-17615 (MCA)(LDW) <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

-------------------------------------------------------x -------------------------------------------------------

RICHARD J. MADISON, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am an Executive Managing Director of Colliers International NJ LLC ("**Colliers**," "**Receiver**," or "**Seller**"), and I have personal knowledge of the facts and circumstances set forth in this Declaration unless otherwise indicated.

2.      Colliers is the Court-Appointed Receiver for the properties that are at issue in the above-referenced actions, pursuant to Orders of the Court entered (i) in *U.S. Bank National Association, as Trustee v. Lenox Temple LLC, et al.*, Civil Action No. 19-cv-17865 (the "**US Bank Action**") on September 13, 2019 (ECF # 5), and amended on December 4, 2019 (ECF # 46), and (ii) *JLS Equities, LLC v. River Funding, LLC, et al.*, Civil Action No. 19-cv-17615-MCA-LDW (the "**JLS Action**," and together with the US Bank Action, the "**Actions**") on September 12, 2019 (ECF # 7), and amended on December 4, 2019 (ECF # 52) (together, the "**Receiver Order**").

3.      I respectfully submit this Declaration in support of the Receiver's Motion to approve the sale of certain properties that are the subjects of the Actions, to authorize the Receiver to disburse the net proceeds from the sale, and for related relief incidental to consummating the sale (the "**Sale Approval Motion**"), pursuant to Paragraphs 6(i) and 27 of the Receiver Order, and the Court's Order Setting Forth Sales Procedures entered May 29, 2020 (the "**Sales Procedure Order**").

4.      Specifically, pursuant to the Receiver Order and Sales Procedure Order, the Receiver respectfully requests the Court's approval of the Agreement of Purchase and Sale, dated as of December 22, 2020, and the subsequent Amendments to the Agreement of Purchase and Sale, dated January 11, 2021, January 21, 2021, January 29, 2021, and February 2, 2021 (collectively, the "**PSA**")[1] entered into between Seller and JP Property Acquisitions, LLC

---

[1] Annexed hereto as **Exhibit A** is a true and correct copy of the PSA, including amendments.

("**Purchaser**"), free and clear of all liens, claims, and encumbrances of any alleged interested or affected party (the "**Interested Parties**"), of the following properties (the "**Subject Properties**"):

| Title Holder | Property Address | First Priority Mortgagee |
|---|---|---|
| Lenox Temple LLC | 54-78 Temple Avenue Hackensack, New Jersey 07601-6027 Block 511, Lot 11 (the "**54-78 Temple Property**") | U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass Through Certificates, Series 2018-SB51 |
| Lenox Liberty LLC | 406-444 Liberty Street Little Ferry, New Jersey Block 6.01, Lot 1 (the "**406-444 Liberty Property**") | SBL NJ Noteholder LLC |
| Lenox Hudson LLC | 107-109 Hudson Street Hackensack, New Jersey Block 67, Lot 24 (the "**107-109 Hudson Property**") | U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass Through Certificates, Series 2018-SB51 |
| Hackensack Norse LLC | 88 McKinley Street Hackensack, New Jersey Block 81, Lot 22 (the "**88 McKinley Property**") | SBL NJ Noteholder LLC |
|  |  |  |

| Hackensack Norse LLC | 170 South Park Street Hackensack, New Jersey Block 222.01, Lot 30 (the "**170 South Park Property**") | SBL NJ Noteholder LLC |
|---|---|---|

### The Status of the Subject Properties

5.      As set forth in the Receiver's Monthly Status Reports submitted in connection with the Actions, and in prior pleadings filed with this Court, prior to the inception of the receivership, the Subject Properties were neglected, in disrepair, and mismanaged by their owners.  Consistent with its duties and obligations to this Court, the Receiver has taken steps to improve, maintain, and halt any further deterioration of the Subject Properties.

6.       While each of the Subject Properties are currently the subject on ongoing foreclosure actions pending in New Jersey State Court, upon information and belief, none of the Subject Properties have been scheduled for sheriff's sale, and the first priority mortgagees for the Subject Properties have consented to the proposed sale to Purchaser.

### The Receiver's Efforts to Market and Sell the Subject Properties

7.       In anticipation of its role as real estate broker for the Subject Properties, Colliers was provided Appraisals Reports from an independent, third-party appraiser, CBRE Valuation and Advisory Services.  Annexed hereto as **Exhibits B** through **E** are copies of relevant excerpts from the March 27, 2020 Appraisal Reports for the Subject Properties.  The appraised/estimated fair market value for each of the Subject Properties are as follows: (i) 54-78 Temple Property: $7,800,000; (ii) 406-444 Liberty Property: $6,300,000; (iii) 107-109 Hudson Property: $2,350,000; and (iv) 88 McKinley Property and 170 South Park Property: $4,000,000.

8.       In accordance with the authorization provided by the Receiver Order, and with consent of KeyBank National Association, authorized agent for U.S. Bank National Association,

as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass Through Certificates, Series 2018-SB51 ("**US Bank**"), on August 26, 2020, Colliers executed an Exclusive Rights Agreement through which the Receiver was appointed as the real estate broker for the Subject Properties owned by Lenox Hudson, LLC, Lenox Temple, LLC, Lenox Liberty LLC, and Hackensack Norse, LLC.[2]  Annexed hereto as **Exhibit F** is a true and correct copy of the Exclusive Rights Agreement.

9.      In its capacity as broker, in compliance with applicable law and consistent with industry standards, Colliers engaged in an extensive marketing campaign to sell the Subject Properties.  Among other things, Colliers engaged in an aggressive call campaign to area owners and prospective purchasers, and marketed this portfolio of properties on the following platforms: Crexi, Loopnet/Costar, and LinkedIn.

10.     Additionally, Colliers performed multiple email blasts during September 2020, which reached approximately 5,400 people/entities per blast, and which received open rates ranging from 18.5% to 21.5%.

11.     Colliers also engaged in 18 separate tours of the Subject Properties with prospective purchasers.

12.     Colliers' marketing efforts resulted in approximately 115 confidential agreements and 28 written offers from prospective purchasers.

---

[2] As of the date US Bank and Receiver entered the Exclusive Rights Agreement, US Bank was the first priority mortgagee of each of the Subject Properties.  US Bank's interests in the Subject Properties owned by Lenox Liberty LLC and Hackensack Norse LLC  were thereafter assigned to SBL NJ Noteholder LLC ("**SBL NJ**").  The 88 McKinley Property and 170 South Park Property, which are owned by Hackensack Norse, LLC, are considered a single asset in the Receivership.   SBL NJ has consented and agreed to Colliers continuing to serve as the broker, and has likewise approved of the sale transactions in the PSA for the 406-444 Liberty Property, the 88 McKinley Property, and the 170 South Park Property.

13.     As set forth in more detail below, Colliers ultimately received a purchase offer that exceeds the fair market value of each of the Subject Properties, and, in Colliers' business judgment, is fair, reasonable, and the best opportunity to maximize a return to the Interested Parties.

### The PSA

14.     As a result of Colliers' marketing efforts, on November 2, 2020, Colliers received a Letter of Intent ("LOI") from Purchaser to purchase the Subject Properties.  Annexed hereto as **Exhibit G** is a true and correct copy of the LOI.

15.     Purchaser is not a successor in interest or alter ego of any the defendants in the Actions or, upon information and belief, of any Interested Party.

16.     Consistent with Colliers' communications with other prospective purchasers, Purchaser required that any sale transaction result in its receipt of clear title to the Subject Properties, free and clear of all prior liens, claims, and encumbrances.

17.     On or about December 22, 2020, Seller and Purchaser executed the PSA, a non-binding contract for the sale and purchase of the Subject Properties, which was subsequently amended as detailed above.

18.     My understanding is that the first position mortgagees for each of the Subject Properties has consented to the terms of the PSA.

19.     Moreover, notwithstanding the Receiver's ongoing efforts to manage, repair, preserve, and market the Subject Properties, because the secured debt held by some of the Interested Parties increases by virtue of accumulation of mortgage interest and real estate taxes, if this sale does not occur, it will only become more difficult to market and sell the Subject Properties such that any Interested Party will receive a larger distribution.

20.     Based on the foregoing, Colliers respectfully requests that the Court grant this Motion, approve the Receiver's Sale of the Subject Properties free and clear of all liens, claims, and encumbrances, and authorize the Receiver to disburse the net proceeds.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 17, 2021.

_____

RICHARD J. MADISON

# Exhibit A

**EXECUTION DRAFT 12/17/20**

**AGREEMENT OF PURCHASE**

**AND SALE**

**dated as of December 22, 2020**

**between**

**Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to**

**the Receiver Order**

**as SELLER,**

**and**

**JP PROPERTY ACQUISITIONS, LLC**

**as PURCHASER**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS; RULES OF CONSTRUCTION** ............................................. 1

    1.1    Definitions ............................................................................................. 1

**ARTICLE 2 PURCHASE AND SALE; DEPOSIT; PAYMENT OF PURCHASE PRICE** ............................................................................................. 6

    2.1    Purchase and Sale ................................................................................. 6

    2.2    Payment of Purchase Price ................................................................... 6

**ARTICLE 3 COURT APPROVAL** ............................................................................... 7

    3.1    **Disclaimer/Court Approval** ............................................................. 7

    3.2    The Approval Order ............................................................................. 7

    3.3    Receivership Estate ............................................................................. 7

**ARTICLE 4 INTENTIONALLY OMITTED** ................................................................... 8

**ARTICLE 5 PURCHASER'S REPRESENTATIONS, WARRANTIES AND COVENANTS** ............................................................................... 8

    5.1    Organization and Power ...................................................................... 8

    5.2    Noncontravention ............................................................................... 8

    5.3    Litigation ........................................................................................... 8

    5.4    OFAC ................................................................................................. 9

    5.5    Anti-Money Laundering Laws .............................................................. 9

    5.6    Patriot Act .......................................................................................... 9

    5.7    Survival ................................................................**Error! Bookmark not defined.**9

**ARTICLE 6 CONDITIONS AND ADDITIONAL COVENANTS** ......................................... 9

    6.1    Conditions to Purchaser's Obligations ................................................. 9

    6.2    Conditions to Seller's Obligations ...................................................... 10

**ARTICLE 7 CLOSING** ............................................................................................. 11

    7.1    Closing .............................................................................................. 11

    7.2    Seller's Deliveries .............................................................................. 11

    7.3    Purchaser's Deliveries ........................................................................ 12

    7.4    Closing Costs ..................................................................................... 13

    7.5    Prorations .......................................................................................... 13

    7.6    Escrow Agent ..................................................................................... 15

-i-

# TABLE OF CONTENTS
(continued)

Page

**ARTICLE 8 CONDEMNATION; RISK OF LOSS** ................................................................ 15

    8.1    Condemnation .......................................**Error! Bookmark not defined.**15

    8.2    Risk of Loss ...........................................**Error! Bookmark not defined.**16

**ARTICLE 9 LIABILITY OF SELLER; TERMINATION RIGHTS** ................................ 16

    9.1    Liability of Seller .............................................................................. 16

    9.2    Termination by Purchaser ................................................................. 17

    9.3    Termination by Seller ........................................................................ 17

**ARTICLE 10 DUE DILIGENCE** ........................................................................................ 18

    10.1    Feasibility Period.. ............................................................................ 18

    10.2    Delivery of Data. ............................................................................. 19

    10.3    Right To Terminate During Feasibility Period. ............................... 19

    10.4    Tenant Estoppels............................................**Error! Bookmark not defined.**20

**ARTICLE 11 MISCELLANEOUS** ...................................................................................... 20

    11.1    Completeness; Modification ............................................................. 20

    11.2    Assignments ..................................................................................... 20

    11.3    Successors and Assigns..................................................................... 20

    11.4    Days .................................................................................................. 20

    11.5    Governing Law ................................................................................. 20

    11.6    Counterparts ..................................................................................... 20

    11.7    Severability ...................................................................................... 21

    11.8    Costs ................................................................................................. 21

    11.9    Notices ............................................................................................. 21

    11.10    Incorporation by Reference .............................................................. 22

    11.11    Further Assurances ........................................................................... 22

    11.12    No Partnership .................................................................................. 22

    11.13    Time of Essence ............................................................................... 22

    11.14    No Third-Party Beneficiary ............................................................. 22

    11.15    Waiver of Jury Trial ......................................................................... 22

    11.16    Transfer Taxes ................................................................................. 23

    11.17    No Representation; Purchaser's Duty to Review............................... 23

-ii-

## TABLE OF CONTENTS

(continued)

**Page**

11.18   Release of Seller. ................................................................................. 24

11.19   Broker ................................................................................................... 24

11.20   Confidentiality; Public Disclosure ..................................................... 25

11.21   Right to Market. .................................................................................. 25

11.22   Waiver of Right to Record Lis Pendens. ............................................ 25

-iii-

BE:11369203.2/PJE002-279216
7619678 v4

**LIST OF EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Owner, Property, Purchaser and Purchase Price |
| Exhibit B-1 | - | Legal Description of Land |
| Exhibit B-2 | - | Legal Description of Land |
| Exhibit B-3 | - | Legal Description of Land |
| Exhibit B-4 | - | Legal Description of Land |
| Exhibit C | - | Sale Order |
| Exhibit D | - | Form of Deed |
| Exhibit E | - | Form of Bill of Sale |
| Exhibit F | - | Form of Assignment and Assumption of Leases, Security Deposits, and Intangible Rights |
| Exhibit G | - | Form of Environmental Indemnity Agreement |
| Exhibit H | - | Form of Tax Affidavit |
| Exhibit I | - | Form of Tenant Notice Letter |
| Exhibit J | - | Affidavit of Title |
| Exhibit K | - | Form Estoppel Certificate |

BE:11369203.2/PJE002-279216
7619678 v4

<u>AGREEMENT OF PURCHASE AND SALE</u>

THIS AGREEMENT OF PURCHASE AND SALE (this "<u>Agreement</u>"), dated as of December 22, 2020 ("<u>Effective Date</u>"), between Colliers International NJ LLC, in its capacity as the Court-Appointed Receiver for that certain real property identified and described on Exhibits A and B annexed hereto and incorporated herein (hereinafter, the "<u>Property</u>"), and as more fully described on Exhibits A and B to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019 (the "<u>Receiver Order</u>"), in *(1) U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-sb51, et al. v. Englewood Funding, LLC, et al., Civil Action No. 19-cv-17865-MCA-LDW, (2) JLS Equities, LLC v. River Funding, LLC, et al., Civil Action No. 19-cv-17615-MCA-LDW, and (3) Portal, et al. v. Levine, et al., Civil Action No. 19-cv-19611-MCA-LDW* (collectively, the "<u>Action</u>") (Colliers International NJ LLC in such capacity is hereinafter referred to as "<u>Seller</u>"), and JP Property Acquisitions, LLC, a New Jersey limited liability company ("<u>Purchaser</u>").

RECITALS:

WHEREAS, Owner, as identified on Exhibit A, owns a fee simple interest in the Property (as further defined below); and

WHEREAS, pursuant to the Receiver Order entered by the United States District Court for the District of New Jersey (the "<u>Court</u>") in the Action, and an Order Setting Forth Sale Procedures, dated December 4, 2019, also entered by the Court in the Action, a copy of which is attached hereto as Exhibit C (the "<u>Sale Order</u>"), Seller is authorized to market and sell the Property; and

WHEREAS, subject to the terms and conditions set forth in this Agreement, Purchaser desires to acquire from Seller and, subject to the entry of the Approval Order (defined below), Seller desires to sell to Purchaser the Property (as defined below) for the Purchase Price (defined below), upon the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE 1
## DEFINITIONS; RULES OF CONSTRUCTION

1.1    <u>Definitions</u>.

The following terms shall have the indicated meanings:

 "<u>Agreement</u>" has the meaning set forth in the <u>preamble</u> hereto.

"<u>Applicable Laws</u>" means all statutes, laws (including common law), regulations, rules, ordinances, codes and other requirements of any Governmental Body, including any Orders.

"<u>Approval Order</u>" means an order of the Court approving the Transaction pursuant to this Agreement, and as further defined in the Sale Order, in form and substance acceptable to the Seller in its reasonable discretion.

"<u>Assignment and Assumption Agreement</u>" means an assignment and assumption agreement pursuant to which Seller shall assign without warranty or representation of any kind, and Purchaser shall assume from Seller, the Security Deposits and the Leases corresponding to the Real Property which such Purchaser shall acquire, a form of which is attached hereto as <u>Exhibit F</u>.

"<u>Bill of Sale</u>" means a bill of sale conveying title to the Tangible Personal Property, and Intangible Personal Property, to the extent assignable, from Seller to Purchaser, a form of which is attached hereto as Exhibit E.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday, or any other day on which commercial banks in New Jersey are authorized or obligated to close under applicable laws.

"<u>Claims</u>" means claims, suits, proceedings, causes of action, Liabilities, losses, damages, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever.

"<u>Closing</u>" means a consummation of a purchase and sale of the Property pursuant to this Agreement.

"<u>Closing Date</u>" means the date on which the Closing occurs, but in no event later than the date identified in <u>Section 7.1</u>.

"<u>Contracts</u>" shall mean any contracts and agreements (other than the Leases) entered into by Seller (whether oral or written) during the Receivership Period, affecting or related to the Property by which Seller is bound in connection with the operation of the Property.

"<u>Deed</u>" means, with respect to the Real Property, a deed conveying title to such Real Property from Seller to the applicable Purchaser in recordable form, in form attached hereto as Exhibit D, conveying to Purchaser all of Seller's right, title and interest in and to the Property, all in an "as-is, where-is condition, and with all faults," and without any representation or warranty other than as expressly set forth in this Agreement, subject to the Permitted Exceptions and acceptable to the Title Company.

"<u>Effective Date</u>" has the meaning set forth in the preamble hereto.

"<u>Encumbrances</u>" means all easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting the title, current use, occupancy or operation of the Property or any part thereof or interest therein, other than the lien of the current mortgage which Seller shall cause to be satisfied at Closing and Mandatory Cure Liens.

"<u>Environmental Indemnity Agreement</u>" shall mean that certain agreement in favor of Seller, a form of which is attached hereto as <u>Exhibit G</u>.

BE:11369203.2/PJE002-279216
7619678 v4

"Final Closing Statement" has the meaning set forth in Section 7.5(b).

"Governmental Body" means any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

"Hazardous Substances" means any substance, chemical or waste that is listed as hazardous, toxic or dangerous under any applicable federal, state, county or local statute, rule, regulation, ordinance or order.

"Improvements" means, with respect to the Land (or any portion thereof) all buildings, improvements, fixtures, structures, and other items of real estate located thereon.

"Intangible Personal Property" means, to the extent assignable, all intangible personal property, if any, under the control and in the possession of Seller and used solely in connection with the ownership, operation, leasing, occupancy or maintenance of the Property, including, without limitation, the escrow accounts, general intangibles, business records, plans and specifications, and surveys pertaining to the Real Property and the Personal Property, all licenses, permits and approvals with respect to the construction, ownership, operation, leasing, occupancy or maintenance of the Property, any unpaid award for taking by condemnation or any damage to the Land by reason of a change of grade or location of or access to any street or highway.

"Land" means the land legally described on Exhibit B hereto, or all such land (as the context may require), together with all easements, rights, privileges, remainders, reversions and appurtenances thereunto belonging or in any way appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of the Seller therein, in the streets and ways adjacent thereto and in the beds thereof, either at law or in equity, in possession or expectancy.

"Leases" means any agreements to lease, leases, renewals of leases, subtenancy agreements and other rights (including licenses) and all amendments thereto entered into directly between Seller and a tenant or occupant (and not any other party, including Owner) during the Receivership Period, in effect at the time of Closing, which Purchaser shall assume and Seller agrees to assign without representation or warranty, in accordance with Section 7.2 hereof by Assignment and Assumption Agreement.

"Liability" means any debt, liability, commitment or other obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or not yet due) and including all costs, fees and expenses relating thereto.

"Order" means any order, court order, writ, judgment, injunction, decree, stipulation, determination, decision, verdict, ruling, or award entered by or with any Governmental Body (whether temporary, preliminary or permanent).

"Mandatory Cure Liens" means all monetary liens or encumbrances affecting the Property, which are for a fixed monetary sum, including, but not limited to, mortgages or other liens securing financing, mechanics liens, judgments and liens for delinquent taxes, assessments and sewer and water charges, and all liens and encumbrances, in each case voluntarily placed by or consented to or otherwise arising out of the acts or omissions of Seller, to the extent sale proceeds are available

BE:11369203.2/PJE002-279216
7619678 v4

for such purpose after payment to the plaintiffs in the Action and payment of such monetary liens and encumbrances has been approved by the Court.

"Party" means Seller or any Purchaser, individually, and "Parties" means Seller and Purchaser, collectively.

"Permitted Exceptions" means: (i) any state of facts that would be shown on any accurate survey of the Real Property prepared by a professionally licensed land surveyor, including any easements, rights of way, covenants, conditions, limitations and restrictions of record, (ii) all Encumbrances; (iii) laws, regulations, resolutions or ordinances, including building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Real Property imposed by any Governmental Body, (iv) liens for Taxes not yet due and payable, (v) all other matters of public record, (vi) intentionally omitted, (vii) all exceptions set forth on the Title Commitment, and (viii) the Leases and other occupancies at the Real Property.

"Person" means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Body or any other entity.

"Personal Property" means the Tangible Personal Property and the Intangible Personal Property.

"Property" means, the Real Property owned by Owner, all related Personal Property and Seller's interest in any Leases (to the extent any are in effect at Closing) and the Security Deposits.

"Purchase Price" means the purchase price specified on Exhibit A hereto, which may be adjusted in accordance with Section 7.5 herein (or as otherwise provided in this Agreement).

"Purchaser" has the meaning set forth in the preamble hereto.

"Real Property" means the Land and the Improvements.

"Receiver Order" shall have the meaning set forth in the preamble hereto.

"Receivership Period" shall mean the period commencing when Seller was appointed the receiver of the Property pursuant to the Receiver Order, through the Closing.

"Rent(s)" shall have the meaning set forth in Section 7.5(a) herein.

"Representative" means with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"Security Deposits" means all refundable tenant security deposits and letters of credit in lieu of cash security deposits actually received by Seller pursuant to the Leases to the extent such deposits have not been applied against any obligations owing by such tenants under the Leases.

4

BE:11369203.2/PJE002-279216
7619678 v4

"Seller" has the meaning set forth in the preamble hereto.

"Survey" means a survey of the Real Property delineating the boundary lines of the Land, location of the Improvements, all rights of way and easements and contiguous public roads, as may be obtained by Purchaser at its cost and expense.

"Tangible Personal Property" means the items of tangible personal property consisting of all furniture, fixtures and equipment situated on, attached to or used solely in the operation of the Property, and all furniture furnishings, equipment, machinery and other personal property of every kind located on or used solely in the operation of any Improvement that Seller has an interest in, if any, or the cash proceeds from the sale of any of the foregoing.

"Tax" or "Taxes" means any federal, state, local or non-U.S. net income, gross income, gross receipts, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, unemployment, payroll, withholding, alternative or add on minimum, ad valorem, value added, transfer, stamp, or environmental tax, escheat payments or any other tax, custom, duty, impost, levy, governmental fee or other like assessment or charge (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by a governmental authority against or on the Property.

"Title Company" means Main Street Title and Settlement Services, LLC, whose contact information is Main Street Title and Settlement Services, LLC, 190 Main Street, Suite #305, Hackensack, New Jersey 07601, Attn:  Norma C. Russo, Email:  nrusso@mainsttitle.com, Tel: 201-487-6949 x 203.

"Title Commitment" means a title insurance commitment from the Title Company, describing the Real Property.

"Title Policy" means an owner's title insurance policy, pro forma, or marked and signed title commitment issued to Purchaser by the Title Company, pursuant to which the Title Company insures the Purchaser's ownership of fee simple title to the Real Property described therein subject only to Permitted Exceptions applicable to such Real Property (but also subject to any encumbrances and liens placed on the Property by Purchaser).

"Transaction" means the transactions contemplated by this Agreement to be consummated at the Closing, including, but not limited to, the purchase and sale of the Property.

"Transfer Taxes" means all state and local transfer, documentary, recording, sales, use, stamp, registration conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, or other similar Taxes or governmental assessment in the United States (including any state, municipality, or county).

Rules of Construction.

The following rules shall apply to the construction and interpretation of this Agreement:

(a)	Singular words shall connote the plural number as well as the singular and vice versa, and the masculine shall include the feminine and the neuter.

5

(b)      All references herein to particular articles, sections, subsections, clauses or exhibits are references to articles, sections, subsections, clauses or exhibits of this Agreement.

(c)      The table of contents and headings contained herein are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

(d)      Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement, and therefore any usual rules of construction requiring that ambiguities are to be resolved against a particular Party shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

## ARTICLE 2
## PURCHASE AND SALE; DEPOSIT; PAYMENT OF PURCHASE PRICE

2.1      <u>Purchase and Sale</u>.  Subject to the terms, conditions and provisions set forth herein, Seller agrees to sell, transfer, assign, set over and convey to the Purchaser "**as-is, where-is and with all faults**," and the Purchaser agrees to purchase, acquire and assume from Seller "**as-is, where-is and with all faults**," all of Seller's right, title and interest, if any, in, to and under the Property (subject to the Permitted Exceptions), for the Purchase Price, in accordance with, and subject to, the terms and conditions set forth herein.

2.2      <u>Payment of Purchase Price</u>.  Subject to the terms of this Agreement, Seller is to sell and Purchaser is to purchase the Property for the Purchase Price.  If more than one Property is included in this sale, the Purchase Price allocated to each Property is set forth on <u>Exhibit A</u>, and is incorporated herein.

(a)      The Purchase Price for the Property shall be paid in the following manner:

(i)      An initial deposit in the amount of **$626,250.00** (together with interest accrued thereon, the "<u>Initial Deposit</u>"), shall be due within one (1) Business Day of the Effective Date, payable by wire in immediately available funds, and shall be delivered to Main Street Title and Settlement Services, LLC, whose contact information is Main Street Title and Settlement Services, LLC, 190 Main Street, Suite #305, Hackensack, New Jersey 07601, Attn:  Norma C. Russo, Email:  nrusso@mainsttitle.com, Tel: 201-487-6949 x 203 ("**Escrow Agent**").

(ii)      A second deposit in the amount of **$626,250.00** (together with interest accrued thereon and the Initial Deposit, the "<u>Earnest Money</u>"), shall be due immediately upon the expiration of the Feasibility Period, payable by wire in immediately available funds, and shall be delivered to Escrow Agent.  The Earnest Money shall be held in escrow by the Escrow Agent in accordance with the terms of this Agreement. The Earnest Money will be non-refundable to Purchaser except as set forth in this Agreement.

(iii)      The balance of the Purchase Price, following any prorations and adjustments at Closing (all as provided below), is due on the Closing Date and is payable in immediately available funds and shall be paid by Purchaser to the Escrow Agent by wire

transfer of immediately available funds at the Closing. Wire instructions shall be sent by or on behalf of the Seller to the Escrow Agent on or before the Closing Date.

# ARTICLE 3
# COURT APPROVAL

3.1    **Disclaimer/Court Approval.  Purchaser acknowledges that it has no legally enforceable rights, claims or causes of action against Seller/Receiver hereunder unless and until this Agreement has been subject to a final, non-appealable Approval Order as defined in Paragraph 9 of the Sale Order.  This Agreement shall automatically terminate in the event the Court declines to enter the Approval Order, whereupon the Earnest Money shall be refunded to Purchaser.**

3.2    The Approval Order.  The Approval Order, as applicable, shall, among other matters:

(a)    approve (i) this Agreement and the consummation of the Transaction upon the terms and subject to the conditions of this Agreement, and (ii) all actions as may be necessary or appropriate to effectuate the Transaction; and

(b)    authorize Seller to assign to Purchaser all Leases (if any); and

(c)    approve any other agreement to the extent provided by this Agreement;

3.3    Receivership Estate.  Purchaser acknowledges that Seller does not own the Property and that Seller is only the duly appointed receiver for the Property as provided in the Receiver Order. Notwithstanding anything in this Agreement to the contrary, any liability of Seller under this Agreement shall be limited solely to the receivership estate ("Receivership Estate") established pursuant to the Receiver Order. It is expressly acknowledged and agreed that no assets of Seller in its individual or limited liability capacity shall be subject to any claim for liability of Seller under this Agreement or in connection with, arising under, or as the result of any documents provided by Seller to Purchaser, any termination of this Agreement, or the consummation of the Transaction contemplated under this Agreement or under any of the documents delivered by Seller at or in connection with the Closing. Any claims of Purchaser under this Agreement shall be paid solely and exclusively from the Receivership Estate. Purchaser further acknowledges that Owner shall have no liability of any kind under this Agreement or with respect to the Property or the consummation of the Transaction.

3.4    Reimbursement of Purchaser's Expenses.   If Purchaser has not otherwise terminated this Agreement and is otherwise ready and able to proceed to Closing but for receipt of the Approval Order, and should the Court thereafter decline to enter the Approval Order, Seller shall reimburse Purchaser for Purchaser's actual out-of-pocket expenses incurred in connection with Purchaser's due diligence investigations, as evidenced by paid receipts, up to the amount of $35,000.00.

7

**ARTICLE 4**
**INTENTIONALLY OMITTED**

**ARTICLE 5**
**PURCHASER'S REPRESENTATIONS, WARRANTIES AND COVENANTS**

To induce Seller to enter into this Agreement and to sell the Property to Purchaser, subject to the terms of this Agreement, Purchaser hereby makes the following representations, warranties and covenants, upon each of which Purchaser acknowledges and agrees that Seller is entitled to rely and has relied. Each such representation and warranty shall be true and correct in all material respects on the Effective Date and on the Closing Date.

5.1     Organization and Power.

(a)     Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New Jersey, and has all powers and all governmental licenses, authorizations, consents and approvals to carry on its business as now conducted and to enter into and perform its obligations under this Agreement and any document or instrument required to be executed and delivered on behalf of Purchaser hereunder.

(b)     Purchaser has full right, authority and capacity to execute and perform this Agreement and to consummate the Transaction.

(c)     if Purchaser is an entity or a trustee of a trust, the individual of the Purchaser who executes and delivers this Agreement and all documents to be delivered to Seller hereunder is and shall be duly authorized to do so.

(d)     Purchaser is not owned, in whole or in part, by, nor does Purchaser own or hold any part of the beneficial ownership in, Seller.

(e)     Purchaser is not in a significantly disparate bargaining position in relation to Seller.

(f)     Purchaser is represented by legal counsel of its own choice and designation in connection with the Transaction.

(g)     Purchaser is purchasing the Property for business or commercial investment or similar purpose and not for use as Purchaser's residence.

5.2     Noncontravention.  The execution and delivery of this Agreement and the performance by Purchaser of its obligations hereunder do not and will not contravene, or constitute a default under, any provisions of Applicable Law, Purchaser's organizational documents, or any agreement, judgment, injunction, order, decree or other instrument binding upon Purchaser.

5.3     Litigation.  To the knowledge of Purchaser, there is no action, suit or proceeding, pending or known by Purchaser to be threatened against or affecting Purchaser in any court or before any arbitrator or before any Governmental Body which (a) in any manner raises any question affecting the validity or enforceability of this Agreement or any other agreement or instrument to which the Purchaser is a party or by which it is bound and that is to be used in

8

connection with, or is contemplated by, this Agreement, (b) could affect the ability of any Purchaser to perform its obligations hereunder, or under any document to be delivered pursuant hereto, (c) could create a lien on the Property, any part thereof or any interest therein, or (d) could adversely affect the Property, any part thereof or any interest therein, or the use, operation, condition or occupancy thereof.

5.4     OFAC.  Purchaser is not now nor shall it be at any time prior to or at the Closing a Person with whom a U.S. Person is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.  Neither Purchaser nor any Person who owns an interest in Purchaser (collectively, a "Purchaser Party") is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a Financial Institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

5.5     Anti-Money Laundering Laws.  Neither Purchaser nor any Purchaser Party, nor any Person providing funds to Purchaser: (a) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violations of any Anti-Money Laundering Laws; (b) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (c) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.

5.6     Patriot Act.  To Purchaser's knowledge, Purchaser is in compliance with any and all applicable provisions of the Patriot Act.

5.7     Survival.  All representations and warranties in this Article 5 shall survive the Closing for a period of one (1) year.

## ARTICLE 6
## CONDITIONS AND ADDITIONAL COVENANTS

6.1     Conditions to Purchaser's Obligations.  Purchaser's obligations hereunder are subject to the satisfaction of the following conditions precedent with respect to the Property and the compliance by Seller with the following covenants, to the extent applicable to Seller:

(a)     Seller's Deliveries.  Seller shall have delivered to the Title Company or the Purchaser, as the case may be, on or before the Closing Date, all of the documents and other information required of Seller pursuant to Section 7.2.

(b)     Court Approval.  The Court shall have entered the Approval Order.

(c)   <u>Owner's Title Policy</u>.  Subject to Article 10, Purchaser shall have obtained a Title Policy for the Property subject to the Title Company's receipt of payment of the cost therefor as hereinafter provided in Section 7.4, in the amount of the Purchase Price and insuring title to the Property subject to the Permitted Exceptions (but also subject to any encumbrances and liens placed on the Property by Purchaser); provided Purchaser, at its cost and expense, shall have the right to request that the Title Company issue extended coverage or endorsements to such standard policy of title insurance as part of or in connection with the issuance of the above-noted Title Policy. The issuance of such extended coverage or endorsements is not a condition precedent to the Closing and shall not delay or extend the Closing Date; provided, however that this condition precedent set forth in this Section 6.1(c) shall be deemed waived by Purchaser if Purchaser fails to use commercially reasonable efforts to obtain such Policy with respect to a specific Property.  The parties agree that a Mandatory Cure Lien shall be deemed to have been removed if payment is bonded or if the Title Company is willing to insure Purchaser against loss by reason thereof, based on Seller's bond, indemnity, escrow or other acceptable arrangement.  Seller may elect to discharge Mandatory Cure Liens out of the Closing proceeds paid to Seller by Purchaser at Closing.

6.2   <u>Conditions to Seller's Obligations</u>.  Seller's obligations hereunder are subject to the satisfaction of the following conditions precedent with respect to the Property and the compliance by Purchaser with the following covenants, to the extent applicable to Purchaser:

(a)   <u>Purchaser's Deliveries</u>.  Purchaser shall have delivered to the Title Company, on or before the Closing Date, the Purchase Price and all of the documents and other information required of such Purchaser pursuant to <u>Section 7.3</u>.

(b)   <u>Representations, Warranties and Covenants; Obligations of Purchaser</u>.  All of Purchaser's representations and warranties made in this Agreement shall be materially true and correct as of the Effective Date and as of the Closing Date as if then made and Purchaser shall have performed all of the covenants and other obligations under this Agreement applicable to the Purchaser(s).

(c)   <u>Court Approval.</u> The Court shall have entered the Approval Order.

6.3   <u>Leases and Security Deposits</u>.  Seller does not undertake or guarantee that the status of the Leases will not change prior to the Closing or that any Lease will be in full force or effect on the Closing, and Purchaser agrees that the voluntary or involuntary expiration or termination of any such Lease(s) or removal of tenants or occupants before or after institution of summary proceedings or otherwise shall not give rise to any reduction or abatement of the Purchase Price or other claim or remedy on the part of Purchaser against Seller.  At Closing, Seller shall afford Purchaser a credit in the amount of all cash Security Deposits, including any interest thereon, held by the Seller or its agent as of the Closing Date and shall assign to Purchaser all rights with respect to any such Security Deposits that are other than cash.  Purchaser acknowledges that although a request has been made for the Owner to turn over all Security Deposits received by Owner in connection with the Real Property to Seller, such funds are, apparently, no longer with Owner. Paragraph 17 of the Receiver Order provides in relevant part as follows:

> The Receiver shall not be liable or responsible for . . . any obligation or liability to refund, return or reimburse any security

deposit(s) to any tenant(s) of the Properties that were paid by the tenant(s) to the owner of the applicable Property (the "Owner") prior to the date on which the original Receiver Order applicable to that Property was entered and for which the Owner of that Property has not transferred such security deposit to the Receiver.

Purchaser shall be responsible for any and all fees payable to the issuer of any letter of credit in connection with the transfer of any such letter of credit to Purchaser in connection with Closing, unless such fees are payable by the Tenant on whose behalf the letter of credit was issued.

## ARTICLE 7
## CLOSING

7.1     <u>Closing</u>.  The Closing shall take place at 10:00 a.m. on the later of ("<u>Closing Deadline</u>"): (a) the fifth Business Day following the expiration of the Feasibility Period (as defined below); or (b) sixty (60) days after the date on which the Court enters the Approval Order (subject to the satisfaction or waiver in writing of the conditions set forth in <u>Article 6</u> and <u>Article 7</u> (other than any conditions that can only be satisfied as of the Closing, but subject to the satisfaction or waiver of such conditions)), through an escrow arrangement with the Title Company, or at such other time or place, or in such other manner as may be mutually agreed to by the Parties.  At Purchaser's election, to be exercised by notice to Seller given at least fifteen (15) days prior to the Closing Deadline, Purchaser may extend the Closing by up to thirty (30) days by depositing an additional $250,000.00 in immediately available funds with the Escrow Agent.  Such additional funds shall become part of the Earnest Money to be held in escrow by the Escrow Agent in accordance with the terms of this Agreement and shall be non-refundable to Purchaser except as otherwise provided herein, but shall be applicable as a credit to the Purchase Price at Closing.  Notwithstanding anything herein to the contrary, neither Party may extend the Closing Date by failing to deliver its respective deliveries set out in Section 7.3 (with respect to the Purchaser) and Section 7.2 (with respect to the Seller) on or before the date of Closing, unless the Parties otherwise agree in writing. In such event, provided that the conditions precedent to either Party's obligation to close have been met as of the Closing Date, such failure to deliver its respective deliveries shall be deemed a default under this Agreement in accordance with the terms and conditions of <u>Article 9</u> hereof.

7.2     <u>Seller's Deliveries</u>.  Subject to the conditions precedent set forth in Section 6.2, Seller shall deliver in escrow to Escrow Agent the following instruments, each of which shall have been duly executed and, where applicable, acknowledged on behalf of Seller:

(a)     The Deed for the Real Property;

(b)     The Bill of Sale for the Personal Property;

(c)     The Assignment and Assumption Agreement;

(d)     A letter to each tenant of the Property (the "<u>Tenant Notification Letter</u>") in the form of **<u>Exhibit I</u>** attached to this Agreement;

11

(e)      a Tax Affidavit, duly executed by Seller, in the form of **Exhibit H** attached to this Agreement;

(f)      Seller shall deliver, without representation or warranty of any kind: (i) the Leases; (ii) a schedule of Security Deposits; (iii) a schedule of operating expenses for the Property; (iv) a collection report regarding Rent actually received from Tenants; (v) current insurance certificates; and (vi) a current tax bill (collectively, the "Property Documents").  Seller shall terminate all Contracts on or prior to Closing.

(g)      The Affidavit of Title in the form attached as Exhibit J, and such affidavits, transfer forms, or other documents as may be reasonably required by the Title Company solely in favor of the Title Company in order to issue the Title Policy or close the Transaction (collectively the "Additional Instruments"); provided, however, that, (i) except with respect to a customary gap indemnity, in no event shall Seller be required to provide any indemnities to Purchaser or the Title Company hereby, and (ii) with respect to any such Additional Instruments, they must be in form and substance acceptable to Seller and Seller shall only be obligated to opine with respect to facts thereunder to its then current actual knowledge and without having made, or being required to make, any independent investigation of the facts, and only with respect to those matters first occurring during the Receivership Period and Seller shall not otherwise be required to increase its liability hereunder in any material respect;

(h)      The Final Closing Statement (as defined below); and

(i)      Any other document or instrument required hereby or required to be executed by Seller in order to record the Deed or reasonably required by the Title Company or Purchaser, provided same does not increase Seller's liability or obligations hereunder and Seller has the power and authority to do so as the Court-Appointed Receiver.

7.3      Purchaser's Deliveries.  At Closing, Purchaser shall deliver in escrow to Escrow Agent the following, each of which, as applicable, shall have been duly executed and, where applicable, acknowledged on behalf of Purchaser:

(a)      The Purchase Price described in Section 2.2;

(b)      An original counterpart of the Assignment and Assumption Agreement;

(c)      The Final Closing Statement (as defined below), duly executed by Purchaser;

(d)      An original Environmental Indemnity in the form of **Exhibit G** attached hereto, duly executed by Purchaser;

(e)      An original counterpart of the Tenant Notification Letter;

(f)       An original counterpart of the Bill of Sale and Assignment;

(g)      Such evidence of the authority and capacity of Purchaser and its Representatives as the Escrow Agent and Title Company may reasonably require; and

12

Case 2:19-cv-17865-MCA-LDW   Document 112-1   Filed 02/19/21   Page 26 of 174 PageID: 16124

(h)     Any documents or instruments required hereby or required to be executed by Purchaser in order to record any Deed or Assignment or Assumption Agreement.

7.4     <u>Closing Costs</u>.  Purchaser shall pay for all costs and expenses associated with the conveyance of the Property, and as set forth in the Sale Order, including, but not limited to, Survey costs and expenses, title insurance premiums and fees (including, but not limited to the premium for the Title Policy and any premium attributable to any extended coverage or the issuance of any endorsements thereto or the deletion of any exceptions including the standard exceptions), any fees for a loan policy of title insurance issued by the Title Company or any other title insurance company, recording fees and taxes, Transfer Taxes in accordance with <u>Section 11.16</u>, all costs associated with the assignment and assumption of the Leases, any customary escrow fee charged by the Escrow Agent in connection with the Closing, due diligence expenses incurred by Purchaser, and all other fees or charges of the Escrow Agent and Title Company in connection with the Closing of the Transaction.  Purchaser shall be responsible for the payment of its own attorney's fees incurred in connection with the Transaction and Seller shall be responsible for the payment of its own attorney's fees incurred in connection with the Transaction.

7.5     <u>Prorations</u>.

(a)     <u>Apportionments Generally</u>. The following items shall be adjusted at Closing:

        (i)     For purposes hereof, the term "<u>Adjustment Time</u>" means 12:01 a.m. Eastern Time on the day of the Closing.

        (ii)     Real estate taxes and any expenses relating to the operation of the Property (including water, sewer and other utilities) shall be adjusted as of the Adjustment Time. If there are water meters at the Property, Seller shall endeavor to furnish final meter readings dated not more than ten (10) days prior to the Closing and the unfixed water rates and charges and sewer rents and taxes covered by such meters, if any, for the intervening time shall be apportioned on the basis of such last reading.  If Seller does not obtain such final meter readings within ten (10) days prior to the Closing, Seller shall at Closing, to the extent sale proceeds are available for such purpose after payment to the plaintiffs in the Action and provided such escrowed amount has been approved by the Court, deposit in escrow with the Title Company, such sum as shall reasonably be requested by the Title Company in order to omit such water charges and until an actual reading is obtained by Seller and provided to the Title Company.

        (iii)     Utility deposits, operating expenses of the Property paid by Seller for any period subsequent to the Adjustment Time shall be credited to Seller at Closing.

        (iv)     Any income received by Seller from any tenants of the Property (each a "<u>Tenant</u>," collective, the "<u>Tenants</u>") allocable to the period from and after the Adjustment Time shall be credited to Purchaser at Closing. Seller shall remain entitled to all Rents owing prior to the Closing Date, and shall be responsible for their collection, and Purchaser will not be responsible for collecting such Rents for Seller, but if received by Purchaser, Purchaser will promptly forward such Rent to the Seller. If, following Closing, either Party receives any Rent attributable to any time period to which it is not entitled, such Party will

13

BE:11369203.2/PJE002-279216
7619678 v4

promptly forward such Rent to the other Party. Seller shall submit to Purchaser any Rent payments received after Closing allocable to the period from and after the Adjustment Time no later than ten Business Days from its receipt. To the extent a Tenant owes Rent for a period prior to the Closing Date and owes Rent for a period from the Closing Date, and makes a payment to Purchaser, Purchaser shall first apply such amount to Rent owed to Purchaser, with any balance to be promptly forwarded to Seller. Without limiting the provisions of this subsection (iv), Seller hereby reserves its right to bring legal proceedings directly against Tenants for collection of any Rent due Seller from such Tenants (without seeking eviction of any Tenant). The term "Rent" or "Rents" shall mean rents due or to become due from Tenants under the Leases, including fixed rent, additional rentals, percentage rentals, escalation rentals (which include each Tenant's prorated share of building operation and maintenance costs and expenses as provided under the Leases), retroactive rentals, all administrative charges, utility charges, Tenant or real property association dues, storage rentals, special event proceeds, temporary rents, telephone receipts, locker rentals, vending machine receipts and other sums and charges payable by Tenants under the Leases or from other occupants or users of the Property. The provisions of this subsection (iv) shall survive the Closing.

(v)     Except as specifically provided in Section 7.5(a)(i) through (iv) hereof, there shall be no prorations of income or expenses at Closing, it being agreed that (i) after Closing, Purchaser shall be liable for the liabilities regarding the ownership and operation of the Property, including any Property-related obligations, costs and liabilities that arise after Closing, and (ii) after Closing, Purchaser shall be entitled to all revenue and income relating to the Property.

(vi)     At Closing, Purchaser shall assume responsibility for the payment of any Tenant Inducement Costs (as hereinafter defined) becoming due and payable from and after the Effective Date, including any Tenant Inducement Costs becoming due and payable by reason of Leases executed after the Effective Date and any Tenant Inducement Costs becoming due and payable from and after the Effective Date by reason of the expansion of the premises demised by a Lease existing as of the Effective Date or the renewal of a Lease existing as of the Effective Date. If Seller shall have paid any such Tenant Inducement Costs as of the Closing Date, Purchaser shall reimburse Seller therefor at Closing. For purposes of the foregoing provisions, the term "Tenant Inducement Costs" shall mean any payment required under a Lease to be paid by the landlord thereunder to or for the benefit of the Tenant thereunder which is in the nature of a tenant inducement, including specifically, without limitation, tenant improvement costs, lease buyouts and moving allowance, but only for any such payments paid after the Effective Date.

(b)     Closing Statement. Prior to the Closing Date, Seller and Purchaser shall cause the Title Company to prepare a draft closing statement, made in accordance with the terms hereof, setting forth amounts to be prorated between Seller and Purchaser at the Closing pursuant to this Article 7. The draft closing statement shall contain Seller's good faith estimate of the amounts (based on facts and circumstances then known to Seller), as of the date of the Closing, of the items to be prorated between Seller and Purchaser, or to be credited to either Party, pursuant to this Article 7. Seller and Purchaser shall cause the information set forth in the draft closing statement to be updated with actual information available as of the Closing Date. Not later than the Closing

Date, Seller and Purchaser cause the Escrow Agent to update the closing statement for purposes of the Closing (the "Final Closing Statement"), which statement shall include the matters on which Seller and Purchaser have agreed pursuant to this Article 7, as updated with actual information as of the Closing Date. With respect to any matter on which Seller and Purchaser still disagree as of such time, Seller's good faith determination of the amount in question as of the Closing Date (based on commercially reasonable practice in purchases and sales of property similar to the Property) shall be deemed the agreed upon amount.   The amounts shown in such Final Closing Statement shall be used in determining the amounts due or credited to Seller at the Closing, and the Escrow Agent shall rely conclusively thereon in settling the accounts of Purchaser and Seller at the Closing.

7.6     Escrow Agent.  Upon authorization from Purchaser and Seller on the Closing Date, the Escrow Agent will:

(a)     record the Deed and release to Purchaser the Bill of Sale and Assignment, the Assignment and Assumption Agreement, the Tenant Notification Letter, the Leases, the Tax Affidavit; and

(b)     release to Seller the sale proceeds and all signed counterparts required under Section 7.3.

7.7     Municipal Inspections.  Purchaser will be responsible for obtaining any smoke detector or similar certificates, certificate of occupancy, or inspections from the relevant municipalities where the Property is located that may be required for the Closing, at its sole cost and expense.

# ARTICLE 8
# CONDEMNATION; RISK OF LOSS

8.1     Condemnation.  In the event of any actual or threatened taking, pursuant to the power of eminent domain, of all or any portion of the Real Property, Seller shall give written notice thereof to the Purchaser promptly after Seller learns or receives notice thereof. If all or any part of the Real Property which would materially adversely interfere with the operation or use of the Real Property as currently operated and used is, or is to be, so condemned or sold, Purchaser shall have the right to elect not to purchase the Real Property and to terminate this Agreement by written notice to Seller delivered within ten (10) days after Purchaser's receipt of Seller's notice. If Purchaser elects to terminate this Agreement pursuant to the terms of this Section 8.1, then the Earnest Money shall be returned to Purchaser and all other rights and obligations of either Party under this Agreement (other than any indemnification rights and obligations under this Agreement and any other obligations which by the express terms of this Agreement are intended to survive any cancellation or termination of this Agreement (collectively, the "Continuing Obligations")) shall be terminated and this Agreement shall be of no further force or effect.  If Purchaser elects not to terminate this Agreement, or fails to timely exercise the foregoing termination right, Purchaser shall proceed with Closing without any reduction in the Purchase Price, provided that

all proceeds, awards and other payments arising out of such condemnation or sale (actual or threatened) shall be paid or assigned, as applicable, to Purchaser at Closing.

8.2     Risk of Loss.  In the event of any fire or other casualty at the Real Property, Seller shall give written notice thereof to Purchaser promptly after Seller learns or receives notice thereof, and Purchaser shall proceed with the Closing without any reduction in the Purchase Price, provided, however, that Seller shall: (i) pay or assign, as applicable, all insurance proceeds and rights to proceeds arising out of such loss or damage to the applicable Purchaser at Closing, less any reasonable costs incurred by Seller to collect such proceeds and any portion of such proceeds that Seller uses to make temporary or emergency repairs that are reasonably consented to by such Purchaser; and (ii) provide Purchaser a credit at Closing for any applicable insurance deductible.

## ARTICLE 9
## LIABILITY OF SELLER;
## TERMINATION RIGHTS

9.1     Liability of Seller.

(a)     Seller shall not be responsible and Purchaser hereby releases Seller from and against any Claims arising out of or in connection with the Property and the Transaction, known or unknown, regardless of whether the Claim arises out of events occurring prior to or after the Closing. The foregoing release includes Claims of which Purchaser is presently unaware or which Purchaser does not presently suspect to exist which, if known by Purchaser, would materially affect Purchaser's release of Seller. Purchaser has carefully reviewed this Section 9.1, has discussed its import with legal counsel, is fully aware of its consequences, and acknowledges that this Section 9.1 is a material part of this Agreement.

(b)     Notwithstanding any other provision set forth in this Agreement, Seller shall have no liability under this Agreement, or any other liability to Purchaser or its successors or assigns resulting from, connected with, or arising out of, any breach or default except with respect to a Post-Closing Breach (as such term is hereinafter defined).  With respect to any Post-Closing Breach, Purchaser must deliver to Seller written notice and demand describing with specificity such breach within 30 days of the Closing Date, otherwise such breach or default will be deemed waived.  Seller's recourse obligations under this Agreement with respect to any breach or default by Seller (regardless of whether such default relates to any of its representations or warranties under this Agreement, relates to the Deed, or otherwise) which occurs or is discovered, brought, claimed or alleged by Purchaser following Closing (in any event a "Post-Closing Breach"), shall not exceed the aggregate sum of $10,000.00 (the "Breach Cap").  Seller shall have no liability to Purchaser after Closing for a breach or default of any of Seller's undertakings unless the valid claims for all such breaches and defaults amount, in the aggregate, to more than $5,000.00 (the "Breach Floor").  Notwithstanding anything to the contrary contained in this Agreement, (a) Purchaser's recourse against Seller for any liability of Seller under this Agreement shall be strictly limited to Seller's proceeds from the sale of the Property received from Purchaser (between the Breach Floor and the Breach Cap) and Purchaser shall have no recourse against any of Seller's other assets, and (b) in no event shall any entity or person, other than Seller itself, be liable for any obligations of Seller under this Agreement.  Notwithstanding anything to the contrary contained in this Agreement, PURCHASER ACKNOWLEDGES AND AGREES THAT THE BREACH

16

CAP REPRESENTS SELLER'S AGGREGATE MAXIMUM POTENTIAL LIABILITY UNDER THIS AGREEMENT FOR A POST-CLOSING BREACH AND, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL SELLER'S AGGREGATE LIABILITY UNDER THIS AGREEMENT FOR ANY POST-CLOSING BREACH EXCEED THE BREACH CAP, REGARDLESS OF THE NUMBER OF POST-CLOSING BREACHES WHICH MAY OCCUR OR HAVE OCCURRED AND REGARDLESS OF THE NUMBER OF DEMANDS MADE BY PURCHASER WHETHER RELATED TO ONE OR MULTIPLE POST-CLOSING BREACHES. Except as expressly provided in this Section 9.1(b), neither Seller nor any other Seller Parties shall have any liability of any kind to Purchaser for any Post-Closing Breach. This Section 9.1(b) shall survive the Closing and any termination of this Agreement.

9.2     <u>Termination by Purchaser</u>. If Seller materially defaults in performing any of its obligations under this Agreement (including its obligation to sell the Property) for any reason other than a default by Purchaser under this Agreement, and Seller fails to cure any such default within three (3) Business Days after notice thereof from Purchaser, Purchaser may, at its option, elect either (but not both) (a) to terminate this Agreement by written notice delivered to the Seller at or prior to the Closing (in which event, however, the Continuing Obligations shall continue in effect), in which event the Earnest Money shall be refunded to Purchaser and all rights and obligations of Seller and Purchaser hereunder shall terminate immediately (except those which expressly survive the termination of this Agreement), or (b) to waive its right to terminate and, instead, to proceed to Closing. In either event, such election by Purchaser shall be its sole and exclusive remedy under this Agreement, under applicable law or in equity, and Purchaser shall not be entitled to any damages of any kind, whether actual, consequential, special, punitive or otherwise.

9.3     <u>Termination by Seller</u>. If Purchaser materially defaults in performing any of its obligations under this Agreement (including its obligation to purchase any Property), and Purchaser fails to cure any such default within three (3) Business Days after notice thereof from Seller (except in the case of Purchaser's failure to perform its obligations on the Closing Date, in which case, Seller may immediately call Purchaser into default under this Agreement), and Purchaser has delivered the Earnest Money to the Escrow Agent as required under this Agreement, then Seller's sole remedy for such default shall be to terminate this Agreement and retain the Earnest Money as liquidated damages. Seller and Purchaser agree that it is difficult to determine, with any degree of certainty, the loss which Seller would incur in the event of Purchaser's failure to close the purchase of the Property, and the Parties have agreed that the amount of the Earnest Money represents a reasonable estimate of such loss and is intended as a liquidated damages provision. If upon the determination of Seller's directors, trustees, members, or agents, as applicable, and upon advice of counsel, any term or provision of this Agreement shall prevent, amend, alter, or reduce Seller's ability to exercise its fiduciary duties under Applicable Law, Seller shall have the right to terminate this Agreement. Notwithstanding the foregoing, (a) if any portion of the Earnest Money is not delivered to Escrow Agent as required under this Agreement, Purchaser shall be in breach under this Agreement and Seller shall have the right to pursue any remedy available at law or in equity as a result of such breach, including specifically, (i) the right to terminate this Agreement and thereafter recover liquidated damages against Purchaser for Purchaser's breach of this Agreement, and (ii) the right to enforce specific performance of this Agreement, and (b) if Purchaser or any affiliate of Purchaser asserts a claim to the Property which clouds Seller's title thereto, and if such claim is found by a court of competent jurisdiction to be

17

without merit, then Seller shall have all remedies available at law or in equity against Purchaser. This <u>Section 9.3</u> shall survive Closing or termination of this Agreement.

## ARTICLE 10
## DUE DILIGENCE

10.1    <u>Feasibility Period</u>.

(a)    Purchaser shall have the right to inspect the Property and conduct due diligence thereon provided Purchaser concludes all such inspections and investigation within twenty (20) days from the Effective Date hereof (the "<u>Feasibility Period</u>").  During the Feasibility Period, Purchaser may conduct or cause to be conducted on its behalf, reasonable physical and other investigations including review of applicable zoning, environmental and other ordinances, statutes and regulations, and feasibility studies with respect to the Property, including without limitation, wetlands, soil, title, architectural, traffic, engineering, geotechnical and environmental inspections, studies, investigations and/or tests (including marketing studies) to evaluate the condition of the Premises (and marketability thereof) (collectively, the "<u>Feasibility Studies</u>"); provided, however, that notwithstanding any provision hereinabove to the contrary, Purchaser shall not perform any drilling, test borings, soil samples, or other invasive activities or testing of any kind on the Property whatsoever.  Purchaser shall not retain an LSRP to conduct any environmental investigation. Seller agrees to permit Purchaser and Purchaser's contractors, engineers, employees, consultants and agents to otherwise enter upon the Property for the purpose of performing the Feasibility Studies provided Seller receives notice from Purchaser at least one (1) Business Day prior to the proposed entry date and Seller confirms such time and date are acceptable.  As a result of the current COVID-19 Public Health Emergency and State of Emergency declared by New Jersey Governor Philip D. Murphy, when accessing the Property Purchaser and its contractors, engineers, employees, consultants and agents shall comply with all safety measures, guidance, recommendations and protocols recommended by the Centers for Disease Control and Prevention (CDC) and the New Jersey Department of Health.  All Feasibility Studies shall be at Purchaser's sole cost and expense. Purchaser agrees to conduct the Feasibility Studies so as to cause a minimum of disruption to the operation of the Property and a minimum of inconvenience for Seller and the Tenants at the Property.  In no event shall Purchaser have access to occupied units.  Seller shall have a right to have a Representative present during all Feasibility Studies. Purchaser shall restore the Property to substantially the same condition it was in before Purchaser's entry upon same and Purchaser shall also indemnify, hold harmless and defend Seller and any of the other Seller Parties (as defined below) from and against all loss, liability, damage, litigation, sums paid in settlement of any of the foregoing and costs (including without limitation reasonable attorneys' fees and disbursements) arising out of death, bodily injury or property damage resulting from any act of Purchaser or its contractors, engineers, employees, consultants and agents in connection with the Feasibility Studies. The foregoing indemnity shall not apply to any condition that existed at the Property prior to Purchaser's entry thereon and was merely discovered by Purchaser or its agents. Prior to any entry upon the Property by Purchaser or Purchaser's contractors, engineers, employees, consultants and agents, Purchaser shall furnish Seller with a policy of liability insurance (or a certificate of the insurer evidencing such insurance) covering any claim for death, bodily injury or property damage arising out of acts of Purchaser and its contractors, engineers, employees, consultants and agents in connection with the Feasibility Studies, in an amount not less than $5,000,000 in the aggregate per person in respect of death, bodily injury or property damage and

under which Seller and Owner shall be named as an additional insured. If Purchaser has employees, Purchaser shall provide Seller with evidence that it maintains worker's compensation insurance in accordance with applicable law prior to entry onto the Property. Any Purchaser or Representative of Purchaser with employees must provide Seller with evidence that it maintains worker's compensation insurance in accordance with applicable law prior to entry onto the Property. The foregoing shall not limit, diminish, negate or release Purchaser's indemnification obligations contained above

(b)     Should Purchaser obtain a supplement or update to its Title Commitment prior to Closing and after the expiration of the Feasibility Period, which indicates any new defects in title and/or survey, excluding the lien for taxes and assessments not due and payable as of the Closing, and any lien or encumbrance caused by Purchaser or its agents, Purchaser shall have the right to raise objections to such items within five (5) days after receipt of such supplement or update. Within five (5) Business Days after Seller's receipt of Purchaser's notice of new title objections ("New Title Objections"), Seller will notify Purchaser in writing whether or not Seller will attempt to remove the New Title Objections for Closing.  If Seller notifies Purchaser that Seller will not or cannot remove the New Title Objections (nothing contained herein shall obligate Seller to remove any title objections), then the New Title Objections shall become Permitted Exceptions, without abatement in the Purchase Price or claim against Seller, unless Purchaser notifies Seller of its election to terminate this Agreement within five (5) days after Purchaser's receipt of Seller's notice that Seller will not or cannot remove the New Title Objections.  If Seller elects to attempt to remove New Title Objections, then at Seller's option, the Closing Deadline will be extended for the time reasonably required to enable Seller to remove New Title Objections; provided, however, if Seller has been unable to remove the New Title Objections by within sixty (60) days after the Closing Deadline, then either Party shall have the right to terminate this Agreement upon five (5) days' prior written notice to the other Party, whereupon the Earnest Money shall be paid by Escrow Agent to Purchaser, and the Parties shall have no further obligations hereunder except those that survive the termination of this Agreement.  In no event shall Seller be liable to Purchaser for damages if Seller is unable or unwilling to cure any title objections as provided herein, any right to claim such damages being expressly waived by Purchaser.

10.2     Delivery of Data.

(a)     Seller shall deliver to Purchaser copies of the Property Documents within three (3) Business Days following the Effective Date.

(b)     Purchaser shall deliver to Seller (without representation) copies of all raw data, test results, documents and reports obtained or generated in connection with the Feasibility Studies (other than work product of Purchaser's attorneys) promptly after the receipt thereof regardless of whether Purchaser terminates this Agreement under Section 10.3 hereof.

10.3     Right To Terminate During Feasibility Period.  If Purchaser is not satisfied with the results of the Feasibility Studies for any or no reason, Purchaser shall have the right to terminate this Agreement by written notice to Seller given on or before the expiration of the Feasibility Period, whereupon the Earnest Money shall be paid by Escrow Agent to Purchaser, and the Parties shall have no further obligations hereunder except those that survive the termination of this Agreement.  In the event Purchaser fails to terminate this Agreement pursuant to this Section 10.3

19

on or before the expiration of the Feasibility Period, Purchaser shall be deemed to have waived its right to terminate this Agreement pursuant to this Section 10, and the Earnest Money shall be non-refundable to Purchaser except as otherwise provided herein, but shall be applicable as a credit to the Purchase Price at Closing. The indemnity obligations of Purchaser set forth in this Article 10 and the release by Purchaser set forth below shall survive the Closing and any termination of this Agreement.

      10.4    <u>Tenant Estoppels</u>.

      Purchaser shall have the right, at its sole cost and expense, to distribute estoppel certificates to all Tenants, in the form attached hereto as Exhibit K.  Seller will reasonably cooperate with Purchaser in the distribution of such certificates, but shall have no obligation to procure same or respond to Tenant's inquires.  All inquiries shall be directed to Purchaser.  Purchaser shall not unreasonably disturb Tenants nor unreasonably interfere with the use, occupancy or operations of the Property.  Receipt of estoppel certificates from Tenants shall not be a condition to Closing, nor Closing be delayed pending receipt of such certificates.

## ARTICLE 11
## MISCELLANEOUS

      11.1    <u>Completeness; Modification</u>.  This Agreement constitutes the entire agreement between the Parties hereto with respect to the Transaction and supersedes all prior discussions, understandings, agreements and negotiations between the Parties hereto. This Agreement may be modified only by a written instrument duly executed by the Parties hereto.

      11.2    <u>Assignments</u>.  Purchaser may assign its rights hereunder with the consent of Seller (which consent shall not be unreasonably withheld) to any affiliate of such Purchaser; <u>provided</u>, <u>however</u>, that Purchaser shall remain liable under this Agreement and shall not be released from its obligations hereunder.  No Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party hereto.

      11.3    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and bind Purchaser and Seller and their respective successors and assigns.

      11.4    <u>Days</u>.  If any action is required to be performed, or if any notice, consent or other communication is given, on a day that is a Saturday or Sunday or a legal holiday in the jurisdiction in which the action is required to be performed or in which is located the intended recipient of such notice, consent or other communication, such performance shall be deemed to be required, and such notice, consent or other communication shall be deemed to be given, on the first (1st) Business Day following such Saturday, Sunday or legal holiday.  Unless otherwise specified herein, all references herein to a "day" or "days" shall refer to calendar days and not Business Days.

      11.5    <u>Governing Law</u>.  This Agreement and all documents referred to herein shall be governed by and construed and interpreted in accordance with the laws of the State of New Jersey.

      11.6    <u>Counterparts</u>.  To facilitate execution, this Agreement may be executed in as many counterparts as may be required.  It shall not be necessary that the signature on behalf of both

BE:11369203.2/PJE002-279216
7619678 v4

Parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement. This Agreement and any amendment shall be binding if executed with an original signature, by facsimile signature, by email through portable document format ("pdf") signature or by DocuSign electronic signatures.

11.7  Severability. If any term, covenant or condition of this Agreement, or the application thereof to any Person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such term, covenant or condition to other persons or circumstances, shall not be affected thereby, and each term, covenant or condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.8  Costs. Regardless of whether Closing occurs hereunder, and except as otherwise expressly provided herein, each Party shall be responsible for its own costs in connection with this Agreement and the Transaction, including without limitation fees of attorneys, engineers and accountants.

11.9  Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be delivered by hand, transmitted by facsimile transmission, sent by electronic mail in ".pdf" format, sent prepaid by Federal Express (or a comparable overnight delivery service) or sent by the United States mail, certified, postage prepaid, return receipt requested, at the addresses and with such copies as designated below. Any notice, request, demand or other communication delivered or sent in the manner aforesaid shall be deemed given or made (as the case may be) when actually delivered to the intended recipient.

| | |
|---|---|
| If to Seller: | Colliers International NJ LLC |
| | c/o Colliers International |
| | 300 Interpace Parkway, Building C, 3rd Floor |
| | Parsippany, New Jersey 07054 |
| | Attention: Richard J. Madison, Executive Managing Director |
| | (Richard.Madison@colliers.com) |
| | Attention: Jacklene Chesler, Executive Managing Director |
| | (Jacklene.Chesler@colliers.com) |
| | |
| with a copy to: | Sills Cummis & Gross P.C. |
| | One Riverfront Plaza |
| | Newark, New Jersey 07102 |
| | Attention: Jaimee Katz Sussner (jsussner@sillscummis.com) |
| | |
| If to Purchaser: | JP Property Acquisitions, LLC |
| | 190 Main Street, Suite 201 |
| | Hackensack, New Jersey 07601 |
| | Attention: John Pjeternikaj (john@jpmgmtllc.com) |
| | |
| with a copy to: | Brach Eichler LLC |
| | 101 Eisenhower Parkway |

21

Roseland, New Jersey 07068
Attention: Allen J. Popowitz, Esq. (apopowitz@bracheichler.com)

If to Title Company:  Main Street Title and Settlement Services, LLC
190 Main Street, Suite #305
Hackensack, New Jersey 07601
Attn:  Norma C. Russo
Email: nrusso@mainsttitle.com

If to Escrow Agent:  Main Street Title and Settlement Services, LLC
190 Main Street, Suite #305
Hackensack, New Jersey 07601
Attn:  Norma C. Russo
Email: nrusso@mainsttitle.com

Or to such other address as the intended recipient may have specified in a notice to the other Party.  Any Party hereto may change its address or designate different or other persons or entities to receive copies by notifying the other Party in the manner described in this Section.  The attorneys for the Parties shall have the right to deliver notices on behalf of their respective clients.

11.10  <u>Incorporation by Reference</u>.  All of the exhibits attached hereto are by this reference incorporated herein and made a part hereof

11.11  <u>Further Assurances</u>.  Subject to the terms of <u>Article 3</u> hereof, Seller and Purchaser each covenant and agree to sign, execute and deliver, or cause to be signed, executed and delivered, and to do or make, or cause to be done or made, upon the written request of the other Party, any and all agreements, instruments, papers, deeds, acts or things, supplemental, confirmatory or otherwise, as may be reasonably required by either Party for the purpose of or in connection with consummating the Transaction described herein.

11.12  <u>No Partnership</u>.  This Agreement does not and shall not be construed to create a partnership, joint venture or any other relationship between the Parties hereto except the relationship of seller and purchaser specifically established hereby.

11.13  <u>Time of Essence</u>.  Time is of the essence with respect to every provision hereof.

11.14  <u>No Third-Party Beneficiary</u>.  The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser, only, and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

11.15  <u>Waiver of Jury Trial</u>.  **SELLER AND PURCHASER EACH HEREBY WAIVE ANY RIGHT TO JURY TRIAL IN CONNECTION WITH THE ENFORCEMENT BY SUCH PURCHASER, OR SELLER, OF ANY OF THEIR RESPECTIVE RIGHTS AND REMEDIES HEREUNDER.**

BE:11369203.2/PJE002-279216
7619678 v4

11.16   <u>Transfer Taxes</u>.  Seller shall be responsible for the payment of Realty Transfer Taxes, if applicable, in connection with the consummation of the sale transactions contemplated by this Agreement, and Purchaser shall be responsible for the "Mansion Tax", if applicable.

11.17   <u>No Representation; Purchaser's Duty to Review</u>.

**AS A MATERIAL INDUCEMENT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY SELLER, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY CONTAINED IN THIS AGREEMENT, AND AS REFLECTED IN THE PURCHASE PRICE, PURCHASER IS PURCHASING THE PROPERTY IN AN "AS-IS, WHERE- IS" CONDITION AND IN AN "AS-IS, WHERE-IS" STATE OF REPAIR, AND WITH ALL FAULTS, IN EACH CASE AS OF CLOSING.** WITHOUT LIMITING THE GENERALITY OF THE FOREGOING,  PURCHASER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE PROPERTY WITH   GOVERNMENTAL   LAWS   (INCLUDING,   WITHOUT   LIMITATION, ACCESSIBILITY FOR HANDICAPPED PERSONS), THE TRUTH, ACCURACY OR COMPLETENESS OF ANY PROPERTY DOCUMENTS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO PURCHASER, OR ANY OTHER MATTER OR THING REGARDING THE PROPERTY.  PURCHASER ACKNOWLEDGES AND AGREES THAT SUBJECT TO SELLER'S RECEIPT OF THE APPROVAL ORDER, UPON CLOSING, SELLER SHALL SELL AND TRANSFER TO PURCHASER, AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS". PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER AND THE OTHER SELLER PARTIES ARE NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO (INCLUDING SPECIFICALLY, WITHOUT LIMITATION, PROPERTY INFORMATION DISTRIBUTED WITH RESPECT TO THE PROPERTY) MADE OR FURNISHED BY SELLER, OWNER, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, OR ANY OF THEIR RESPECTIVE AGENTS, LOAN SERVICERS, EMPLOYEES, MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS, MANAGERS, PARTNERS, ATTORNEYS, REPRESENTATIVES, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS (COLLECTIVELY, "<u>SELLER PARTIES</u>"), CERTIFICATE HOLDERS AND BONDHOLDERS OF OWNER OR ANY MEMBER OF OWNER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING.  PURCHASER ACKNOWLEDGES AND UNDERSTANDS THAT SELLER CANNOT AND (EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT) DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES OR GIVE ANY ASSURANCES

23

REGARDING THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS PROVIDED TO PURCHASER, INCLUDING, BUT NOT LIMITED TO THOSE MATERIALS PROVIDED TO PURCHASER PURSUANT TO SECTION 7.2(F) HEREOF. PURCHASER REPRESENTS TO SELLER THAT PURCHASER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO THE EXPIRATION OF THE FEASIBILITY PERIOD, SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS SUBSTANCES ON OR DISCHARGED FROM THE PROPERTY, AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT, AND NO SUCH EXPRESS REPRESENTATIONS, WARRANTIES OR COVENANTS OF SELLER SHALL SURVIVE CLOSING.  THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

11.18   Release of Seller.

(a)      After the Closing Date, Purchaser irrevocably waives and releases, on behalf of Purchaser, Purchaser's agents, Purchaser's affiliates and all successors in title to the Property, any claims against Seller and the Seller Parties arising out of or in connection with any conditions, including subsurface conditions, whether known or unknown, latent or apparent, defects, violations of any applicable laws, rules, regulations or ordinances (including and whether such claims are based on or sound in contract, tort, statute, common law liability, contribution, indemnity, strict liability or any other theory or cause of action which Purchaser might have asserted or alleged against Seller or any of the other Seller Parties, at any time by reason of or arising out of any defects, physical conditions, violations of any applicable laws, rules, regulations or ordinances (including, without limitation, any environmental, housing or rent control laws, rules, regulations or ordinances) and any and all other acts, omissions, events, circumstances or matters regarding the Property or its occupancy or operation. The provisions of this Section 11.18 shall survive the Closing. Purchaser acknowledges and agrees that it has carefully reviewed this Section 11.18, has discussed its import with legal counsel, is fully aware of its consequences, and acknowledges that the provisions of this Section 11.18 are a material part of this Agreement.

(b)      The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every representation, warranty and covenant made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those, if any, which are herein specifically stated to survive Closing, including, without limitation Section 9.1(b).

11.19   Broker.  Seller and Purchaser each warrant and represent to the other that they have not dealt with any broker, agent, finder or similar person in connection with this Agreement, other than Colliers International NJ LLC ("Seller's Broker") and The Kislak Company, Inc. ("Purchaser's Broker").  Seller shall pay all commissions and fees due to Seller's Broker pursuant to a separate written agreement between Seller and Seller's Broker. Purchaser shall pay all

24

commissions and fees due to Purchaser's Broker pursuant to a separate written agreement between Purchaser and Purchaser's Broker. Seller agrees to indemnify, defend and hold Purchaser harmless in full against all claims for commissions, fees and similar compensation asserted by anyone (including Seller's Broker and Purchaser's Broker) based on alleged dealings with Seller in connection with the Transaction.   Purchaser agrees to indemnify, defend and hold Seller harmless in full against all claims for commissions, fees and similar compensation asserted by anyone (including Seller's Broker and Purchaser's Broker) based on alleged dealings with Purchaser in connection with the Transaction.  The provisions of this Section 11.19 shall survive the Closing.

      11.20   Confidentiality; Public Disclosure.  Purchaser agrees that it shall keep confidential this Agreement, the terms and conditions of this Agreement and all materials, documents and information pertaining to the Property and the Leases that are at any time (whether before or after the Effective Date) delivered or made available by Seller or any of its agents or representatives to the Purchaser or any of its agents or representatives (collectively, the "Confidential Information") and that Purchaser shall not disclose the Confidential Information to any person or entity for any reason whatsoever except as specifically permitted herein or except as may be necessary to comply with the order of any court or any other Governmental Body of competent jurisdiction or as required by law or regulation. Purchaser shall restrict dissemination of Confidential Information within its own organization and to Purchaser's representatives, advisors, consultants or lenders and to the Title Company and Escrow Agent so that the Confidential Information shall be revealed only to the extent necessary to enable Purchaser to fulfill the terms of this Agreement.  Nothing herein contained shall prohibit Purchaser's right to obtain a zoning report for the Property. Notwithstanding any term or provision of this Agreement to the contrary, the terms and provisions of this Section 11.20 shall survive any termination or cancellation of this Agreement (but not the Closing).  In the event this Agreement is terminated or Purchaser defaults hereunder, Purchaser shall promptly return to Seller any and all Confidential Information.  In the event of a breach or threatened breach by Purchaser or its agents under this Section 11.20, Seller shall be entitled to an injunction restraining Purchaser or its agents from disclosing, in whole or in part, any Confidential Information. Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach. Prior to Closing, any release to the public of information by Purchaser with respect to any matters set forth in this Agreement, including the existence of this Agreement, will be made only in the form approved by Seller and its counsel.

      11.21   Right to Market.  Notwithstanding anything in this Agreement to the contrary, and to the fullest extent permitted by any laws applicable to this Agreement, Seller hereby reserves the right to market the Property to potential purchasers at any time up to the date of Closing, including entering into back-up contracts for the purchase of the Property.  By its execution of this Agreement, Purchaser hereby acknowledges such reservation of marketing rights and agrees that any such actions by or on behalf of Seller at any time up to the date of Closing shall not constitute a default by Seller under this Agreement.

      11.22   Bulk Sale.  The Parties hereby acknowledge that pursuant to *N.J.S.A.* 54:32B-22(c) and *N.J.S.A.* 54:50-38, Purchaser is required to notify the Director of the Division of Taxation in the Department of the Treasury of the State of New Jersey (the "Department"), at least ten (10) Business Days prior to the transfer of title, of the proposed sale and of the price, terms and conditions of the Transaction.  Purchaser shall be responsible for submitting the required

notification of the pending sale to the Department, identifying Seller as the seller of the Property, together with a copy of this Agreement and the Approval Order (the "Bulk Sales Notice"). Purchaser shall deliver a copy to Seller's attorney prior to filing such notification and Seller agrees to reasonably cooperate with any such submissions.  If the Department determines that any or all of the sale proceeds at Closing are to be held in escrow following the Closing, then, and provided there is no conflict with the Approval Order, such funds as determined by the Department shall be held in escrow by the Escrow Agent.  Upon receipt of notice of the sums owed to the State of New Jersey, provided there is no conflict with the Approval Order, Escrow Agent is authorized to disburse such amounts from the escrow in satisfaction of such outstanding obligation.  Escrow Agent shall continue to hold any undisbursed amounts from the escrow  until such time as the Parties are in receipt of a tax clearance letter from the Department authorizing the release of the escrow, in which event the balance of the escrow shall be immediately paid to Seller.  Closing shall not be delayed in any manner or for any reason including, but not limited to, Purchaser's failure to timely submit a complete Bulk Sales Notice or the Department's failure to provide a response to the Bulk Sales Notice prior to the Closing Date.  Purchaser shall have no right, title or interest in or to the escrowed funds and shall have no right to demand or receive payment of all or any portion of the escrowed funds, except in accordance with the terms of the above described escrow.  The funds held in escrow shall be held in an interest bearing account utilizing Seller's taxpayer identification number for reporting purposes, and the interest accrued on the escrowed funds shall be the sole property of Seller and shall be disbursed to Seller from time to time upon Seller's request.  Seller shall be solely responsible for all taxes, interest and penalties due and owing to the State of New Jersey by Seller.  This Section shall survive the Closing.

11.23   <u>1031 Transaction</u>.  Seller acknowledges that this Agreement may be part of an IRC Section 1031 transaction for Purchaser ("Exchange") and agrees to reasonably cooperate to effect such a transaction, provided same is at no cost or liability to Seller and the Exchange does not result in any delay or postponement of the Closing.  Purchaser's rights under this Agreement may be assigned to a qualified intermediary for the purpose of completing such an Exchange.  Purchaser shall notify Seller at least ten (10) Business Days prior to the date of Closing of its election to undertake an Exchange.  If any such Exchange should fail to occur for whatever reason, the sale of the Property by Seller shall nonetheless be consummated in accordance with the terms, covenants and conditions of this Agreement (other than this Section 11.23).  Seller assumes no liability in connection with the Exchange, and Purchaser hereby indemnifies and holds Seller harmless from any and all liability including, without limitation, reasonable costs, expenses and attorneys' fees, arising out of, resulting from, and/or relating to the Exchange and Seller's performing acts requested by Purchaser to effectuate such Exchange, which indemnification shall survive the Closing.

11.24   Waiver of Right to Record Lis Pendens.  AS PARTIAL CONSIDERATION FOR SELLER ENTERING INTO THIS AGREEMENT, PURCHASER EXPRESSLY WAIVES ANY RIGHT UNDER APPLICABLE STATE STATUTES OR AT COMMON LAW OR OTHERWISE TO RECORD OR FILE A LIS PENDENS OR A NOTICE OF PENDENCY OF ACTION OR SIMILAR NOTICE AGAINST ALL OR ANY PORTION OF THE PROPERTY IN CONNECTION WITH ANY ALLEGED DEFAULT BY SELLER HEREUNDER. PURCHASER AND SELLER HEREBY EVIDENCE THEIR SPECIFIC AGREEMENT TO THE TERMS OF THIS WAIVER BY PLACING THEIR INITIALS IN THE PLACE

26

PROVIDED HEREINAFTER.  THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE CLOSING OR ANY TERMINATION OF THIS AGREEMENT.

_____*JP*_____                              _____

PURCHASER'S INITIALS                          SELLER'S INITIALS


_____                              _____

[SIGNATURES ON FOLLOWING PAGE]

27

PROVIDED HEREINAFTER.  THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE CLOSING OR ANY TERMINATION OF THIS AGREEMENT.

_____                _____RJM_____

PURCHASER'S INITIALS                                SELLER'S INITIALS

_____                                        _____

[SIGNATURES ON FOLLOWING PAGE]

BE:11369203.2/PJE002-279216
7619678 v4

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed as of the day and year first above written.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____
      Name:  Richard J. Madison
      Title:   Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC**,
a New Jersey limited liability company

By: _____
Name: John Pjeternikaj
Title:  Manager

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed as of the day and year first above written.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____
    Name:  Richard J. Madison
    Title:   Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC,**
a New Jersey limited liability company

By: _____
Name: John Pjetern kaj
Title:  Manager

## ESCROW AGENT RECEIPT

The undersigned Escrow Agent acknowledges receipt of a fully executed copy of this Agreement and the Earnest Money in the amount of $626,250.00 to be held and disbursed in accordance with the terms of this Agreement.  Copies of the fully executed Agreement, signed also by the Escrow Agent, shall be delivered to Seller's counsel and Purchaser's counsel at the addresses listed in Section 11.9 above. The Escrow Agent does not assume and shall not be under any liability on account of performance or non-performance of any party to this Agreement, except for any loss, cost, claim, damage or expense resulting from Escrow Agent's negligence or willful misconduct. The Earnest Money shall be disposed of only in accordance with the provisions of escrow instructions signed by both parties.  In the event of a dispute hereunder, Escrow Agent may deposit the Earnest Money into a court of competent jurisdiction.  The Escrow Agent has assigned this Agreement GF number: _____.

Dated: _____, 2020.

**MAIN STREET TITLE AND SETTLEMENT SERVICES, LLC**

By: _____
Name:
Title:   Ryau Nazor
         President

**EXHIBIT A**

**OWNER, PROPERTY, PURCHASE PRICE**

| Owner | Address | No. of Units | Purchase Price |
|---|---|---|---|
| Lenox Temple LLC | **54-78 Temple Avenue, Hackensack, New Jersey, 07601** | 60 | $9,622,312.00 |
| Lenox Liberty LLC | **406-444 Liberty Street, Little Ferry, New Jersey 07643** | 44 | $7,056,362.00 |
| Lenox Hudson LLC | **107-109 Hudson Street, Hackensack, New Jersey 07601** | 18 | $3,086,694.00 |
| Hackensack Norse LLC | **88 McKinley Street Hackensack, New Jersey 07601** | 14 | $2,077,206.00 |
| Hackensack Norse LLC | **170 South Park Street, Hackensack, New Jersey 07601** | 20 | $3,207,438.00 |
| **TOTAL** | | **156** | **$25,050,012.00** |

Ex. A-1

**EXHIBIT B-1**

**LEGAL DESCRIPTION OF LAND**

**ADDRESS: 54-78 TEMPLE AVENUE, HACKENSACK, NEW JERSEY, 07601**

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Hackensack, County of Bergen, State of New Jersey.

BEING known and designated as Lot 18-23 as shown on a certain map entitled, "Map of Property of Anderson and Ward, situated in Hackensack, Bergen County, N.J.", duly filed in the Office of the Bergen County Clerk on May 25, 1972 as Map No.196.

BEGINNING at a point in the northeasterly side of Temple Avenue, distant 471.54 feet northwesterly from its intersection with the northwesterly side of Hackensack Avenue; running thence

1.      Along the northeasterly side of Temple Avenue, North 43 degrees 10 minutes West, 300.00 feet; thence

2.      North 46 degrees 50 minutes East, 212.93 feet; thence

3.      South 43 degrees 04 minutes 10 seconds East, 300.00 feet; thence

4.      South 46 degrees 50 minutes West, 212.42 feet to the point and place of BEGINNING.

The above description is in accordance with a survey made by Hallard & Associates dated April 20, 2007.

BE:11369203.2/PJE002-279216
7619678 v4

**EXHIBIT B-2**

**LEGAL DESCRIPTION OF LAND**

**ADDRESS: 406-444 LIBERTY STREET, LITTLE FERRY, NJ 07643**

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Little Ferry, County of Bergen, State of New Jersey.

BEING known and designated as Lot 1-10 In Block 6 as shown on a certain map entitled, "Amended Map of Property of Bendix Homes. Inc., Little Ferry, Bergen County, New Jersey", dated August 28, 1941 and duly filed October 17, 1941 in the Office of the Clerk of Bergen County as Map # 3279.

BEGINNING at a Point in the easterly line of Liberty Street, said point being distant northerly 25.00 feet from the corner formed by the intersection of the said easterly line of Liberty Street with the northerly line of West Gate and from said point of beginning running; thence

1.      Northerly along said easterly line of Liberty Street, North 21 degrees 44 minutes East 262.40 feet to a deflection in said easterly line of Liberty Street; thence

2.      Northerly and still along said easterly line of Liberty Street, North 21 degrees 20 minutes East 223.00 feel to a point; thence

3.      South 85 degrees 58 minutes East 104.74 feet to the westerly line of Lot No. 19 in Block No. 6 as the same is shown on map entitled, "Amended Map of Property of Bendix Homes, Inc., Little Ferry, Bergen County, New Jersey", which map was filed in the Bergen County Clerk's Office on October 17, 1941 as Map No. 3879; thence

4.      Southerly along the westerly line of Lots Nos. 19, 18,17 and a portion of 16 in Block No. 6 as shown on said map, South 21 degrees 20 minutes West, 254.50 feet to a point; thence

5.      Southerly along a portion of the westerly line of said Lot No 16 and along the westerly line of Lots 15, 14, 13, 12 and 11 in Block No. 6 as shown on said map, South 21 degrees 44 minutes West 227.35 feet to a point; thence

6.      Westerly parallel with West Gate North 68 degrees 16 minutes West, 15.00 feet to a point: thence

7.      Southerly parallel with the first course herein described South 21 degrees 44 minutes West, 60.40 feet to the northerly line of West Gate; thence

8.      Westerly along the same, North 68 degrees 16 minutes West 60.00 feet to a point; thence

Ex. B-2

9.      Curving to the right along a curve having a radius of 25.00 feet, an arc distance of 39.27 feet to said easterly line of Liberty Street and the point or place of BEGINNING.

NOTE FOR INFORMATION: Being Lot(s) 1, Block 6.01. Tax Map of the Borough of Little Ferry. County of Bergen.

BE:11369203.2/PJE002-279216
7619678 v4

# EXHIBIT B-3

## LEGAL DESCRIPTION OF LAND

### ADDRESS: 107-109 HUDSON STREET, HACKENSACK, NJ 07601

### EXHIBIT A

#### DESCRIPTION OF THE LAND

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Hackensack, County of Bergen, State of New Jersey.

BEGINNING at a point located in the southwesterly sideline of Hudson Street, said point being distant 137.45 feet measured southeasterly along the aforementioned sideline of Hudson Street from its intersection with the southwesterly sideline of Kansas Street, as produced, and from said beginning point running; thence

1. Along the aforementioned sideline of Hudson Street, South 10 degrees 00 minutes 00 seconds East, 84.60 feet to a point; thence

2. South 80 degrees 00 minutes 00 seconds West, 188.60 feet to a point; thence

3. North 03 degrees 49 minutes 06 seconds East, 87.12 feet to a point; thence

4. North 80 degrees 00 minutes 00 seconds East, 167.79 feet to the point and place of BEGINNING.

Being in accordance with a survey prepared by Hallard & Associates, Watchung, New Jersey dated April 20, 2007.

NOTE FOR INFORMATION:  Being Lot(s) 24, Block 67, Tax Map of the City of Hackensack, County of Bergen.

Unofficial Copy Bergen County Clerk

New Jersey
Multifamily Mortgage, Assignment of Rents
and Security Agreement

Page A-1

Ex. B-3

BE:11369203.2/PJE002-279216
7619678 v4

# EXHIBIT B-4

## LEGAL DESCRIPTION OF LAND

### ADDRESS: 88 MCKINLEY STREET AND 170 SOUTH PARK STREET, HACKENSACK, NJ 07601

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Hackensack, County of Bergen, State of New Jersey.

**TRACT I:**

BEING known and designated as Lots 52, 53, 54 on a map entitled "Map of Property of William E. Taylor, Near Essex Street Depot, Hackensack, N.J." filed October 8, 1894, as Map No. 710 and part of Lot 51 in map entitled "Map of Property of William E. Taylor, Near Essex Street Depot, Hackensack, N.J." filed October 8, 1894, as Map No. 710 and part of Lot 14 on Map entitled, "Property of Carl O. Larson, Hackensack, N.J." filed February 6, 1905 as Map No. 960.

BEGINNING at a point on the southeasterly R.O.W. line of McKinley Street (formerly South First Street, 50.00 feet R.O.W.), said point being a distance of 150.00 feet from its intersection with the southwesterly R.O.W. line of Lexington Avenue (50.00 feet R.O.W.) and running; thence

1. South 18 degrees 00 minutes 00 seconds West, a distance of 125.00 feet to a point; thence

2. South 78 degrees 50 minutes 15 seconds East, a distance of 150.00 feet to a point; thence

3. North 18 degrees 00 minutes 00 seconds East, a distance of 125.00 feet to a point; thence

4. North 78 degrees 50 minutes 15 seconds West, a distance of 150.00 feet to the point and place of BEGINNING.

The above description is in accordance with a survey made by Morgan Engineering & Surveying, dated 02/05/2015.

NOTE: Being Lot(s) 22, Block 81, Tax Map of the City of Hackensack, County of Bergen, State of New Jersey.

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected situate, lying and being in the City of Hackensack, County of Bergen, State of New Jersey.

**TRACT II:**

Parcel A:

BEGINNING in the easterly line of Park Street at the southwesterly corner of the tract conveyed to John O'Shea by Jane Berry and her husband by deed bearing date May 10, 1888 being the northeasterly corner of the lot hereby conveyed being also 47 feet southerly from the southwesterly corner of the lot conveyed by the said William E. Taylor to Wilhelmine Leinweber by deed bearing date October 8, 1906; running thence

1. Easterly along said lot conveyed to John O'Shea, 135.00 feet; thence

2. Southerly and parallel with Park Street and along land now or formerly of George Shafer and others,

Ex. B-4

1. Along said line of South Park Street, South 22 degrees 41 minutes West, 70.59 feet; thence

2. South 67 degrees 29 minutes East, 135.00 feet; thence

3. North 22 degrees 41 minutes East, 69.43 feet; thence

4. North 66 degrees 59 minutes 30 seconds West, 135.00 feet to the said line of South Park Street and the point of BEGINNING.

BEING further known and described as:

BEGINNING at the point of intersection of the southeasterly R.O.W. line of Park Street (30' R.O.W.) with the northeasterly R.O.W. line of a lane, and running; thence

1. South 67 degrees 29 minutes 00 seconds East, a distance of 135.00 feet to a point; thence

2. North 22 degrees 41 minutes 00 seconds East, a distance of 107.43 feet to a point; thence

3. North 66 degrees 59 minutes 30 seconds West, a distance of 135.00 feet to a point; thence

4. South 22 degrees 41 minutes 00 seconds West, a distance of 108.59 feet to the point and place of BEGINNING.

The above description is in accordance with a survey made by Morgan Engineering & Surveying, dated 02/05/2015.

NOTE:  Being Lot(s) 30, Block 222.01, Tax Map of the City of Hackensack, County of Bergen, State of New Jersey.

BE:11369203.2/PJE002-279216
7619678 v4

**EXHIBIT C**

SALE ORDER

Ex. C-1

SILLS CUMMIS & GROSS P.C.
Jaimee Katz Sussner, Esq.
Joshua N. Howley, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

*Attorneys for Court-Appointed Receiver*
*Colliers International NJ, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

----------------------------------------------------x

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-SB51, *et al.*, | Civil Action No. 19-cv-17865 (MCA)(LDW) |
| Plaintiffs, | |
| vs. | **ORDER SETTING FORTH** |
| | **SALE PROCEDURES** |
| ENGLEWOOD FUNDING LLC,  *et al.*, | |
| Defendants. | |

----------------------------------------------------x

**THIS MATTER** having been opened to the Court by counsel for the plaintiffs in the

following actions:  (i) *OREC NJ, LLC v. Levine, et al.*, Civil Action No. 19-cv-17421-MCA-LDW,

(ii) *Wells Fargo Bank, National Association v. Levine, et al.*, 19-cv-17866-MCA-LDW, (iii) *U.S.*

*Bank National Association v. Englewood Funding, LLC, et al.*, 19-cv-17865-MCA-LDW, (iv) *JLS*

*Equities LLC v. River Funding, LLC, et al.*, 19-cv-17615-MCA-LDW, (v) *Privcap Funding, LLC*

*v. Levine, et al.*, 19-cv-18122-MCA-LDW, and (vi) *Conventus, LLC v. Levine, et al.*, 19-cv-18137-

MCA-LDW (the "**Actions**"), and Sills Cummis & Gross P.C., in its capacity as counsel for the

court-appointed receiver in the Actions (the "**Receiver**"), for an Order setting forth the procedures

for the property owners (collectively, the "**Property Owners**" and individually, the "**Property Owner**") identified as defendants in the Actions and/or the Receiver (collectively, the "**Seller**") to sell the subject properties that are identified in Exhibit A attached hereof (collectively, the "**Properties**" and individually, the "**Property**"); and any objections to entry of this Order that were filed having been addressed by the Court; and the Court having considered the papers submitted in connection with this application, and having heard the arguments of counsel, if any; and for good cause shown;

IT IS on this 29th day of ___May___, 2020,

**ORDERED** as follows:

1.     The Seller is hereby authorized to execute non-binding contracts (each a "**Non-Binding Contract**") for the sale of one or more of the Properties.  Each Non-Binding Contract executed by the Seller shall contain a provision (the "**Disclaimer**") that the purchaser or other counter-party thereto shall not have any legally enforceable rights, claims or causes of action against the seller counter-party thereunder unless and until such Non-Binding Contract has been the subject of an final, non-appealable Approval Order (as herein defined) entered by this Court in accordance with the procedures set forth herein.

2.     Within three (3) business days of execution of a Non-Binding Contract, the proponent of the sale shall serve a copy of the Non-Binding Contract upon (i) the Property Owner(s), c/o Seth Levine, 636 South Forest Drive, Teaneck, New Jersey, with a copy to Jacob Kaplan, Esq., Brafman & Associates, P.C., 767 Third Avenue, 26th Floor, New York, New York 10017, Email: jkaplan@braflaw.com, (ii) Sills Cummis & Gross P.C. on behalf of the Receiver, (iii) the attorneys for the affected first mortgagee(s), (iv) those persons who have appeared in the Action(s) relating to the subject Property(s), and (v) those persons purporting to hold secured debt

2

3

or otherwise to have an interest in the subject Property(s), including any mezzanine lenders (collectively, the "**Parties**" and individually, a "**Party**"), via e-mail (or first class mail, if e-mail is not possible).

3.      Within three (3) business days thereafter, the proponent of the sale shall file proof of service of the Non-Binding Contract on the Parties.  The proponent of the sale shall serve the Parties with any and all proposed amendments, modifications and addenda to the Non-Binding Contract (which shall contain the Disclaimer provided for in paragraph 1 above) within three (3) business days after execution thereof, and shall file proof of service of any and all proposed amendments, modifications and addenda to the Non-Binding Contract originally served on the Parties.

4.      Upon the request of a Party, the proponent of a sale shall furnish, within seven (7) calendar days of the receipt of such request, information concerning the proposed purchaser and the transaction as the Party requests, including but not limited to information that would reasonably allow a Party to make a determination as to the proposed purchaser's financial wherewithal and other capabilities to close the transaction and the likelihood that any contingencies contained in the Non-Binding Contract can reasonably be satisfied.   Such information shall include the following information to the extent it can be obtained from the proposed purchaser: (i) confirmation whether the proposed purchase is all cash or is contingent upon financing; (ii) if financing is required, the name of the anticipated bank/lender; (iii) proof of funds sufficient to close; and (iv) information concerning the party(s) tendering the purchase offer, including a list of principals.

5.      Within thirty (30) calendar days of service of the Non-Binding Contract, the first mortgagee(s) and any other secured creditors with respect to the Property(s) that is/are the subject

3

4

matter of such Non-Binding Contract (including any mezzanine lenders) shall provide payoff statements to the Property Owner(s) c/o Seth Levine, 636 South Forest Drive, Teaneck, New Jersey, with a copy to Jacob Kaplan, Esq., Brafman & Associates, P.C., 767 Third Avenue, 26th Floor, New York, New York 10017, Email: jkaplan@braflaw.com, and Sills Cummis & Gross P.C. on behalf of the Receiver, via e-mail (or first class mail, if e-mail is not possible). The payoff statements shall include per diem interest and a detailed breakdown of the amounts claimed to be due. Additionally, the Receiver shall within such period provide a payoff statement setting forth all sums due to the Receiver in connection with the Property(s). The Property Owners and any Party holding secured debt or otherwise having an interest in the subject Property(s) shall be entitled to request and receive copies of such payoff statements.

6.       Within five (5) calendar days following receipt of all payoff statements, the Seller shall confirm in writing to the Property Owner(s) and any Party holding secured debt or otherwise having an interest in the subject Property(s) whether it agrees to pay the full sum demanded in the first mortgagee's payoff statement and all sums due to the Receiver in good funds at closing, without deduction or offsets of any kind. In addition, the Seller shall within such five-day period advise such parties whether it agrees to pay any other secured creditors the full sum demanded in their payoff statements in good funds at closing, without deduction or offsets of any kind.

7.       In the event the Seller agrees to pay in full all sums demanded by the first mortgagee, any other secured creditors and the Receiver, the Seller may make a motion on no less than twenty-four (24) days' notice to the Parties for approval of the sale (a "**Sale Approval Motion**"). Each Sale Approval Motion shall include a proposed distribution schedule for all sale proceeds, reflecting that the Seller shall pay the full sum demanded in the payoff statements

4

BE:11369203.2/PJE002-279216
7619678 v4

provided by the first mortgagee(s) and any other secured creditors, together with all sums due to the Receiver, in good funds at closing, without deduction or offsets of any kind.

8.      Any objections to a Sale Approval Motion shall be made in accordance with the applicable rules of the Court.  Any disputes regarding the proposed distribution schedule shall be resolved insofar as possible in connection with the Court's consideration of a Sale Approval Motion.  To the extent any bona fide disputes with respect to the validity, extent or priority of a secured claim cannot be so resolved, the Court may require the escrow of any disputed secured claim amounts; provided, however, that the Court shall not approve the proposed sale or require the escrow of any disputed secured claim amounts without the consent of any secured creditor that is not being paid in full.

9.      If the Court approves the sale, the approval order (an **"Approval Order"**) shall state the manner in which the sale proceeds are to be distributed or, as applicable, escrowed.  In addition, any Approval Order shall set forth the terms, conditions and limitations under which the Seller shall be authorized to sign any and all closing documents necessary to convey title to the subject Property(s).  The Approval Order shall further require that the Receiver be contacted forty-eight (48) hours prior to closing to ensure that any supplemental expenditures made by the Receiver and any other sums due to the Receiver with respect to the subject Property(s), as well as any protective advances made by any Party, are satisfied at closing, without deduction or offsets of any kind.

10.      At closing, to the extent existing and in its possession or reasonable control, the Receiver shall turn over to the purchaser copies of the following for each Property, without representation or warranty of any kind: (i) existing surveys and maps, (ii) leases, amendments, and subleases, (iii) a certified rent roll, (iv) all approvals, applications, and communications to and

5

6

from government agencies, boards, or bodies with respect to the Property, (v) a Schedule of Operating Expenses, (vi) copies of active vendor contracts, and (vii) a current tax bill.

11.     If, pursuant to an Approval Order, sale proceeds are escrowed by reason of any unresolved disputes, any party claiming an interest in such escrowed proceeds shall make a motion on notice to the Parties within thirty (30) calendar days following the closing of title seeking direction from the Court regarding the distribution of escrowed funds.  Any Party claiming an interest in the escrowed funds may respond to the motion in accordance with the applicable Court rules.

12.     Any surplus funds in excess of amounts needed to pay (i) all secured claims relating to such Property(s), (ii) any sums due to the Receiver, and (iii) normal closing costs (including reasonable attorneys' fees), shall be escrowed pending further order of the Court.  Notwithstanding the prior sentence, in the event there are surplus funds after payment of the amounts set forth in Paragraphs 12(i), (ii) and (iii), any mezzanine lender that is a Party and has provided all information required in Paragraph 5 above, shall be entitled to be paid at closing from the surplus funds, unless an entity or individual claiming an interest in the surplus funds files an objection to payment to such mezzanine lender.  In no event shall the original Property Owner(s) and/or Seth Levine receive surplus funds absent further order of the Court.

13.     In the event that any person or entity, including but not limited to a Party, the respective Property Owner(s) and/or the Receiver, attempts to obtain Court approval of a sale with respect to any Property(s) without abiding by the terms and conditions of this Order, any Party or interest holder shall be deemed to have reserved, and not released, waived or impaired, any and all of its rights to object to such sale, and the entry of this Order and the terms thereof shall not be

6

7

cited, referred to or relied upon as the basis for a finding that such Party has waived any of its rights or claims.

14.     The terms of this Order are not intended (i) to apply to any foreclosure action instituted by a first mortgagee or other secured creditor or (ii) to interfere with, or place limits or conditions upon, the foreclosure of any properties by first mortgagees or other secured creditors. Additionally, the terms of this Order shall not prevent the Parties from seeking approval of a sale pursuant to state law in a pending foreclosure action.  State court approval of such a sale shall be deemed to satisfy the requirement set forth in this Court's Amended Preliminary Injunction and Receivership Order dated December 4, 2019 that Court approval be obtained for any sale.

*Leda Dunn Wettre*
_____
HON. LEDA DUNN WETTRE, U.S.M.J.

7

8

**Exhibit A —**
**Subject Properties and Owners**

*U.S. Bank National Association v. Englewood Funding, LLC, et al.*
Civil Action No. 19-cv-17865-MCA-LDW

| Property Address | Property Owner |
|---|---|
| 191 First Street<br>Englewood, New Jersey 07631 | Englewood Funding, LLC |
| 54-78 Temple Avenue<br>Hackensack, New Jersey 07601 | Lenox Temple, LLC |
| 406-444 Liberty Street<br>Little Ferry, New Jersey 07643 | Lenox Liberty, LLC |
| 107-109 Hudson Street<br>Hackensack, New Jersey 07601 | Lenox Hudson, LLC |
| 197-199 Grant Street &<br>359-361 Gorden Street<br>Perth Amboy, New Jersey 08861 | Plainfield Norse, LLC |
| 88 McKinley Street<br>& 170 South Park Street<br>Hackensack, New Jersey 07601 | Hackensack Norse, LLC |
| 77 Hope Avenue<br>Passaic, New Jersey 07055 | Post Avenue Ventures, LLC |
| 159 Fort Lee Road<br>Teaneck, New Jersey 07666 | FLR Ventures LLC |
| 301, 401 & 501 Browning Lane<br>Brooklawn, New Jersey 08030 | Brooklawn Norse, LLC |
| 12 Meadow Road<br>Pennsville, New Jersey 08070 | Penn Norse, LLC |
| 123 Pierre Avenue, 132 Jewell Street<br>a/k/a 113-115<br>Garfield, New Jersey 07026 | Garfield Norse, LLC |
| 357 & 363 West End Avenue<br>Elizabeth, New Jersey 07202 | Elizabeth Norris, LLC |
| 516 Kennedy Boulevard<br>Bayonne, New Jersey 07002 | Sussex Norse, LLC |

8

9

| Property Address | Property Owner |
|---|---|
| 212, 214 & 225 Atlantic Avenue<br>Atlantic City, New Jersey 08401 | Atlantic Norse, LLC |
| 190 Ackerman Avenue, 286 Parker Avenue, 77 Randolph Avenue<br>Clifton, New Jersey 07011 | Clifton DL Ventures, LLC |
| 301 Broadway<br>Bayonne, New Jersey 07002 | Bayonne Broadway Norse, LLC |
| 137-139 Third Street<br>Passaic, New Jersey 07055 | 137-139 Third Norse, LLC |
| 60-62 Dayton Avenue &<br>15 Hobart Street<br>Passaic, New Jersey 07055 | Passaic Norse, LLC |
| 352-354 New Brunswick Avenue<br>Perth Amboy, New Jersey 08861 | Perth NB Ventures, LLC |
| 2680 John F. Kennedy Boulevard<br>Jersey City, New Jersey 07306 | 2680 Kennedy Ventures LLC |

BE:11369203.2/PJE002-279216
7619678 v4

**EXHIBIT D**

**FORM OF DEED**

Prepared By: _____

# QUIT CLAIM DEED

This Quit Claim Deed is made on _____, 20__,

**BETWEEN**

> **COLLIERS INTERNATIONAL NJ LLC, IN ITS CAPACITY AS THE COURT-APPOINTED RECEIVER** pursuant to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, in *Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Amherst Pierpoint Commercial Mortgage Securities, LLC, Multifamily Mortgage Pass-Through Certificates, Series 2019-SB59, et al., v. Levine, et al.*, Civil Action No. 19-cv-17866-MCA-LDW (the "Receivership Order"), having an address of _____, referred to as

> **GRANTOR**

**AND**      _____, a _____, having an address of _____, referred to as

**GRANTEE**

The word "Grantee" shall mean all Grantees listed above.

**Transfer of Ownership.**  The Grantor grants and conveys (transfers ownership of) the property described below to the Grantee.  This transfer is made for the sum of _____ DOLLARS ($_____).  The Grantor acknowledges receipt of this money.

**Tax Map Reference.**  (N.J.S.A. 46:15-1.1) Municipality of _____

Block No.  Lot No.                         Account No.

Ex. D-4

☐   No property tax identification number is available on the date of this Deed.  (check box if applicable.)

      **Property.**  The property consists of the land in the _____, County of _____ and State of New Jersey.  The legal description is:

See Legal Description annexed hereto as Schedule "A" and made a part hereof.

      **Type of Deed.**  This Deed is called a Quitclaim Deed.  The Grantor makes no promises as to ownership or title, but simply transfers whatever interest the Grantor has to the Grantee, subject to all matters listed on Schedule "B" attached hereto and made a part hereof.

      **Authority**.  Grantor's authority to execute and deliver this Deed is given pursuant to that certain [_____], entered by the [_____] on [_____], 20__[1], entered in *Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Amherst Pierpoint Commercial Mortgage Securities, LLC, Multifamily Mortgage Pass-Through Certificates, Series 2019-SB59, et al., v. Levine, et al.*, Civil Action No. 19-cv-17866-MCA-LDW, and Grantor's execution and delivery of this Deed is strictly in its capacity as receiver pursuant to the Receivership Order.

[SIGNATURE ON FOLLOWING PAGE]

---

[1] Insert information related to the Sale Order.

Ex. D-4

**Signatures.**  The Grantor signs this Deed as of the date at the top of the first page.  If the Grantor is a corporation, this Deed is signed and attested to by its proper corporate officers and its corporate seal is affixed.

WITNESSED BY:                          **COLLIERS INTERNATIONAL NJ LLC, IN ITS CAPACITY AS THE COURT-APPOINTED RECEIVER** pursuant to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, in *Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Amherst Pierpoint Commercial Mortgage Securities, LLC, Multifamily Mortgage Pass-Through Certificates, Series 2019-SB59, et al., v. Levine, et al.*, Civil Action No. 19-cv-17866-MCA-LDW

_____          By: _____
                                               Name:
                                               Title:

STATE OF NEW JERSEY
COUNTY OF _____ SS.:

I CERTIFY that on _____, 20____, _____, personally came before me and stated to my satisfaction that this person (or if more than one, each person):

(a)      was the maker of the attached Deed;
(b)      was authorized to and did execute this Deed as _____ of Colliers International NJ LLC, the Court-Appointed Receiver for the Property, pursuant to the Receivership Order, the Grantor named in this Deed;
(c)      signed, sealed and delivered this Deed as his or her voluntary act and deed;
(d)      made this Deed for $_____ as the full and actual consideration paid or to be paid for the transfer of title.  (Such consideration is defined in N.J.S.A.  46:15-5).


                                  _____
                                  Notary Public


**RECORD & RETURN TO:**

_____
_____
_____


                                 Ex. D-4

<u>SCHEDULE A</u>

Legal Description of the Property

(To Be Added)

Ex. D-4

BE:11369203.2/PJE002-279216
7619678 v4

<u>SCHEDULE B</u>

Permitted Exceptions

(To Be Added)

Ex. D-4

Ex. E-1

**EXHIBIT E**

**FORM OF BILL OF SALE**

<u>BILL OF SALE AND ASSIGNMENT</u>

This BILL OF SALE AND ASSIGNMENT (this "<u>Bill of Sale</u>") is made from Colliers International NJ LLC, in its capacity as the Court-Appointed Receiver pursuant to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, in *(1) U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-sb51, et al. v. Englewood Funding, LLC, et al., Civil Action No. 19-cv-17865-MCA-LDW, (2) JLS Equities, LLC v. River Funding, LLC, et al., Civil Action No. 19-cv-17615-MCA-LDW, and (3) Portal, et al. v. Levine, et al., Civil Action No. 19-cv-19611-MCA-LDW* ("<u>Assignor</u>"), to [_____], a [_____] ("<u>Assignee</u>").

<u>RECITALS</u>

Pursuant to that certain Agreement of Purchase and Sale executed on _____, 2020, by Assignor and Assignee (the "<u>PSA</u>"; capitalized terms not defined herein have the meanings ascribed to them in the PSA), the Assignor has executed and delivered to Assignee on the date hereof that certain deed (the "<u>Deed</u>") pursuant to which Assignor is selling and conveying to Assignee the Real Property.

Assignor desires to assign, transfer and convey to Assignee, and Assignee desires to obtain as of the Closing Date the Tangible Personal Property, to the extent transferrable, all of Seller's utility and entitlement rights benefitting the Real Property (the "<u>Utilities and Entitlement Rights</u>"), and, to the extent transferrable, any easements (including, without limitation, reciprocal easement agreements, if any) belonging to or inuring to the benefit of the Seller and pertaining to the Real Property (the "<u>Easements and Covenants</u>"), all at the time of Closing, subject to the terms and conditions of the PSA.

NOW, THEREFORE, in consideration of the receipt of $10.00 and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged by Assignor, Assignor does hereby ASSIGN, TRANSFER, SET OVER, and DELIVER to Assignee the Tangible Personal Property, the Utilities and Entitlement Rights, and Easements and Covenants, subject to the terms and conditions of the PSA.

Notwithstanding anything to the contrary contained herein, Assignor's liability under this Bill of Sale is expressly subject to the limitations set forth in <u>Section 9.1(b)</u> of the PSA.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Ex. E-3

EXECUTED to be effective as of _____, 2020.

**ASSIGNOR:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order


By: _____
Name:  Richard J. Madison
Title:   Executive Managing Director


**ASSIGNEE:**

[_____],
a [_____]



By:_____
Name:_____
Title:_____

BE:11369203.2/PJE002-279216
7619678 v4

**EXHIBIT F**
**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

<u>ASSIGNMENT AND ASSUMPTION OF LEASES, SECURITY DEPOSITS, AND INTANGIBLE RIGHTS</u>

This ASSIGNMENT AND ASSUMPTION OF LEASES, SECURITY DEPOSITS, AND INTANGIBLE RIGHTS (this "Assignment") is made by and between Colliers International NJ LLC, in its capacity as the Court-Appointed Receiver pursuant to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, in *(1) U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-sb51, et al. v. Englewood Funding, LLC, et al., Civil Action No. 19-cv-17865-MCA-LDW, (2) JLS Equities, LLC v. River Funding, LLC, et al., Civil Action No. 19-cv-17615-MCA-LDW, and (3) Portal, et al. v. Levine, et al., Civil Action No. 19-cv-19611-MCA-LDW* ("<u>Assignor</u>"), to [_____], a [_____] ("<u>Assignee</u>").

<u>RECITALS</u>

Pursuant to that certain Agreement of Purchase and Sale executed on [_____], 2020, by Assignor and Assignee (the "<u>PSA</u>"; capitalized terms not defined herein shall have the meaning ascribed to such terms in the PSA), the Assignor has executed and delivered to Assignee on the date hereof that certain deed (the "<u>Deed</u>") pursuant to which Assignor is selling and conveying to Assignee the Real Property.

Assignor desires to assign, transfer and convey to Assignee, and Assignee desires to assume, all of Assignor's right, title and interest in and to the Leases, the Security Deposits and all assignable intangible personal property and general intangibles of every nature whatsoever (the "<u>Intangible Rights</u>"), to the extent permitted by law and assignable and the PSA, subject to the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the sum of $10.00 and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby SELL, ASSIGN, CONVEY, TRANSFER, SET-OVER and DELIVER unto Assignee all of Assignor's right, title and interest in and to the Leases, Security Deposits and Intangible Rights.

This Assignment is made by Assignor and accepted by Assignee subject to the "<u>Permitted Exceptions</u>" described in the Deed, to the extent that the same validly exist and affect the Leases and Intangible Rights.

By execution of this Assignment and subject to all the terms and conditions of the PSA, Assignee assumes and agrees to perform all of the covenants, agreements and obligations under the Leases.

Notwithstanding anything to the contrary contained herein, Assignor's liability under this Assignment is expressly subject to the limitations set forth in **Section 9.1(b)** of the PSA.

Ex. F-4

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXECUTED to be effective as of _____, 2020.

**ASSIGNOR:**

Colliers International NJ LLC, as Court-Appointed
Receiver for the Property, Pursuant to the Receiver
Order
By: _____
Name:  Richard J. Madison
Title:   Executive Managing Director


**ASSIGNEE:**

[_____],
a [_____]


By:_____
Name:_____
Title:_____

BE:11369203.2/PJE002-279216
7619678 v4

**EXHIBIT G**

**FORM OF ENVIRONMENTAL INDEMNITY AGREEMENT**

In connection with the purchase by [_____], a [_____] ("Purchaser"), of certain property in Hackensack, County of Bergen, New Jersey, more particularly described on Exhibit A attached hereto and made a part hereof for all purposes (the "Property") from Colliers International NJ LLC, in its capacity as the Court-Appointed Receiver pursuant to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, in *(1) U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-sb51, et al. v. Englewood Funding, LLC, et al., Civil Action No. 19-cv-17865-MCA-LDW, (2) JLS Equities, LLC v. River Funding, LLC, et al., Civil Action No. 19-cv-17615-MCA-LDW, and (3) Portal, et al. v. Levine, et al., Civil Action No. 19-cv-19611-MCA-LDW* ("**Seller**"), and in consideration of the conveyance of the Property by Seller, Purchaser hereby unconditionally and irrevocably waives any claim against Seller arising from the presence of Hazardous Substances on the Property. Further, Purchaser hereby indemnifies Seller and the other Seller Parties harmless from and against all loss, liability, damage and expense, including reasonable attorneys' fees, suffered or incurred by Seller arising out of or resulting from the introduction of such Hazardous Substances on the Property from and after the date hereof, including, without limitation, (a) any liability under or on account of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as the same may be amended from time to time or related regulations or any similar applicable laws or regulations, including the assertion of any lien thereunder (collectively, "Environmental Law") as such relates to introduction of such Hazardous Substances on the Property from and after the date hereof, (b) any loss of value of the Property as a result of introduction of such Hazardous Substances on the Property from and after the date hereof, (c) claims brought by third parties for loss or damage incurred or sustained subsequent to the date hereof, which do not arise, result or are related to Seller's ownership and operation of the Property; and (d) liability with respect to any other matter affecting the Property resulting from noncompliance with any Environmental Law, not related to, arising out of or resulting from Seller's ownership and operation of the Property. Capitalized terms not defined herein have the meanings given them in that certain Agreement of Purchase and Sale by and between Purchaser and Seller dated as of _____, 2020.

IN WITNESS WHEREOF, Purchaser has executed this Environmental Indemnity to be effective as of _____, 2020.

PURCHASER:

[_____],
a [_____]

By: _____
Name: _____
Title: _____

Ex. G-1

**<u>EXHIBIT A TO ENVIRONMENTAL INDEMNITY AGREEMENT</u>**

**<u>PROPERTY</u>**

Ex. G-2

BE:11369203.2/PJE002-279216
7619678 v4

**EXHIBIT H**

**FORM OF TAX AFFIDAVIT**

**SELLER'S NON-FOREIGN AFFIDAVIT**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| COUNTY OF _____ | § | |

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform [_____] ("Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by Colliers International NJ LLC, in its capacity as the Court-Appointed Receiver pursuant to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, in *(1) U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-sb51, et al. v. Englewood Funding, LLC, et al., Civil Action No. 19-cv-17865-MCA-LDW, (2) JLS Equities, LLC v. River Funding, LLC, et al., Civil Action No. 19-cv-17615-MCA-LDW, and (3) Portal, et al. v. Levine, et al., Civil Action No. 19-cv-19611-MCA-LDW* ("Transferor"), the undersigned hereby certifies as follows:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terns are defined in the Internal Revenue Code and Income Tax Regulations);

2. Transferor's U.S. employer identification number is: # _____;

3. Transferor's office address is [_____].

Transferor understands that this certification may be disclosed to the Internal Revenue Service by the Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, the undersigned, in the capacity set forth below, hereby declares that he has examined this certification and to the best of its knowledge and belief it is true, correct, and complete, and the undersigned further declares that he has authority to sign this document in such capacity.

**[SIGNATURE ON NEXT PAGE]**

Ex. H-1

**TRANSFEROR:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____
     Name:  Richard J. Madison
     Title:   Executive Managing Director

THE STATE OF _____ §
                                    §
COUNTY OF _____ §

      On this, the _____ day of _____, 2020, before me, the subscriber, a Notary Public in and for the State of _____, personally appeared Richard J. Madison, the Executive Managing Director of Colliers International NJ LLC, as Court-Appointed Receiver for the Property, pursuant to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, in *(1) U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2018-sb51, et al. v. Englewood Funding, LLC, et al., Civil Action No. 19-cv-17865-MCA-LDW, (2) JLS Equities, LLC v. River Funding, LLC, et al., Civil Action No. 19-cv-17615-MCA-LDW, and (3) Portal, et al. v. Levine, et al., Civil Action No. 19-cv-19611-MCA-LDW.* He is personally known to me.

_____
Notary Public in and for the State of Texas

_____
Printed/Typed Name of Notary

My Commission Expires: _____

BE:11369203.2/PJE002-279216
7619678 v4

**EXHIBIT I**

**FORM OF TENANT NOTICE LETTER**

**[Name and Address of Tenant]**

Date: _____, 2020

      Re:    Sale of [_____] located at [_____]

Ladies and Gentlemen:

    Please be advised that _____, a _____ ("Purchaser") has purchased the captioned property, in which you occupy space as a tenant pursuant to a lease (the "Lease"), from [_____] ("Seller"), the court appointed Receiver of the Property.  In connection with such purchase, Seller has assigned its interest as landlord in the Lease to Purchaser.  Purchaser specifically acknowledges responsibility for the Security Deposit, the intent of Purchaser and Seller being to relieve Seller of any liability for the return of the Security Deposit.

    All rental and other payments that become due subsequent to the date hereof should be payable to _____ and should be addressed as follows:

                  _____

                  _____

                  _____

    In addition, all notices from you to the landlord concerning any matter relating to your tenancy should be sent to _____ at the address above.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

BE:11369203.2/PJE002-279216
7619678 v4

Very truly yours,

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____
      Name:  Richard J. Madison
      Title:   Executive Managing Director

**PURCHASER:**

[_____],
a [_____]

By:_____
Name:_____
Its:_____

Ex. G-2

# EXHIBIT J

## AFFIDAVIT OF TITLE

STATE OF _____                    )
                                          ) **ss:**
COUNTY OF _____                   )


_____ says under oath:

1.     **Officers.**  I am an officer of Colliers International NJ LLC ("Receiver"), the Court-Appointed Receiver for the Property (hereafter defined).  I am fully familiar with the business of the Receiver.  I am a citizen of the United States of America and at least 18 years old.

2.     **Representations.**  The statements contained in this affidavit are true to the best of my knowledge, information and belief.

3.     **Ownership and Possession.**  Based solely on title commitment No. _____ dated July 23, 2013 ("Title Commitment "), issued by _____ ("Title Company"), [Owner] has owned the property designated on the tax map of the _____ of _____, County of _____, New Jersey, as Block _____, Lot ____, commonly known as _____, New Jersey (the "Property") since _____.  The Property is being conveyed by Receiver to _____.

4.     **Improvements.**  Receiver is not aware that anyone has filed or intends to file a mechanic's lien, stop notice, building contract or notice of unpaid balance related to the Property.  No one has notified Receiver that money is due and owing from Receiver for construction or repair work on the Property.

5.     **Liens or Encumbrances.**  Receiver has not created or allowed any interests (legal rights) which affect its ownership or use of the Property.  To Receiver's actual knowledge, there are no pending lawsuits or judgments against Receiver or other legal obligations which may be enforced against the Property.  No bankruptcy or insolvency proceedings have been started by or against Receiver.

6.     **Exceptions and Additions.**  The following is a complete list of exceptions and additions to the above statements: (a) items set forth in Section II of Schedule B of the Title Commitment, as modified to date by an authorized agent of said title insurer, (b) subject to all matters of record, (c) the Leases; and (d) the Receiver Order and all proceedings thereunder.

BE:11369203.2/PJE002-279216
7619678 v4

      7.    **Reliance.**  Receiver makes this affidavit in order to induce the Title Company to insure title to the Property.  It is aware that the Title Company will rely on the statements made in this affidavit and on its truthfulness.

**COLLIERS INTERNATIONAL NJ LLC**

Signed and sworn to before
me on _____, 20__

By:_____

  Name:

  Title:

_____
Notary Public

**EXHIBIT K**
**FORM ESTOPPEL CERTIFICATE**

**TENANT ESTOPPEL/CONFIRMATION**

**TENANT:** _____

**ADDRESS:** _____

**DATE OF**
**LEASE:** _____

       In order to confirm the terms of the above lease (the "Lease"), the Tenant hereby certifies, represents, warrants and agrees as follows:

       1.     If available, a true, correct and complete copy of the Lease is attached to this Estoppel/Confirmation.

       2.     The current term of the Lease began on _____, and will expire on _____.

       3.     The current monthly rent is _____.

       4.     No rent has been paid more than thirty (30) days in advance of its due date.

       5.     Tenant has no agreement with the landlord identified in the Lease ("Landlord") or with the current landlord concerning free rent, partial rent, rebate of rental payments or any other type of rental concession except as follows:

       6.     Tenant has delivered a security deposit to Landlord in the amount of $_____.

       7.     Has Tenant elected to apply the security deposit to the payment of rent pursuant to the State of New Jersey Executive Order __?  Circle **YES** or **No**.

       The Tenant hereby signs this Estoppel/Confirmation as of _____, 2021.

By:_____

Print Name:_____

7619678 v4

## FIRST AMENDMENT TO AGREEMENT OF PURCHASE

**THIS FIRST AMENDMENT TO AGREEMENT OF PURCHASE** (this "**Amendment**") is made as of January 11, 2021, by and between **COLLIERS INTERNATIONAL NJ LLC, as Court-appointed Receiver for the Property, pursuant to the Receiver Order** ("**Seller**"), and **JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company ("**Purchaser**").

### WITNESSETH:

**WHEREAS**, Seller, as seller, and Purchaser, as purchaser, entered into that certain Agreement of Purchase and Sale dated December 22, 2020 (the "**Agreement**"), wherein Seller agreed to cause to be sold, and Purchaser agreed to purchase, those certain properties known as 54-78 Temple Avenue, Hackensack, New Jersey 07601, 406-444 Liberty Street, Little Ferry, New Jersey 07643, 107-109 Hudson Street, Hackensack, New Jersey 07601, 88 McKinley Street, Hackensack, New Jersey 07601 and 170 South Park Street, Hackensack, New Jersey 07601, as more particularly described in the Agreement (collectively, the "**Property**");

**WHEREAS**, the parties are now desirous of amending certain provisions of the Agreement.

**NOW THEREFORE,** in consideration of the properties and the mutual promises and covenants contained herein, the parties, each intending to be legally bound, hereby agree as follows:

1.     **Previously Defined Terms; Conflict.** Each capitalized terms not expressly defined in this Amendment shall have the meaning ascribed thereto in the Agreement. All references to "this Agreement" in the Agreement or this Amendment shall be deemed to mean the Agreement and this Amendment inclusive.   In the event of any conflict or inconsistency between the Agreement and this Amendment, this Amendment shall control.

2.     **Feasibility Period**. The Feasibility Period, as set forth in Section 10.1(a) of the Agreement, is hereby extended to January 22, 2021.

3.     **No Other Revisions to Agreement.** All other provisions of the Agreement which are not specifically amended by this Amendment shall remain the same and in full force and effect.

4.     **Counterparts**. This Amendment may be executed in one or more counterparts and via facsimile, pdf and/or by electronic signature, and each when taken together shall constitute one and the same original document.

*[No further text on this page; signatures follow]*

The undersigned parties, after reviewing, reading and understanding the contents of this document, have caused this Amendment to be executed and delivered in their names and on their behalf as of the date set forth above.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____

Name: Richard J. Madison

Title:   Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company

By: _____

Name: John Pjeternikaj

Title:   Manager

Signature Page
First Amendment to Agreement of Purchase
Lenox Portfolio, New Jersey

BE:11529624.1/PJE002-279216

**SECOND AMENDMENT TO AGREEMENT OF PURCHASE AND SALE**

**THIS SECOND AMENDMENT TO AGREEMENT OF PURCHASE AND SALE** (this "**Amendment**") is made as of January 21, 2021, by and between **COLLIERS INTERNATIONAL NJ LLC, as Court-appointed Receiver for the Property, pursuant to the Receiver Order** ("**Seller**"), and **JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company ("**Purchaser**").

**WITNESSETH:**

**WHEREAS**, Seller, as seller, and Purchaser, as purchaser, entered into that certain Agreement of Purchase and Sale dated December 22, 2020, as amended by that certain First Amendment to Agreement of Purchase and Sale dated January 11, 2021 (collectively, the "**Agreement**"), wherein Seller agreed to cause to be sold, and Purchaser agreed to purchase, those certain properties known as 54-78 Temple Avenue, Hackensack, New Jersey 07601, 406-444 Liberty Street, Little Ferry, New Jersey 07643, 107-109 Hudson Street, Hackensack, New Jersey 07601, 88 McKinley Street, Hackensack, New Jersey 07601 and 170 South Park Street, Hackensack, New Jersey 07601, as more particularly described in the Agreement (collectively, the "**Property**");

**WHEREAS**, the parties are now desirous of amending certain provisions of the Agreement.

**NOW THEREFORE,** in consideration of the properties and the mutual promises and covenants contained herein, the parties, each intending to be legally bound, hereby agree as follows:

1.      **Previously Defined Terms; Conflict.** Each capitalized terms not expressly defined in this Amendment shall have the meaning ascribed thereto in the Agreement. All references to "this Agreement" in the Agreement or this Amendment shall be deemed to mean the Agreement and this Amendment inclusive.   In the event of any conflict or inconsistency between the Agreement and this Amendment, this Amendment shall control.

2.      **Feasibility Period**. The Feasibility Period, as set forth in Section 10.1(a) of the Agreement, is hereby extended to January 29, 2021.

3.      **No Other Revisions to Agreement.** All other provisions of the Agreement which are not specifically amended by this Amendment shall remain the same and in full force and effect.

4.      **Counterparts**. This Amendment may be executed in one or more counterparts and via facsimile, pdf and/or by electronic signature, and each when taken together shall constitute one and the same original document.

*[No further text on this page; signatures follow]*

The undersigned parties, after reviewing, reading and understanding the contents of this document, have caused this Amendment to be executed and delivered in their names and on their behalf as of the date set forth above.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By:   _____

Name:   Richard J. Madison

Title:   Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company

By:   _____

Name:   John Pjeternikaj

Title:   Manager

Signature Page
Second Amendment to Agreement of Purchase
Lenox Portfolio, New Jersey

The undersigned parties, after reviewing, reading and understanding the contents of this document, have caused this Amendment to be executed and delivered in their names and on their behalf as of the date set forth above.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____
Name: Richard J. Madison
Title:   Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company

By: _____
Name: John Pjetemarkaj
Title:   Manager

Signature Page
Second Amendment to Agreement of Purchase
Lenox Portfolio, New Jersey

BE:11549297.1/PJE002-279216

**THIRD AMENDMENT TO AGREEMENT OF PURCHASE AND SALE**

**THIS THIRD AMENDMENT TO AGREEMENT OF PURCHASE AND SALE** (this "**Amendment**") is made as of January 29, 2021, by and between **COLLIERS INTERNATIONAL NJ LLC, as Court-appointed Receiver for the Property, pursuant to the Receiver Order** ("**Seller**"), and **JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company ("**Purchaser**").

**WITNESSETH:**

**WHEREAS**, Seller, as seller, and Purchaser, as purchaser, entered into that certain Agreement of Purchase and Sale dated December 22, 2020, as amended by that certain First Amendment to Agreement of Purchase and Sale dated January 11, 2021, and as further amended by that certain Second Amendment to Agreement of Purchase and Sale dated January 21, 2021 (collectively, the "**Agreement**"), wherein Seller agreed to cause to be sold, and Purchaser agreed to purchase, those certain properties known as 54-78 Temple Avenue, Hackensack, New Jersey 07601, 406-444 Liberty Street, Little Ferry, New Jersey 07643, 107-109 Hudson Street, Hackensack, New Jersey 07601, 88 McKinley Street, Hackensack, New Jersey 07601 and 170 South Park Street, Hackensack, New Jersey 07601, as more particularly described in the Agreement (collectively, the "**Property**");

**WHEREAS**, the parties are now desirous of amending certain provisions of the Agreement.

**NOW THEREFORE,** in consideration of the properties and the mutual promises and covenants contained herein, the parties, each intending to be legally bound, hereby agree as follows:

1.      **Previously Defined Terms; Conflict.** Each capitalized terms not expressly defined in this Amendment shall have the meaning ascribed thereto in the Agreement. All references to "this Agreement" in the Agreement or this Amendment shall be deemed to mean the Agreement and this Amendment inclusive.  In the event of any conflict or inconsistency between the Agreement and this Amendment, this Amendment shall control.

2.      **Feasibility Period**. The Feasibility Period, as set forth in Section 10.1(a) of the Agreement, is hereby extended to February 2, 2021.

3.      **No Other Revisions to Agreement.** All other provisions of the Agreement which are not specifically amended by this Amendment shall remain the same and in full force and effect.

4.      **Counterparts**. This Amendment may be executed in one or more counterparts and via facsimile, pdf and/or by electronic signature, and each when taken together shall constitute one and the same original document.

*[No further text on this page; signatures follow]*

BE:11564882.1/PJE002-279216

The undersigned parties, after reviewing, reading and understanding the contents of this document, have caused this Amendment to be executed and delivered in their names and on their behalf as of the date set forth above.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____

Name:  Richard J. Madison

Title:   Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company

By: _____

Name:  John Pjeternikaj

Title:   Manager

Signature Page
Third Amendment to Agreement of Purchase
Lenox Portfolio, New Jersey

BE:11564882.1/PJE002-279216

The undersigned parties, after reviewing, reading and understanding the contents of this document, have caused this Amendment to be executed and delivered in their names and on their behalf as of the date set forth above.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By:     _____
Name: Richard J. Madison
Title:   Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company

By:     _____
Name: John Pjeternikaj
Title:   Manager

Signature Page
Third Amendment to Agreement of Purchase
Lenox Portfolio, New Jersey

**FOURTH AMENDMENT TO AGREEMENT OF PURCHASE AND SALE**

THIS **FOURTH AMENDMENT TO AGREEMENT OF PURCHASE AND SALE** (this "**Amendment**") is made as of February 2, 2021, by and between **COLLIERS INTERNATIONAL NJ LLC, as Court-appointed Receiver for the Property, pursuant to the Receiver Order** ("**Seller**"), and **JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company ("**Purchaser**").

**WITNESSETH:**

**WHEREAS**, Seller, as seller, and Purchaser, as purchaser, entered into that certain Agreement of Purchase and Sale dated December 22, 2020, as amended by that certain First Amendment to Agreement of Purchase and Sale dated January 11, 2021, as further amended by that certain Second Amendment to Agreement of Purchase and Sale dated January 21, 2021, and as further amended by that certain Third Amendment to Agreement of Purchase and Sale dated January 29, 2021 (collectively, the "**Agreement**"), wherein Seller agreed to cause to be sold, and Purchaser agreed to purchase, those certain properties known as 54-78 Temple Avenue, Hackensack, New Jersey 07601, 406-444 Liberty Street, Little Ferry, New Jersey 07643, 107-109 Hudson Street, Hackensack, New Jersey 07601, 88 McKinley Street, Hackensack, New Jersey 07601 and 170 South Park Street, Hackensack, New Jersey 07601, as more particularly described in the Agreement (collectively, the "**Property**");

**WHEREAS**, the parties are now desirous of amending certain provisions of the Agreement.

**NOW THEREFORE,** in consideration of the properties and the mutual promises and covenants contained herein, the parties, each intending to be legally bound, hereby agree as follows:

1.     **Previously Defined Terms; Conflict.** Each capitalized terms not expressly defined in this Amendment shall have the meaning ascribed thereto in the Agreement. All references to "this Agreement" in the Agreement or this Amendment shall be deemed to mean the Agreement and this Amendment inclusive.  In the event of any conflict or inconsistency between the Agreement and this Amendment, this Amendment shall control.

2.     **Feasibility Period.** Purchaser hereby acknowledges that the Feasibility Period has concluded, and that except as expressly set forth in Paragraph 5 below and in Section 8.1 (Casualty), Section 9.2 (Seller Default) and Section 10.1 (b) (New Title Objections), Purchaser has no other rights to terminate the Agreement.

3.     **Purchase Price**.   **Exhibit A** attached to the Agreement is hereby deleted in its entirely and replaced with **Exhibit A** attached to this Amendment.

4.     **Second Deposit**. The second deposit set forth in Section 2.2(a)(ii) of the Agreement is hereby increased from $626,250.00 to $1,252,500.00, and shall be paid immediately upon execution of this Amendment and as a pre-condition to the effectiveness of this Amendment.

5.      **Approval Order**. If the Approval Order, or Seller by other means within its reasonable control prior to the Closing, does not: (a) extinguish all of those certain Declarations of Restrictions affecting the Property identified in **Exhibit B** attached hereto; (b) discharge all of the first mortgages and second mortgages encumbering the Property as disclosed in the title commitments identified on **Exhibit B** attached hereto (the "**Title Commitments**") upon payment of outstanding amounts thereunder at Closing, and (c) extinguish all of those certain judgments against Owner and prior owners of the Property as disclosed in the Title Commitments and identified in **Exhibit B** attached hereto, then Purchaser has the option to terminate the Agreement upon notice to Seller delivered within three (3) Business Days after Purchaser's receipt of notice from Seller that such items will not or cannot be discharged or extinguished at Closing.  If Purchaser timely exercises the foregoing termination right, the Earnest Money shall be refunded to Purchaser and Seller shall reimburse Purchaser for Purchaser's actual out-of-pocket expenses incurred in connection with Purchaser's due diligence investigations, as evidenced by paid receipts, up to the amount of $35,000.

6.      **Leases.** Seller hereby agrees that, Seller will not, without consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed, enter into new leases for vacant portions of the Property after the expiration of the Feasibility Period (except as may be required by Law in connection with existing Tenants of the Property), provided this Agreement has not been terminated by either party or otherwise terminated.  If Purchaser does not provide written consent or detailed reasons in writing for disapproval of a new lease within three (3) Business Days after its receipt of Seller's request for consent, Purchaser's consent shall be deemed given. Notwithstanding anything to the contrary herein, to the extent this subsection conflicts with the Receiver Order, this subsection will have no force or effect.

7.      **Release of Claims**. As a material part of the consideration for Seller's execution of this Amendment, Buyer does hereby unconditionally, irrevocably and unequivocally:

(a)      acknowledge, agree and affirm that Purchaser does not possess any claims, defenses, offsets, or counterclaims of any kind or nature against or with respect to the Agreement or this Amendment (including any aspect of the negotiation or enforcement thereof) or any knowledge of any facts or circumstances that might give rise to or be the basis of any such claims, defenses, offsets, or counterclaims.

(b)      release and forever discharge Seller and its past, present, and future members, directors, managers, officers, employees, attorneys, advisers, consultants, servicers, representatives or agents (collectively, the "**Released Parties**") from any and all existing, future, or potential liabilities, obligations, actions, claims, causes of action, suits, proceedings, demands, damages, costs and expenses of every kind whatsoever, whether known or unknown, arising from or relating to any alleged or actual act, omission, occurrence, or transaction prior to or the date of this Amendment (collectively, the "**Claims and Liabilities**").

(c)      acknowledge that, subsequent to the execution of this Amendment, Purchaser may discover Claims and Liabilities that are now unknown to or unanticipated by it, including unknown or unanticipated Claims and Liabilities that may have materially affected the decision to execute this Agreement. Purchaser acknowledges that it is assuming the risk that such unknown or unanticipated Claims and Liabilities exist, and

2

agree that the releases granted by Purchaser in this Agreement shall apply to and are effective with respect to all such Claims and Liabilities.

(d)     acknowledge that Seller is specifically relying upon the Buyer's acknowledgments and agreements in this Section 7 in executing this Amendment, and that in the absence of such agreements Seller would be unwilling to agree to this Amendment

8.     **No Defaults**.  As of the date hereof, Seller has complied in all respects with the Agreement and there exists no default or event that with the passage of time would become a default by Seller under the Agreement.

9.     **No Other Revisions to Agreement.** As hereby modified and amended, the Agreement and the rights and obligations of the parties hereto remain in full force and effect.  All other provisions of the Agreement which are not specifically amended by this Amendment shall remain the same and in full force and effect.

10.     **Counterparts**. This Amendment may be executed in one or more counterparts and via facsimile, pdf and/or by electronic signature, and each when taken together shall constitute one and the same original document.

*[No further text on this page; signatures follow]*

3

The undersigned parties, after reviewing, reading and understanding the contents of this document, have caused this Amendment to be executed and delivered in their names and on their behalf as of the date set forth above.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____
Name: Richard J. Madison
Title:   Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company

By: _____
Name: John Pjeternikaj
Title:   Manager

Signature Page
Fourth Amendment to Agreement of Purchase
Lenox Portfolio, New Jersey

The undersigned parties, after reviewing, reading and understanding the contents of this document, have caused this Amendment to be executed and delivered in their names and on their behalf as of the date set forth above.

**SELLER:**

Colliers International NJ LLC, as Court-Appointed Receiver for the Property, Pursuant to the Receiver Order

By: _____
Name: Richard J. Madison
Title:  Executive Managing Director

**PURCHASER:**

**JP PROPERTY ACQUISITIONS, LLC**, a New Jersey limited liability company

By: _____
Name: John Pjetrnikaj
Title:  Manager

Signature Page
Fourth Amendment to Agreement of Purchase
Lenox Portfolio, New Jersey

BE:11567668.1/PJE002-279216
7814963 v2

**EXHIBIT A**

**OWNER, PROPERTY, PURCHASE PRICE**

| Owner | Address | Number of Units | Purchase Price |
|---|---|---|---|
| Lenox Temple LLC | 54-78 Temple Avenue, Hackensack, New Jersey, 07601 | 60 | $9,500,012.00 |
| Lenox Liberty LLC | 406-444 Liberty Street, Little Ferry, New Jersey 07643 | 44 | $6,800,000.00 |
| Lenox Hudson LLC | 107-109 Hudson Street, Hackensack, New Jersey 07601 | 18 | $2,900,000.00 |
| Hackensack Norse LLC | 88 McKinley Street Hackensack, New Jersey 07601 | 14 | $2,000,000.00 |
| Hackensack Norse LL | 170 South Park Street, Hackensack, New Jersey 07601 | 20 | $3,000,000.00 |
| **TOTAL** | | **156** | **$24,200,012.00** |

## EXHIBIT B

## TITLE COMMITMENTS

| Seller | Address | Title Commitment | Declaration of Restrictions | Judgments (Owner and Prior Owner) |
|---|---|---|---|---|
| Lenox Temple LLC | **54-78 Temple Avenue, Hackensack, New Jersey, 07601** | ALTA Commitment for Title Insurance issued by Main Street Title & Settlement Services, LLC, as agent for Old Republic National Title Insurance Company, No. MSQ-8389, dated December 1, 2020 | Declaration of Restriction, dated 5/21/19, DB V3270, Page 572<br><br>Declaration of Restrictions, dated 1/15/19, DB V3287, Page 1308<br><br>Declaration of Restrictions, dated 1/15/19, DB V3299, Page 1125<br><br>(Schedule BII, #19 & 20) | Referenced in Schedule BI, #24 |
| Lenox Liberty LLC | **406-444 Liberty Street, Little Ferry, New Jersey 07643** | ALTA Commitment for Title Insurance issued by Main Street Title & Settlement Services, LLC, as agent for Old Republic National Title Insurance Company, No. MSQ-8390, dated December 1, 2020 | Declaration of Restriction, dated 5/21/19, DB V3270, Page 691 (Schedule BII, #19) | Referenced in Schedule BI, #24 & 26 |

6

| | | | | |
|---|---|---|---|---|
| Lenox Hudson LLC | **107-109 Hudson Street, Hackensack, New Jersey 07601** | ALTA Commitment for Title Insurance issued by Main Street Title & Settlement Services, LLC, as agent for Old Republic National Title Insurance Company, No. MSQ-8391, dated December 1, 2020 | Declaration of Restriction, dated 8/21/17, DB V3278, Page 1843 (Schedule BII, #19) | Referenced in Schedule BI, #24 & 26 |
| Hackensack Norse LLC | **88 McKinley Street Hackensack, New Jersey 07601** | ALTA Commitment for Title Insurance issued by Main Street Title & Settlement Services, LLC, as agent for Old Republic National Title Insurance Company, No. MSQ-8392, dated December 1, 2020 | Declaration of Restriction, dated 6/12/19, DB V3356, Page 1879 (Schedule BII, #22) | Referenced in Schedule BI, #24 |
| Hackensack Norse LL | **170 South Park Street, Hackensack, New Jersey 07601** | ALTA Commitment for Title Insurance issued by Main Street Title & Settlement Services, LLC, as agent | Declaration of Restriction, dated 6/12/19, DB V3356, Page 1868 (Schedule BII, #19) | Referenced in Schedule BI, #23 |

7

| | | for Old Republic National Title Insurance Company, No. MSQ-8393, dated December 1, 2020 | | |
|---|---|---|---|---|

BE:11567668.1/PJE002-279216
7814963 v2

# Exhibit B

**CBRE VALUATION & ADVISORY SERVICES**

# APPRAISAL REPORT

54-78 TEMPLE AVENUE
HACKENSACK, NEW JERSEY  07601
CBRE GROUP, INC. FILE NO. 20-047NE-0213-1

KEYBANK NA

**CBRE**

VALUATION & ADVISORY SERVICES

**CBRE**

One Penn Plaza Ste. 1835
New York, NY  10119

T  212-207-6100
F  212-207-6069

www.cbre.com

March 27, 2020

Ms. Jessica Broocke
KEYBANK NA
11501 Outlook Street
Overland Park, KS  66211

RE:     Appraisal of: 54-78 Temple Avenue
        Hackensack, Bergen County, New Jersey
        CBRE, Inc. File No. 20-047NE-0213-1

Dear Ms. Broocke:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property.  Our analysis is presented in the following Appraisal Report.

The subject property consists of three, two-story multi-family walk up apartment buildings located at 54-78 Temple Avenue in Hackensack, Bergen County, New Jersey. The improvements are situated on a 63,990-square foot site and were built in 1967. The complex consists of (61) one-bedroom apartments within an estimated  41,175 -square feet of net rentable space (which was provided by the client). We note that one unit is occupied by management. The property is legally identified on the municipal tax maps as Block 511, Lot 11. The subject was 90.2% leased according to the rent roll provided.

The subject was inspected with the property manager on February 10, 2020 and was found in average condition for its age and use at the time. The subject is more fully described, legally and physically, within the enclosed report.

The subject is currently in receivership. We have been provided the following statement by Colliers International on the current situation.

U.S. Bank Statement of the Case  In this action, plaintiff U.S. Bank National Ass'n seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

Jessica Broocke
March 27, 2020

For this reason, we have not been provided with historical documents. As such, please refer to the extraordinary assumptions of which our appraisal is subject to.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | February 10, 2020 | $7,800,000 |

Compiled by CBRE

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute. It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).



Jessica Broocke
March 27, 2020

It has been a pleasure to assist you in this assignment.  If you have any questions concerning the analysis, or if CBRE, Inc. can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES


Tom Low, MAI, CFA
Director

Phone: 212-207-6025
Fax:     212-207-6069
Email:    Tom.Low@cbre.com

Carolyn Kakareka, MAI
Managing Director
NJ State Certification No. 42RG00252000

Phone:   212-715-5754
Fax:       212-207-6069
Email:    Carolyn.Kakareka@cbre.com

John Guyer
Appraiser

Phone: 212-207-6032
Fax:     212-207-6069
Email:  John.Guyer@cbre.com



# Certification

We certify to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.
2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.
3.  We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.
4.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
5.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
6.  This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.
7.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of New Jersey.
8.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
9.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
10. As of the date of this report, Carolyn Kakareka, MAI and Tom Low, MAI, CFA have completed the continuing education program for Designated Members of the Appraisal Institute.
11. John Guyer has inspected the property while Carolyn Kakareka, MAI and Tom Low, MAI, CFA have not made a personal inspection of the property that is the subject of this report.
12. No one provided significant real property appraisal assistance to the persons signing this report.
13. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.



14. Carolyn Kakareka, MAI, Tom Low, MAI, CFA, and John Guyer have not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding agreement to perform this assignment.

_____

Tom Low, MAI, CFA
Director

Phone: 212-207-6025
Fax:     212-207-6069
Email:    Tom.Low@cbre.com

_____

Carolyn Kakareka, MAI
Managing Director
NJ State Certification No. 42RG00252000

Phone:   212-715-5754
Fax:      212-207-6069
Email:    Carolyn.Kakareka@cbre.com

_____

John Guyer
Appraiser

Phone: 212-207-6032
Fax:     212-207-6069
Email:  John.Guyer@cbre.com

# Subject Photographs



Aerial View



Subject Photographs



Photo 1



Photo 2



Photo 3



Photo 4



Photo 5



Photo 6

*Subject Photographs*



Photo 7



Photo 8



Photo 9



Photo 10



Photo 11



Photo 12

# Executive Summary

| | |
|---|---|
| **Location** | 54-78 Temple Avenue, Hackensack, Bergen County, NJ 07601 |
| **Parcel** | Block 511 Lot 11 |
| **Client** | KeyBank NA |
| **Highest and Best Use** | |
| As If Vacant | Apartment |
| As Improved | Apartment |
| **Property Rights Appraised** | Leased Fee Interest |
| **Date of Inspection** | February 10, 2020 |
| **Estimated Exposure Time** | 3 - 6 Months |
| **Estimated Marketing Time** | 3 - 6 Months |
| **Land Area** | 1.47 AC                                         63,990 SF |
| **Zoning** | M-2 |
| **Improvements** | |
| Property Type | Apartment          (Garden) |
| Number of Buildings | 3 |
| Number of Stories | 2 |
| Gross Building Area | 45,694 SF |
| Net Rentable Area Estimated | 41,175 SF |
| Number of Units | 61 |
| Average Unit Size | 675 SF |
| Year Built | 1967 |
| Condition | Average |
| **Buyer Profile** | Investor-Local |
| **Financial Indicators** | |
| Current Occupancy | 90.2% |
| Stabilized Occupancy | 96.0% |
| Overall Capitalization Rate | 5.25% |

| **Pro Forma Operating Data** | *Total* | *Per Unit* |
|---|---|---|
| Effective Gross Income | $782,637 | $12,830 |
| Operating Expenses | $375,753 | $6,160 |
| Expense Ratio | 48.01% | |
| Net Operating Income | $406,884 | $6,670 |

| **VALUATION** | *Total* | *Per Unit* |
|---|---|---|
| Sales Comparison Approach | $7,800,000 | $127,869 |
| Income Capitalization Approach | $7,800,000 | $127,869 |
| Insurable Value | $4,230,000 | $69,344 |



| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | February 10, 2020 | $7,800,000 |

Compiled by CBRE

*The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.

## STRENGTHS, WEAKNESSES, OPPORTUNITIES AND THREATS (SWOT)

### Strengths/ Opportunities

- Market demand for apartment units is strong within the local area, and the subject property benefits from this situation.

### Weaknesses/ Threats

- Economic uncertainty.
- The subject represents older construction, and is in average overall condition.

### Important Warning-Material Valuation Uncertainty from Novel Coronavirus

The outbreak of the Novel Coronavirus (COVID-19), declared by the World Health Organization as a "Global Pandemic" on the 11th March 2020, is causing heightened uncertainty in both local and global market conditions. Global financial markets have seen steep declines since late February largely on the back of the pandemic over concerns of trade disruptions and falling demand. Many countries globally have implemented strict travel restrictions and a range of quarantine and "social distancing" measures.

Market activity is being impacted in most sectors. As at the valuation date, we consider that we can attach less weight to previous market evidence for comparison purposes, to inform opinions of value. Indeed, the current response to COVID-19 means that we are faced with an unprecedented set of circumstances on which to base a judgement.

Our valuation is therefore reported on the basis of 'material valuation uncertainty'. Consequently, less certainty – and a higher degree of caution – should be attached to our valuation than would normally be the case. Values may change more rapidly and significantly than during standard market conditions. Given the unknown future impact that COVID-19 might have on the real estate market, we recommend that you keep the valuation of the subject under frequent review.



## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- We have included the following statement provided in an inventory report by Colliers International for further explanation of the subject's current position.

U.S. Bank Statement of the Case In this action, plaintiff U.S. Bank National Ass'n seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

- Since we have not been provided unit measurements by ownership, we have employed the extraordinary assumption that our estimated gross building area and net rentable square footage measurements are considered reasonable and exemplify the subject accurately.
- Although requested, we have not been provided with any other historical operating statements or pro forma for the subject. However, due to the subject's current situation, this document may have been impaired by the uncooperative nature of ownership as described above and accordingly rely on comparables for our estimate of expenses. If the subject has abnormal recurring expenditures, we reserve the right to amend the report accordingly.
- Although requested, we have not been provided with a rent roll stating the most recent lease expiration dates. The client has instructed us to assume any lease that has expired before the appraisal's effective date to have rolled into a month-to-month lease at the same rental rate indicated during their lease term. Therefore, we employ the extraordinary assumption that the rent roll provided is accurate with the current rental rates tenants are paying for their month-to-month lease agreement. If there is any change in the rental rates provided for this appraisal, it may cause a material impact.
- During the on-site inspection, management reported that the majority of the tenants on-site have lived at the subject for a great length of time, although we have not been provided with their original lease commencement dates. It was also reported that the subject abides by rent control regulations within Hackensack, which is a contributory factor to the low rents currently being achieved. Therefore, we employ the extraordinary assumption that the subject is under rent control and the rents provided for each unit are reflective of the permitted annual CPI rental increases within the city. This further shows the rental difference between the subject and market rent standards.

The use of these extraordinary assumptions may have affected the assignment results.

---

[1] The Appraisal Foundation, *USPAP, 2020-2021*



## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

## OWNERSHIP AND PROPERTY HISTORY

| OWNERSHIP SUMMARY | |
|---|---|
| | Current |
| Owner: | LENOX TEMPLE LLC |
| Date Purchased: | Jun 12, 2009 |
| Purchase Price: | $7,000,000 |
| Legal Reference | Tax Records |
| County/Locality Name: | Bergen |
| Pending Sale: | No |
| Change of Ownership - Past 3 Years | No |
| Compiled by CBRE | |

Although requested, we have not received any information on the basis of the sale and the support to the concluded sale price. However, the 2018 operating statement provided shows the subject's rental income to be greater than it currently is, per the current rent roll provided. Our appraisal is based off of the subject's current market position and income it is achieving. Our value conclusions are supported by market data and are considered reasonable.

To the best of our knowledge, the subject is currently not being marketed or under contract of sale.

## EXPOSURE/MARKETING TIME

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;

---

[2] The Appraisal Foundation, *USPAP, 2020-2021*



- exposure/marketing time information from the CBRE, Inc. National Investor Survey and the PwC Real Estate Investor Survey; and
- the opinions of market participants.

The following table presents the information derived from these sources.

| EXPOSURE/MARKETING TIME DATA | | | |
|---|---|---|---|
| Investment Type | Exposure/Mktg. (Months) | | |
| | Range | | Average |
| *PwC Apartment* | | | |
|   National Data | 1 - 9 | | 3.7 |
| Local Market Professionals | 2.0 - 6.0 | | 6.0 |
| **CBRE Exposure Time Estimate** | **3 - 6 Months** | | |
| **CBRE Marketing Period Estimate** | **3 - 6 Months** | | |
| Source: PwC Real Estate Survey | | | |

The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.



**CBRE VALUATION & ADVISORY SERVICES**

**JOHN GUYER**
Valuation & Advisory Services
John.Guyer@cbre.com
212-207-6032

**TOM LOW, MAI, CFA**
Valuation & Advisory Services
Tom.Low@cbre.com
212-207-6032

**www.cbre.com**



# Exhibit C

**CBRE VALUATION & ADVISORY SERVICES**

# APPRAISAL REPORT

406-444 LIBERTY STREET
LITTLE FERRY, NEW JERSEY  07643
CBRE GROUP, INC. FILE NO. 20-047NE-0213-2

KEYBANK NA

**CBRE**

VALUATION & ADVISORY SERVICES

**CBRE**

One Penn Plaza Ste. 1835
New York, NY 10119

T 212-207-6100
F 212-207-6069

www.cbre.com

March 27, 2020

Ms. Jessica Broocke
KEYBANK NA
11501 Outlook Street
Overland Park, KS 66211

RE:     Appraisal of: 406-444 Liberty Street
        Little Ferry, Bergen County, New Jersey
        CBRE, Inc. File No. 20-047NE-0213-2

Dear Ms. Broocke:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property.  Our analysis is presented in the following Appraisal Report.

The subject property consists of two, two-story multi-family walk up apartment buildings located at 406-444 Liberty Street in Little Ferry, Bergen County, New Jersey. The improvements are situated on a 51,000-square foot site and were built in 1963. The complex consists of (44) one-bedroom apartments within an estimated  22,000 square feet of net rentable space (which was provided by the client). The property is legally identified on the municipal tax maps as Block 6.01, Lot 1. The subject was 86.4% leased according to the rent roll provided.

The subject was inspected with the property manager on February 10, 2020 and was found in average condition for its age and use at the time. The subject is more fully described, legally and physically, within the enclosed report.

The subject is currently in receivership. We have been provided the following statement by Colliers International on the current situation.

U.S. Bank Statement of the Case: In this action, plaintiff U.S. Bank National Ass'n seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

Jessica Broocke
March 27, 2020

For this reason, we have not been provided with historical documents. As such, please refer to the extraordinary assumptions of which our appraisal is subject to.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | February 10, 2020 | $6,300,000 |

Compiled by CBRE

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.  It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report.  No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).



Jessica Broocke
March 27, 2020

It has been a pleasure to assist you in this assignment.  If you have any questions concerning the analysis, or if CBRE, Inc. can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES


Tom Low, MAI, CFA
Director

Phone: 212-207-6025
Fax:     212-207-6069
Email:   Tom.Low@cbre.com

John Guyer
Appraiser

Phone: 212-207-6032
Fax:     212-207-6069
Email:   John.Guyer@cbre.com

Carolyn Kakareka, MAI
Managing Director
NJ State Certification No. 42RG00252000

Phone:   212-715-5754
Fax:       212-207-6069
Email:    Carolyn.Kakareka@cbre.com



# Certification

We certify to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.
4. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
5. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
6. This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.
7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of New Jersey.
8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
10. As of the date of this report, Carolyn Kakareka, MAI and Tom Low, MAI, CFA have completed the continuing education program for Designated Members of the Appraisal Institute.
11. John Guyer has inspected the property while Carolyn Kakareka, MAI and Tom Low, MAI, CFA have not made a personal inspection of the property that is the subject of this report.
12. No one provided significant real property appraisal assistance to the persons signing this report.
13. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.



14. Carolyn Kakareka, MAI, Tom Low, MAI, CFA, and John Guyer have not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding agreement to perform this assignment.


_____

Tom Low, MAI, CFA
Director

Phone: 212-207-6025
Fax:    212-207-6069
Email:   Tom.Low@cbre.com


_____

Carolyn Kakareka, MAI
Managing Director
NJ State Certification No. 42RG00252000

Phone:   212-715-5754
Fax:     212-207-6069
Email:   Carolyn.Kakareka@cbre.com

_____

John Guyer
Appraiser

Phone: 212-207-6032
Fax:    212-207-6069
Email:  John.Guyer@cbre.com

## Subject Photographs



Aerial View

*406-444 Liberty Street, Little Ferry , NJ*



**Subject Photographs**



Photo 1



Photo 2




Photo 3



Photo 4



Photo 5



Photo 6

406-444 Liberty Street, Little Ferry , NJ

iv

CBRE



Photo 7



Photo 8



Photo 9



Photo 10



Photo 11



Photo 12

CBRE

# Executive Summary

| | |
|---|---|
| **Location** | 406-444 Liberty Street, Little Ferry, Bergen County, NJ 07643 |
| **Parcel** | Block 6.01 Lot 1 |
| **Client** | KeyBank NA |
| **Highest and Best Use** | |
| As If Vacant | Apartment |
| As Improved | Apartment |
| **Property Rights Appraised** | Leased Fee Interest |
| **Date of Inspection** | February 10, 2020 |
| **Estimated Exposure Time** | 3 - 6 Months |
| **Estimated Marketing Time** | 3 - 6 Months |
| **Land Area** | 1.17 AC                            51,000 SF |
| **Zoning** | RM |
| **Improvements** | |
| Property Type | Apartment            (Garden) |
| Number of Buildings | 2 |
| Number of Stories | 2 |
| Gross Building Area | 35,134 SF |
| Net Rentable Area Estimated | 22,000 SF |
| Number of Units | 44 |
| Average Unit Size | 500 sq ft |
| Year Built | 1963 |
| Condition | Average |
| **Buyer Profile** | Investor-Local |
| **Financial Indicators** | |
| Current Occupancy | 86.4% |
| Stabilized Occupancy | 96.0% |
| Overall Capitalization Rate | 5.25% |

| **Pro Forma Operating Data** | Total | Per Unit |
|---|---|---|
| Effective Gross Income | $563,213 | $12,800 |
| Operating Expenses | $229,155 | $5,208 |
| Expense Ratio | 40.69% | |
| Net Operating Income | $334,058 | $7,592 |

| **VALUATION** | Total | Per Unit |
|---|---|---|
| Sales Comparison Approach | $6,300,000 | $143,182 |
| Income Capitalization Approach | $6,300,000 | $143,182 |
| Insurable Value | $3,260,000 | $74,091 |



| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | February 10, 2020 | $6,300,000 |

Compiled by CBRE

*The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.

## STRENGTHS, WEAKNESSES, OPPORTUNITIES AND THREATS (SWOT)

### Strengths/ Opportunities

- Market demand for apartment units is strong within the local area, and the subject property benefits from this situation.

### Weaknesses/ Threats

- Economic uncertainty.
- The subject represents older construction, and is in average overall condition.

### Important Warning-Material Valuation Uncertainty from Novel Coronavirus

The outbreak of the Novel Coronavirus (COVID-19), declared by the World Health Organization as a "Global Pandemic" on the 11th March 2020, is causing heightened uncertainty in both local and global market conditions. Global financial markets have seen steep declines since late February largely on the back of the pandemic over concerns of trade disruptions and falling demand. Many countries globally have implemented strict travel restrictions and a range of quarantine and "social distancing" measures.

Market activity is being impacted in most sectors. As at the valuation date, we consider that we can attach less weight to previous market evidence for comparison purposes, to inform opinions of value. Indeed, the current response to COVID-19 means that we are faced with an unprecedented set of circumstances on which to base a judgement.

Our valuation is therefore reported on the basis of 'material valuation uncertainty'. Consequently, less certainty – and a higher degree of caution – should be attached to our valuation than would normally be the case. Values may change more rapidly and significantly than during standard market conditions. Given the unknown future impact that COVID-19 might have on the real estate market, we recommend that you keep the valuation of the subject under frequent review.



## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- We have included the following statement provided in an inventory report by Colliers International for further explanation of the subject's current position.

U.S. Bank Statement of the Case In this action, plaintiff U.S. Bank National Ass'n seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

- Since we have not been provided unit measurements by ownership, we have employed the extraordinary assumption that our estimated gross building area and net rentable square footage measurements are considered reasonable and exemplify the subject accurately.
- Although requested, we have not been provided with any other historical operating statements or pro forma for the subject. However, due to the subject's current situation, this document may have been impaired by the uncooperative nature of ownership as described above and accordingly rely on comparables for our estimate of expenses. If the subject has abnormal recurring expenditures, we reserve the right to amend the report accordingly.
- Although requested, we have not been provided with a rent roll stating the most recent lease expiration dates. The client has instructed us to assume any lease that has expired before the appraisal's effective date to have rolled into a month-to-month lease at the same rental rate indicated during their lease term. Therefore, we employ the extraordinary assumption that the rent roll provided is accurate with the current rental rates tenants are paying for their month-to-month lease agreement. If there is any change in the rental rates provided for this appraisal, it may cause a material impact.
- During the on-site inspection, management reported that the majority of the tenants on-site have lived at the subject for a great length of time, although we have not been provided with their original lease commencement dates.

The use of these extraordinary assumptions may have affected the assignment results.

---

[1] The Appraisal Foundation, *USPAP, 2020-2021*



## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

## OWNERSHIP AND PROPERTY HISTORY

| OWNERSHIP SUMMARY | |
|---|---|
| | Current |
| Owner: | LENOX LIBERTY, LLC |
| Date Purchased: | Aug 20, 2008 |
| Purchase Price: | $4,850,000 |
| Legal Reference | Tax Records |
| County/Locality Name: | Bergen |
| Pending Sale: | No |
| Change of Ownership - Past 3 Years | No |
| Compiled by CBRE | |

Although requested, we have not received any information on the basis of the sale and the support to the concluded sale price. However, the 2018 operating budget provided shows the subject's rental income to be greater than it currently is, per the current rent roll provided. Our appraisal is based off of the subject's current market position and income it is achieving. Our value conclusions are supported by market data and are considered reasonable.

To the best of our knowledge, the subject is currently not being marketed or under contract of sale.

## EXPOSURE/MARKETING TIME

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;

---

[2] The Appraisal Foundation, *USPAP, 2020-2021*



- exposure/marketing time information from the CBRE, Inc. National Investor Survey and the PwC Real Estate Investor Survey; and
- the opinions of market participants.

The following table presents the information derived from these sources.

| EXPOSURE/MARKETING TIME DATA | | | |
|---|---|---|---|
| Investment Type | Exposure/Mktg. (Months) | | |
| | Range | | Average |
| *PwC Apartment* | | | |
| National Data | 1 - 9 | | 3.7 |
| Local Market Professionals | 2.0 - 6.0 | | 6.0 |
| **CBRE Exposure Time Estimate** | **3 - 6 Months** | | |
| **CBRE Marketing Period Estimate** | **3 - 6 Months** | | |
| Source: PwC Real Estate Survey | | | |

The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.



**CBRE VALUATION & ADVISORY SERVICES**

**JOHN GUYER**
Valuation & Advisory Services
John.Guyer@cbre.com
212-207-6032

**TOM LOW, MAI, CFA**
Valuation & Advisory Services
Tom.Low@cbre.com
212-207-6032

**www.cbre.com**



# Exhibit D

**CBRE VALUATION & ADVISORY SERVICES**

# APPRAISAL REPORT

107-109 HUDSON STREET
HACKENSACK, NEW JERSEY  07601
CBRE GROUP, INC. FILE NO. 20-047NE-0213-3

KEYBANK NA

**CBRE**

VALUATION & ADVISORY SERVICES

**CBRE**

One Penn Plaza Ste. 1835
New York, NY 10119

T 212-207-6100
F 212-207-6069

www.cbre.com

March 31, 2020

Ms. Jessica Brooke
KeyBank NA
11501 Outlook Street
Overland Park, KS 66211

RE:     Appraisal of: 107-109 Hudson Street
        Hackensack, Bergen County, New Jersey
        CBRE, Inc. File No. 20-047NE-0213-3

Dear Ms. Broocke:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property. Our analysis is presented in the following Appraisal Report.

The subject property consists of a two-story multi-family apartment building located at 107-109 Hudson Street in Hackensack, Bergen County, New Jersey. The improvements are situated on a 15,298-square foot site and were built in 1972. The subject totals (20) one-bedroom apartment units within 10,500 -square feet of net rentable space (which was provided by the client). The property is legally identified on the municipal tax maps as Block 67, Lot 24.

The subject was 80.0% leased according to the rent roll provided. The subject was inspected on February 10, 2020 and was in average condition for its age and use at the time. The subject is more fully described, legally and physically, within the enclosed report.

Additionally, the subject is currently in receivership. We have included the following statement provided by Colliers International for further explanation of the subject's current position.

U.S. Bank Statement of the Case: In this action, plaintiff U.S. Bank National Ass'n seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

Jessica Brooke
March 31, 2020

For this reason, we have not been provided with historical documents. As such, please refer to the extraordinary assumptions of which our appraisal is subject to.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | February 10, 2020 | $2,350,000 |

Compiled by CBRE

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.  It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report.  No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).



Jessica Brooke
March 31, 2020

It has been a pleasure to assist you in this assignment.  If you have any questions concerning the analysis, or if CBRE, Inc. can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

Tom Low, MAI, CFA
Director

Phone: 212-207-6025
Fax:      212-207-6069
Email:    Tom.Low@cbre.com

John Guyer
Appraiser

Phone: 212-207-6032
Fax:      212-207-6069
Email:    John.Guyer@cbre.com

Carolyn Kakareka, MAI
Managing Director
NJ State Certification No. 42RG00252000

Phone:    212-715-5754
Fax:        212-207-6069
Email:      Carolyn.Kakareka@cbre.com



# Certification

We certify to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.
4. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
5. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
6. This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.
7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of New Jersey.
8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
10. As of the date of this report, Carolyn Kakareka, MAI and Tom Low, MAI, CFA have completed the continuing education program for Designated Members of the Appraisal Institute.
11. John Guyer has inspected the property while Carolyn Kakareka, MAI and Tom Low, MAI, CFA have not made a personal inspection of the property that is the subject of this report.
12. No one provided significant real property appraisal assistance to the persons signing this report.
13. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

107-109 Hudson Street, Hackensack, *NJ*



14. Carolyn Kakareka, MAI, Tom Low, MAI, CFA, and John Guyer have not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding agreement to perform this assignment.

CBRE - VALUATION & ADVISORY SERVICES

_____
Tom Low, MAI, CFA
Director

Phone: 212-207-6025
Fax:     212-207-6069
Email:    Tom.Low@cbre.com

_____
Carolyn Kakareka, MAI
Managing Director
NJ State Certification No. 42RG00252000

Phone:   212-715-5754
Fax:      212-207-6069
Email:    Carolyn.Kakareka@cbre.com

_____
John Guyer
Appraiser

Phone: 212-207-6032
Fax:     212-207-6069
Email:   John.Guyer@cbre.com



## Subject Photographs



Aerial View





Photo 1



Photo 2



Photo 3



Photo 4



Photo 5



Photo 6

iv

107-109 Hudson Street, Hackensack, *NJ*

CBRE



Photo 7



Photo 8



Photo 9



Photo 10



Photo 11



Photo 12

# Executive Summary

| | |
|---|---|
| **Location** | 107-109 Hudson Street, Hackensack, Bergen County, NJ 07601 |
| **Parcel** | Block 67, Lot 24 |
| **Client** | KeyBank NA |
| **Highest and Best Use** | |
| As If Vacant | Apartment |
| As Improved | Apartment |
| **Property Rights Appraised** | Leased Fee Interest |
| **Date of Inspection** | February 10, 2020 |
| **Estimated Exposure Time** | 3 - 6 Months |
| **Estimated Marketing Time *** | 3 - 6 Months |
| **Land Area** | 0.35 AC        15,298 SF |
| **Zoning** | B-1 |
| **Improvements** | |
| Property Type | Apartment |
| Number of Buildings | 1 |
| Number of Stories | 2 |
| Gross Building Area | 12,500 SF |
| Net Rentable Area | 10,500 SF |
| Number of Units | 20 |
| Average Unit Size | 525 SF |
| Year Built | 1972 |
| Condition | Average |
| **Buyer Profile** | Investor-Local |
| **Financial Indicators** | |
| Current Occupancy | 80.0% |
| Stabilized Occupancy | 96.0% |
| Overall Capitalization Rate | 5.50% |

| **Pro Forma Operating Data** | *Total* | *Per Unit* |
|---|---|---|
| Effective Gross Income | $241,782 | $12,089 |
| Operating Expenses | $111,811 | $5,591 |
| Expense Ratio | 46.24% | |
| Net Operating Income | $129,971 | $6,499 |

| **VALUATION** | *Total* | *Per Unit* |
|---|---|---|
| Sales Comparison Approach | $2,450,000 | $122,500 |
| Income Capitalization Approach | $2,350,000 | $117,500 |
| Insurable Value | $1,300,000 | $65,000 |



| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | February 10, 2020 | $2,350,000 |

Compiled by CBRE

*The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.

## STRENGTHS, WEAKNESSES, OPPORTUNITIES AND THREATS (SWOT)

### Strengths/ Opportunities

- Market demand for apartment units is strong within the local area, and the subject property benefits from this situation.

### Weaknesses/ Threats

- Economic uncertainty.
- The subject represents older construction, and is in average overall condition.

### Important Warning-Material Valuation Uncertainty from Novel Coronavirus

The outbreak of the Novel Coronavirus (COVID-19), declared by the World Health Organization as a "Global Pandemic" on the 11th March 2020, is causing heightened uncertainty in both local and global market conditions. Global financial markets have seen steep declines since late February largely on the back of the pandemic over concerns of trade disruptions and falling demand. Many countries globally have implemented strict travel restrictions and a range of quarantine and "social distancing" measures.

Market activity is being impacted in most sectors. As at the valuation date, we consider that we can attach less weight to previous market evidence for comparison purposes, to inform opinions of value. Indeed, the current response to COVID-19 means that we are faced with an unprecedented set of circumstances on which to base a judgement.

Our valuation is therefore reported on the basis of 'material valuation uncertainty'. Consequently, less certainty – and a higher degree of caution – should be attached to our valuation than would normally be the case. Values may change more rapidly and significantly than during standard market conditions. Given the unknown future impact that COVID-19 might have on the real estate market, we recommend that you keep the valuation of the subject under frequent review.

107-109 Hudson Street, Hackensack, NJ



## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- We have included the following statement provided in an inventory report by Colliers International for further explanation of the subject's current position.

> U.S. Bank Statement of the Case In this action, plaintiff U.S. Bank National Ass'n seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

- Since we have not been provided unit measurements by ownership, we have employed the extraordinary assumption that our estimated gross building area and net rentable square footage measurements are considered reasonable and exemplify the subject accurately.
- Although requested, we have not been provided with any other historical operating statements or pro forma for the subject. However, due to the subject's current situation, this document may have been impaired by the uncooperative nature of ownership as described above and accordingly rely on comparables for our estimate of expenses. If the subject has abnormal recurring expenditures, we reserve the right to amend the report accordingly.
- Although requested, we have not been provided with a rent roll stating the most recent lease expiration dates. The client has instructed us to assume any lease that has expired before the appraisal's effective date to have rolled into a month-to-month lease at the same rental rate indicated during their lease term. Therefore, we employ the extraordinary assumption that the rent roll provided is accurate with the current rental rates tenants are paying for their month-to-month lease agreement. If there is any change in the rental rates provided for this appraisal, it may cause a material impact.
- During the on-site inspection, management reported that the majority of the tenants on-site have lived at the subject for a great length of time, although we have not been provided with their original lease commencement dates. It was also reported that the subject abides by rent control regulations within Hackensack, which is a contributory factor to the low rents currently being achieved. Therefore, we employ the extraordinary assumption that the subject is under rent control and the rents provided for each unit are reflective of the permitted annual CPI rental increases within the city. This further shows the rental difference between the subject and market rent standards.

The use of these extraordinary assumptions may have affected the assignment results.

---

[1] The Appraisal Foundation, *USPAP, 2020-2021*



## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

## OWNERSHIP AND PROPERTY HISTORY

| OWNERSHIP SUMMARY | |
|---|---|
| | Current |
| Owner: | Lenox Hudson, LLC |
| Date Purchased: | Aug 1, 2008 |
| Purchase Price: | $1,875,000 |
| Legal Reference | Tax Records |
| County/Locality Name: | Bergen |
| Pending Sale: | No |
| Change of Ownership - Past 3 Years | No |
| Compiled by CBRE | |

Although requested, we have not received any information on the basis of the sale and the support to the concluded sale price. However, the 2018 operating statement provided shows the subject's rental income to be greater than it currently is, per the current rent roll provided. Our appraisal is based off of the subject's current market position and income it is achieving. Our value conclusions are supported by market data and are considered reasonable.

To the best of our knowledge, the subject is currently not being marketed or under contract of sale.

## EXPOSURE/MARKETING TIME

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;

---

[2] The Appraisal Foundation,  *USPAP, 2020-2021*



- exposure/marketing time information from the CBRE, Inc. National Investor Survey and the PwC Real Estate Investor Survey; and
- the opinions of market participants.

The following table presents the information derived from these sources.

| EXPOSURE/MARKETING TIME DATA | | | |
|---|---|---|---|
| Investment Type | Exposure/Mktg. (Months) | | |
| | Range | | Average |
| *PwC Apartment* | | | |
|   National Data | 1 - 9 | | 3.7 |
| Local Market Professionals | 2.0 - 6.0 | | 6.0 |
| **CBRE Exposure Time Estimate** | **3 - 6 Months** | | |
| **CBRE Marketing Period Estimate** | **3 - 6 Months** | | |
| Source: PwC Real Estate Survey | | | |

The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.



**CBRE VALUATION & ADVISORY SERVICES**

**JOHN GUYER**
Valuation & Advisory Services
John.Guyer@cbre.com
212-207-6032

**TOM LOW, MAI, CFA**
Valuation & Advisory Services
Tom.Low@cbre.com
212-207-6032

**www.cbre.com**



# Exhibit E

**CBRE VALUATION & ADVISORY SERVICES**

# APPRAISAL REPORT

## 88 MCKINLEY STREET & 170 SOUTH PARK STREET
## HACKENSACK, NEW JERSEY  07601
## CBRE GROUP, INC. FILE NO. 20-047NE-0213-8

KEYBANK NA

**CBRE**

VALUATION & ADVISORY SERVICES

**CBRE**

One Penn Plaza Ste. 1835
New York, NY 10119

T 212-207-6100
F 212-207-6069

www.cbre.com

March 31, 2020

Ms. Jessica Brooke
KeyBank NA
11501 Outlook Street
Overland Park, KS 66211

RE:     Appraisal of: 88 McKinley Street & 170 South Park Street
        Hackensack, Bergen County, New Jersey
        CBRE, Inc. File No. 20-047NE-0213-8

Dear Ms. Broocke:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property. Our analysis is presented in the following Appraisal Report.

The subject consists of two multi-family apartment buildings under the same ownership and represent a single asset holding. Per the client's request, we have appraised the properties as a single economic unit.

The individual properties are described as follows:

<u>88 McKinley Street</u>

This building consists of a, two-story walk-up apartment building located at 88 McKinley Street, Hackensack, Bergen County New Jersey. The improvements were built in 1964 and have a gross building area of 18,000-square feet. They are situated on a 18,750-square foot site in the B-1 zoning district. The subject totals (16) one-bedroom apartments and (2) two-bedroom apartment units within 12,150 -square feet of net rentable space (which was provided by the client). It is legally identified on Bergen County tax maps as Block 81, Lot 22.

<u>170 South Park Street</u>

This building consists of a, two-story walk-up apartment building located at 170 South Park Street, Hackensack, Bergen County New Jersey. The improvements were built in 1966 and have a gross building area of 13,528-square feet. They are situated on a 14,622-square foot site in the R3-B zoning district. The subject totals (9) one-bedroom and (5) two-bedroom apartment units within 10,225-square feet of net rentable space (which was provided by the client). It is legally identified on Bergen County tax maps as Block 222.01, Lot 30.

Jessica Brooke
March 31, 2020

In total, the subject has 31,528-square feet of gross building area with 32 apartment units (22,375-square feet is  considered net rentable area). The subject was 90.6% leased according to the rent roll provided. The subject was inspected on February 10, 2020 and was found in average condition for its age and use at the time. The subject is more fully described, legally and physically, within the enclosed report.

Additionally, the subject is currently in receivership. We have included the following statement provided by Colliers International for further explanation of the subject's current position.

U.S. Bank Statement of the Case  In this action, plaintiff U.S. Bank National Ass'n seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

For this reason, we have not been provided with historical documents. As such, please refer to the extraordinary assumptions of which our appraisal is subject to.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | February 10, 2020 | $4,000,000 |
| Compiled by CBRE | | | |

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.  It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report.  No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party,



Jessica Brooke
March 31, 2020

and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

It has been a pleasure to assist you in this assignment.  If you have any questions concerning the analysis, or if CBRE, Inc. can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES


Tom Low, MAI, CFA
Director

Phone: 212-207-6025
Fax:     212-207-6069
Email:    Tom.Low@cbre.com


John Guyer
Appraiser

Phone: 212-207-6032
Fax:     212-207-6069
Email:   John.Guyer@cbre.com


Carolyn Kakareka, MAI
Managing Director
NJ State Certification No. 42RG00252000

Phone:   212-715-5754
Fax:      212-207-6069
Email:    Carolyn.Kakareka@cbre.com



# Certification

We certify to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.
4. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
5. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
6. This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.
7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of New Jersey.
8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
10. As of the date of this report, Carolyn Kakareka, MAI and Tom Low, MAI, CFA have completed the continuing education program for Designated Members of the Appraisal Institute.
11. John Guyer has inspected the property while Carolyn Kakareka, MAI and Tom Low, MAI, CFA have not made a personal inspection of the property that is the subject of this report.
12. No one provided significant real property appraisal assistance to the persons signing this report.
13. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.



14. Carolyn Kakareka, MAI, Tom Low, MAI, CFA, and John Guyer have not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding agreement to perform this assignment.

CBRE - VALUATION & ADVISORY SERVICES

Tom Low, MAI, CFA
Director

Phone: 212-207-6025
Fax:     212-207-6069
Email:    Tom.Low@cbre.com

John Guyer
Appraiser

Phone: 212-207-6032
Fax:     212-207-6069
Email:   John.Guyer@cbre.com

Carolyn Kakareka, MAI
Managing Director
NJ State Certification No. 42RG00252000

Phone:   212-715-5754
Fax:      212-207-6069
Email:    Carolyn.Kakareka@cbre.com



# Subject Photographs



Arial View

*2-Property Portfolio, Hackensack, NJ*



Subject Photographs


Exterior- 88 McKinley Street


Exterior- 88 McKinley Street


Living Area- 88 McKinley Street


Kitchen- 88 McKinley Street


Typical Bedroom-88 McKinley Street


View of Basement- 88 McKinley Street

CBRE

Subject Photographs



Exterior- 170 South Park Street



Exterior Street- 170 South Park Street



Living Area- 170 South Park Street



Kitchen- 170 South Park Street



Typical Bedroom- 170 South Park Street



Basement- 170 South Park Street

*2-Property Portfolio, Hackensack, NJ*



# Executive Summary

| | | |
|---|---|---|
| **Location** | 88 McKinley Street and 170 South Park Street, Hackensack, Bergen County, NJ 07601 | |
| **Parcel** | | |
| 88 McKinley Street | Block 81, Lot 22 | |
| 170 South Park Street | Block 222.01, Lot 30 | |
| **Client** | KeyBank NA | |
| **Highest and Best Use** | | |
| As If Vacant | Apartment | |
| As Improved | Apartment | |
| **Property Rights Appraised** | Leased Fee Interest | |
| **Date of Inspection** | February 10, 2020 | |
| **Estimated Exposure Time** | 3 - 6 Months | |
| **Estimated Marketing Time \*** | 3 - 6 Months | |
| **Land Area (Total)** | 0.77 AC | 33,372 SF |
| **Zoning** | R-3B & B-1 | |
| **Improvements** | | |
| Property Type | Apartment | |
| Number of Buildings | 3 | |
| Number of Stories | 2 to 3 | |
| Gross Building Area (Total) | 31,528 SF | |
| Net Rentable Area (Total) | 22,375 SF | |
| Number of Residential Units | 32 | |
| Year Built | 1964/1966 | |
| Condition | Average | |
| **Buyer Profile** | Investor-Local | |
| **Financial Indicators** | | |
| Current Occupancy | 90.6% | |
| Stabilized Occupancy | 96.0% | |
| Overall Capitalization Rate | 5.50% | |

| **Pro Forma Operating Data** | *Total* | *Per Unit* |
|---|---|---|
| Effective Gross Income | $386,954 | $12,092 |
| Operating Expenses | $166,018 | $5,188 |
| Expense Ratio | 42.90% | |
| Net Operating Income | $220,936 | $6,904 |

| **VALUATION** | *Total* | *Per Unit* |
|---|---|---|
| Sales Comparison Approach | $4,050,000 | $126,563 |
| Income Capitalization Approach | $4,000,000 | $125,000 |
| Insurable Value | $2,950,000 | $92,188 |



| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | February 10, 2020 | $4,000,000 |

Compiled by CBRE

*The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.

## STRENGTHS, WEAKNESSES, OPPORTUNITIES AND THREATS (SWOT)

### Strengths/ Opportunities

- Market demand for apartment units is strong within the local area, and the subject property benefits from this situation.

### Weaknesses/ Threats

- Economic uncertainty.
- The subject represents older construction, and is in average overall condition.

### Important Warning-Material Valuation Uncertainty from Novel Coronavirus

The outbreak of the Novel Coronavirus (COVID-19), declared by the World Health Organization as a "Global Pandemic" on the 11th March 2020, is causing heightened uncertainty in both local and global market conditions. Global financial markets have seen steep declines since late February largely on the back of the pandemic over concerns of trade disruptions and falling demand. Many countries globally have implemented strict travel restrictions and a range of quarantine and "social distancing" measures.

Market activity is being impacted in most sectors. As at the valuation date, we consider that we can attach less weight to previous market evidence for comparison purposes, to inform opinions of value. Indeed, the current response to COVID-19 means that we are faced with an unprecedented set of circumstances on which to base a judgement.

Our valuation is therefore reported on the basis of 'material valuation uncertainty'. Consequently, less certainty – and a higher degree of caution – should be attached to our valuation than would normally be the case. Values may change more rapidly and significantly than during standard market conditions. Given the unknown future impact that COVID-19 might have on the real estate market, we recommend that you keep the valuation of the subject under frequent review.



## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- We have included the following statement provided in an inventory report by Colliers International for further explanation of the subject's current position.

  <u>U.S. Bank Statement of the Case</u> In this action, plaintiff U.S. Bank National Ass'n seeks to foreclose a commercial mortgage encumbering certain residential apartment buildings located throughout the State of New Jersey, as more particularly identified and described in the Schedule annexed to this Court's Order appointing Colliers International NJ LLC to serve as the Receiver for the properties at issue. The corporate borrowers deferred maintenance and other management responsibilities for these properties, creating profound and immediate issues for which this appointment was necessary. Due to an ongoing criminal investigation, the managing member for these entities (Seth Levine) refused to provide critical operating information or to otherwise assist with the Receiver's assumption of the management responsibilities necessary to stabilize these assets at the time of its appointment. This Inventory and Report is provided pursuant to the Court's Order.

- Since we have not been provided unit measurements by ownership, we have employed the extraordinary assumption that our estimated gross building area and net rentable square footage measurements are considered reasonable and exemplify the subject accurately.
- Although requested, we have not been provided with any other historical operating statements or pro forma for the subject. However, due to the subject's current situation, this document may have been impaired by the uncooperative nature of ownership as described above and accordingly rely on comparables for our estimate of expenses. If the subject has abnormal recurring expenditures, we reserve the right to amend the report accordingly.
- Although requested, we have not been provided with a rent roll stating the most recent lease expiration dates. The client has instructed us to assume any lease that has expired before the appraisal's effective date to have rolled into a month-to-month lease at the same rental rate indicated during their lease term. Therefore, we employ the extraordinary assumption that the rent roll provided is accurate with the current rental rates tenants are paying for their month-to-month lease agreement. If there is any change in the rental rates provided for this appraisal, it may cause a material impact.
- During the on-site inspection, management (who now reports to the receiver) reported that the majority of the tenants on-site have lived at the subject for a great length of time, although we have not been provided with their original lease commencement dates. It was also reported that the subject abides by rent control regulations of Hackensack, which is a contributory factor to the low rents currently being achieved. Therefore, we employ the extraordinary assumption that the subject is under rent control and the rents provided for each unit are reflective of the permitted annual rental increases within the city. This further shows the rental difference between the subject and market rent standards.

The use of these extraordinary assumptions may have affected the assignment results.

---

[1] The Appraisal Foundation, *USPAP, 2020-2021*



## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

## OWNERSHIP AND PROPERTY HISTORY

| OWNERSHIP SUMMARY | |
|---|---|
| | Current |
| Owner: | Hackensack Norse, LLC |
| Date Purchased: | Mar 1, 2015 |
| Purchase Price: | $3,900,000 |
| Legal Reference | Tax Records |
| County/Locality Name: | Bergen |
| Pending Sale: | No |
| Change of Ownership - Past 3 Years | No |
| Compiled by CBRE | |

Although requested, we have not received any information on the basis of the sale and the support to the concluded sale price. However, the 2018 operating statement provided shows the subject's rental income to be greater than it currently is, per the current rent roll provided. Our appraisal is based off of the subject's current market position and income it is achieving. Our value conclusions are supported by market data and are considered reasonable.

To the best of our knowledge, the subject is currently not being marketed or under contract of sale.

## EXPOSURE/MARKETING TIME

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;

---

[2] The Appraisal Foundation, *USPAP, 2020-2021*



- exposure/marketing time information from the CBRE, Inc. National Investor Survey and the PwC Real Estate Investor Survey; and
- the opinions of market participants.

The following table presents the information derived from these sources.

| EXPOSURE/MARKETING TIME DATA | | | |
|---|---|---|---|
| Investment Type | Exposure/Mktg. (Months) | | |
| | Range | | Average |
| *PwC Apartment* | | | |
| National Data | 1 - 9 | | 3.7 |
| Local Market Professionals | 2.0 - 6.0 | | 6.0 |
| **CBRE Exposure Time Estimate** | **3 - 6 Months** | | |
| **CBRE Marketing Period Estimate** | **3 - 6 Months** | | |
| Source: PwC Real Estate Survey | | | |

The marketing period estimate does not incorporate the impact of any legal proceedings that are on-going.



**CBRE VALUATION & ADVISORY SERVICES**

**JOHN GUYER**
Valuation & Advisory Services
John.Guyer@cbre.com
212-207-6032

**TOM LOW, MAI, CFA**
Valuation & Advisory Services
Tom.Low@cbre.com
212-207-6032

**www.cbre.com**



# Exhibit F

## Exclusive Right Agreement

This Exclusive Right Agreement ("**Agreement**") made as of August 26, 2020, between Colliers International NJ LLC, having an office at 300 Interpace Parkway, Parsippany, New Jersey 07054, in its capacity as the Court-Appointed Receiver (the "**Receiver**") for that certain real property identified and described on Schedule A annexed hereto and incorporated herein (hereinafter, the "**Receivership Properties**"), and as more fully described on Exhibits A and B to that certain Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, *U.S. Bank National Ass'n v. Englewood Funding, LLC, et al.*, Civil Action No. 19-cv-17865-MCA-LDW (the "**Action**"), and Colliers International NJ LLC in its capacity as a real estate broker (the "**Agent**"). Agent represents that it is a duly licensed real estate broker in the State of New Jersey. Receiver and Agent intending to be legally bound hereby agree as follows:

1.     Receiver hereby appoints and directs Agent to serve as Receiver's sole and exclusive agent granted with the sole and exclusive right to procure a sale or any other acceptable transfer of one or more of the Receivership Properties (including all improvements now or hereafter made and all appurtenances thereto), except in connection with any sale or other transfer of any of the Receivership Properties made to a sponsor of the defendant in the Action or effectuated under the applicable pooling and servicing agreement (the "**PSA**") governing plaintiff U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass Through Certificates, Series 2018-SB51 ("**Plaintiff**") (collectively a "**Sale**") as contemplated, set forth, and agreed in the Receiver Order (defined below), and certain additional orders entered in the Action, and Agent accepts such sole and exclusive right consistent with the terms of this Agreement and the Receiver Order (defined below). References herein to the Receivership Properties shall be understood to include all or any portion of one or more of the Receivership Properties.  Plaintiff acknowledges that Receiver's authority to sell or transfer the Receivership Properties, or to direct the sale or transfer of the Receivership Properties, is defined and set forth in: (i) the Amended Preliminary Injunction and Receivership Order, entered on December 4, 2019, by the United States District Court for the District of New Jersey (the "**Court**") in the Action, and in all related actions identified therein (the "**Receiver Order**"), (ii) the Order Setting forth Sale Procedures, entered on May 29, 2020, by the United States District Court for the District of New Jersey in the Action (the "**Sale Procedures Order**"), and (iii) any other orders that have been or may be entered by the Court in the Action. The parties to this Agreement agree and acknowledge that Agent's ability to consummate a sale transaction for one or more of the Receivership Properties is subject to the approval of Plaintiff, any other party required by the Court to consent to the sale, and the Court that entered the Receiver Order, as set forth in Paragraph 6(i) of the Receiver Order.

2.     During the term of this Agreement, Plaintiff and Receiver agree to refer to Agent all offers, inquiries and solicitations related in any way to a Sale and Agent agrees to investigate and develop such offers, inquiries and solicitations.  All negotiations shall be conducted through Agent with assistance and input from Plaintiff and Receiver.  Agent agrees to assist Plaintiff and Receiver in gathering information to enable Plaintiff and Receiver to make a determination as to the credit worthiness of any prospective purchaser (including any designee, successor assignee or related entity hereinafter collectively "**Prospect(s)**"), but the determination to accept or reject a Prospect shall be made by Plaintiff and Receiver. Plaintiff shall not rely on Agent, and Agent shall have no liability, for the financial condition or credit worthiness of a Prospect.  Plaintiff and Receiver will be responsible for determining the legal sufficiency of a Sale and any other documents relating to any transactions contemplated by this Agreement. Plaintiff and/or Receiver shall supply Agent with a copy of the contract of sale upon request by Agent.

3.     This Agreement shall become effective as of the date hereof and shall continue for an initial term of nine (9) months.  Thereafter this Agreement shall continue on a month-to-month basis unless and until either party hereto shall serve written notice of cancellation to the other party at the address set forth above, in which event this Agreement shall terminate thirty (30) days after the service of such notice.  The date that this

Agreement shall terminate shall hereinafter be referred to as the "**Termination Date**." Within ten (10) business days after the Termination Date, Agent shall deliver to Plaintiff: (i) a list of all Prospects who have toured any of the Receivership Properties and/or have submitted or received written offers with respect to a Sale of one or more Receivership Properties, and (ii) a list of any pending, proposed and incomplete transactions in connection with a Sale. In the event that a Sale is completed (or a contract of Sale is executed) with a Prospect (defined below) within one hundred twenty (120) days after the Termination Date, Agent shall be paid a commission in accordance with the terms of this Agreement as if the Termination Date had not occurred. In the event a Sale is still being negotiated with a Prospect (defined below) at the time such one hundred twenty (120) day period expires, then the one hundred twenty (120) day period shall be further extended for an additional one hundred twenty (120) day period and Agent shall be compensated as if this Agreement were in full force and effect. For purposes of this Section, Prospect shall include (i) a Prospect whom Agent, during the term of this Agreement, had negotiations regarding a Sale, or from whom Agent received a written offer to purchase any or all of the Receivership Properties, (ii) a Prospect that has executed a confidentiality agreement, and/or (iii) a Prospect that is on a list of Prospects prepared by Agent and delivered to Plaintiff within ten (10) business days following the expiration or termination of this Agreement.

4.     In connection with a Sale, Agent shall be paid a commission as set forth in this Agreement and in accordance with the terms and rates on Schedule B, attached hereto and made a part hereof. Agent is hereby authorized to cooperate with cooperating brokers (a "**Cooperating Broker**"). In the event that a Cooperating Broker shall procure a Prospect, Agent shall be paid a commission as set forth in this Agreement and in accordance with the terms and rates on Schedule B, and the Cooperating Broker shall be responsible to obtain its commission from its principal. Receiver and Agent shall use commercially reasonable efforts to provide that the Cooperating Broker be compensated by its principal and that Plaintiff, Receiver, and Agent and shall have no liability or responsibility to pay any commission to Cooperating Broker. For purposes of this Agreement, any broker or salesperson associated with Agent other than Jacklene Chesler, Patrick Norris, Matthew Brown or Frank Summers that procures a Prospect shall be treated as a Cooperating Broker.

5.     Agent is exclusively authorized to advertise the Property on behalf of Receiver. The parties acknowledge, however, that the owners of the Receivership Properties have separately engaged The Kislak Company, Inc. ("**Kislak**"), which has also listed the Receivership Properties for sale, subject to the terms and limitations contained in the Receiver Order and the Sale Procedures Order. Receiver agrees that in the event of a sale procured by Kislak or any other third party, Agent shall be reimbursed for all reasonable out-of-pocket expenses incurred during the preparation of the offering packages and the actual marketing of the Receivership Properties in the amount of no more than $5,000 per any of the individual Receiverships Properties, excluding attorneys' fees and other professional fees. Any such expense is to be approved by Plaintiff and Receiver prior to Agent incurring it. When requesting reimbursement, Agent will provide Plaintiff and Receiver with copies of actual receipts as verification of all individual expenses. Payment shall be made upon the earlier of: (i) the closing of title, whereupon all such sums shall be paid from the sale proceeds, as set forth in Paragraph 7 of the Sale Procedure Order, or (ii) 15 days after an invoice for such amounts has been provided to Plaintiff and Receiver. Nothing contained herein shall affect or modify any sums otherwise due to the Receiver in the Action.

6.     Agent is a national brokerage firm and that in some cases it may represent Prospects. Plaintiff desires that the Receivership Properties be presented to such persons or entities, and consents to the dual representation created thereby. Agent shall not disclose the confidential information of one principal to the other.

7.     Neither Receiver nor Agent is obligated to and has made no independent investigation of the physical conditions of the Receivership Properties including, but not limited to, the condition of any structures (exterior and interior) on the Receivership Properties, the electrical and mechanical systems thereof, the fixtures, personal property and equipment therein, or of any environmental matters with respect thereto, or of hazardous substances thereon, if any (collectively, the "**Physical Conditions**"). All documents and materials, investigations, reports and information with respect to the Physical Conditions may be furnished to Prospects,

as may be required by the Receiver Order or Sale Procedure Order. Agent acknowledges that neither Plaintiff nor Receiver shall make any representations or warranties regarding the Physical Conditions of the Receivership Properties. As such, Agent shall advise all Prospects that the Receivership Properties shall be sold "AS IS, WITH ALL FAULTS, KNOWN OR UNKNOWN," without representation or warranty of any kind and in their present condition.

8.      The validity and interpretation of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey applicable to agreements made and to be fully performed therein (excluding the conflicts of laws rules).  The parties hereto irrevocably submit to the jurisdiction of the Court in the Action for the purpose of any suit, action, or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby. Neither party shall be liable for consequential, punitive, special, exemplary or similar type damages.  In the event that any litigation is brought with respect to any dispute between the parties hereto, the losing party in such litigation shall reimburse the prevailing party for all of its reasonable out-of-pocket costs incurred, including reasonable attorney's fees and disbursements, in connection with such litigation and the costs of collection of any settlement or judgment thereon. PLAINTIFF, RECEIVER, AND AGENT KNOWINGLY AND VOLUNTARILY WAIVE THE RIGHT TO A JURY TRIAL IN THE EVENT OF A DISPUTE ARISING UNDER THIS AGREEMENT.

9.      Each signatory to this Agreement represents and warrants that (s)he has full authority to sign this Agreement on behalf of the party for whom (s)he signs and that this Agreement binds such party, subject to any limitations, restrictions, or obligations contained in the Receivership Order, the Sale Procedure Order, or another order entered in the Action.

10.     The Receivership Properties will be offered in compliance with all anti-discrimination laws.

11.     This Agreement constitutes the entire agreement between Receiver and Agent with respect to the subject matter hereof and supersedes all prior discussions, negotiations and agreements, whether oral or written.  No amendment, alteration, cancellation or withdrawal of this Agreement shall be valid or binding unless made in writing and signed by Receiver and Agent.  This Agreement shall be binding upon, and shall benefit, the heirs, successors and assignees of the parties. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute a fully executed agreement, with the same effect and validity as a single, original agreement signed by all of the parties.  Facsimile and PDF signatures shall have the same validity and effect as original signatures.

The undersigned Plaintiff hereby acknowledges receipt of a copy of this Agreement.

*Agreed and Accepted:*

Colliers International NJ LLC, as Agent

By:_____
       Name:   Richard J. Madison
       Title: Executive Managing Director
Print:_____
       Richard J. Madison

*Agreed and Accepted:*

Colliers International NJ LLC, as Court-Appointed Receiver for the Receivership Properties, Pursuant to the Receivership Order,

By:_____
       Name:   Richard J. Madison
       Title:    Executive Managing Director
Print:_____
       Richard J. Madison

74327662
7420294 v3

*Acknowledged by and Agreed and Accepted by:*

U.S. Bank National Association, as Trustee
for the Registered Holders of Wells Fargo
Commercial Mortgage Securities, Inc.,
Multifamily Mortgage Pass Through
Certificates, Series 2018-SB51

By: KeyBank National Association
    a national banking association,
    as authorized agent

By: _____

Name: Mike Jenkins

Title: Vice President

Print: Mike Jenkins _____

**Consult your advisors.** This document has legal consequences.  No representation or recommendation is made by Agent as to the legal or tax consequences of this Agreement or the transaction(s) which it contemplates. These are questions for your attorney and financial advisors.

## SCHEDULE A

***U.S. Bank National Association v. Englewood Funding, LLC, et al.***
**Civil Action No. 19-cv-17865-MCA-LDW**

| Property Address | Property Owner |
|---|---|
| 107-109 Hudson Street<br>Hackensack, New Jersey 07601 | Lenox Hudson, LLC |
| 88 McKinley Street<br>Hackensack, New Jersey 07601 | Hackensack Norse, LLC |
| 54-78 Temple Avenue<br>Hackensack, New Jersey 07601 | Lenox Temple, LLC |
| 406-444 Liberty Street<br>Little Ferry, New Jersey 07643 | Lenox Liberty, LLC |

## SCHEDULE B

### Sale Commission

Agent shall be paid a commission equal to four percent (4%) of the gross purchase price or other consideration (including without limitation any existing mortgage that is assumed) for the sale of any of the individual Receivership Properties. If two or more of the individual Receivership Properties are sold to one (1) Purchaser the commission due to Agent would be reduced to three percent (3%).   The commission shall be included on the proposed distribution schedule for all sale proceeds, as set forth in Paragraph 7 of the Sale Procedures Order, and shall be paid from the sales proceeds for any Receivership Property at the closing, together with all sums due to Plaintiff, Receiver, and any other secured creditors, without deduction or offsets of any kind.

Notwithstanding anything herein to the contrary, the following reduced commission structure shall govern in the event of a sale of one or more Receivership Properties effectuated under Section 3.22 of the PSA:

Except as set forth below, if any of the individual Receivership Properties are purchased by an Option Holder (as defined in the PSA, and disclosed on Schedule C annexed to this Agreement), pursuant to the terms of Section 3.22 of the PSA, Agent shall receive a reduced commission of 2.5% of the gross purchase price or other consideration (including without limitation any existing mortgage that is assumed) for the sale of such individual Receivership Property. The reduced commission described in this paragraph shall not apply to (i) Axonic Capital LLC, a Delaware limited liability company ("**Axonic**"), (ii) JG Funding Corp. ("**JG**"), or (iii) any assignee, designee, contract vendee, agent, affiliate, parent, or successor of Axonic or JG (together, the "**Excluded Option Holders**"), which shall instead be governed by the following in the event of a sale of one or more Receivership Properties to an Excluded Option Holder:

- If a letter of intent and/or purchase & sale agreement to purchase any of the individual Receivership Properties pursuant to Section 3.22 of the PSA is executed by Axonic, or its assignee, designee, contract vendee, agent, affiliate, parent, or successor, within 21 days after the "launch date," Agent will receive a commission upon the consummation of the sale contemplated under such letter of intent and/or purchase & sale agreement in the amount of 2.5% of the gross purchase price or other consideration (including without limitation any existing mortgage that is assumed) for the sale of such individual Receivership Property.

- If a letter of intent and/or purchase & sale agreement to purchase any of the individual Receivership Properties pursuant to Section 3.22 of the PSA is executed by Axonic, or its assignee, designee, contract vendee, agent, affiliate parent, or successor, 21 days or more after the "launch date," the commission will revert to 4% as set forth above without reduction, discount, or compromise or the reduced amount of 3% if for all or part of the assets.

- If one or more individual Receivership Properties are sold to JG, or its assignee, designee, contract vendee, agent, affiliate, parent, or successor, Agent shall be paid a full commission as set forth above as though JG was not an Option Holder pursuant to Section 3.22 of the PSA.

- Plaintiff represents that to its knowledge, as of the date hereof, no Option Holder (other than the Excluded Option Holders) has expressed an intention to exercise any right contemplated by Section 3.22 of the PSA.

- The "launch date" will occur approximately two weeks following the execution of this listing agreement.

**Miscellaneous**

**In the event Receiver fails to make payments within 30 days of the time limits set forth herein, then from the expiration of the such 30 days period until paid the delinquent amount shall bear interest at the lesser of the maximum rate permitted by law in New Jersey or the rate of ten percent (10%) per annum.**

74327662
7420294 v3

**SCHEDULE C**

Option Holders

In order of purchasing rights:

1. Junior Loan Holder Purchaser
2. DCH Purchaser
3. Freddie Mac Purchaser

Exhibit G

November 2, 2020

Jacklene Chesler
Executive Managing Director
c/o Colliers International
10 Woodbridge Center Drive, Suite 1010
Woodbridge, NJ 07095
Email: jacklene.chesler@colliers.com;  patrick.norris@colliers.com;  matthew.brown@colliers.com

RE:    **Purchase LOI**
       **The Lenox Multifamily**
       **Portfolio Hackensack and**
       **Little Ferry, NJ**

Dear Ms. Chesler.

This will serve as our Letter of Intent (LOI) and general outline of the terms and conditions for the prospective purchase of the subject property. This LOI is not legally binding on either party, except as hereafter set forth. It is, however, an indication of good faith intent between the parties to be detailed in a future contractual agreement if the parties so agree.

**Seller:**              c/o Colliers International

**Purchaser:**           JP Management and/or assignee(s)

**Property:**

| Address | City, State | Block/Lot | Approximate # of Units | Price |
|---|---|---|---|---|
| ☒ 54-78 Temple Avenue | Hackensack. NJ | 511/11 | 60 | $ 9.634,620 |
| ☒ 406-444 Liberty Street | Little Ferry. NJ | 6.01/1 | 44 | $ 7,065,388 |
| ☒ 88 Mc Kinley Street | Hackensack. NJ | 81/22 | 18 | $ 2.890,386 |
| ☒ 170 South Park | Hackensack. NJ | 222.01/30 | 14 | $ 2,280,078 |
| ☒ 107-109 Hudson Street | Hackensack, NJ | 67124 | 20 | $ 3,211,540 |
| ***Total Purchase Price:*** | | | | $25.050,012 |

**Total Purchase Price:**     **$25,050,012**.  The balance of the Purchase Price as adjusted for closing prorations and less credit for the Deposit, shall be paid by Purchaser to Seller in cash via wire transfer at the Closing.

**CAPEX:**                    The above Purchase Price factors in an estimated amount, determined by the Purchaser, of **$550,000** for capital expenses. Regardless of the ultimate expense, the Purchaser understands this is an "as-is, where-is" sale and assumes full responsibility for any outcome of inspections and/or

required repairs, will not look for any additional credits to the purchase price, and will take title to the Property subject to all existing conditions.

**Purchase and Sale Agreement (the PSA):**

The parties shall begin negotiations concerning the terms of a PSA mutually satisfactory to both parties, which shall supersede the terms of this LOI, unless otherwise indicated herein. The PSA will be prepared by the Seller's counsel and submitted to the Purchaser for review and be subject to Court approval.

**Court Approval:**

Purchaser understands this offer is subject to Court approval in the case filed in the United States District Court for the Plaintiffs, as (i) U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC. MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-SB51 et al v. ENGLEWOOD FUNDING, LLC et al., Civil Action No. 2:19-CV-17865 (MCA)(LDW) (the "U.S. Bank Action"), and (ii) PORTAL et al v. LEVINE et al., Civil Action No. 2:19-CV- 19611 (MCA)(LDW) (the "PORTAL Action"), and (iii) JLS EQUITIES LLC v. RIVER FUNDING LLC et al., Civil Action No. 2:19-CV-17615 (MCA)(LDW).

**Deposit:**

The initial deposit shall be **$626,250** to be paid upon mutual execution of the PSA. An additional deposit **$626,250** to be paid upon the satisfactory completion of the due diligence period. This deposit is refundable upon cancellation of this contract by either party prior to the end of the Due Diligence Period. Upon satisfactory completion or Purchaser's waiver of the Due Diligence Period, the Deposit shall become nonrefundable.

**Due Diligence:**

Purchaser shall have a twenty (20) day Due Diligence period that shall commence on the date following the date of execution of the PSA by Seller and Purchaser.. Purchaser shall have the right to terminate as a result of Purchaser's dissatisfaction with the results of its due diligence investigation and receive a full refund of the Deposit in such case.

**Closing and Closing Costs:**

Purchaser shall have sixty (60) days to close from the date that court approval is granted for Purchaser to proceed with the purchase. Purchaser shall be responsible for the costs of its due diligence including its own third-party fees and legal costs, and any expenses incurred by Purchaser prior to Court Approval. Closing costs shall otherwise be incurred by Seller and Purchaser as is customary in the local market. Notwithstanding the foregoing, Purchaser shall have the option to extend the closing date by an additional thirty (30) days by posting an additional non-refundable deposit of **$250,000**.

Notwithstanding the foregoing, if Purchaser successfully completes Due Diligence but is not granted court approval to proceed with the purchase for any or no reason, Seller shall reimburse Purchaser for Purchaser's actual out of pocket Due Diligence expenses up to **$35,000** plus the Deposit. Due Diligence reports shall be conducted at arm's length by a reputable third-party vendor(s) and must be completed prior to the conclusion of Due Diligence. All such reports shall become property of the Seller in the case of a refund

| | |
|---|---|
| **Contingency:** | This agreement is not subject to any contingencies other than those contained herein. |
| **Prorations:** | Taxes, utilities, operating expenses, rents and other customarily apportioned items will be prorated or apportioned as of Closing. |
| **Brokerage:** | Purchaser and Seller acknowledge the only brokers that are due a commission on the consummation of this transaction are Colliers International and The Kislak Company, Inc. Colliers shall be paid a commission by the Seller. Said commission will be the sole responsibility of the Seller. Purchaser shall pay The Kislak Company, Inc. a commission per separate agreement. |
| **Confidentiality:** | The existence of this proposal, the Seller's and Purchaser's response thereto, and all subsequent correspondence and the requirements stated therein are confidential and may not be disseminated or disclosed by either party, except as required by law or a court of competent jurisdiction. |

This letter shall serve as an expression of interest only and does not bind Purchaser or Seller in any way, except for the provision regarding Confidentiality set forth above. No discussion, negotiation or verbal agreement regarding the proposed transaction and no presentation, negotiation or revision of any document regarding the proposed transaction, shall constitute a contract or evidence of a contract, and there shall be no binding agreement, unless and until a written agreement is executed by and delivered to all parties.

If you agree to the terms and conditions described in this letter, please sign below. We look forward to working with you on this transaction.

Sincerely,

**Purchaser**

**JP Management**

Signature: _____

Name: John Pjeternikaj

Title: President

Date: November 2, 2020

**Seller**

Signature: _____

Name: Richard J Madison

Title: Executive Managing Director

Date: 11/6/2020