# Exhibit G

| | |
|---|---|
| **From:** | Seth Levine <Seth@NorseHoldings.com> |
| **Sent:** | Mon, 14 Jan 2019 18:01:26 -0500 (EST) |
| **To:** | Tepfer & Tepfer P.C. <tepferlaw@gmail.com> |
| **Subject:** | Temple Ave, Hackensack Docs |
| **Attachments:** | Certified Mortgage New Jersey, 54-78 Temple.PDF;Note Hybrid, 54-78 Temple.PDF;Corp Docs-Temple.pdf;Temple Organizational Chart.docx;RentRoll2019W.xls;ProForma2019W.xls |

Pro Forma, RR, Corp and mortgage docs for property in Hackensack, NJ. Property is worth approx. $12 million – Existing Mortgage is approx. $6.3

Thank you,

Seth Levine
Norse Holdings, LLC
Tel. 201-490-7801
seth@norseholdings.com

---

**From:** Andrew Selevan
**Sent:** Monday, January 14, 2019 10:09 AM
**To:** Seth Levine <Seth@NorseHoldings.com>
**Subject:** Temple Docs

Andrew Selevan, Esq.
Norse Holdings
210 River Street, Suite 12
Hackensack, NJ 07601
Tel: (201) 904-0097
aselevan@norseholdings.com

# ATTACHMENT

*NEW JERSEY DEPARTMENT OF TREASURY*
*DIVISION OF REVENUE*

### CERTIFICATE OF FORMATION

### LENOX TEMPLE LLC

*0400240453*

The above-named DOMESTIC LIMITED LIABILITY COMPANY was duly filed in accordance with New Jersey state law on 07/11/2008 and was assigned identification number 0400240453. Following are the articles that constitute its original certificate.

1. **Name:**
   LENOX TEMPLE LLC
2. **Registered Agent:**
   CARMEL AND FREDERICKSON
3. **Registered Office:**
   523 RIVER ROAD
   EDGEWATER, NJ 07020
4. **Business Purpose:**
   Real Estate

5. **Members/Managers:**

   LENOX REAL ESTATE PARTNERS LLC
   PO BOX 2018
   FORT LEE, NJ 07024

6. **Main Business Address:**
   PO BOX 2018
   FORT LEE, NJ 07024

**Signatures:**

   MOSHAEL J. STRAUS
   AUTHORIZED REPRESENTATIVE



IN TESTIMONY WHEREOF, I have
hereunto set my hand and affixed my
Official Seal at Trenton, this
11th day of July, 2008

*R. David Rousseau*
*State Treasurer*

Certification# 112249045
Verify this certificate at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

ASCENDSMP000101

 **IRS** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH   45999-0023

Date of this notice:   07-11-2008

Employer Identification Number:
26-2959809

Form:  SS-4

Number of this notice:  CP 575 G

LENOX TEMPLE LLC
% LENOX REAL ESTATE PARTNERS LLC SO
PO BOX 2018
FORT LEE, NJ  07024

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

### WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN).  We assigned you EIN 26-2959809.  This EIN will identify you, your business accounts, tax returns, and documents, even if you have no employees.  Please keep this notice in your permanent records.

When filing tax documents, payments, and related correspondence, it is very important that you use your EIN and complete name and address exactly as shown above.  Any variation may cause a delay in processing, result in incorrect information in your account, or even cause you to be assigned more than one EIN.  If the information is not correct as shown above, please make the correction using the attached tear off stub and return it to us.

A limited liability company (LLC) may file Form 8832, *Entity Classification Election*, and elect to be classified as an association taxable as a corporation.  If the LLC is eligible to be treated as a corporation that meets certain tests and it will be electing S corporation status, it must timely file Form 2553, *Election by a Small Business Corporation*.  The LLC will be treated as a corporation as of the effective date of the S corporation election and does not need to file Form 8832.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov.  If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

**IMPORTANT REMINDERS:**

*   Keep a copy of this notice in your permanent records.  **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.**

*   Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

*   Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice.  If you write, please tear off the stub at the bottom of this notice and send it along with your letter.  If you do not need to write us, do not complete and return the stub.  Thank you for your cooperation.

ASCENDSMP000102

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

of

LENOX TEMPLE, LLC

A NEW JERSEY LIMITED LIABILITY COMPANY

Adopted as of July _3_, 2013

-i-

ASCENDSMP000103

OPERATING AGREEMENT

OF

LENOX TEMPLE, LLC

A New Jersey Limited Liability Company

This Operating Agreement of LENOX TEMPLE, LLC (the "Operating Agreement"), dated as of July 2, 2013 is (a) adopted by the Members (as defined below) and (b) executed and agreed to, for good and valuable consideration, by the Members (as defined below).

## ARTICLE I
## DEFINITIONS

1.01 **Definitions.**   As used in this Operating Agreement, the following terms have the following meanings (unless otherwise expressly provided herein):

"Act" means the New Jersey Limited Company Law, Chapter 34 of the Consolidated Laws, as amended from time to time, and including any successor statute of similar import.

"Adjusted Capital Contribution" means a Member's Capital Contribution adjusted downward for distributions made pursuant to section 5.01(b)(ii).

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question.

"Agreed Value" means with respect to a Member's Membership Interest, the fair market value of such Membership Interest as determined in good faith by a Majority In Interest.  If the affected Member shall not agree with said valuation, then the Members shall hire an independent 3rd party appraiser, unanimously agreed to, to determine the fair market value of such Membership Interest.

"Articles" means the articles of formation of the Company as provided for pursuant to the Act, as originally filed with the Office of the Secretary of State of New Jersey, as amended and restated from time to time as herein provided.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which

-1-

ASCENDSMP000104

national banking associations in the State of New Jersey are closed or are authorized by law or executive action to close.

"Capital Account" means the capital account maintained for a Member pursuant to Section 4.05.

"Capital Contribution" means any contribution by a Member to the capital of the Company.
"Capital Proceeds" means the net proceeds from the disposition of any assets of the Company, any net insurance proceeds or net condemnation proceeds paid to the Company and/or any net refinancing proceeds of the Company.

"Code" means the Internal Revenue Code of 1986 and any successor statute as amended from time to time.

"Company" means LENOX TEMPLE, LLC, a New Jersey limited liability company.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"Dispose," "Disposing," or "Disposition" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law), or the acts thereof.

"Economic Interest" means a Member's or a Transferee's share of the Company's Profits, Losses, items of income, gain, loss, deduction, and credit, and distributions pursuant to this Operating Agreement and the Act, but shall not include any right to vote or participate in management or the affairs of the Company. The Economic Interest of a Member or Transferee shall be equal to such Member's or Transferee's Sharing Ratio, as set forth on Exhibit B.

"Fiscal Year" means (i) the period commencing on the effective date of this Operating Agreement and ending on December 31, 2013, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period

ASCENDSMP000105

described in clause (ii) for which the Company is required to allocate Profits, Losses and other items of income, gain, loss, deduction or credit pursuant to Article V hereof.

"Gross Asset Value" means, with respect to any asset, the asset's Adjusted Basis except as follows:

> (i)   The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by a Majority in Interest of the Members;

> (ii)   The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by a Super Majority in Interest of the Members as of the following times: (a) the acquisition of a Membership Interest in the Company by any new Member or the acquisition of an additional Economic Interest in the Company by any existing Member in exchange for more than a de minimis Capital Contribution and (b) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for such Member's Membership Interest in the Company or in connection with the complete liquidation of the Company; and

> (iii) The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by a Super Majority in Interest of the Members.

"Incapacity" means the inability of an employee or the Manager to perform his employment or management function in his customary manner by reason of mental, emotional or physical disease or disability.

"Majority In Interest" means one or more Members having among them more than fifty percent (50%) of the Voting Power of all Members.

"Manager" means Seth Levine, or any successor manager elected by the Members in accordance with this Operating Agreement.

"Member" means a Person who (i) has been admitted to the Company as an initial Member in accordance with the Articles or this Operating Agreement, (ii) has been admitted to the Company as an additional Member pursuant to Section 3.03 hereof or (iii) is a qualified Transferee under Section 3.02(a) or Section 3.02(b) who is admitted to the Company pursuant to Section 3.03 hereof. As of the

-3-

ASCENDSMP000106

date hereof, the Members are those Persons set forth on Exhibit A hereof.

"Membership Interest" means a Member's rights in the Company collectively, including the Member's Economic Interest, the Member's Capital Account in the Company, the Member's right to vote or participate in the management of the Company, and the Member's right, if any, to information concerning the business and affairs of the Company provided by the Act.

"Net Cash Flow" means for any applicable period the excess, if any, of Operating Revenues over the sum of (i) Operating Expenses and (ii) Reserves.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations § 1.704-2(b)(1).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations § 1.704-2(b)(3).

"Operating Agreement" has the meaning given that term in the introductory paragraph.

"Operating Expenses" means, for any applicable period, the aggregate amount of expenses paid or incurred by the Company in connection with its operations other than expenses properly allocable to transactions and activities giving rise to Capital Proceeds.

"Operating Revenues" means, for any applicable period, the aggregate amount of revenues derived by the Company in connection with its operations; provided, however, that Operating Revenues shall not include Capital Proceeds or Capital Contributions.

"Person" means an individual, partnership, trust, estate, association, corporation, limited liability company, or other entity, whether residing in or formed pursuant to the laws of the State of New Jersey or otherwise.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss) with the following adjustments:

> (i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

> (ii) Any expenditures of the Company described in Section 705(a)(2)(B) of the Code

– 4 –

ASCENDSMP000107

or treated as Section 705(a)(2)(B) of the Code as expenditures pursuant to Treasury Regulations §1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any asset is adjusted (in accordance with the definition thereof), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of an asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of such asset disposed of, notwithstanding that the adjusted basis (as determined under the Code) of such asset differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition thereof; and

(vi) Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 5.02 of this Operating Agreement shall not be taken into account in computing Profits or Losses. The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to this Operating Agreement shall be determined by applying rules analogous to those set forth in this definition.

"Reserves" means the amount of operating reserves, capital reserves and other reasonable reserves established by the Manager.

"Securities Act" means the Securities Act of 1933, as amended.

"Sharing Ratio" with respect to any Member or Transferee means the Sharing Ratio of each Member or Transferee as set forth on Exhibit B hereof, as amended from time to time. The Sharing Ratios of the Members and Transferees shall be subject to adjustment pursuant to Section 5.02 hereof.

"Supermajority In Interest" means Member or Members having, individually or among them, sixty-six percent (66%) or more of the Voting Power of all Members.

ASCENDSMP000108

"Tax Matters Partner" means any Member designated under Section 9.03 to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code, but does not include any Member who has ceased to be such "tax matters partner" of the Company.

"Transferee" means an owner of an Economic Interest who is not admitted as a Member of the Company. A Member's Transferees are those Transferees to whom such Member transferred Economic Interests.

"Treasury Regulations" means the regulations promulgated under the Code from time to time.

"Voting Power" with respect to any Member means the Voting Power, expressed as a percentage, as set forth on Exhibit B.

Other terms defined herein have the meanings so given them.

1.02  **Construction.**   Whenever the context requires, the gender of all words used in this Operating Agreement includes the masculine, feminine, and neuter. Unless otherwise expressly provided herein, all references to Articles and Sections refer to articles and sections of this Operating Agreement, and all references to Exhibits, if any, are to Exhibits attached hereto, each of which is made a part hereof for all purposes.

ARTICLE II
ORGANIZATION

2.01  **Formation.**   The Company has been organized as a New Jersey limited liability company by the filing of the Articles. The Members hereby agree to execute, file and record (or the Manager shall execute, file and record) all such other certificates and documents, including amendments to the Articles, and to such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of New Jersey and any other jurisdiction in which the Company may own property or conduct business.

2.02  **Name.**   The name of the Company is "LENOX TEMPLE, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as a Majority in Interest of the Members may select from time to time.

2.03  **Registered Office; Registered Agent Principal Office in the United States; Other Offices.**   The registered office of the Company required by the Act to be maintained in the State of New Jersey shall be the office of the initial registered agent named in the Articles or such other office

ASCENDSMP000109

(which need not be a place of business of the Company) as the Manager may designate, from time to time in the manner provided by law. The registered agent of the Company in the State of New Jersey shall be the initial registered agent named in the Articles or such other Person or Persons as the Manager may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at 210 River Street, Hackensack, New Jersey 07601, or such place as the Manager may designate from time to time, which need not be in the State of New Jersey, and the Company shall maintain records there as required by the Act and shall keep the street address of such principal office in the registered office of the Company. The Company may have such other offices as the Majority in Interest of the Members may designate, from time to time.

2.04 **Purposes.** The purposes for which the Company is organized are to lease, acquire, own, manage, operate and dispose of real estate relative to the premises known as and by 54-78 Temple Avenue, Hackensack, New Jersey.

2.05 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than New Jersey, the Manager shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Manager, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. Each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Operating Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.06 **Term.** The Company commenced on the date the Articles were filed with the Secretary of State of New Jersey and shall continue in existence for the period fixed in the Articles for the duration of the Company, or such earlier time as this Operating Agreement may specify.

2.07 **Mergers and Exchanges.** Subject to the requirements of the Act, the Articles, and Section 6.02(b)(ii) hereof, the Company may be a party to a merger, consolidation, share or interest exchange, reorganization or other transaction authorized by the Act.

ARTICLE III
MEMBERSHIP; DISPOSITIONS OF INTERESTS

3.01 **Initial Members.** The initial Members of the Company are the Persons executing this Operating Agreement as of the date of this Operating Agreement as Members, each of whom is admitted to the Company as a Member effective contemporaneously with the execution by such Person of this Operating Agreement and each of whom is set forth on Exhibit A hereto.

–7–

ASCENDSMP000110

3.02  **Restrictions on the Disposition of Membership Interests.**  (a)  Except as otherwise expressly provided in this Article III, no Member shall Dispose of all or any portion of his Membership Interest, including his Economic Interest, whether voluntarily, involuntarily or by operation by law, and any attempted Disposition of a Membership Interest in violation of this prohibition shall not be effective to pass any right, title or interest therein, but shall instead be null, void and of no effect.  Notwithstanding the preceding prohibition against any Disposition of a Membership Interest (including an Economic Interest), any Member may Dispose of its Membership Interest (or a portion thereof) to a Person provided such Member obtains the prior written consent of the Majority In Interest of the Members (other than the Member whose Membership Interest is to be transferred) which written consent may be withheld by the Majority In Interest of such nontransferring Members, at his (or their) sole and absolute discretion.  Anything in this Article III to the contrary notwithstanding, no Transferee shall be admitted to the Company as a Member without the prior written consent of the Majority of Interest of the Members (other than the Member whose Transferee is being considered for admission) which written consent may be withheld by the Majority In Interest of the Members at his (or their) sole and absolute discretion.  In the event the Manager shall opt to sell his interest, the other Members shall have the right to include their interest, or any portion of their interest, in said sale, at the same price (on a pro-rated basis).

(b)  Notwithstanding the prohibition against any Disposition of a Membership Interest (including an Economic Interest) set forth in Section 3.02(a) hereof, a Member may Dispose of all or any portion of his Membership Interest without the requisite written consent of Section 3.02(a) if the Disposition is to a Permitted Transferee.  A "Permitted Transferee" is a (i) parent, child or spouse of such Member, (ii) a corporation, limited liability company or partnership which is directly or indirectly controlled by such Member or by a parent, child or spouse of such Member, (iii) a corporation, limited liability company or partnership which directly or indirectly controls such Member, or an entity directly or indirectly under the same control as such member, or (iv) a trust (or similar entity thereto) of which such Member, or a parent, child or spouse of such Member, is a principal beneficiary.  Notwithstanding the right of any Member to Dispose of his Membership Interest (or any position thereof) to his Permitted Transferee, such Permitted Transferee shall not be admitted as a Member without (i) the prior written consent of a Majority In Interest of the Members (other than the Member whose Permitted Transferee is under consideration for admission) which written consent may be withheld by such Majority In Interest of the Members at his (or their) sole and absolute discretion, and (ii) satisfaction of the conditions set forth in Section 3.02(c) hereof.

(c)  A Transferee shall only be admitted to the Company as a Member upon satisfaction of the following conditions, as applicable:

(i) the Transferee shall be admitted as a substitute Member upon the requisite written consent pursuant to Section 3.02(a) or Section 3.02(b) hereof, with the Capital

-8-

ASCENDSMP000111

Account, Sharing Ratio and other rights, duties and obligations (or the applicable portion thereof) of the Disposing Member;

(ii) the Manager shall cause this Operating Agreement to be amended to reflect such Disposition and admission of a substitute Member, if applicable;

(iii) the Transferee shall in writing assume and agree to perform all of its duties and obligations as a Member under this Operating Agreement;

(iv) the Disposing Member shall pay, or agree to reimburse the Company for, all costs incurred by the Company in connection with the Disposition;

(v) the Disposing Member shall agree fully to indemnify on an after-tax basis the other Members against any adverse tax consequences to them which might result from any termination of the Company for tax purposes on account of such transfer; and

(vi) the Company shall have received from counsel reasonably satisfactory to the Members an opinion that the Disposition was made in accordance with all applicable laws and regulations (including securities laws), and that the Disposition, when added to the total of all other Dispositions within the preceding 12 months, would not result in the Company's being considered to have terminated within the meaning of Section 708 of the Code.

(d)   If a Member disposes of his Membership Interest (or a portion thereof), to a Transferee in accordance with Section 3.02(a) or Section 3.02(b) hereof, and such Transferee is not admitted to the Company as a Member in accordance with Section 3.02(c) hereof, then for purposes of this Operating Agreement, such Transferee shall be treated as having acquired the Economic Interest, Sharing Ratio and Capital Account (or a corresponding portion thereof) of such Member; however, such Transferee shall not be treated as having been transferred the Voting Power (or corresponding portion thereof) of such Member.

3.03  **Additional Members.**  Membership Interests may be issued to additional Persons and such Persons may become Members only upon the prior consent of all the Members, which consent may be withheld in his (or their) sole and absolute discretion, and on such terms and conditions as may be specified in such written consent. The terms and conditions of any such additional Membership Interests may include, without limitation, provisions regarding the removal of such new Member upon, for example, the termination of such new Member's employment with the Company, the material breach by such new Member of a provision of this Operating Agreement or such other reason as the Manager shall deem appropriate, and the payment by the Company to such removed

ASCENDSMP000112

Member in redemption of its Membership Interests. Any admission of a new Member under this Section 3.03 shall be effective only after the new Member has executed and delivered to the Company its agreement to be bound by this Operating Agreement.

3.04  **Interests in a Member.**  A Member that is not a natural person may not cause or permit an interest, direct or indirect, in itself to be Disposed of such that, after the Disposition, (a) the Company would be considered to have terminated within the meaning of section 708 of the Code or (b) without the written consent of the Majority in Interest of the Members, which consent may be withheld in his (or their) sole and absolute discretion, that Member shall cease to be controlled by substantially the same Persons who control it as of the date of its admission to the Company.  Transfer to a Permitted Transferee shall not require the aforementioned consent.  On any breach of the provisions of clause (b) of the immediately preceding sentence, the Company shall have the option to buy, and on exercise of that option the breaching Member shall sell, at a price consisting of the Agreed Value, the breaching Member's Membership Interest.

3.05  **Liability to Third Parties.**  Except as otherwise expressly agreed in writing, no Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.06  **Withdrawal of Capital Contributions.**  No Member or Transferee shall have the right or power to withdraw any part of his Capital Contribution or Capital Account from the Company without the consent of a Supermajority In Interest.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.01  **Initial Contributions.** Contemporaneously with the execution by such Member of this Operating Agreement (except as otherwise provided), each Member shall make Capital Contributions as follows:

| | |
|---|---|
| (a) Seth Levine | $190,000.00 |
| (b) Shira Levine | $110,000.00 |
| (c)  Tara Levine | $50,000.00 |
| (d) Jason levine | $50,000.00 |
| (e)  Alexandra Levine | $50,000.00 |

ASCENDSMP000113

(f)     Joshua Levine                    $50,000.00

4.02  **Return of Contributions.**   A Member is not entitled to the return of any part of his Capital Contributions or to be paid interest in respect of either his Capital Account or his Capital Contributions.  An un-repaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

4.03  **Advances by Members.**   Except as otherwise provided in the Articles or this Operating Agreement, if the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the written consent of the Majority In Interest of the Members may advance all or part of the needed funds to or on behalf of the Company (a "Member Advance"). A Member Advance shall be an obligation of the Company, and shall bear interest at a rate agreed upon by the Member making such advance and the Majority in Interest.

4.04  **Capital Accounts.**   The Company shall maintain for each Member a separate Capital Account in accordance with the rules of the Treasury Regulations promulgated from time to time under Section 704(b) of the Code.  For purposes of computing the amount of each item of income, gain, deduction, or loss to be reflected in the Capital Accounts of the Members, the determination, recognition, and classification of such items shall be the same as the determination, recognition, and classification for federal income tax purposes, unless otherwise required by such Treasury Regulations.  Upon a qualified Disposition of a Membership Interest or an Economic Interest in the Company (or a portion thereof), the Capital Account of the transferor Member (or the applicable portion thereof) shall become the Capital Account of the Transferee.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01  **Distributions of Net Cash Flow & Capital Proceeds.**  Distributions of the Company's Net Cash Flow and Capital Proceeds for any Fiscal Year shall be made at least annually (and Manager shall use its best efforts to make distributions at least quarterly), and in no event later than the date of filing of the federal income tax return for such Fiscal Year (in which case the Company's accountants shall designate in writing the amount of any such distributions that are attributable to such Fiscal Year), or at such other times as the Manager designates.  Any such distribution shall be made to the Members in proportion to their respective Sharing Ratios as of the date of such distribution.  In

-11-

ASCENDSMP000114

additional to the foregoing, distributions shall be made to the members in an amount equal to such Members' income taxes attributable to any profits allocated to such members under 5.03 (a) exceed actual distributions made to such members.

5.02 **Distribution Upon Liquidation.** (a) On liquidation, the Company assets shall be distributed in payment of the liabilities of the Company and to the Members in the following order:

> (i) To the payment of the debts and liabilities of the Company (including any Member Advances) and the expenses of liquidation, including a sales commission to the selling agent, if any.

> (ii) To the setting up of any reserves which the Manager deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. At the expiration of such period as the Manager shall deem advisable, the balance thereof, if any, shall be distributed in the manner provided in this Article, and in the order named. Such reserves shall not be unreasonable and shall be in accordance with acceptable accounting and business standards.

> (iii)  To the Members in accordance with Section 5.01.

(b)  A reasonable time, as determined by the Manager, shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Members or their representatives to minimize any losses attendant upon liquidation.

(c)  Anything in this Agreement to the contrary notwithstanding, no Member shall be personally liable for the return of the Capital Contribution of any other Member, or any portion thereof, or of the monetary value thereof; it is expressly understood that any such return shall be made solely from Company assets. No Member shall have the right to demand or receive any property other than cash in connection with termination and liquidation of the Company.

5.03 **Allocation of Profits and Losses**. Except as otherwise provided by Section 704 of the Code and the related Treasury Regulations, Profits and Losses shall be allocated among the Members as follows:

(a)  <u>Allocation of Profits</u>.  Profits for any Fiscal Year shall be allocated as follows:

-12-

(i) First, if any Member's Adjusted Capital Contribution at the end of such Fiscal Year shall exceed the credit balance in such Member's Capital Account at the end of such Fiscal Year (as determined prior to the allocation of Profits for such Fiscal Year and by adding to the actual balance in such Capital Account such Member's share of partnership minimum gain of the Company and such Member's share of partner nonrecourse debt minimum gain of the Company), to the Member or Members whose Adjusted Capital Contribution so exceeds such balance (as so determined), in proportion to such excesses (as so determined), until such excesses (as so determined) are reduced to zero;

(ii) then, to the Members, pro rata, until each Member has received an amount equal to the amount distributed or required to be distributed to such Member pursuant to Section 5.01; and

(iii) thereafter, to the Members in accordance with their respective Sharing Ratios.

(b) <u>Allocation of Losses</u>.  Losses for any Fiscal Year shall be allocated as follows:

(i) First, if the Profits allocated to the Members for all prior Fiscal Years exceed the sum of distributions made to them pursuant to Section 5.01 hereof and Losses allocated to them pursuant to this Section 5.03 for all prior Fiscal Years and for the Fiscal Year in question, then to such Members ratably until such excess is reduced to zero;

(ii) then, to the Members in proportion to the respective credit balances in their Capital Accounts (as determined immediately after the allocation described in Section 5.05(i) for such Fiscal Year and by adding to the actual balance in each Member's Capital Account such Member's share of partnership minimum gain of the Company and such Member's share of partner nonrecourse debt minimum gain of the Company), determined as of the last day of such Fiscal Year, until such credit balances (as so determine) are reduced to zero; and

(iii) thereafter, to the Members in accordance with their respective Sharing Ratios.

## ARTICLE VI
## MANAGER

6.01 **Number, Tenure, and Qualifications.**  The Company shall have one (1) Manager.  The initial Manager shall be Seth Levine.  Any successor Manager shall be elected by the affirmative vote

ASCENDSMP000116

of a Majority In Interest of the Members. The successor Manager (a) must be a Member of the Company and (b) need not be a resident of the State of New Jersey.

    6.02  **Management by Manager.**  (a) Subject to the provisions of Sections 6.02(b) and 6.07, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Manager. The Manager may make all decisions and take all actions for the Company not otherwise provided for in this Operating Agreement, including, without limitation, the following:

> (i) subject to Section 6.02(b)(i), sell, lease, exchange, transfer, assign, license, mortgage, pledge, grant a security interest in, or otherwise dispose of or encumber any and all the properties or assets of the Company, or interests therein;

> (ii) entering into, making and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

> (iii) select and hire a management company and agree on behalf of the Company to pay such management company such fees as he shall in his sole discretion determine. Such fees shall be at a rate of 4% of the gross rental or the industry standard whichever is lower;

> (iv) maintaining the assets of the Company in good order;

> (v) select, remove, or change the authority and responsibility of lawyers, accountants, and other advisers and consultants retained by the Company;

> (vi) obtaining insurance for the Company;

> (vii) paying any and all taxes, charges and assessments which may be levied, assessed or imposed upon any property of the Company;

> (viii) demanding, suing for, collecting, recovering and receiving all goods, claims, debts, monies, interests and demands whatsoever now due or that may hereafter become due, and commencing or maintaining any action, suit or other legal proceeding for the recovery of any property to the possession of which the Company may be entitled, and making, executing and delivering receipts, releases or other discharges therefor under seal or otherwise;

ASCENDSMP000117

(ix) making, executing, endorsing, accepting, collecting and delivering any and all bills of exchange, checks, drafts, notes and trade acceptances, and opening, paying into and drawing from a bank account or accounts of the Company;

(x) paying all sums of money at any time or times that may hereafter be owing by the Company upon any bill of exchange, check, draft, note or trade acceptance made, executed, endorsed, accepted or delivered by or for the Company;

(xi) defending, settling, adjusting, compounding, submitting to arbitration and compromising all actions, suits, accounts, reckonings, claims and demands whatsoever that now are or hereafter shall be pending between the Company and any Person, firm, association or corporation, in such manner and all respects as he shall think fit;

(xii) filing any proof of debt or taking any other proceedings, under any bankruptcy law of the United States or of any state in the United States, in connection with any claim, debt, money or demand due to the Company, including the election of any trustee or trustees or the designation of any assignee or assignees, and demanding, receiving and accepting any dividend or dividends or distributions that may be or become payable thereon;

(xiii) without in any way limiting the foregoing, but subject to the foregoing and to the provisions of Section 6.02(b) hereof, generally doing, executing and performing any other act, deed, matter or thing whatsoever that ought to be done, executed or performed, or that in his opinion ought to be done, executed or performed, of every nature and kind whatsoever relating to the normal day-to-day operation of the Company; and

(xiv) make any decision regarding the establishment, application and amount of any Reserves, Depreciation and accounting methods or the treatment of various transactions for Federal income tax purposes;

(b)  Notwithstanding the provisions of Section 6.02(a), the Manager may not cause the Company to do any of the following without the affirmative vote or consent of a Majority In Interest of the Members:

(i) sell or otherwise dispose of real property owned by the Company;

(ii) borrowing money or otherwise committing the credit of the Company for

-15-

ASCENDSMP000118

Company activities and voluntary prepayments or extensions of debt;

(iii) be a party to any merger, consolidation, reorganization, exchange, or similar transaction, including, but not limited to, a merger, consolidation, share or interest exchange, reorganization or other transaction authorized by the Act;

(iv) during any calendar year, incur or agree to incur any indebtedness, obligations, or liabilities for the repayment of borrowed money or the equivalent thereof (whether to Members or other persons or entities) representing, in the aggregate, an expenditure of an amount or value in excess of $10,000,

(v) grant any general power of attorney or other unlimited authority to act on behalf of or in the name of the Company, provided that grantee is an attorney licensed to practice within the State of New Jersey;

(vi) amend, repeal, restate, modify, supplement, or alter the Articles or adopt a new certificate of formation of the Company (this provision shall need the approval of a Supermajority in interest);

(vii) amend, repeal, restate, modify, supplement, or alter this Operating Agreement or adopt a new operating agreement of the Company, provided that membership interest and associated rights shall not diminish (this provision shall need the approval of a Supermajority of the members in interest) ;

(viii) authorize any transaction, agreement, or action on behalf of the Company that is unrelated to its purposes as set forth in the Articles or this Operating Agreement or that otherwise contravenes this Operating Agreement; or

(ix) authorize any act that would make it impossible to carry on the ordinary business of the Company.

(x)  transact any business with an affiliate other than on substantially arms length market terms.

(c)  The Manager shall devote as much time to the management of the Company in accordance with this Agreement as is necessary to ensure that the purposes of this Agreement are fulfilled as provided for herein, which time may be less than full time.

ASCENDSMP000119

6.03 **Liability for Certain Acts.**   The Manager shall perform his managerial duties in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. The Manager, under such circumstances, shall not have any liability by reason of being or having been a Manager of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct, breach of fiduciary duty, or' a wrongful taking by the Manager.

6.04 **Removal.**   At a meeting called expressly for that purpose  the Manager may be removed at any time, with or without cause, by the affirmative vote of the Majority in Interest of the Members.  For purposes of this Section, cause shall mean the permanent Incapacity of the Manager or a material breach by the Manager of any of his duties or obligations, whether as a Manager or a Member, pursuant to this Operating Agreement. The removal of the Manager shall not affect his rights as a Member and shall not constitute his withdrawal from the Company.

6.05 **Delegation of Authority and Duties.**  The Manager may, from time to time and in his sole discretion, appoint officers of the Company and delegate to such officers such authority and duties as the Manager may deem advisable.  Unless otherwise provided in the Articles or other provision of law, such officers need not be Members of the Company.  Any officer to whom a delegation is made pursuant to this section shall serve in the capacity delegated unless and until such delegation is revoked by the Manager.  The officers, if appointed, shall exercise such powers and perform such duties as specified in this Operating Agreement and as shall be determined from time to time by the Manager and in any event a decision or veto by the Manager shall supersede any decision made by any of the officers of the Company.

6.06 **Actions by Members.**  In managing the business and affairs of the Company and exercising its powers, the Members shall act collectively through meetings and written consents consistent as may be provided or limited in the Articles or other provisions of this Operating Agreement.

ARTICLE VII

MEETINGS OF MEMBERS

7.01 **Meetings.** (a)  A quorum shall be present at a meeting of Members if the holders of a Majority In Interest are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Voting Power of all Members entitled to vote is required by the Act, the Articles, or this Operating

-17-

Agreement, the affirmative vote of a Majority In Interest at a meeting of Members at which a quorum is present shall be the act of the Members.

(b)  All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of New Jersey as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 7.05.

(c)  Notwithstanding the other provisions of the Articles or this Operating Agreement, the chairman of a meeting of the Members at which a quorum is present shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Majority In Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)  An annual meeting of the Members, for the transaction of all business as may properly come before the meeting, may be held at such place, within or without the State of New Jersey, on such date and at such time as the Non-Manager Member shall set forth in the notice of the meeting.

(e)  Special meetings of the Members for any proper purpose or purposes may be called at any time by the holders of at least twenty five percent (25%) of the Voting Power of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Operating Agreement may be conducted at a special meeting of the Members.

(f)  Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten nor more than 60 days before the date of the meeting, either personally or by mail, by or at the direction of the Person or Persons calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his address as set forth on Exhibit A (or such other address as provided by such Member), with postage thereon prepaid.

(g)  The date on which notice of a meeting of Members is mailed or the date on which a resolution declaring a distribution is adopted by the Members, as the case may be,

-18-

ASCENDSMP000121

shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members and Transferees entitled to receive such distribution.

7.02 **Voting List.**   The Member or other Person having charge of the records reflecting the Membership Interest of each Member shall make, at least ten days before each meeting of Members, a complete list of the Members (and their proxies, if any) entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Voting Power held by each, which list, for a period of ten days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours.   Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting.   The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members.   Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

7.03 **Proxies.**   A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Company, before or at the time of the meeting or execution of the written consent, as the case may be.   All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the chairman of the meeting, who shall decide all questions touching upon the qualifications of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions.   No proxy shall be valid after 11 months from the date of its execution unless otherwise provided in the proxy.   A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.   Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Voting Power that is the subject of such proxy is to be voted with respect to such issue.

ASCENDSMP000122

7.04 **Conduct of Meetings.**   All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Member (or representative thereof) designated by a Majority In Interest. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

7.05 **Action by Written Consent or Telephone Conference.**   Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holder or holders of not less than the supermajority of the members.  Every written consent shall bear the date of signature of each Member who signs the consent.  A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

(a)   The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Member having custody of the records in which proceedings of meetings of Members are recorded. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Member having custody of the records in which proceedings of the meetings of Members are recorded.

(b)   If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of New Jersey as a result of the taking of the action shall state, in lieu of any statement required by the Act concerning any vote of Members, that written consent has been given in accordance with the provisions of the Act and that any written notice required by the Act has been given.

(c)   Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground

ASCENDSMP000123

that the meeting is not lawfully called or convened.

# ARTICLE VIII
# INDEMNIFICATION

8.01 **Indemnification.** To the fullest extent permitted by law, each Member shall indemnify the Company and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Operating Agreement.

# ARTICLE IX
# TAXES

9.01 **Tax Returns.** The Tax Matters Partner shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 9.02. Each Member shall furnish to the Tax Matters Partner all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

9.02 **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting and to keep the Company's books and records on the income-tax method;

(c) if a distribution of Company property as described in section 734 of the Code occurs or if a transfer of a Membership Interest as described in section 743 of the Code occurs, on written request of any Member, to elect, pursuant to section 754 of the Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under section 195 of the Code ratably over a period of 60 months as permitted by section 709(b) of the Code; and

ASCENDSMP000124

(e)  any other election the Tax Matters Partner may deem appropriate and in the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Operating Agreement (including, without limitations, Section 2.08) shall be construed to sanction or approve such an election.

9.03  **Tax Matters Partner.**  The Company's initial Tax Matters Partner shall be Seth Levine.  Thereafter, a Majority In Interest of the Members shall designate a successor Tax Matters Partner.  The Tax Matters Partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of section 6223 of the Code.  The Tax Matters Partner shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" (as defined in section 6231 of the Code) by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.  The Tax Matters Partner may not take any action contemplated by sections 6222 through 6232 of the Code without the consent of a Majority In Interest, but this sentence does not authorize such Member (or any other Member) to take any action left to the determination of an individual Member under sections 6222 through 6232 of the Code.

## ARTICLE X
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

10.01  **Maintenance of Books.**  The Company shall keep books and records of accounts, shall keep minutes of the proceedings of its Members, and shall keep such other books and records as provided by the Act and as the Company may deem necessary or advisable.  Such books and records shall be subject to the inspection of any Member.

10.02  **Reports.**  On or before the 90th day following the end of each fiscal year during the term of the Company, the Tax Matters Partner shall cause each Member to be furnished with the following:

(a)  an unaudited balance sheet and statement of operations, Members' equity and changes in financial position, all of which shall be prepared in accordance with accounting principles generally employed for the cash-basis records consistently applied (except as therein noted); and

-22-

ASCENDSMP000125

(b)  (i) U.S. federal income tax Form K-1 and any similar forms required by any state or local taxing authority and (ii) any other information concerning the Company reasonably necessary for the preparation of the Members' federal and state income tax returns.

Upon showing good cause (which shall be determined without regard to the foreseeability of such cause), the Tax Matters Partner shall be entitled to a reasonable extension of the 90-day period.  The Tax Matters Partner also may cause to be prepared or delivered such other reports as he or she may deem appropriate. The Company shall bear the costs of all these reports.

10.03  **Accounts.**  The Manager or such officer of the Company to which the Manager delegates shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Manager or such officer of the Company determines, subject to the prior consent of a Majority In Interest of the Members.  No Member may commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Members' investment of their own funds or investments by their Affiliates.

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, AND TERMINATION

11.01  **Dissolution.**   The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(a)  the written consent of a Supermajority In Interest of the Members;

(b)  entry of a decree of judicial dissolution of the Company under section  702 of the Act; or

(c)  the expiration of the term of the Company as stated in the Articles, if any.

11.02  **Dissolution Process.**  Dissolution of the Company shall commence as of the day on which the event occurs giving rise thereto. Notwithstanding the dissolution of the Company and prior to the termination thereof, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Operating Agreement. Upon

ASCENDSMP000126

the commencement of the dissolution of the Company, an independent certified public accounting firm shall be designated by a Majority In Interest of the Members to audit the Company's financial statements and prepare and deliver to each Member, within sixty (60) days after its appointment, a report containing a balance sheet as of the effective date of such dissolution and statements of income, capital account and changes in financial position for the portion of the fiscal year prior to, through and including the effective date of such dissolution. Pending the preparation and delivery of such report, the assets of the Company shall be applied and distributed as contemplated by Section 11.03 hereof.

11.03   **Distributions upon Dissolution.**   A reasonable time shall be allowed for the orderly liquidation of the assets of the Company, the settlement of its accounts and the discharge of its liabilities to creditors, so as to minimize the losses attendant upon liquidation.  The then remaining assets of the Company shall be applied in the following order of priority:

(a)  to the payment of creditors, other than the Members, in the order of priority provided by law;

(b)  to the payment of any indebtedness of the Company to Members for money borrowed, including without limitation any loans by Members to the Company pursuant to Section 4.04 hereof;

(c)  to the setting up of any contingency reserves which the Majority In Interest of the Members (or any liquidator appointed thereby) deems reasonably necessary for the payment of any contingent or unforeseen liabilities or obligations of the Company, such reserves to be paid over to such bank or other person as shall be appointed by the Majority In Interest of the Members (or the appointed liquidator) and held for the purpose of disbursing such reserves in payment of any such contingencies until, at the expiration of such period as the Majority In Interest of the Members (or the appointed liquidator) shall deem advisable, the bank or such other person shall distribute the balance thereafter remaining in the priority and manner provided in this Section 12.03; and

(d)  to the Members and Transferees in accordance with their positive Capital Account balances at that time.

The distribution of cash and/or property to a Member or Transferee in accordance with the provisions of this Section 11.03 shall constitute a complete distribution to the Member or Transferee of its interest in all the Company's property and a compromise to which all Members or Transferee have consented within the meaning of the Act.

-24-

ASCENDSMP000127

11.04  **Deficit Capital** Accounts.   Notwithstanding anything to the contrary contained in this Operating Agreement, and notwithstanding any custom or rule of law to the contrary, upon dissolution of the Company no Capital Account deficit shall be an asset of the Company and such Members or Transferees shall not be obligated to contribute such amount to the Company to bring the balance of such Member's or Transferee's Capital Account to zero.

11.05  **Articles of Dissolution.**   On completion of the distribution of Company assets as provided herein, the Company is terminated, and such Person or Persons as the Act may require or permit shall file Articles of Dissolution with the Secretary of State of New Jersey, cancel any other filings made pursuant to Section 2.05, and take such other actions as may be necessary to terminate the Company.

ARTICLE XII
DISPUTE RESOLUTION

12.01  **Arbitration.**

(a)  Any controversy, dispute or claim arising out of or relating to this Operating Agreement, or the breach thereof, shall be resolved by arbitration before a panel of three (3) arbitrators under the auspices of the American Arbitration Association and in accordance with its then outstanding Commercial Rules. A ruling of the arbitrators shall be final and binding and may be entered as a judgment in any court of competent jurisdiction and shall be based upon the substantive law of the State of New Jersey. The prevailing party shall be entitled to costs of the arbitration and reasonable attorney's fees.  Any arbitration pursuant to this provision shall be held in the State of New Jersey, unless otherwise agreed by the parties, applying the substantive laws of the State of New Jersey, without giving effect to its conflicts of laws principles.

(b)  Notwithstanding subsection 12.01(a), the Company or the Members shall retain the right to seek from a court of competent jurisdiction, upon seventy-two (72) hours notice given prior to seeking such relief, preliminary or permanent injunctive relief, specific performance or any other equitable remedy with respect to any aspect of this Operating Agreement.

ARTICLE XIII
GENERAL PROVISIONS

ASCENDSMP000128

13.01 **Offset.** Whenever the Company is to pay any sum to any Member or Transferee, any amounts that Member or Transferee owes the Company may be deducted from that sum before payment.

13.02 **Notices.** Except as expressly set forth to the contrary in this Operating Agreement, all notices, requests, or consents provided for or permitted to be given under this Operating Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Operating Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member and Transferees must be sent to or made at the addresses given for that Member and Transferees on Exhibit A, or such other address as that Member and Transferees may specify by notice to the other Members and Transferees. Whenever any notice is required to be given by law, the Articles or this Operating Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.03 **Entire Agreement; Supersession.** This Operating Agreement constitutes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

13.04 **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach-or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run.

13.05 **Amendment or Modification.** This Operating Agreement may be amended or modified from time to time only as provided in the Articles and Section 6.02(b)(vi).

13.06 **Binding Effect.** Subject to the restrictions on Dispositions set forth in this Operating Agreement, this Operating Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

-26-

ASCENDSMP000129

13.07  **Governing Law; Severability.**  THIS OPERATING AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW JERSEY, INCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS OPERATING AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of any conflict between the provisions of this Operating Agreement and (a) any provision of the Articles, or (b) any mandatory provision of the Act the applicable provision of the Articles or the Act shall control. If any provision of this Operating Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Operating Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

13.08  **Further Assurances.**  In connection with this Operating Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Operating Agreement and those transactions.

13.09  **Waiver of Certain Rights.**  Each Member irrevocably waives any right it may have to maintain any action for partition of the property of the Company.

13.10  **Notice to Members of Provisions of this Agreement.**  By executing this Operating Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions of this Operating Agreement, including, without limitation, the restrictions on the transfer of Membership Interest set forth in Article III, and (b) all of the provisions of the Articles.  Each Member hereby agrees that this Operating Agreement constitutes adequate notice of all such provisions, and any, without limitation, any notice requirement under the Act and each Member hereby waives any requirement that any further notice thereunder be given.

ASCENDSMP000130

13.11 **Counterparts.** This Operating Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

The undersigned, being all the initial Members of the Company, hereby certify that this Operating Agreement was unanimously adopted by the Members.

IN WITNESS WHEREOF, the Members have executed this Operating Agreement as of the date first set forth above.

MEMBERS:

_____
SETH LEVINE

_____
SHIRA LEVINE

_____
TARA LEVINE

_____
JASON LEVINE

_____
ALEXANDRA LEVINE

_____
JOSHUA LEVINE

ASCENDSMP000131

EXHIBIT A

Sharing Ratios :   Voting Power of Members

| Name | Sharing Ratio | Voting Power |
|---|---|---|
| Seth Levine | 38.0% | 38.0% |
| Shira Levine | 22.0% | 22.0% |
| Tara Levine | 10.0% | 10.0% |
| Jason Levine | 10.0% | 10.0% |
| Alexandra Levine | 10.0% | 10.0% |
| Joshua Levine | 10.0% | 10.0% |

ASCENDSMP000132