# Exhibit I

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW JERSEY

 3                 DOCKET NO:  2:19-cv-17615-MCA-LDW

 4   ------------------------------------x

 5   JLS EQUITIES, LLC, A NEW YORK LIMITED :

 6   LIABILITY COMPANY,                    :

 7              Plaintiff,                 : CIVIL ACTION

 8       vs.                              :

 9   RIVER FUNDING, LLC; LENOX HUDSON,     :

10   LLC; LENOX TEMPLE, LLC; TEANECK PLAZA :

11   VENTURES, LLC; SETH LEVINE and SHIRA  :

12   LEVINE,                               :

13              Defendants.                :

14   ------------------------------------x

15               V I D E O C O N F E R E N C E

16           DEPOSITION OF:  HERBERT TEPFER

17           DATE:  THURSDAY, MARCH 24, 2022

18             COMMENCING AT:  10:08 A.M.

19

20               RENZI LEGAL RESOURCES

21      Court Reporting, Videography & Legal Services

22           2277 STATE HIGHWAY #33, SUITE 410

23           HAMILTON SQUARE, NEW JERSEY 08690

24      TEL: (609) 989-9199  TOLL FREE: (800) 368-7652

25             www.RLResources.com  No. 412107
```

1

2          Computer-aided transcript of the deposition

3 testimony of HERBERT TEPFER taken stenographically

4 in the above-entitled matter before Donna Brunck, a

5 Certified Court Reporter, License #30XI00148700, and

6 Notary Public of the State of New Jersey, via Zoom

7 Videoconference, on March 24, 2022, commencing at

8 10:08 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  A P P E A R A N C E S (all appearing remotely):

 2

 3  STARK & STARK, P.C.

 4  BY:   TIMOTHY P. DUGGAN, ESQ.

 5        Princeton Corporate Park

 6        993 Lenox Drive

 7        Lawrenceville, New Jersey 08648

 8        Tel: (609) 896-9060

 9        Email: Tduggan@stark-stark.com

10         -and-

11  BECKER & POLIAKOFF

12  BY:   SARAH KLEIN, ESQ.

13        1776 On the Green

14        67 East Park Place, Suite 800

15        Morristown, New Jersey 07960

16        Tel: (973) 898-6502

17        Email: Sklein@beckerlawyers.com

18  Attorneys for Plaintiff

19

20

21

22

23

24

25
```

```
 1  A P P E A R A N C E S (all appearing remotely):

 2

 3  LAW OFFICES OF YAN MARGOLIN

 4  BY:  YAN MARGOLIN, ESQ.

 5        315 West 36th Street

 6        New York, New York 10018

 7        Tel: (212) 964-6200

 8        Email: Yan@margolinlawny.com

 9         -and-

10  BARRY S. MILLER, ESQ.

11        70 Clinton Avenue

12        Newark, New Jersey 07114

13        Tel: (973) 622-5297

14        Email: Bmiller@barrymilleresq.com

15  Attorneys for J&J Capital Realty Associates, LLC,

16  Herbert Tepfer and Park National Capital Funding LLC

17

18  GLENN AGRE BERGMAN & FUENTES

19  BY:  MICHAEL PAUL BOWEN, ESQ.

20        SKYE TIAN GAO, ESQ.

21        55 Hudson Yards, 20th Floor

22        New York, New York 10001

23        Tel: (212) 358-5600

24        Email: Mbowen@glennagre.com

25  Attorneys for DSE and Ascend
```

```
1                    I N D E X

2  WITNESS                                    PAGE

3     HERBERT TEPFER

4        EXAMINATION BY MR. DUGGAN            7

5        EXAMINATION BY MS. KLEIN             86

6        EXAMINATION BY MR. BOWEN             90

7

8

9                  E X H I B I T S

10  ID              DESCRIPTION               PAGE

11  JLS-1           Document....................... 10

12  JLS-2           Document request............... 26

13  JLS-3           Interrogatories................ 73

14  JLS-4           Interrogatories................ 76

15  JLS-5           Pleading....................... 32

16  JLS-6           Listing of members of Lenox

17                  Temple......................... 56

18  JLS-7           Listing of members of Teaneck

19                  Plaza Ventures, LLC............ 57

20  JLS-11          Participation agreement........ 37

21  JLS-12          Note sale and assignment

22                  agreement...................... 40

23  JLS-14          Mortgage....................... 65

24  JLS-15          Personal Guarantee of Seth

25                  Levine......................... 55
```

1                     E X H I B I T S

2    ID            DESCRIPTION                PAGE

3    JLS-17        Mortgage note.................. 60

4    JLS-18        Document...................... 66

5    JLS-19        Wire confirmation............. 60

6    JLS-20        Proof of mailing.............. 72

7    JLS-21        Series of emails.............. 70

8    JLS-23        Interrogatories from federal

9                  case.......................... 76

10   JLS-24        Federal pleading.............. 86

11   Ascend 1      Certificate of formation Lenox

12                 Temple, LLC................... 99

13

14        (EXHIBITS NOT ANNEXED HERETO)

15

16

17

18                    R E Q U E S T S

19   DESCRIPTION                        PAGE-LINE

20      REQUEST                           71-23

21

22

23

24

25

1   HERBERT TEPFER, having been first duly sworn (via

2   Zoom videoconference), testified as follows:

3       - - - -

4   EXAMINATION BY MR. DUGGAN:

5           Q.          Thank you.  Mr. Tepfer, my name is

6   Timothy Duggan.  I represent JF Equities in a

7   lawsuit that is pending in the federal district

8   court?

9                   MR. MARGOLIN:  It's JLS Equities.

10                  MR. DUGGAN:  JLS Equities, yes.

11          Q.          JLS Equities in a federal action and

12  companion state court action filed in the Superior

13  Court of New Jersey.  Are you aware of those

14  lawsuits?

15          A.          I'm aware that they exist.  I don't

16  know the details.

17          Q.          Have you ever been deposed before?

18          A.          I think so, yeah.

19          Q.          Now, where are you today?  Are you in

20  your lawyer's office?

21          A.          Yes.

22          Q.          And for purposes of this deposition,

23  the balance of the attorneys are in remote locations

24  and we are taking this deposition remotely with you

25  being in your office, your lawyer's office.  Do you

8

1  understand that?

2      A.      Yeah.

3      Q.      Okay.  There's a court reporter here

4  today that will be taking down what you say and it

5  will be turned into a transcript.  Do you understand

6  that?

7      A.      Yeah.

8      Q.      Although this seems to be a little

9  more formal, it has the same force and effect as

10 being in a courtroom in front of a judge and jury.

11 Do you understand that?

12     A.      Yeah.

13     Q.      When I ask questions, if you could

14 please allow me to finish the question, even if you

15 know where I'm going, so that the court reporter can

16 accurately take down the question and the answer as

17 opposed to a casual conversation.  If that will be

18 okay?

19     A.      I will do my best.

20     Q.      If a question's confusing, I'd ask

21 you not to guess.  Please tell me it's confusing and

22 I will try to reword it, and for purposes of today's

23 responses, unless you say otherwise, we'll assume

24 that they are based upon your firsthand knowledge.

25 Do you understand that?

```
 1        A.        Yeah.
 2        Q.        If there's an objection made by your
 3  counsel, please stop speaking and allow us to
 4  resolve the objection.  Again, so we will have a
 5  clean record as it gets turned into a transcript.
 6  If you need a break --
 7        A.        Okay.
 8        Q.        If you need a break for any reason,
 9  just let us know.
10        A.        I will.
11        Q.        Just let us know and we'll go.  Are
12  you taking any medications that would impair your
13  ability to understand questions or answer
14  accurately?
15        A.        No.
16        Q.        Do you have any other health
17  conditions that would impair your ability to proceed
18  today before we get going?
19        A.        No.
20        Q.        So feeling pretty good today?
21        A.        Yeah.
22        Q.        I'd like to show you what we've
23  marked as Exhibit JLS Exhibit 1.  Could everybody
24  see that?
25                  MR. MARGOLIN:  I can.  Tim, are you
```

1 going to share those documents like that?

2          MR. DUGGAN:  I'll share the

3 documents, everyone has them.

4          MR. MARGOLIN:  I have them, yeah.

5          MR. DUGGAN:  They can look at them

6 themselves.  I'll also share in case, does everybody

7 have them from the file?

8          MR. MARGOLIN:  I'll tell you what I

9 do.  When you are sharing documents what I'm going

10 to do is I'm going to move the screen onto the side

11 because it's larger, a second larger screen.  You

12 are going to see Herb from the side because the

13 camera is still in front of him.

14          MR. DUGGAN:  That's fine.

15          MR. MARGOLIN:  He's looking this way.

16    Q.       You see we've marked as Exhibit JLS

17 Exhibit 1 with the marking on the bottom of the

18 first page.

19          (Exhibit JLS-1, Document, is received

20 and marked for identification.)

21    A.       I see that, yeah.

22    Q.       Have you seen this document before?

23    A.       I believe so, yeah.

24    Q.       Are you here today as a

25 representative of J&J Capital Realty Associates LLC?

1      A.        Yes.

2      Q.        For today if I refer to J&J Capital,

3 it will be to J&J Capital Realty Associates; is that

4 okay?

5      A.        Yes.

6      Q.        For my client, JLS Equities, LLC,

7 I'll refer to them as JLS, if that's okay?

8      A.        Okay.

9      Q.        Great.  If I go down to Schedule A

10 here, are you the witness with the knowledge of all

11 the categories that we have on Schedule A?

12     A.        I don't think any intimate knowledge

13 of the details of all of that, not at my fingertips,

14 but I'm the witness of J&J and I know about as much

15 as anybody else does.

16     Q.        So you are here today as the

17 designated representative in response to Exhibit JLS

18 Exhibit 1?

19     A.        Yes.

20     Q.        How many times have you been deposed,

21 Mr. Tepfer, do you believe?

22     A.        Maybe once, twice -- two or three

23 times, in connection with a personal injury case and

24 one other matter, yeah.  Twice maybe.

25     Q.        Besides the personal injury case, was

1 the other one a case involving any type of business

2 transaction?

3          A.          Yes.

4          Q.          What kind of case was that?

5          A.          It was also a real estate

6 transaction.

7          Q.          Approximately when was that?

8          A.          Maybe ten years ago, eight years ago.

9          Q.          Have you been a -- you or J&J been a

10 party to any lawsuit over the past ten years?

11          A.          I've been named as a nominal party

12 as -- on some lawsuits.

13          Q.          Have you been a plaintiff in any

14 lawsuits?

15          A.          Possibly foreclosure lawsuits with

16 J&J, not myself.

17          Q.          How many foreclosures do you think

18 J&J's filed in the past ten years?

19          A.          Maybe two -- one or two or three,

20 something like that.  One or two maybe.

21          Q.          Have you ever testified at trial as a

22 party in any case?

23          A.          I think not.

24          Q.          What did you do to prepare for

25 today's deposition?  And I would request that you do

1 not disclose any discussions that you had with your

2 attorney.

3      A.      Well, I'll disclose that I had

4 discussions with my attorney, but that's what I did

5 to prepare.  I viewed some documents.

6      Q.      What documents did you review?

7           MR. MARGOLIN:  Objection, that is

8 work -- attorney work product.  He reviewed them

9 with me.  We selected them together.  We thought

10 about it together.  Don't answer that question.

11           MR. DUGGAN:  That is not an

12 attorney-client privilege.  The fact that he looked

13 at loan documents is not work product.

14           MR. MARGOLIN:  I agree.  It is

15 totally not attorney-client privilege.  It's an

16 objection to attorney/client --

17           MR. DUGGAN:  I asked what documents

18 did he review for today's deposition, and, Yan, if I

19 understand your objection, you are saying it's

20 attorney work product.

21           MR. MARGOLIN:  Yes, because he

22 reviewed them with me.  If you reviewed anything

23 without me present and without us talking about it

24 together, you can answer that question, but as far

25 as anything we are doing together during a

1  preparatory session, yeah, work product.

2            MR. DUGGAN:  I'm going to ask it one

3  more time and put your objection on the record.

4       Q.       What documents did you personally

5  review yourself in preparing for this deposition?

6            MR. MARGOLIN:  Objection as to

7  attorney work product for any documents reviewed

8  with me together in your office when we met

9  yesterday.  That is absolutely attorney work

10 product.  Anything you reviewed separately, you may

11 answer.  If you didn't or you don't remember, you

12 can also answer.

13            MR. DUGGAN:  We'll let the judge make

14 the call.

15      Q.       Did you review any documents

16 separately from your attorney?

17      A.       Yes.

18      Q.       What documents?

19      A.       The basic loan documents in this

20 file.

21      Q.       What were those?

22      A.       A note, a mortgage, a rider, some

23 affidavits, an agreement, that's basically it, five

24 or six documents.

25      Q.       Any emails or any other documents?

1      A.      No, I did not review those.

2      Q.      Did you review any of the documents

3  that were produced by JLS in this case?

4      A.      No.

5      Q.      Did you discuss this deposition with

6  anyone other than your counsel?

7      A.      Yes.

8      Q.      Who's that?

9      A.      I told my wife where I was going this

10 morning.

11      Q.      Anybody else?

12      A.      No.

13      Q.      Is your wife an owner of J&J Capital?

14      A.      Her name is on it, yeah.  I think in

15 the initial filings may have been in her name, she

16 and another family member.

17      Q.      Well, might as well -- who are the --

18 J&J Capital is a limited liability company?

19      A.      Yes.

20      Q.      Who are the members?

21      A.      It's Joseph Tepfer, my brother and

22 myself and I believe his wife and my wife may be on

23 it.

24      Q.      So basically it's you and your

25 brother and your spouses, correct?

1        A.        Yes.

2        Q.        Just give us shortly your educational

3   background?

4        A.        I graduated college.  I graduated law

5   school and I'm practicing law.

6        Q.        And where did you go to college?

7        A.        Brooklyn College, City College.

8        Q.        Where did you go to law school?

9        A.        Brooklyn Law School.

10       Q.        Did you take any -- do you have any

11   other degrees besides your undergraduate and your

12   law degree?

13       A.        No.

14       Q.        Where are you presently employed?

15       A.        I have my own office at 4429 18th

16   Avenue in Brooklyn, 11204.

17       Q.        What kind of office is that?  Is that

18   a law office?

19       A.        Law office.

20       Q.        So presently you're practicing as a

21   lawyer, correct?

22       A.        Yes.

23       Q.        How long -- what's the name of that

24   firm?

25       A.        Tepfer & Tepfer.

1      Q.      And how long have you been at that

2 firm?

3      A.      For the last --

4         MR. MARGOLIN:  Forever.

5      A.      -- 43 years or something like that,

6 maybe 41 years, 41, two years.

7         MR. MARGOLIN:  Longer than I've been

8 alive.

9      Q.      During the past 41 years, you've been

10 in practice for yourself essentially?

11      A.      Yeah.

12      Q.      Were you involved in any other

13 businesses during that time period?

14      A.      I bought and sold a piece of real

15 estate here or there.  Not much.  No.

16      Q.      Do you have a real estate license?

17      A.      No.

18      Q.      Besides the law license, driver's

19 license and marriage license, do you have any other

20 professionals licenses?

21      A.      Notary license.

22      Q.      What type of law do you generally

23 practice?

24      A.      Generally real estate.

25      Q.      Do you represent lenders?

1      A.      Yes.

2      Q.      What percentage of your practice do
3 you think is lenders roughly?

4      A.      50, 60 percent.

5      Q.      50, 60 percent lenders, and what's
6 the balance?

7      A.      The balance could be a hodgepodge of
8 buyers and sellers and, yeah, I guess pretty much,
9 and then general stuff.  It's a storefront office,
10 so sometimes it's just a power of attorney
11 preparation or a notary or sale of a business or,
12 you know, things like that.  Neighborhood stuff.

13     Q.      Are you involved in actual lending
14 yourself?

15     A.      Me personally?  Sometimes my money
16 will go into a loan.

17     Q.      Can you explain what that means?

18     A.      Means on occasion if there are two or
19 three investors putting together money, I will say
20 okay, I'll put a little bit of my money in as well.

21     Q.      What's the mechanism for the
22 investors to get together to make those loans?

23     A.      The mechanism?  Well, I have clients
24 that have money and I have clients that need money,
25 and sometimes I will make arrangements so that the

1 ones that have it can give it to the ones that need

2 it.

3        Q.        When you do that, do you generally do

4 that through J&J Capital or one of your other

5 entities?

6        A.        There are instances when the lender

7 himself has got his own loan.  He's asking you to do

8 documentation.  The loan will be in the lender or

9 group of lenders, their own names, but where it's

10 something that I would have put together, then it

11 would be in the name of J&J Capital.

12        Q.        What's Park National?

13        A.        Park National is another lender that

14 I sometimes represent.

15        Q.        Are you a member of Park National?

16        A.        No.

17        Q.        Do you invest in Park National?

18        A.        No.  I may have jointly made a loan

19 or two with them maybe under J&J and Park National,

20 but I don't invest with them.  I'm not a member or

21 in any way connected with them.

22        Q.        So the only entity that you're an

23 owner of and make loans through would be J&J

24 Capital?

25        A.        Yes, yeah, I think so.

1    Q.      When J&J makes a loan, does it get
2 investors to invest in the loan, or is it just money
3 from the individual members?

4    A.      No, it would be money from an
5 investor, from investors, yeah, participants, yeah.

6    Q.      Participants, okay.  So if J&J, I'm
7 trying to understand how you structure it.  If J&J
8 is making a loan and there's investors, how do you
9 structure it?

10    A.      I just do the loan in the name of J&J
11 and I'll acknowledge each of the participants, you
12 are a participant, you put in 50,000, you put in
13 100,000, you put in 200,000, and each one knows the
14 extent of his participation.

15    Q.      Is that participation in the form of
16 a capital contribution to the LLC?

17    A.      No, it's just a money transfer to,
18 generally to my attorney IOLA account, and from
19 there the closing disbursements are made.  They
20 don't become members in J&J.  They are not making
21 capital contributions.

22    Q.      That's done on a participation basis?

23    A.      An individual loan, yeah.  They
24 participate in an individual loan.

25    Q.      Then is J&J Capital more of a

1 servicer in those situations?

2       A.        Yeah, yeah.  Initiator and a

3 servicer, yeah.

4       Q.        How does J&J Capital get paid?

5       A.        We get paid at the closing for some

6 origination fee or broker's fee and it would -- and

7 then it gets paid monthly, you know, from the

8 borrower monthly and then makes distribution.

9       Q.        How is that distribution determined?

10       A.        By check -- how is it determined?

11       Q.        Yeah.

12       A.        By the amount that each investor put

13 in.  Each one gets his pro rata share.

14       Q.        So if you have a participation, then

15 J&J Capital would be the lead in the participation?

16       A.        J&J Capital is the lead name wise,

17 not always money wise.

18       Q.        Do you have participation agreements

19 with the investors?

20       A.        I generally don't, no.  Most of them

21 are old clients, old friends, family members even

22 sometimes.  No, I don't enter into a full formal

23 participation agreement.  I can give them a letter,

24 I give them copies of the documents and things like

25 that, but I don't have a full-fledged participation

1 agreement.

2          Q.          So if a family member or friend
3 invests with J&J, J&J is the lead in an oral
4 participation agreement with the payments being made
5 on a pro rata basis, correct?

6          A.          Right.

7          Q.          Do you know Seth Levine?

8          A.          I know the name.

9          Q.          Have you ever met him?

10          A.          No.

11          Q.          How do you know the name?

12          A.          I know the name because he was one of
13 the people that I did loans with.

14          Q.          How many loans did you do with him?

15          A.          Three.

16          Q.          Do you recall the three loans?

17          A.          I recall there were three.  I can't
18 recite to you the addresses by heart.  I have -- to
19 or the collateral mortgage addresses by heart, but I
20 know that there were three loans that I did with
21 him.

22          Q.          Do you know who the borrowers were on
23 those three loans?

24          A.          Seth Levine and the various entities
25 in which he -- through the various entities that he

1  operated different buildings under, different

2  properties under.

3                 MR. MARGOLIN:  Just for the record,

4  I'm trying to clarify.  When you say when I, do you

5  mean you J&J, or do you mean you like him

6  personally?

7                 MR. DUGGAN:  Let me ask him.

8       Q.        What entity made the three loans?

9       A.        J&J.

10      Q.        Is one of those loans the loan we are

11  here on today?

12      A.        I believe so, yeah.

13      Q.        Then there's two other mortgage

14  loans?

15      A.        Yes.

16      Q.        You don't recall what entity was the

17  borrower on those loans?

18      A.        I'd have to, you know, look up some

19  documents or papers that I, you know, right now

20  looking at you, I can't recite the addresses of

21  them.

22      Q.        Do you know Andrew Selevan?

23      A.        I never met him, but I know the name.

24                 MR. MARGOLIN:  It's Selevan, not

25  Selevan.

```
 1                    MR. DUGGAN:   Selevan.

 2        Q.        Do you recall that he's Mr. Levine's

 3  lawyer?

 4        A.        Yes.

 5        Q.        Have you ever personally met him?

 6        A.        No.

 7        Q.        How do you know of him?

 8        A.        I know of him through the deals that

 9  we did with Seth Levine.  He interfaced with me and

10  sent me certain documents and I sent him certain

11  documents.  We had conversation on the phone.

12        Q.        Was he the lawyer involved in all

13  three loans that J&J made to Seth Levine and his

14  entities?

15        A.        Yes.

16        Q.        Have you ever had any business or

17  legal dealings with him outside of the three Levine

18  transactions?

19        A.        No, I think not.  I don't think so.

20        Q.        Besides the three loans you just

21  spoke about, have you had any other business

22  dealings at all with Seth Levine or any of his

23  entities?

24        A.        I may have done some of the legal

25  papers on behalf of another lender with Seth Levine.
```

25

```
 1        Q.        What other lender was that?
 2        A.        Park National.
 3        Q.        You believe that Seth Levine had the
 4 same lawyer?
 5        A.        Yeah.
 6        Q.        Are you familiar with any of the
 7 other lenders that made loans to Seth Levine or
 8 other Levine entities?
 9        A.        No, I don't think so.
10        Q.        Do you know Jacob Sod?
11        A.        No.
12        Q.        Have you ever heard that name before?
13        A.        I don't recall at this moment.  I
14 don't recall ever hearing it.
15        Q.        Have you ever heard of JLS Equities,
16 LLC?
17        A.        No, other than it's on the caption in
18 this case.
19        Q.        Are you familiar with the scheme
20 perpetrated by Seth Levine?
21        A.        I think I'm a victim.
22        Q.        Just what's your understanding of
23 what happened?
24        A.        I think he was pledging multiple
25 properties to multiple investors, multiple lenders,
```

26

1  and exceeding his authority and misstating his

2  authority and his position in a standing in various

3  entities.

4      Q.      I'd like to show you what I put up on

5  the screen which is marked as JLS Exhibit 2.

6              (Exhibit JLS-2, Document request, is

7  received and marked for identification.)

8      Q.      I ask you if you recognize that

9  document?

10     A.      Yeah, I saw it earlier.

11             MR. MARGOLIN:  This is from the state

12  case.

13             MR. DUGGAN:  No, this is from the

14  federal case.

15             MR. MARGOLIN:  Okay, federal, okay.

16  This is from the 6/15 caption.

17     A.      I may lean forward a little bit to

18  see a little better.  Does that take me out of the

19  camera?

20     Q.      Don't worry about the camera.  As

21  long as we can hear you, it's fine.  We are not

22  videotaping, so it's just taken down in a written

23  transcript.  Do whatever makes you comfortable.

24             Do you see the document request on

25  page --

1                    MR. MARGOLIN:  This is about as big

2 as I can get it.

3         A.        I see it.

4         Q.        If you see there, there's 20

5 categories of documents.  Do you recall reviewing

6 this and looking for the documents?

7         A.        Yeah.

8         Q.        And did J&J produce all documents in

9 its possession or control that are identified in

10 this document request?

11         A.        To the best of my ability, whatever I

12 was able to put my hands on.  There's nothing that I

13 withheld.  Anything that I was able to find and

14 comply, I did.

15         Q.        Just going back to J&J, when J&J

16 Capital makes a loan, who's the person that

17 negotiates the terms of the loans in general?

18         A.        It could be an intermediary, perhaps

19 a broker involved or if, you know, and they would

20 negotiate between myself, my brother and the

21 borrower and/or it could be us if it indicates us

22 directly.

23                    MR. MARGOLIN:  Off the record for one

24 second.

25                    (A discussion takes place off the

1 record.)

2      Q.      You were just discussing how the

3 deals were negotiated either through a broker or you

4 and your brother directly, correct?

5      A.      Yes.

6      Q.      And once you struck a deal, who would

7 be responsible on J&J's side for putting the

8 structure together?

9      A.      What do you mean by structure,

10 looking for the participants?

11      Q.      How you were going to structure it,

12 yeah.  A loan?  A mortgage?  You know, the structure

13 of the transaction?

14      A.      Well, I would prepare the mortgage

15 documents.  All the loans were done as mortgages.

16      Q.      So is it correct to say J&J Capital

17 just makes mortgage loans?

18      A.      Yeah, J&J Capital Realty does

19 mortgage loans, yeah.

20      Q.      Are most of these short-term loans?

21      A.      Usually have a one-year term,

22 sometimes they are shorter, sometimes one year drags

23 to two or three.

24      Q.      Would you consider that a form of

25 bridge lending?

1      A.          Not always, no.  Not always bridge

2 lending.  Sometimes they would, it would be for

3 construction purposes, you know, or for acquisition

4 purposes.  I don't know, depends how long the bridge

5 is.

6      Q.          In these transactions, how often do

7 you use the declaration of restrictions as a

8 document?

9      A.          All the time.

10      Q.          Why do you do that?

11      A.          Because I don't want them to -- I

12 want to restrict the secondary financing and the

13 placing of additional financial burden onto whatever

14 the cash flow the borrower has or the property has.

15      Q.          Do you use the declaration of

16 restriction when you also file a mortgage against

17 the property?

18      A.          Yes.

19      Q.          Why would you use both?

20      A.          Well, I would use a declaration on

21 top of it, because some people could just go

22 willy-nilly and just sell the property to a new

23 owner and disregard the restriction on the sale that

24 the mortgage contains, and they'll say okay, so go

25 foreclose, and I don't want to be put into bed with

1 a new borrower that I don't know, that I didn't

2 approve to give the loan to.

3      Q.      How would the declaration of

4 restrictions provide you with any more protection

5 than the mortgage document itself?

6      A.      Some buyer may want to buy and he'll

7 say I don't care whether there's a mortgage on it or

8 not.  I'll take it with the mortgage, but the

9 declaration of restriction I think will put his

10 title company on notice and they would probably, you

11 know, halt and not insure his title with that

12 declaration.

13      Q.      When J&J Capital does make a mortgage

14 loan, you know, who does the due diligence on behalf

15 of J&J Capital?

16      A.      If there's a broker involved and it's

17 someone that we have familiarity and some confidence

18 in, they would have done it.  If not, then we would

19 do it.

20      Q.      That due diligence is commonly

21 referred to underwriting of the loan?

22      A.      We are not that formal.  I don't have

23 an underwriting department.  I don't -- you know,

24 I'll give it the smell test.  I'll see who the

25 borrower is.  I'll look at where the property is

1 and, you know, know a little bit about the

2 neighborhood and the property itself and maybe

3 online, maybe a visit to the property, if it's

4 local, and that's the extent of the underwriting.

5      Q.      That was really my next question is

6 to ask you to describe your underwriting process.

7 Did you just do that for us?

8      A.      Yeah.

9      Q.      Generally do you have the borrowers

10 or does J&J get a formal appraisal before making a

11 loan?

12      A.      No.  Online appraisals, you know, and

13 neighborhood scouting the neighborhoods, speaking to

14 local brokers.

15      Q.      What types of documents do you

16 generally get, again I'm talking the general process

17 with J&J Capital, from borrowers before deciding to

18 make a mortgage loan?

19      A.      Before the signing?

20      Q.      Yes.

21      A.      Before the granting of the loan?

22      Q.      Correct.

23      A.      It would be, I guess, sometimes it

24 would require a deposit, a good faith deposit, and

25 sometimes it could be a credit report on occasion.

1  Not always.  I would get, there's entity documents.

2          Q.          Anything else?

3          A.          No.

4          Q.          I'd like to show you what we've

5  marked as Exhibit JLS-5.  Is that up there?

6                      (Exhibit JLS-5, Pleading, is received

7  and marked for identification.)

8          A.          Yes, I see it.

9          Q.          Are you familiar with this document?

10         A.          Is that the one you showed me

11 earlier?

12         Q.          No, this is a new document.  In fact,

13 what I'll do is I'll get right to it.  If you go to

14 page 18 cross the top it says cross-claims, do you

15 see that there?

16         A.          Yeah.

17         Q.          I'll represent that this is a

18 pleading filed in this case, and I'm going to ask

19 you if you are familiar with this and if this

20 document describes the loan that you're trying to

21 collect in this action?

22                      MR. MARGOLIN:  Objection, Tim, when

23 you say a "pleading filed," can you identify by whom

24 it was filed, on whose behalf, so he understands?

25                      MR. DUGGAN:  Yeah.  It was filed by

1  J&J's counsel in the District Court action as set

2  forth with the filing stamp up here, so if we go to

3  the first page, which is up here, it gives you the

4  captions that it was filed in.  It's a document that

5  covers --

6              MR. MARGOLIN:  It's J&J's pleading in

7  this case.  I didn't want to say it, I didn't want

8  to testify on the record.  That's what it is.

9              MR. DUGGAN:  Yeah.

10     Q.       So if you look at page 18, that's the

11  beginning of a cross-claim against JLS.  Do you see

12  that there?

13     A.       Yeah.

14     Q.       Is that the loan we are here on

15  today?

16              MR. MARGOLIN:  Calls for speculation,

17  but --

18     A.       I'm just reading it now.

19     Q.       I don't understand the speculation

20  document.  I'm asking this is the pleading that we

21  are here on today in this case?

22     A.       Yes, that's the lawsuit that we're

23  talking about.

24              MR. MARGOLIN:  Is there any way to

25  make it bigger?  I feel Herb is squinting.

```
 1        Q.        Are you familiar with the loan
 2  described in the cross-claims against JLS?
 3        A.        The loans, the two loans made by J&J,
 4  the loans --
 5        Q.        The single loan made by J&J Capital
 6  that you contend is secured by the two mortgages?
 7        A.        Am I familiar with the loan?  Yeah.
 8        Q.        Yes, okay.  How did this loan arise?
 9        A.        This was the third loan that I did
10  with Seth Levine, and I had done the first two on
11  the introduction of a broker involved, and he had
12  done other loans with Seth Levine I think with Park
13  National prior to that, and that's how -- this is
14  one of the three that arise through that broker's
15  introduction.
16        Q.        Who was the broker?
17        A.        Fellow named Tyrnauer.
18        Q.        How do you spell that?
19        A.        T-y-r-n-a-u-e-r.
20        Q.        How do you know Mr. Tyrnauer?
21        A.        Well, he's been introducing loans and
22  giving me loans, you know, recommending loans,
23  referring loans to me for a while, for years.
24        Q.        So he's the one that introduced you
25  to Mr. Levine on this particular loan?
```

1      A.          Yeah.

2      Q.          Who negotiated the terms of the J&J

3  Capital loan that we are here on today?

4      A.          It was, again, it was through Mr.

5  Levine and Mr. Tyrnauer and myself.

6      Q.          What did you do in terms of due

7  diligence on this particular loan?

8      A.          I believe Mr. Tyrnauer visited the

9  office of Mr. Levine, and he took a look at the

10 operation, the management of the property, the rent

11 collections of the property, some of the deposits

12 that were being made, and he reported back to me.

13     Q.          Did he prepare a report for you or

14 how did he report back to you?

15     A.          No, no, just orally.

16     Q.          Then what did J&J Capital do after it

17 received the verbal report from the broker?

18     A.          Well, we were going to go ahead and

19 do the loan.

20     Q.          Then who decided on the loan terms?

21     A.          It was negotiated with Mr. Levine.

22 Maybe Mr. Selevan -- no, I don't think he

23 participated in the terms.  It was Mr. Levine,

24 myself and the broker.

25     Q.          Then who prepared the documents?

```
 1          A.        We did.

 2          Q.        When you say "we," do you mean you?

 3          A.        Yeah.  My office.

 4          Q.        You individually at your office

 5  prepared the documents?

 6          A.        Yes.

 7          Q.        What was the collateral for the loan?

 8          A.        The two properties in Jersey.

 9          Q.        Do you recall the purpose of the

10  loan?

11          A.        He was going to be buying the

12  mortgage, taking an assignment of a mortgage from

13  some bank and that he needed the funding for that.

14          Q.        Okay.  Do you recall what he needed

15  the funding for?

16          A.        Yeah, to purchase a mortgage from a

17  bank.

18          Q.        So it's your understanding that the

19  loan was providing purchase money financing for the

20  purchase of a loan from another lender?

21          A.        Yes.

22          Q.        Do you recall who was -- what entity

23  was going to purchase that loan?

24          A.        Mr. Levine's entity.  I don't know

25  the name of it, but -- I don't remember the name of
```

1  it, but an entity of Mr. Levine's.

2       Q.       For the balance of the deposition,

3  when I reference the J&J Capital loan, I'll be

4  referring to the loan that's described in the

5  cross-claim filed in the case; is that okay?

6       A.       Yeah.

7       Q.       Okay.  I'd like to show you what

8  we've marked as Exhibit JLS-11 and ask you if you

9  recognize that document?

10      A.       Yeah.

11      Q.       What is this document?

12               (Exhibit JLS-11, Participation

13  agreement, is received and marked for

14  identification.)

15      A.       It's sort of an agreement that was

16  alongside the mortgage and the note and the

17  guarantee and the other loan documents and the

18  declaration.

19      Q.       Who prepared it?

20      A.       My office with, together with

21  Mr. Selevan.

22      Q.       If I go to the seventh page, is that

23  your signature on the seventh page?

24      A.       Yeah.

25      Q.       Is this the main document governing

1 the terms of the J&J Capital loan?

2        A.        The main document is the mortgage,

3 but this was sort of a -- (inaudible) touches on the

4 terms as well.

5                  (Zoom cut out.)

6                  (The question is read back by the

7 reporter.)

8        A.        Yes, the main document was the

9 mortgage, the loan documents were the guarantee and

10 this was sort of an ancillary document to sort of

11 give it the structure and the purpose.

12       Q.        So if we look at the top here, you

13 have it's the entities that signed this are Seth

14 Levine, Norse Holdings and River Funding.  Do you

15 see that there?

16       A.        Yes.

17       Q.        Do you know why they are referred to

18 as the assignees?

19       A.        Assignees, I think that they were

20 going to be taking assignment of that mortgage.

21       Q.        Okay.  Lenox Temple and Teaneck Plaza

22 are not parties to the agreement, are they?

23       A.        You have to look at the signature

24 page.

25       Q.        Referring now to the signature page,

1  which is page 7 of the participation agreement?

2       A.       Right.  So they are not party to this

3  agreement, just Seth Levine is party on behalf of

4  Norse and River.

5       Q.       J&J Capital is referred to as an

6  investor.  Why is J&J Capital referred to as an

7  investor?

8       A.       I don't know.  Loosely, I guess, J&J

9  capital is referred to as -- that's my group of

10 investors, I guess.

11      Q.       So that's referring to the group of

12 investors investing in this transaction with the

13 assignees?

14      A.       Yeah, lending the money, yeah.

15      Q.       This is an investment, not a loan,

16 correct?

17               MR. MARGOLIN:  Calls for speculation.

18 Counsel is testifying.

19      Q.       You can answer it if you can.

20      A.       No, it was a mortgage.  It was a

21 loan.

22      Q.       If we go down to the first whereas,

23 it says it's currently under contract for the

24 purchase of a note and assignment of a foreclosure

25 action.  Do you see that there?

1      A.        Yes.

2      Q.        That's with Provident Bank and Norse

3 Holdings?

4                MR. MARGOLIN:  Calls for speculation.

5                MR. DUGGAN:  I'm asking if he knows.

6 It's not speculation.

7      A.        The name sounds familiar, yeah.

8                MR. MARGOLIN:  You didn't ask if he

9 knows, Tim.  You said is it.  If you want to ask him

10 if he knows, ask him.  Don't say it as a statement

11 of fact.

12     Q.        I'd like to show you what we've

13 marked as Exhibit JLS Exhibit 12?

14                (Exhibit JLS-12, Note sale and

15 assignment agreement, is received and marked for

16 identification.)

17     A.        Yes.

18     Q.        Have you seen this document before?

19     A.        I believe so, yeah.

20     Q.        What's your understanding of this

21 document?

22     A.        That was the document that Seth

23 Levine was going to be making and buying using my

24 loan money to buy it.

25     Q.        If you look down here, paragraph 1 is

1  the purchase price of $1,550,000?

2         A.       Yeah.

3         Q.       The assignee at the top is who?

4         A.       Norse -- let me see the agreement.

5  Norse.

6         Q.       Norse Holdings, LLC?

7         A.       Yes.

8         Q.       So Norse Holdings, LLC was going to

9  purchase a loan from Provident Bank and part of the

10 purchase price was going to be funded by J&J

11 Capital?

12        A.       Yes.

13                 MR. MARGOLIN:  Counsel's testifying,

14 but you can answer.

15        Q.       I'd like to go back to the

16 participation agreement that we marked as JLS

17 Exhibit 11.  The next paragraph says that the

18 assignees are to assign the contract we just looked

19 at to River Funding.  Do you see that there, second

20 whereas?

21        A.       Yeah.

22        Q.       What was the purpose of that?

23        A.       I don't know.  It was just a Seth

24 Levine purpose.  He might know it.

25        Q.       But you don't know?

1      A.          No.

2      Q.          At the end of the day, was it your

3 understanding that River Holdings would be the

4 entity that would take title to the note and

5 mortgage?

6                  MR. MARGOLIN:  Calls for speculation.

7 Counsel is testifying.  Answer it.

8      A.          I don't know.  I don't know.

9      Q.          If we go to the next paragraph, it

10 says Seth Levine is authorized and empowered as

11 managing member of Norse and River to enter into

12 this agreement and to bind the LLC and is further

13 authorized to mortgage properties that are

14 identified there.  Do you see that?

15     A.          Yeah.

16     Q.          What's the purpose of that clause?

17                 MR. MARGOLIN:  Objection, document

18 speaks for itself.

19     A.          To have him verify and re-verify the

20 fact that he's empowered to give me the mortgage on

21 those two properties.

22     Q.          What do those two properties have to

23 do with this loan?

24     A.          That was the loan was for the two

25 properties that -- they were the collateral for the

1 loan.

2     Q.        Were the owners of those two

3 properties getting any of the cash --

4                MR. MARGOLIN:  Objection, calls for

5 speculation.

6     Q.        -- from the loan?

7     A.        No.  Seth Levine was going to be

8 getting it in his entity, and he would be using it

9 for the purchase.  Those two properties were being

10 put up as collateral for the loan.

11     Q.        If I go to the next paragraph, it

12 says assignees are in need of $750,000.  Is the

13 purpose of that, and it says in funding to qualify

14 with Provident Bank.  What does that mean?

15                MR. MARGOLIN:  Calls for speculation.

16     A.        I don't know.  I think it means for

17 the purchase of the loan.

18     Q.        Do you know what the words "to

19 qualify with Provident Bank" means?

20                MR. MARGOLIN:  Objection.  Counsel,

21 he's testified multiple times that this is a Levine

22 transaction, so he doesn't know exactly what Levine

23 wanted to do with it.

24                MR. DUGGAN:  That's not his

25 testimony.  He prepared this document.  He prepared

1  it.   I'm asking him -- we don't have speaking

2  objections.   You can object to form.   This is a

3  deposition under New Jersey court rules.   I'm asking

4  him -- federal rules, as the drafter of this

5  agreement and as a signer of this agreement, I'm

6  asking him what this provision means.   If he doesn't

7  know, he can say that.

8         Q.       Let me ask it again.   On the whereas

9  clause that starts with "assignees are in need of

10 $750,000 in funding to qualify for Provident Bank."

11 What does qualify for Provident Bank mean?

12        A.       You have to have the money available

13 to make the payments.

14        Q.       It's not just to show good faith

15 funds?

16        A.       No, not to pay all the good faith

17 funds.   It's to make the payment for the purchase,

18 towards the purchase.

19        Q.       Now I'm going on to the third page.

20 Do you see where it says, "now therefore it's

21 mutually agreed"?

22        A.       Yeah.

23        Q.       The first sentence says, "investors

24 shall invest."   Why did you use the words investors

25 shall invest as opposed to investors shall loan?

```
 1        A.         I don't know.  It was a little bit of
 2  poor wording, I think.  This was a slap dash type of
 3  arrangement, agreement.  He had to -- I think he had
 4  a deadline.  He had a time of the essence deadline,
 5  and this agreement was sort of prepared on the fly
 6  and on the run passed back and forth with the
 7  signatures, so that might have been a poor choice of
 8  wording.
 9        Q.         If I go to paragraph No. 2, says,
10  "assignees shall repay."  Do you see that there?
11        A.         Yeah.
12        Q.         "Shall repay 750,000 with a 10
13  percent return of $75,000."  Do you see that there?
14        A.         Yes.
15        Q.         That's correct?  Those were the
16  terms?
17                   MR. MARGOLIN:  Objection, document
18  speaks for itself.
19        A.         Yeah.
20        Q.         And that is the payment of both of
21  principal and the 10 percent is due February 10,
22  2019, correct?
23        A.         I'm sorry, repeat that question?  My
24  mind wasn't focusing on it.  I was reading
25  something.
```

1        Q.        If I'm on paragraph 2 --

2        A.        Yeah.

3        Q.        -- it says, "assignees shall repay

4 the full principal of $750,000 together with a 10

5 percent return of $75,000 on or before February 10,

6 2019.  Do you see that there?

7        A.        Yeah.

8        Q.        And the loan, if we go up to the top,

9 this agreement's dated January 15, 2019.  Do you see

10 that there?

11        A.        Yeah.

12        Q.        So if I read this correctly, this was

13 a short-term loan of approximately 26 days to be

14 repaid to the investors by February 10, 2019 with

15 the 10 percent return, correct?

16        A.        That was the representation.  That

17 was the hope, yeah.

18        Q.        But that was the term of the

19 transaction that's set forth in this agreement?

20        A.        Well, it allows for it to continue in

21 the event of non-repayment by that date, yeah.

22        Q.        So the initial term was 26 days to

23 get a return of the principal and $75,000, correct?

24        A.        Yeah.

25        Q.        Then if I go further down, I look at

1  paragraph 4, it says, "Norse shall assign the

2  interest in the agreement with Provident Bank to the

3  investors."  Do you see that there?

4       A.       Yes.

5              MR. MARGOLIN:  Could we take a

6  five-minute break after you finish your question?

7  Then we'll take a break.

8              MR. DUGGAN:  I just wanted to say

9  when we take breaks, you know, Mr. Tepfer, you are

10 not allowed to speak with your attorney about the

11 deposition during the break.  Do you understand

12 that?

13             THE WITNESS:  Yeah.

14      Q.       If I look at paragraph 4, Norse is to

15 assign the contract to investors, do you see that

16 there?

17      A.       Yes.

18      Q.       Earlier on, I'm going up to the

19 second whereas, it says, "the assignee's are to

20 assign the contract to River."  Do you see that

21 there?

22      A.       Yes.

23      Q.       Do you know why they have it assigned

24 to River but also assigned from Norse to investors?

25      A.       Well, I don't know why he had it

1  assigned to River.  I don't know.  That was the

2  entity that he wanted to ultimately go to, but the

3  assignment to investors is only like as conditional

4  collateral besides for the mortgage, for the loan.

5  It would just be like a collateral assignment.  I

6  never got the collateral assignment.  He never gave

7  it to me.

8        Q.      Do you know if he ever purchased the

9  loan from Provident?

10       A.      No.

11              MR. MARGOLIN:  Tim, I thought we were

12  doing a five-minute break.  If you have one more

13  question to ask.

14       Q.      If I go down to paragraph 5 --

15              MR. MARGOLIN:  I thought we were only

16  doing -- can we take a break?

17              MR. DUGGAN:  You can take a break.

18              MR. MARGOLIN:  All right, five

19  minutes, four minutes.  I'm going to get some water.

20              MR. DUGGAN:  Just do it quick.  We'll

21  take a break.  I'd tend to make this the last break.

22              (A brief recess is taken.)

23              MR. DUGGAN:  One other comment I want

24  to make, it seems that I hear whispering in the

25  background here.  There can't be discussions between

1  counsel and the witness during the deposition.  I'm

2  not sure what it is I would ask that there's no

3  communication whatsoever while you are in the

4  conference room or we are just going to need the

5  video to zoom back out so we can see all the people

6  in there.

7          MR. MARGOLIN:  The video hasn't moved

8  unless the computer moved.

9          MR. DUGGAN:  I'm not saying the

10  video's moved.  When you have people that are live

11  and they are in the room and we hear whispering in

12  the background, I don't know what's going on.  I

13  want to make sure that -- you know, this is no

14  different than all of us sitting in the conference

15  room looking at each other and no communication with

16  the witness while --

17          MR. MARGOLIN:  People leave

18  conference rooms during physical depositions.  I

19  took plenty of those too.  It's not like everyone is

20  locked in the room and you must monitor at all

21  times.  It's not that different.

22          MR. DUGGAN:  It is absolutely

23  different.  I don't want any communications and

24  prefer there's no whispering.

25      Q.       If we can go to paragraph 5 of the

1 participation agreement?

2      A.      Yeah.

3      Q.      Do you see that there?

4      A.      Yeah.

5      Q.      Is this the paragraph you were

6 talking about earlier that allows it to be extended?

7      A.      Well, and the mortgage document

8 itself allowed for it to be extended.

9      Q.      I'm asking about the participation

10 agreement.

11      A.      It was all one set of documents, but

12 okay.  Let me see.  Yes.

13      Q.      So if I have this right, there's the

14 ability to have a six-month extension, correct?

15      A.      In this participation agreement, yes.

16      Q.      And what's the annualized interest

17 during the extension period?

18      A.      It says 20 percent.

19      Q.      And this is an extension that brings

20 it out six months to August 10, 2019?

21      A.      Yes.

22      Q.      That's when the entire principal

23 75,000 plus the 20 percent interest would be due?

24      A.      Yes.

25      Q.      So the original loan was for 26 days

1  with a $75,000 return with the option to be able to
2  extend six months with 20 percent interest, correct?
3          A.        Well, the 75,000 was sort of an
4  origination fee, and that was just added into the
5  loan and to be collateralized as part and parcel of
6  the note and mortgage, because he did not pay it at
7  the time of the granting of the loan, at the time of
8  the execution of this agreement, so that 75 was
9  added on into -- to be collateralized by the note
10 and the mortgage.
11         Q.        Well, if I look in here, it says the
12 set amount represents the $75,000 invested plus --
13 $750,000 invested plus the $75,000 return?
14         A.        Yeah.
15         Q.        And then the next sentence is 20
16 percent per annum on top of that, correct?
17         A.        20 percent per annum on top of that,
18 yeah.  That's if the 75 was not paid back.
19         Q.        Right.  So you get 20 percent on
20 $825,000, correct?
21         A.        It would be 20 percent, umm, 875, if
22 it was not paid back.
23         Q.        Was it paid back?
24         A.        Well, no, it was not paid back.
25         Q.        I'd like to go to paragraph 7.  Do

52

1  you see that there?

2       A.        Yes.

3       Q.        The 750 was to be wired to Norse

4  Holdings.  Do you see that there?

5       A.        Yeah.

6       Q.        Is that correct?

7       A.        Yeah.

8       Q.        That is correct?

9       A.        Say it again?  I'm sorry.

10      Q.        The 750,000 was to be wired to an

11 account in Norse Holdings.  Do you see that there?

12      A.        Yeah.

13      Q.        Is that correct?  What was supposed

14 to happen?

15      A.        Yeah, yeah.

16      Q.        And the next sentence?

17      A.        Or any other account, or any other

18 account that he would specify.

19      Q.        What did he specify?

20      A.        I don't recall where I sent the wire

21 to.  I don't recall what entity it was.  I'd have to

22 look at the wire.

23      Q.        Do you see the next sentence where it

24 says, "It is specifically represented that the funds

25 shall remain on deposit not to be used for any

1  purpose and shall be returned to investors with a 10

2  percent return either upon the closing of the

3  agreement," and then it continues.

4          Do you see that sentence there?

5      A.      Yeah, I think that's a misread -- a

6  mis -- should not be used for any other purpose, I

7  should have said, but all right.

8      Q.      Well, it says it has to stay in the

9  bank account and can't be used.  Do you see that

10 there?

11     A.      I see that's what it says, but the

12 intent was it not be used for any other purpose

13 other than the purchase of the mortgage.  That was,

14 again, sloppy, rushed draftsmanship.

15     Q.      Again -- and you Mr. Levine's counsel

16 prepared this document, correct?

17     A.      Yeah, I did probably.  I did most of

18 the preparing.

19     Q.      So you prepared the participation

20 agreement that we're looking at that's marked as

21 Exhibit JLS Exhibit 11?

22     A.      Yes.  May have been some comments and

23 some changes made by Mr. Selevan.  I don't remember

24 specifically, but I prepared it.

25     Q.      Do you know why this is called a

54

1 participation agreement as opposed to a loan

2 agreement?

3          A.          Well, there was the participants of

4 the agreement were all of the entities of Seth

5 Levine and also maybe to, you know, this was a loan

6 being given by an Orthodox Jew to an Orthodox Jew,

7 and there are biblical prohibitions about charging

8 interest and things like that, so there's something

9 called a heteriska that sort of cloaks, creates a

10 legal fiction that allows the interest to be charged

11 and the lender has to be called, you know, again, as

12 a fig leaf as a participant rather than just a

13 lender.  So as a participant, you are entitled to

14 take interest from a fellow observer Orthodox Jew.

15          Q.          So the way this was structured from

16 a, I'll call it a religious point of view, was as an

17 investment between J&J Capital and Seth Levine and

18 his two entities to purchase the note, correct?

19          A.          As part of the I'll call it the

20 religious requirement, to meet the religious

21 requirement.  It was a loan.  It was a loan.  It was

22 a mortgage loan, but, you know, it was dressed up

23 this way simply for -- in line with the heteriska,

24 which is a document that accompanies

25 interest-bearing loans.

1      Q.        I'd like to show you what we've

2 marked as Exhibit JLS-15.

3                (Exhibit JLS-15, Personal Guarantee of

4 Seth Levine, is received and marked for

5 identification.)

6      Q.        When I increase the size on my

7 screen, does it increase on your screen?

8      A.        Yeah, that's very helpful.

9      Q.        This is Exhibit JLS-15, and I'm down

10 at the signature page if you see it there, and then

11 I'll go back up to the top.  Do you recognize this

12 document?

13     A.        Yes.

14     Q.        What is this document?

15     A.        This is a personal guarantee of Seth

16 Levine for repayment of the loan.

17     Q.        He's the only guarantor on this loan,

18 correct?

19     A.        Yeah, I believe so.

20     Q.        Okay.

21     A.        I believe so.

22                MR. MARGOLIN:  Document speaks for

23 itself.

24     Q.        This is the only guarantee that was

25 produced to us, so is this the only guarantee that

56

1  J&J has?

2      A.      Yes, I believe so.

3      Q.      In this case, Mr. Levine is

4  guaranteeing the $825,000 loan that we just reviewed

5  in the participation agreement, correct?

6      A.      Yeah.

7      Q.      Mr. Levine signed the participation

8  agreement?

9      A.      Yes.

10     Q.      There's no other guarantors, correct?

11     A.      I believe not.

12     Q.      I would like to show you what we've

13  marked as Exhibit JLS Exhibit 6.  Do you see that

14  there?

15             (Exhibit JLS-6, Listing of members of

16  Lenox Temple, is received and marked for

17  identification.)

18     A.      Yes.

19     Q.      Are those the owners of Lenox Temple?

20             MR. MARGOLIN:  Calls for speculation.

21  Document speaks for itself.  Document out of

22  context.  Answer if you understand.

23     A.      It's a listing of it.  I didn't

24  prepare that listing.  It's a listing of the members

25  of Lenox Temple.

1      Q.      Do you know who the members of Lenox

2 Temple are?

3      A.      Definitively?  No, I know only what

4 was represented by Mr. Levine.

5      Q.      Do you know who the members of

6 Teaneck Plaza are, Teaneck Plaza Ventures, LLC?

7      A.      You just put an exhibit on.

8      Q.      I'm just asking you.  Do you know?

9      A.      I know what he represented to me.

10     Q.      What did he represent to you?

11     A.      You took it off, so I think that

12 would have had himself and his wife on it.

13     Q.      I'm going to show you what we've

14 marked as Exhibit JLS Exhibit 7.

15              (Exhibit JLS-7, Listing of members of

16 Teaneck Plaza Ventures, LLC, is received and marked

17 for identification.)

18     Q.      Does that refresh your recollection

19 of who the members of Teaneck Plaza Ventures, LLC

20 are?

21     A.      That refreshes my recollection of

22 what he represented to me, yes.

23     Q.      Do you know who the members of Norse

24 Holdings were?

25     A.      You have to show me an exhibit if you

1 have any such exhibit.

2          Q.          I'm just asking you if you know?

3          A.          Off the top of my head at this

4 moment, no.  I know Seth Levine was and, you know,

5 he was certainly the signatory and the manager and

6 the managing member or whatever, but I don't know

7 the specific percentages.  I don't know that one

8 unless I see an exhibit.

9          Q.          Do you know how many entities Mr.

10 Levine has an interest in?

11          A.          No.  No.

12          Q.          Do you know how many of those

13 entities own real estate?

14          A.          No.

15          Q.          Do you know the names of any of the

16 other entities?

17          A.          Other than what's been listed in the

18 context of this litigation?

19          Q.          Well, I'm asking -- let me rephrase

20 it.

21                      Do you know the names of any of the

22 entities that Mr. Levine has an interest in?

23          A.          Not off the top of my head.

24                      MR. MARGOLIN:  Calls for speculation.

25          A.          Not off the top of my head at this

1  moment.  He was partial to the name of Norse for

2  some reason.  He must have watched a Viking movie as

3  a child.  He liked the word Norse.  I saw some

4  variations of Norse, Norse Holdings, Norse I, Norse

5  II, I had seen that on other deals.

6              MR. MARGOLIN:  Off the record for a

7  second?

8              (A discussion takes place off the

9  record.)

10      Q.      Do you have any firsthand knowledge

11  of the ownership or assets of any of the other Seth

12  Levine entities?

13      A.      No, just firsthand from what he

14  provided me.

15      Q.      And when you say "what he provided

16  me," it was for the transactions that we are

17  reviewing now involving Lenox Temple, Teaneck Plaza,

18  Norse Holdings and River?

19      A.      Yes.

20      Q.      You don't have any other knowledge

21  about the ownership, his interest or assets of any

22  of the other entities he may have an interest in?

23      A.      No, not at this time, no.

24      Q.      I'd like to show you what we marked

25  as Exhibit JLS Exhibit 17.  Do you see that there?

1      A.      Yes.

2              (Exhibit JLS-17, Mortgage note, is

3  received and marked for identification.)

4      Q.      What is this document?

5      A.      That's the mortgage note.

6      Q.      This -- and who are the borrowers on

7  this note?

8      A.      Teaneck Plaza and Lenox Temple.

9      Q.      Did either Teaneck Plaza Ventures or

10 Lenox Temple, LLC get $825,000 from J&J Capital?

11             MR. MARGOLIN:  Calls for speculation.

12     A.      Did they ultimately get it?  Or did I

13 wire it?  I can tell you who I wired the funding to.

14     Q.      Well, let me do this:  I am going to

15 pull up what we marked as Exhibit JLS 19.  Do you

16 see that on the bottom?

17             (Exhibit JLS-19, Wire confirmation, is

18 received and marked for identification.)

19     A.      Yes.

20     Q.      Do you recognize this document?

21     A.      It's a wire confirmation.

22     Q.      Is this for this loan?

23     A.      Yes.

24     Q.      Who's the recipient of the wire?

25     A.      Norse Holdings, LLC.

1          Q.          And do you know why?

2          A.          Yes, that was the request that Mr.

3   Levine had sent it to this entity.

4          Q.          When you say "this entity," that's

5   Norse Holdings, LLC?

6          A.          Yes.

7          Q.          Norse Holdings, LLC was the entity

8   that was under contract to purchase the Provident

9   Bank loan?

10               MR. MARGOLIN:   Calls for speculation.

11         A.          You showed me that contract earlier.

12   I think it was Norse.   If you show me the document

13   again, I can --

14         Q.          Okay.   I would like to show you again

15   what we marked as JLS Exhibit 12.   Do you see that

16   document?

17         A.          Yes, it was Norse Holdings.

18         Q.          So Norse Holdings was the entity that

19   was to buy the loan from Provident Bank, correct?

20         A.          Yes.

21         Q.          And the money for that purchase was,

22   in fact, wired to Norse Holdings, LLC, correct?

23         A.          Yes.

24         Q.          So looking at the mortgage note for

25   $825,000, it's clear that Teaneck Plaza Ventures and

1  Lenox Temple did not receive $825,000 from J&J

2  Capital?

3           MR. MARGOLIN:  Objection, counsel is

4  testifying.  Asked and answered.  He's already

5  stated what the question is.  He's already stated

6  what he knows.  Absolutely objectionable.

7           MR. DUGGAN:  Stop, stop, Yan.

8           MR. MARGOLIN:  Yelling stop is not

9  going to make me stop.

10          MR. DUGGAN:  I'm going to re-ask the

11 question.

12          MR. MARGOLIN:  I will object to the

13 same exact question.

14      Q.      Did Teaneck Plaza Ventures get

15 $825,000 from J&J Capital?

16          MR. MARGOLIN:  The same objections,

17 please, on the record.  That question makes no

18 sense.  Ask a different question.  He's answered the

19 question as to where the money was wired.  He's not

20 Seth Levine.  Ask that question to Seth Levine.

21          MR. DUGGAN:  No.

22      Q.      Do you have any knowledge whether or

23 not Teaneck Plaza Ventures received $825,000 from

24 J&J Capital?

25      A.      From J&J Capital?  Yes, I have

1  knowledge of the money that was wired.

2       Q.       To Teaneck Plaza Ventures, LLC?

3       A.       No, not to Teaneck.  It was wired to

4  Norse.

5       Q.       Correct.  I'm asking a specific

6  question.  Do you have any knowledge whether Teaneck

7  Plaza Ventures received $825,000 from J&J Capital

8  Realty ever?

9       A.       They received the wire, the amount of

10 the wire that was indicated and they -- as

11 additional collateral for the original $75,000

12 origination fee, they stood there to guarantee that

13 the mortgage and the note stood there to

14 collateralize that additional 75 to 750 and 75 is

15 the 825.

16      Q.       That's not my question.

17      A.       That's the answer though.  They

18 didn't get 825.

19      Q.       Correct.

20      A.       There was no wire for 825.  There was

21 a wire for the net or the 750 and the obligation,

22 undertaking the obligation to pay the additional 75.

23      Q.       The wire went to Norse Holdings,

24 correct?

25      A.       Yes.

64

1      Q.        And no money was wired to Teaneck
2 Plaza Ventures, correct?

3      A.        Yeah, correct.  It was wired to the
4 end at this indicated.

5      Q.        No money was wired to Lenox Temple,
6 LLC, correct?

7      A.        It was not wired to the party putting
8 up the collateral, the mortgage collateral, to Lenox
9 or to Teaneck.

10      Q.        So when I look at Exhibit JLS Exhibit
11 17, which is a mortgage note, neither borrower that
12 are set forth on this note received any money from
13 J&J Capital, correct?

14              MR. MARGOLIN:  Objection, this
15 document speaks for itself, calls for speculation.
16 You can answer the question.

17      A.        The specific entities that put up the
18 collateral didn't guarantee -- to guarantee the loan
19 did not receive the money.  They put up the
20 collateral and the entity, the Seth Levine entity of
21 Norse is the one that received the wire.

22      Q.        Going down, the amount of the
23 obligation referenced in this note is $825,000 with
24 20 percent interest, correct?

25      A.        Yes.

65

1      Q.        That represents the $750,000 loan,

2  the $75,000 that was to be repaid as the 10 percent

3  return, plus 20 percent interest on the combined

4  amount, correct?

5                MR. MARGOLIN:  Document speaks for

6  itself.

7      A.        Well, the 10 percent wasn't returned.

8  It was 10 percent was the origination.  So but this

9  collateralized and included all of the amount.

10     Q.        I'd like to refer you to a document

11 we marked as Exhibit JLS Exhibit 14 and ask you if

12 you recognize this document.

13                (Exhibit JLS-14, Mortgage, is received

14 and marked for identification.)

15     A.        Yes.

16     Q.        Did you prepare this document?

17     A.        Yes.

18     Q.        What is this document?

19     A.        That's the mortgage covering the two

20 parcels.

21     Q.        It's the same $825,000?

22     A.        Yes.

23     Q.        Who are the borrowers under this

24 mortgage?

25     A.        The borrowers were Teaneck Plaza and

1  Lenox Temple.

2       Q.       They are the same borrows from the

3  promissory note we just looked at?

4       A.       Yes.

5       Q.       So this mortgage secures the loan

6  obligations evidenced by the promissory note in the

7  sum of $825,000 that we just looked at?

8       A.       Yes.

9       Q.       When I say the note we just looked

10 at, it's Exhibit JLS Exhibit 17?

11      A.       Yes.

12      Q.       I'd like to show you a document that

13 question identified as JLS Exhibit 18.

14               (Exhibit JLS-18, Document, is received

15 and marked for identification.)

16      A.       Yes.

17      Q.       Did you prepare this document?

18      A.       Yes.

19      Q.       Is that your signature on the

20 document?

21      A.       Yes.

22      Q.       What's the purpose of this document?

23      A.       As additional collateral, you know,

24 that it's part of my, my loan document package most

25 often, that he would execute an assignment of shares

1  and resignation Seth Levine and the other members,

2  that in the event of default, I would give him

3  notice and I could take these shares and, so to

4  speak, possibly short circuit the foreclosure

5  process.  Doesn't always work, but it's an

6  additional collateral security.

7       Q.       Do you see the first sentence where

8  the mortgage is placed in escrow?

9       A.       Where does it say -- this letter

10 confirms, hold it.  Mortgage assignment shares with

11 enunciation -- yes, I see that.

12      Q.       So the mortgage was to be held in

13 escrow by you pending an event of default?

14               MR. MARGOLIN:  Calls for speculation.

15 Answer if you can.

16      A.       Yeah, there was a specific request

17 that I hold the mortgage for a couple of days until

18 he finishes and repays, because there was a

19 short-term loan.  It was anticipated as a short-term

20 loan.  Here we are three years later and nothing has

21 happened, but it was anticipated to be a short-term

22 loan, and I was going to hold the mortgage and not

23 record it unless there was a default or that there

24 was something untoward came up.

25      Q.       If I look at the second paragraph, it

1  says, in event of default, upon 60 days' written

2  notice with an opportunity to cure, then the

3  documents would be released from escrow, correct?

4          A.        Yeah.

5          Q.        Did you ever send a notice of

6  default?

7          A.        I don't recall.  I think by the

8  time -- I think his office was closed at some point

9  in time shortly thereafter.  I don't remember

10  exactly.

11          Q.        I'll represent that no notice of

12  default was produced in discovery.  Does that

13  refresh your recollection?

14          A.        If it was not produced, I would say

15  that I could not find one, that I did not provide

16  one.

17                MR. MARGOLIN:  I believe I sent one

18  later once the implosion occurred, once I was

19  retained.

20          A.        There was an occurrence, the office

21  was closed, the phones weren't being answered, the

22  FBI raided his office, I don't know who what or why

23  or where to send anything or contact.  I couldn't

24  contact anyone.

25          Q.        So J&J never sent a 60-day written

1  notice with a right to cure to any of the parties to

2  the participation agreement, note or mortgage?

3      A.      There was no formal written notice.

4  They were not to be found.

5      Q.      When did you try to -- when did J&J

6  try to first record the mortgage?

7      A.      I have to refresh -- I have to see

8  some document that will refresh me on the date.  I

9  don't know exactly when it was.  It was sometime

10 after the default and the implosion and the scandal

11 that started spreading through the grapevine in the

12 neighborhood.

13     Q.      So J&J --

14             MR. DUGGAN:  No.

15             MR. MARGOLIN:  I have to object.

16     Q.      J&J Capital -- so J&J Capital did not

17 try to record the mortgage until after the FBI

18 raided Mr. Levine's office?

19             MR. MARGOLIN:  Objection.  Counselor,

20 there are emails that were produced to you.

21             MR. DUGGAN:  I'm asking his firsthand

22 knowledge.

23             MR. MARGOLIN:  You are asking --

24 trying to support perjury because you know there

25 were emails that were different?

 1                    MR. DUGGAN:  I'll ask the questions.

 2                    MR. MARGOLIN:  Please don't ask --

 3                    MR. DUGGAN:  No.

 4        Q.        So your testimony was that you tried

 5   to record the mortgage after the FBI came in and

 6   raided, correct?

 7        A.        I can't say that specifically.  I

 8   don't have a clear recollection of the chronology of

 9   dates.

10        Q.        Do you know whether or not you tried

11   to record it within a month or two of the closing?

12        A.        Perhaps, yeah.  Perhaps, if there's

13   some email that shows a date, then I would have to

14   see that.

15        Q.        I'd like to show you what we've

16   marked as Exhibit JLS Exhibit 21?

17        A.        Yes.

18        Q.        It's a series of emails that were

19   produced in discovery?

20                    (Exhibit JLS-21, Series of emails, is

21   received and marked for identification.)

22                    MR. MARGOLIN:  Are you presenting

23   these are the first emails of their kind?

24                    MR. DUGGAN:  I'm not presenting the

25   witness anything.

 1          MR. MARGOLIN:  The objection is the

 2 witness is being shown an exhibit out of context as

 3 part of a larger chain that is not being shown.

 4          MR. DUGGAN:  I don't understand that

 5 objection.

 6     Q.      I'm showing you a document.  Do you

 7 recognize this document?

 8     A.      It's a part of the email chain that I

 9 was sending to, to a title company, I think, yeah.

10          MR. MARGOLIN:  One of a series of

11 emails.

12     A.      Madison Title Company.

13     Q.      What was the purpose of this email?

14     A.      It says we were sending them the

15 mortgage for recording.

16     Q.      Do you know whether this was before

17 or after an event of default?

18     A.      I don't know.  It must have been

19 after.  I assume it was after.

20     Q.      Do you have a payment history for the

21 loan?

22     A.      Not currently at my fingertips.

23     Q.      (REQUEST) I don't recall one being

24 produced in discovery.  We request that you produce

25 a payment history, and your counsel and I can follow

1 up on that.

2            MR. MARGOLIN:  Yes, no problem.  If

3 you could, for my own sanity, if you can record any

4 like ongoing or extra demands and then email them to

5 me at the end, that would be super helpful, because

6 I'm not listing them.  My computer is occupied so

7 I'm not taking them down.

8      Q.      I'd also like to show you what we've

9 marked as JLS Exhibit 20.

10            (Exhibit JLS-20, Proof of mailing, is

11 received and marked for identification.)

12     Q.      Do you see that here?

13     A.      Yes.

14     Q.      This was produced in discovery and

15 the dates April 23, 2019, do you see that there?

16     A.      Yeah.

17     Q.      It says reference record description

18 for properties Levine?

19     A.      Yes.

20     Q.      And this is sent by you?

21     A.      To Madison, yeah.

22     Q.      It was identified in production as

23 proof of mailing in April 2019?

24     A.      That's what it seems to be.

25     Q.      Is this an attempt also to record the

1 mortgage in April of 2019?

2      A.      This is dated April.

3      Q.      Right.  So is this an effort to try

4 to record the mortgage in April of 2019?

5      A.      I believe so.

6      Q.      Okay.

7      A.      I believe so.

8      Q.      In April of 2019, in June of 2019,

9 based upon the emails and this FedEx, you were

10 trying to have the mortgage that we looked at

11 earlier recorded, correct?

12      A.      I must say that I don't know which of

13 these included the Lenox Temple and the, you know,

14 the mortgages on this or may have included the

15 mortgages that had been previously closed by, with

16 Seth Levine that the mortgage loans had previously

17 entered, there were two others and I don't know

18 which package contained which.

19      Q.      I would like to show you, I need to

20 show you two documents which are the

21 interrogatories, so I'd like to show you this

22 Exhibit JLS Exhibit 3.

23           (Exhibit JLS-3, Interrogatories, is

24 received and marked for identification.)

25      Q.      I ask you if you've seen this

74

1  document and whether you recognize it.

2        A.        Yes, I've seen it.

3        Q.        Did you review the questions that

4  were in this document and provide answers?

5        A.        Yes.

6                  MR. MARGOLIN:  Is this the federal or

7  state, Tim?

8                  MR. DUGGAN:  These are the ones you

9  answered, so these are the state ones.

10                 MR. MARGOLIN:  What was the date of

11 our response to this?

12                 MR. DUGGAN:  I'll show that next.

13       Q.        Here's the response.  I don't have

14 the signature page.  I think you provided a

15 signature page on these rog answers as a separate

16 document.

17                 I'll ask you to take a look at these

18 interrogatory answers and see if these are the

19 interrogatory answers to those questions?

20                 MR. MARGOLIN:  After he answers this

21 question, I need to consult with my co-counsel, so

22 we are going to take a three-minute break.

23       A.        I recognize these answers.  I'm not

24 reading each and every one now, but yeah.

25       Q.        I'd like to go through these rog

1 answers.

2            MR. MARGOLIN:  So we are going to

3 take a three-minute break.  I'm going to speak to

4 Barry and we'll get back to you.

5            MR. DUGGAN:  What do you need a break

6 for?  It's in the middle of the deposition.

7            MR. MARGOLIN:  I'm speaking to

8 co-counsel.  I'm allowed to do this.  There are

9 certain legal issues coming up here and I need to.

10            MR. DUGGAN:  We'd like to keep the

11 camera on and keep the witness there.

12            MR. MARGOLIN:  I don't mind if the

13 witness sits there.  This is not a short deposition.

14 This is going to be a very long deposition.  Don't

15 ask him any questions obviously, but he can stay

16 here if he wants, unless he's going to the bathroom.

17 That's fine.

18            (A brief recess is taken.)

19            THE COURT REPORTER:  Mr. Bowen, are

20 you going to be ordering a copy of today's

21 transcript?

22            MR. BOWEN:  Yes.

23            MR. MARGOLIN:  Tim, we are here for a

24 federal deposition under the special masters

25 allocation.  This is not --

1                MR. DUGGAN:  I'm showing you a

2  different exhibit.  It's basically the same.  I'm

3  changing the exhibit to the interrogatories from the

4  federal case.

5                MR. MARGOLIN:  That's fine.  I was

6  going to object to something -- to that.  I'm glad

7  you did that.  That obviates my objection.  We're

8  good.

9       Q.       I'd like to show you what we've

10  marked as Exhibit JLS Exhibit 23.

11                (Exhibit JLS-23, Interrogatories from

12  federal case, is received and marked for

13  identification.)

14       Q.       Which are the interrogatories from

15  the federal case, and then what we showed you

16  earlier, which is Exhibit 4, which are the answers

17  to the interrogatories in the federal case.  Do you

18  see that there?

19                (Exhibit JLS-4, Interrogatories, is

20  received and marked for identification.)

21                MR. MARGOLIN:  No, we just see you,

22  Tim, but I assume you are going to bring it up in a

23  second, share screen or whatever it is.

24       Q.       So this is JLS-4.

25                MR. MARGOLIN:  These are the ones we

1 answered about a month ago?

2　　　　　　MR. DUGGAN:  Yes.  Then here is the

3 actual questions.  So we can put it back and forth

4 if we need to.

5　　　Q.　　　I'd like to go through the answers,

6 and if we could go to answer No. 2, do you see where

7 it says, "Mr. Tepfer, agent of J&J, dealt personally

8 with Mr. Levine and negotiated the note, mortgage

9 and attendant documents to form the basis of the

10 claim."

11　　　　　　Do you see that there?

12　　　A.　　　Yes.

13　　　Q.　　　You testified earlier that the broker

14 was also involved?

15　　　A.　　　Yes.

16　　　Q.　　　So it wasn't just you his agent, it

17 was also the broker?

18　　　A.　　　Yeah, he may have interfaced maybe

19 delivered some communications back and forth.

20　　　Q.　　　If I go down to No. 11, it says, "no

21 communications regarding JLS."

22　　　　　　Do you see answer 11?

23　　　A.　　　Yes.

24　　　Q.　　　At the time J&J made the loan, the

25 J&J loan, was J&J aware that JLS was also in

1 negotiations to make a separate loan?

2       A.       No.

3       Q.       When J&J Capital made its loan, the

4 J&J Capital loan that we are here on today, did J&J

5 Capital have any knowledge of the existence of JLS?

6       A.       No.

7       Q.       And then it says you learned about

8 the relationship in late 2019.  Do you see that

9 there?

10       A.       I see that, yeah.

11       Q.       Do you recall how you found out about

12 JLS?

13       A.       No.  I think that perhaps through my

14 counsel.  I don't know who JLS is.  I don't know any

15 of the parties or participants, and I never heard of

16 them other than in the context of some legal

17 documents of this case.

18       Q.       If I could go to paragraph 16, the

19 second part of the second sentence says, "but the

20 documents in the case and the New Jersey law allows

21 funds sent to one cross stream entity and a family

22 of related entities to be sent funds credit against

23 all entities in the family," do you see that there?

24       A.       Yeah.

25       Q.       What does that mean?

```
 1         A.         The means that the fact that I wired
 2 -- they are all Seth Levine entities, and the fact
 3 that I wired to Norse was, is deemed as, and Lenox
 4 and Lenox Temple are the ones that gave me the
 5 collateral.  I didn't wire funds to each and every
 6 entity.  I wired it to the Norse entity and they are
 7 all part of the Seth Levine group of entities, so he
 8 directed me to wire it to Norse and I wired it to
 9 Norse, but it was for collateral I got for the note
10 and mortgage on Lenox and Temple -- Lenox Temple.
11         Q.         If I go to Paragraph 19 --
12         A.         Yes.
13         Q.         Says consideration received -- let me
14 withdraw that.  On paragraph 21 --
15         A.         Yes.
16         Q.         -- answer, the third sentence starts
17 with "the loan was always to the entire group."
18         A.         Of entities, yes.
19                    MR. MARGOLIN:  This is 19?
20                    MR. DUGGAN:  This is 21.
21                    MR. MARGOLIN:  Starting with --
22                    MR. DUGGAN:  Start with the second
23 sentence.
24         Q.         It says the two chief entities?
25         A.         Yes.
```

80

```
 1        Q.        Could you read that sentence to
 2  yourself?
 3        A.        Yes.
 4        Q.        It says Lenox Temple, LLC and Teaneck
 5  Plaza, LLC agreed to co-sign the participation
 6  agreement.  Do you see that there?
 7        A.        Yes.
 8        Q.        They didn't sign the participation
 9  agreement, did they?
10        A.        No, that's a misstatement.  They
11  agreed to sign the note and mortgage.
12        Q.        If we can go down to answer 24?
13        A.        Yes.
14        Q.        Can you read that first sentence?
15        A.        Yes.
16        Q.        So about a month after the loan was
17  made, J&J Capital tried to record the mortgages,
18  correct?
19        A.        I don't know which of the mortgages.
20  That happened in February.  I don't recall if it was
21  on this loan or if it was on the two previous loans.
22        Q.        Well, these interrogatory answers
23  were for this case, and you prepared these answers,
24  correct?
25        A.        Yeah but the sentence mentions to
```

1 record the mortgage and if you can go back to that

2 line?  And other mortgages it says, so I can't tell

3 you definitively what went into this FedEx envelope

4 and what went into the other FedEx envelope.

5        Q.        I'm showing you the question,

6 question No. 24.

7        A.        Yes.  Why was the mortgage recorded

8 about nine months after it was executed?

9        Q.        Okay.  So why was the mortgage that

10 J&J Capital seeks to enforce in this action, right,

11 so do you agree that question 24 relates to the

12 mortgage from this case?

13        A.        Yes.

14        Q.        And then the answer is, Mr. Tepfer,

15 which is you, sought to have Madison Title record

16 the mortgage in this and other loans with Levine as

17 early as February?

18        A.        Yes, I see that.

19        Q.        That's a month after the loan?

20        A.        Yes, it would be a month after the

21 loan, yes.  So I don't know -- I can't tell you

22 whether it was this loan, you know, I don't know

23 what was put into each FedEx envelope, I must say

24 that.

25                 MR. MARGOLIN:  The interrogatory

82

 1  answers speak for themselves.  They were provided at

 2  the time when the witness would review documents in

 3  his possession.

 4              MR. DUGGAN:  I'm asking --

 5              MR. MARGOLIN:  He may not remember

 6  them.

 7       Q.       I'm asking a question.  Did you

 8  prepare this answer or did your lawyer prepare it?

 9              MR. MARGOLIN:  Objection,

10  attorney-client, attorney work product.

11       Q.       Did you sign the -- these

12  interrogatories based upon your firsthand knowledge?

13       A.       I signed the interrogatories, yes.

14       Q.       I'm asking you what you meant when

15  you signed the interrogatories for the first

16  sentence in paragraph 24 of your answer?

17              MR. MARGOLIN:  Objection.  The

18  document speaks for itself.

19       Q.       I'm asking for your firsthand

20  knowledge of what that sentence means?

21       A.       That sentence means that I started

22  the process of recording Seth Levine mortgages in

23  late February.  I don't -- it doesn't specify.  In

24  fact, the answer sort of includes a little bit of

25  that ambiguity.

1    Q.        Okay.  Why do you have ambiguity when
2  the question is pretty direct?

3    A.        The question is direct, and not every
4  question can be answered directly.  I answered it to
5  the best of my knowledge that I started, I sent a
6  Seth Levine mortgage out for recording to Madison in
7  this and other loans beginning February.  There was
8  another one that followed in April.  I don't know if
9  this one was in February or this was in the April.
10 I cannot say that with specificity, and I didn't say
11 it in 24 with any specificity.

12              MR. DUGGAN:  I have no further
13 questions.

14              MR. MARGOLIN:  I'm assuming Ascend
15 has questions?

16              MS. KLEIN:  I also have questions.
17 You can go first, Michael.

18              MR. MARGOLIN:  Ascend, JLS has two
19 counsel.  Why are we having two different sets of
20 counsel asking questions for one party?

21              MR. DUGGAN:  They are different
22 topics.

23              MR. MARGOLIN:  I don't think it
24 matters.  One second.  Could we get the federal rule
25 discussing how many attorneys can ask questions per

1 party?  I've never seen in any jurisdiction where
2 multiple attorneys can ask a series of questions for
3 the same party.

4          MR. DUGGAN:  When you have co-counsel
5 in a case and they are not duplicative, then you
6 can.

7          MR. MARGOLIN:  They are duplicative
8 by nature of representing the same party.

9          MR. DUGGAN:  They are not duplicative
10 if they are different topics.  I could have taken
11 the list of questions and asked them.  It's a
12 different topic.

13          MR. MARGOLIN:  My question is not
14 that.

15          MR. DUGGAN:  You can object asked and
16 answered is a proper objection.

17          MR. MARGOLIN:  What are the federal
18 rules?  In every single litigation I've done in any
19 jurisdiction, I've never allowed more than one
20 attorney.  In fact, I thought we discussed this
21 already.

22          MR. DUGGAN:  We didn't discuss it.

23          MR. MARGOLIN:  I don't know whether
24 or not that's even legal.  Look, I prefer to have
25 one attorney ask all the questions.

 1                    MR. DUGGAN:  Pull up the federal

 2  rules.

 3                    MR. MARGOLIN:  Let's take a look at

 4  the federal rules.  It wouldn't be the federal

 5  rules.  It would likely be local district rules.

 6                    MR. DUGGAN:  We don't have -- our

 7  local district rules do very little to the Feds on

 8  the discovery rules.  I would suggest that Michael

 9  starts.

10                    MR. BOWEN:  Let me say, because I

11  hope that these questions won't take too long, but

12  it depends obviously.  Let's just begin.

13                    MR. MARGOLIN:  I was going to ask,

14  I'm sorry, Ms. Klein, what topic are your questions

15  pertaining to?  I guess, Mike, I know that you

16  represent the insurer.  I think the Eagle line

17  policy is provided in your coverage.  Are they

18  different?  I don't want to cause a ruckus for

19  nothing.

20                    MS. KLEIN:  I have like three

21  questions.  It's not anything that Mr. Duggan's

22  covered, so I don't think it's really an issue.

23                    MR. MARGOLIN:  Why not have Sarah go

24  now since they are the same party?

25                    MR. BOWEN:  That's fine with me.  Go

1  ahead, Sarah.

2              MS. KLEIN:  That's fine.  All right.

3  EXAMINATION BY MS. KLEIN:

4      Q.        Good afternoon, sir.  My name is

5  Sarah Klein from Becker, Poliakoff.  I'm co-counsel

6  for JLS Equities.  I have a handful of questions for

7  you.  Let me share my screen.

8              MS. KLEIN:  Tim, what was the last

9  number of your exhibit?

10             MR. DUGGAN:  It was the fed rogs I

11 think was 23.  23.

12             MR. MARGOLIN:  Did you use every

13 single exhibit?

14             MR. DUGGAN:  No.

15             MS. KLEIN:  I know you premarked a

16 bunch of them, so what would be the next number?

17             MR. DUGGAN:  JLS Exhibit 24.

18             MS. KLEIN:  So I'm going to mark this

19 as JLS Exhibit 24.

20             (Exhibit JLS-24, Federal pleading, is

21 received and marked for identification.)

22     Q.        This is on the federal case Docket

23 No. 291.  Do you recognize this document, sir?

24     A.        Yes.

25     Q.        I'm scrolling down to the affirmative

1  defenses.

2            MR. MARGOLIN:  This is the same

3  pleading we filed earlier this month?

4            MS. KLEIN:  This is J&J's response to

5  JLS's cross-claim, correct?

6            MR. MARGOLIN:  So it's not the same

7  thing as earlier.  That was our response to Ascend.

8            MS. KLEIN:  Correct.  This is J&J's

9  response to JLS.

10            MR. MARGOLIN:  Yes.

11       Q.       Please take a look at affirmative

12  defense No. 5.  Read it to yourself and my question

13  is what is the factual basis for this affirmative

14  defense?

15            MR. MARGOLIN:  Objection, you can

16  provide basis of fact if you understand it.  You

17  cannot give legal opinions or explain the legal

18  theory behind the --

19       A.       Let me try and understand this.  You

20  want me to try to interpret it?

21       Q.       No, I want the factual basis for this

22  affirmative defense, No. 5?

23            MR. MARGOLIN:  I object to the

24  question.  It's a legal question, but --

25       A.       I'm not, I can't answer that

1 question.  I can't answer that question.

2     Q.     Does J&J allege that JLS knew of it

3 in some fashion?

4     A.     I think that's what the words say,

5 constructive, implied or constructive knowledge.

6               MR. MARGOLIN:  I think the document

7 speaks for itself, Ms. Klein.

8     Q.     Is that based on any particular

9 document?

10     A.     I don't know.  I don't have the

11 document in front of me.

12               MR. MARGOLIN:  I object further and I

13 believe it's inappropriate to ask witness questions

14 about a pleading that is a legal document and it is

15 something that is appropriate for --

16     Q.     Please take a look at affirmative

17 defense No. 6.  Read it to yourself and let me know

18 the factual basis for it?

19     A.     Yes, I read that.

20     Q.     What's the factual basis for this

21 affirmative defense?

22               MR. MARGOLIN:  The same objection.

23 This calls to his knowledge of what JLS did.  He's

24 not his own attorney in this case.  This is not a,

25 it's a legal question and a legal theory.  If you

1 know or remember what you think it might be, you may

2 answer, but otherwise, I object.

3       A.       I can read it and understand it,

4 because I wasn't in law school that long ago.  I was

5 there only 45 years ago, so it says.

6       Q.       What's the factual basis?

7       A.       Excuse me?

8       Q.       What's the factual basis for

9 affirmative defense No. 6?

10              MR. MARGOLIN:  Same objections and

11 same --

12       A.       I don't have that at my fingertips.

13 I'm not aware of it at this time.

14       Q.       Please take a look at affirmative

15 defense No. 11 and let me know the factual basis for

16 it?

17       A.       Well, they specify here that land

18 records --

19              MR. MARGOLIN:  Before you -- same

20 objection as last time, say discussion of pleadings

21 that is inappropriate for depositions, same

22 questions are more appropriate to a lawyer than

23 asking him.  Asking him information that's outside

24 of his knowledge.  That having been said, he can

25 answer if he can.

1      A.       I can say that there are land records
2 that indicated that Seth Levine was signing on
3 behalf of Lenox Temple, and these were ratified and
4 accepted by JLS several years before our
5 transactions, so I believe so that they are -- they
6 allowed that implied authority, actual authority on
7 behalf of Seth Levine to sign on behalf of those
8 entities.
9                MS. KLEIN:  That's all I have.
10               MR. MARGOLIN:  Okay.  Mike, is it
11 worth giving him a breather or do you think you'll
12 be quick?  Not to be rude, but he's not a young man
13 necessarily.
14               MR. BOWEN:  It's up to the witness.
15 If you need a break, we can take a five-minute
16 break.
17               (A brief recess is taken.)
18 EXAMINATION BY MR. BOWEN:
19      Q.       My name is Mike Bowen.  I'm the
20 attorney for the Ascend entities in this matter.
21               I take it from your prior testimony
22 you didn't do any due diligence yourself about
23 whether or not Seth Levine had any authority to
24 mortgage the Lenox Temple property; is that correct?
25               MR. MARGOLIN:  Objection, counsel's

1  testifying.  Misstating previous testimony.  That's
2  about it.
3       Q.       Is that correct, Mr. Tepfer?
4       A.       No.
5       Q.       What did you do personally to
6  determine whether or not Mr. Levine had authority to
7  put a mortgage for your transaction on the Lenox
8  Temple property?
9       A.       There was -- there had been documents
10 recorded on those properties that had previously
11 been executed by Mr. Levine.
12      Q.       So what documents are you referring
13 to?
14      A.       I think there was a mortgage, I'm
15 talking from memory now, there's mortgages and other
16 loans that had been taken on the property by Mr.
17 Levine and he showed me an operating agreement, I
18 think, and he executed, made a statement, he signed
19 affidavits stating that he has the authority.
20      Q.       Well, leaving aside anything that Mr.
21 Levine told you, what did you do to independently
22 confirm that he had the ability he claimed to have
23 on behalf of Lenox Temple?
24               MR. MARGOLIN:  If you remember.
25      A.       I have a recollection of some prior

92

1 recordings having his signature on that, on that

2 property.

3       Q.       That's something that you

4 independently obtained or did you get that from Mr.

5 Levine?

6       A.       From the title companies, it was part

7 of some of the title searches that I got.

8       Q.       The title report that you have, that

9 would have been from Madison Title; is that right?

10                MR. MARGOLIN:  Objection, if you can

11 remember.

12       A.       Yeah.

13       Q.       Well, the one that you produced was

14 from January of 2018.  Is that the only one you had?

15       A.       For this property?

16       Q.       Yes.

17       A.       Yeah, but they would have included

18 copies of documents that had Mr. Levine's signature

19 previously recorded, copies of previously recorded

20 documents with Mr. Levine was acting on behalf of

21 this entity.

22       Q.       Other than the 2018 Madison Title

23 report, you didn't get an updated report late in

24 2018 before you entered into this agreement with Mr.

25 Levine in January of 2019, correct?

1              MR. MARGOLIN:  Objection, there are

2  documents that have been produced that may or may

3  not answer that asking him now, to the best of his

4  recollection.

5       A.       I don't recall, but I was satisfied

6  that he had the authority to act on behalf of it.

7  So Mr. Levine came to me with a little bit of a

8  reputation.  He was known in the community,

9  certainly the Teaneck community, and his father was

10  a prominent man.  He was a prominent man taking, you

11  know, business opportunities that were presented to

12  him by his father who was a bank executive or

13  something like that, and, you know, he came to me

14  recommended and he was all on the up and up, and I

15  didn't think he's gonna do anything that's, you

16  know, that's fraudulent or anything like that.

17       Q.       Did you know his father?

18       A.       I knew him through an intermediary.

19       Q.       Did you know him directly?

20       A.       No.

21       Q.       Who recommended Seth Levine to you?

22       A.       It was a gentleman -- well, actually

23  -- Judah Tyrnauer, the broker that I mentioned

24  earlier, and also, a relative of someone from Park

25  National was a good friend of his, was a good friend

1 of his father's so I got it from Park National also.

2     Q.     Who at Park National?

3     A.     Park National, Kenneth Schaum.

4     Q.     How do you spell the last name?

5     A.     S-c-h-a-u-m.

6           MR. MARGOLIN:  Before the next

7 question, Mr. Schaum represents Park National.  He's

8 Park National's executive.  Mr. Tepfer was an

9 attorney for Ken Schaum and for Park National.  To

10 extent there were communications regarding any legal

11 work that Mr. Tepfer was doing, obviously he can't

12 answer that.

13           MR. BOWEN:  I'm not asking anything

14 like that.

15           MR. MARGOLIN:  I want to preface that

16 to make it clear.

17     Q.     Mr. Tepfer, when you referred to

18 Tyrnauer, is that a woman or a man?

19     A.     Man.

20     Q.     What's the first name?

21     A.     J-u-d-a-h.

22     Q.     Judah Tyrnauer also knew Seth Levine?

23     A.     Yes, he had met with him.

24     Q.     Other than that Madison title report

25 and other than what you heard about Mr. Levine's

1 reputation or what you had previously known about

2 it, did you, yourself, do anything else to

3 independently determine whether Mr. Levine had the

4 authority to mortgage the Lenox Temple property?

5                    MR. MARGOLIN:  Objection, the

6 documents speak for themselves.

7        A.        If there's been any verification like

8 operating agreements and title reports, that's the

9 extent of it, and then his own affidavit, his own

10 affirmation.

11       Q.        I'm asking things, I'm sorry to

12 interrupt you, but I'm asking for things that were

13 done independently, not relying on Seth Levine, but

14 independently from him.  I take it the answer to

15 that is no, correct?

16                    MR. MARGOLIN:  Objection, counsel,

17 time out.  Counsel specify the question.  I don't

18 understand what the distinction is between reviewing

19 documents that are public record provided by Seth

20 Levine and independent.  It sounds like you are

21 trying to confuse the witness.

22                    MR. BOWEN:  Mr. Margolin, I'm asking

23 you to stop coaching the witness.  Let him answer.

24 If he doesn't understand, I will clarify.

25       Q.        Mr. Tepfer, you and me, please answer

1  my questions.  The question is simple.  Other than

2  looking at the Madison title report which had filed

3  documents attached or at least referred to publicly

4  filed documents, other than that, did you yourself

5  personally do something independent of anything Mr.

6  Levine did or said to you to determine or to satisfy

7  yourself that he had the authority to act on behalf

8  of Lenox Temple in mortgaging Lenox Temple's

9  property?

10              MR. MARGOLIN:  My objection's noted.

11      A.       Okay, I can't tell you anything

12  specifically at this time.  But I was satisfied

13  myself.

14      Q.       Mr. Tepfer, please just focus on my

15  question.  We've been going all morning.  I'm trying

16  to end my questioning concisely and quickly?

17      A.       Thank you.

18      Q.       You don't have to explain yourself.

19  I'm just asking you to direct your answers to my

20  questions and you have opportunities to explain

21  yourself later?

22      A.       That's all that I can recall at this

23  time.  That's all.

24      Q.       You also testified earlier -- I'll

25  withdraw that.  You never met Mr. Levine, right?

```
 1        A.         Face-to-face, correct.

 2        Q.         And you spoke to him on the phone or

 3 no?

 4        A.         Yes, certainly.

 5        Q.         You spoke with him on the phone but

 6 you never met with him in person, right?

 7        A.         Correct.

 8        Q.         And you never met any of his family

 9 members, correct?

10        A.         No, that is correct.

11        Q.         So you never met his wife or his

12 kids?

13        A.         No.

14        Q.         And you never spoke to them, right?

15        A.         I think I may have spoken to them.

16 They may have been in the office perhaps.  I may

17 have spoken to them.

18        Q.         I'm sorry, you said they may have

19 been in the office?

20        A.         Yeah, with him, not in mine.

21        Q.         So were they on the phone with you or

22 no?

23        A.         I have no specific recollection, but

24 I may have spoken to the wife at some point.

25        Q.         But I'm asking you as a witness under
```

 1  oath, can you testify that you did or are you just

 2  saying you don't know?

 3      A.      I can say I don't know.  I have some

 4  sort of memory of having spoken to the wife.  I

 5  can't specify.

 6      Q.      Now, you said that Mr. Levine gave

 7  you the operating agreement for Lenox Temple,

 8  correct?

 9              MR. MARGOLIN:  Mischaracterizes

10  testimony.

11              MR. BOWEN:  I'll withdraw the

12  question.

13      Q.      Did Mr. Levine give you the operating

14  agreement for Lenox Temple as part of the due

15  diligence you did for this loan, your loan?

16      A.      If it was in the documents that were

17  produced, then he gave it to me.  If it was not, I

18  don't have a recollection of it at this moment.

19      Q.      Did he give it to you -- let me ask

20  it this way.  Did you get an operating agreement for

21  Lenox Temple at some time after the FBI raided

22  Mr. Levine's office?

23      A.      I don't know.  I don't know if I got

24  it or if I didn't, and I don't know when I got it.

25      Q.      I'll represent to you that there was

1  an operating agreement for Lenox Temple that was in

2  your production, the J&J production to us in this

3  litigation?

4          A.        Okay.

5          Q.        Is that a document that you had as

6  part of the due diligence or did it come sometime

7  later?

8                   MR. MARGOLIN:  If you recall.  Again,

9  there are emails that say it.

10         A.        I think it would have been certainly

11  earlier than the FBI raided, but I don't recall

12  exactly.  I can't say exactly.

13         Q.        Now, that operating agreement, let's

14  show it to you.  We'll mark this as Ascend No. 1.

15  So Exhibit Ascend 1.

16                  (Exhibit Ascend 1, Certificate of

17  formation Lenox Temple, LLC, is received and marked

18  for identification.)

19         Q.        If we go to the third page of that

20  document, please.  Do you see the title page here,

21  Mr. Tepfer?

22         A.        Yes.

23         Q.        Dated July 3, 2013?

24         A.        Yes.

25         Q.        Do you remember reviewing this

1 document as part of your due diligence?

2      A.      At this moment, I do not remember,

3 no.

4      Q.      Are you aware today that this

5 document, although it gives Mr. Levine managerial

6 duties, he's not authorized unless he has the

7 majority in interest vote to mortgage the Lenox

8 Temple property; are you aware of that?

9           MR. MARGOLIN:  Objection, compound

10 question.  Objection, counsel testifying.

11 Objection, confusing question.

12           MR. BOWEN:  I'll restate it if you

13 are confused.

14      Q.      The question is simply are you aware

15 sitting here today right now that this document does

16 not give Mr. Levine the authority to mortgage the

17 Lenox Temple property unless he has the majority in

18 interest vote of all the members?

19           MR. MARGOLIN:  Objection, don't

20 answer that.  Counsel is now testifying what a

21 document states.  It's not counsel's place to

22 testify.  You can ask him a question what you

23 believe it says.  You may not say yes or no to your

24 understanding.

25      A.      I'll read it if you move it up a

1 little bit.

2  Q.  Let me ask you this then before we

3 show you the document.  Do you have any idea what

4 this document says?  Do you remember about --

5  A.  The contents?  No, I don't remember

6 the contents of the document, no.

7  Q.  So the contents say what they say.

8 I'm not going to take the time to show it to you.

9  A.  Okay.

10  Q.  It says what it says.  If you had

11 read this document, do you have any memory saying to

12 yourself wait a minute, Mr. Levine does not have the

13 authority under this document to mortgage the Lenox

14 Temple document?

15    MR. MARGOLIN:  Same objection,

16 counsel's testifying.

17  A.  You're saying had I read it before

18 the loan, I would have insisted on something else?

19 Most certainly.

20  Q.  I'll try to clarify my question.  My

21 question is simply -- I'll ask it in a couple steps.

22 The first step is, do you recall actually reading

23 this document as part of your due diligence before

24 you made the loan to Seth Levine?

25  A.  I don't recall that specifically now,

1  no.

2      Q.    So the next question is, do you

3  recall at any point before you made the loan to Mr.

4  Levine having some question whether he had the

5  authority to mortgage the Lenox Temple property in

6  accordance with the Lenox Temple operating

7  agreement?

8      A.    Did I have any question about it?

9      Q.    Right.  Do you recall thinking that

10  might be an issue there?

11      A.    No, no.  I gave him the money without

12  that hesitation.

13      Q.    Now this document is dated July 3,

14  2013.  Are you aware that there was a mortgage filed

15  and publicly recorded in Bergen County in November

16  of 2013 on behalf of Len Tepfer that was signed by

17  Ascend?  Are you aware of that?

18      A.    I don't recall that.

19      Q.    And you didn't do your own

20  independent review of the public recordings for this

21  property, right?

22      MR. MARGOLIN:  Misstatement, I'm

23  sorry, I have to object.  There was a title policy.

24  This document did not appear in the title policy

25  because that mortgage had already been terminated.

1  So you are misleading the witness.

2  MR. BOWEN:  Mr. Margolin, that's a

3  nice bit of testimony from you.

4  MR. MARGOLIN:  As was yours.

5  Q.  Mr. Tepfer, I'm asking you a

6  question.  The question is, did you ever go, leaving

7  aside the Madison title report, did you ever go

8  yourself to look at what was publicly recorded with

9  Bergen County about this property?

10  A.  I don't think so.  Pay a visit to the

11  county clerk to look at a record of old documents,

12  no, I did not do that.

13  Q.  You didn't ask Mr. Tyrnauer to do

14  that, right?

15  A.  No, to go to look at the documents,

16  no.

17  Q.  Did you ask or direct Mr. Tyrnauer to

18  do any due diligence specifically on the question

19  whether Mr. Levine had the authority under the Lenox

20  Temple operating agreement to mortgage the Len

21  Tepfer property?

22  MR. MARGOLIN:  Asked and answered.

23  Q.  This is specifically about

24  Mr. Tyrnauer.  Did you direct Mr. Tyrnauer to do any

25  work to confirm that Mr. Levine had the authority to

1 mortgage the Len Tepfer property?

2        A.        I don't recall that.  I don't recall

3 that.  I cannot say yes.

4        Q.        Was Mr. Tyrnauer paid a fee, a

5 brokers fee or finder's fee?

6        A.        Yes, he was.  Perhaps by Mr. Levine.

7 I don't recall the exact disbursements.

8        Q.        Well, was he paid by you?

9        A.        I don't think so.  I don't think so.

10        Q.        By you, I mean J&J?

11        A.        J&J, I have to look at the

12 disbursement that we made reference to earlier and

13 see if he received a disbursement on this.

14        Q.        Is there a document that shows the

15 disbursements for this loan?

16        A.        There would just be notations that I

17 would have made and copies of checks or something,

18 if he would have gotten paid.

19        Q.        Where would those notations be made?

20        A.        Something in a book or, you know.

21        Q.        Did you produce those?

22        A.        Did I produce that?  No, I don't

23 think I did.  If I didn't produce it, then there

24 probably wasn't any.  Then I didn't pay him the fee.

25        Q.        Well, this is a related topic, but --

1  I can move there.  You produced the wire

2  confirmation?

3          A.          Yes.

4          Q.          But we don't have any record from you

5  about any other disbursements other than that wire

6  confirmation related to this note, to this loan; is

7  that right?

8          A.          Right, yes.

9          Q.          So you didn't make any other

10 disbursements, you meaning J&J?

11         A.          I think not.

12         Q.          Okay.  Now, the wire confirmation

13 that you produced was for the amount of $739,500,

14 not the full amount of 750,000.  So the difference,

15 which is $10,500, where did that money go?

16         A.          That went to pay for legal fees and

17 for possible -- for contingent title expenses that

18 would be required for the recording of the

19 documents.

20         Q.          So that money was held by J&J in

21 escrow?

22         A.          Yes.

23         Q.          It was held by you as the lawyer for

24 J&J?

25         A.          Yeah, yeah.

1    Q.        Was that $10,500, was that actually
2 disbursed at some point?
3    A.        Yes, it was disbursed for the
4 recordings, and there's a legal fee for the drafting
5 and preparation of the documents.
6    Q.        And you got that legal fee?
7    A.        Yes.
8    Q.        How much was that?
9    A.        My firm, I think it was 7,500 or
10 6,500.  I have to see the breakdown.
11    Q.        But Mr. Tyrnauer didn't get any
12 portion of that money; is that right?
13    A.        I think not.
14    Q.        Now, I did have some follow-up
15 questions to your testimony earlier today about the
16 mortgage.  If we show you the mortgage agreement,
17 which I think is JLS Exhibit 12?
18              MR. MARGOLIN:  Was that 12 used or 12
19 of premarked?
20              MR. BOWEN:  12 is the note.
21              MR. MARGOLIN:  I guess what I'm
22 saying here is I wish they weren't premarked with a
23 number.  Now we are going to have --
24              MR. BOWEN:  We are using that
25 numbering.  Mr. Duggan didn't change the numbering.

1  That's the numbering that the exhibit has.

2            MR. MARGOLIN:  There will be holes in

3  numbers.  There will be one then three then eight.

4            MR. DUGGAN:  The documents all have

5  separate numbers.

6            MR. MARGOLIN:  I know that.  What I'm

7  saying, I'm just saying I won't be able to go later

8  and say document, one, two, three, four, five were

9  used.  It will be one, two, four, six, nine.

10            MR. DUGGAN:  That's correct.

11            MR. MARGOLIN:  So we need a list.  We

12  all have these documents.  This is nothing new.

13            MS. GAO:  It was JLS-14.

14            MR. BOWEN:  Thank you.  Let's put

15  that up.

16       Q.     So if we go -- just go to the first

17  page of that, please.  This document was eventually

18  recorded, right?

19       A.     Yes.

20       Q.     But you didn't record the

21  participation agreement, right?

22       A.     No.

23       Q.     Now, if you go to the text of this

24  document, starts with the definitions, probably page

25  2, right, okay, and I'm going to ask you then to go

1  to page --

2            MR. MARGOLIN:  He can't go anywhere.

3  You have to show him.

4            MR. BOWEN:  We are directing your

5  witness through the screen.

6       Q.       So we are going to go to page 6, pdf

7  page 6, paragraph No. 4.  Mr. Tepfer, this mortgage

8  was designed to be a first priority mortgage, right?

9       A.       Excuse me?

10      Q.       This mortgage was designed to be a

11  first priority mortgage, correct?

12      A.       I believe so, yes.

13      Q.       So, for example, if you look at

14  paragraph 4 of this document, and again there's

15  something wrong with the screen.  I don't know,

16  Skye, could you see the whole document?  Now it's

17  clear.

18            That paragraph requires the borrower

19  to discharge any lien that has priority over this

20  loan, right?

21      A.       Yeah.

22      Q.       You knew at the time that you made

23  this loan that there was a prior first position

24  mortgage on the property in the amount of about $6

25  million, correct?

```
 1        A.         I believe so.  I have recollection of
 2  that, yeah.
 3        Q.         So the expectation was that this
 4  mortgage would never be filed; is that right?
 5                   MR. MARGOLIN:  Objection, calls for
 6  speculation.  Misstates testimony.  Counsel's
 7  testifying.
 8                   MR. BOWEN:  I'm asking for
 9  Mr. Tepfer's expectation at the time he entered into
10  this loan.  The expectation was this mortgage would
11  not need to be filed; isn't that right?
12                   MR. MARGOLIN:  Again, keep rephrasing
13  that.  You are misstating his previous testimony and
14  you are testifying.  You can ask him what his
15  understanding was, not yours.
16        Q.         Isn't that right, Mr. Tepfer?
17        A.         No, it's not.
18        Q.         So you entered into a participation
19  agreement with Seth Levine where you loaned him
20  $750,000 on the understanding that -- in which Mr.
21  Levine took on the obligation to repay that amount
22  plus $75,000 within 26 days, correct?
23        A.         Yes.
24        Q.         And the expectation was that if that
25  didn't happen, he would have another six months
```

1  until August of 2019 to pay the loan with the

2  interest, right?

3          MR. MARGOLIN:  Misstates testimony.

4  You can answer the question.

5      A.      Well, he was going to be granted an

6  additional period of time on the loan if he could

7  not pay it within the first 26 days.

8      Q.      The additional period of time was six

9  months?

10     A.      Yeah.

11     Q.      Only if that happened, only if he

12 didn't make the full repayment by the end of the six

13 months, then you would be in a position to collect

14 on the collateral, right?

15         MR. MARGOLIN:  No, no, misstatement

16 of documents and his testimony.

17         MR. BOWEN:  Mr. Margolin, I'm going

18 to ask you to try to restrain yourself.  Let your

19 witness give testimony.  He's doing fine.

20     Q.      Mr. Tepfer, I know you said --

21         MR. MARGOLIN:  For your questions

22 he's doing fine.

23         MR. BOWEN:  Yan, you can't keep

24 speaking over me.  We are not going to have a

25 record.

```
 1              MR. MARGOLIN:  You just gave an
 2  instruction and then immediately continued speaking,
 3  so obviously I'm going to respond to.
 4              MR. BOWEN:  I'm directing the
 5  witness.
 6       Q.     Mr. Tepfer, I'm directing this
 7  question to the witness.  Mr. Tepfer, you said the
 8  answer to that question was no, right?
 9              MR. MARGOLIN:  I'm sorry, with I
10  question.
11       A.     What was the question?
12       Q.     The previous question was that if
13  Levine did not pay back the loan amount with the
14  interest within six months, then you, meaning J&J,
15  would have the ability at that point in time to
16  collect against the collateral, right?
17       A.     Well, he had to continue to maintain
18  monthly payments as well.  There were other -- I can
19  collect on the collateral if he defaulted as well.
20       Q.     That's my question.  My question is,
21  if he doesn't meet the terms of the six-month
22  requirement, meaning he doesn't fully pay you back
23  within six months, he's paying the monthly interest?
24       A.     Yes.
25       Q.     Is that what happened here, that
```

1  after February came and went, you didn't get the

2  $825,000, right?

3       A.       He didn't pay, but he didn't pay the

4  monthly either.

5       Q.       Right.  So by March, the next payment

6  that was due was the 20 percent interest on 825 was

7  due in March, correct, under the participation

8  agreement?

9       A.       Yes.

10      Q.       He missed that payment, right?

11      A.       I have to check the record.  I don't

12  recall exactly.  Did I -- is that part of the record

13  that I submitted?

14      Q.       Well, you know that Mr. Levine never

15  paid any money back on this loan, correct?

16               MR. MARGOLIN:  Objection.  When you

17  say money back, you mean principal or interest?

18               MR. BOWEN:  Anything.

19      Q.       I'll change the question.  Did Mr.

20  Levine pay you any money on this loan?

21      A.       I have to check.  I have to check my

22  record of payment if I ever got one or two monthly

23  payments.  I don't recall.

24               MR. MARGOLIN:  What is this box?  I

25  see a box.

1              MR. BOWEN:  There's something wrong
2  with your screen.  You can take the exhibit down.
3        Q.       Mr. Tepfer, sitting here today, you
4  don't know if you got any payment from Mr. Levine on
5  this loan?
6        A.       I did get -- when you say this loan,
7  I did get some payments on the prior loans, two
8  loans with him, and I have to check and see if he
9  ever made any single payment on this loan.  I'd have
10 to check and see.  I don't want to misstate
11 anything.  He may have paid one or two months.  I
12 don't have a recollection of when everything broke
13 loose and when the FBI raided him.  I don't have
14 that straight in my head the dates when he
15 defaulted.  He went out of business, I think, or
16 closed down as the rumors were spreading about him
17 having a serious problem maybe before the FBI
18 actually raided.  I don't recall exactly, and I'd
19 have to see if he made any payment, one payment or
20 two payments or no payments on this loan.  I have to
21 get back to you on that.
22       Q.       Did you produce the documents, the
23 financial documents, showing payments on the loan?
24       A.       I don't recall if I did not, then I
25 don't have any.  Then the answer would be no.

```
 1                MR. MARGOLIN:  I believe Tim already
 2  asked for the payment history, so we are going to
 3  produce that after the deposition.  We'll make sure
 4  you get that.
 5       Q.        The fact of the matter is is that at
 6  some point before August of 2019 Mr. Levine was in
 7  breach of the participation agreement, correct?
 8       A.        Yes, right.
 9       Q.        You then took some steps to declare
10  default, right?
11       A.        Yes.
12       Q.        And that's when you took steps to
13  record the mortgage?
14       A.        Record the mortgage, yes.
15       Q.        But it wasn't until that missed
16  payment, whenever that occurred; is that right?
17       A.        Yeah.
18       Q.        Now, let's put up the participation
19  agreement which is JLS Exhibit 11.  If you go down
20  to the terms look for the $75,000 return payment,
21  It's paragraph 2?
22       A.        Yes.
23       Q.        So this 10 percent return of $75,000
24  was due to be paid February 10, 2019?
25       A.        Yes.
```

1    Q.      Correct?

2    A.      Yes.

3    Q.      That was not paid, right?

4    A.      No.

5    Q.      Now, the way this document works is

6  at the time that he failed to pay the $75,000 by

7  February 10, he could keep the loan for another six

8  months as long he paid the monthly payment of

9  interest that's set forth?

10    A.      Under the note --

11            MR. MARGOLIN:  Counsel is

12  characterizing the document speaks for itself.

13    Q.      Is that correct?

14    A.      I believe so, yeah.

15    Q.      But he still owed the $75,000 too,

16  correct?

17    A.      Yes.  That was rolled into the

18  amount.  It's for the 825.

19    Q.      Now you testified that at some point

20  you said this was an initiation fee, $75,000?

21    A.      Origination, yeah, yeah.

22    Q.      Origination fee.  That's not what the

23  document calls it, right?

24    A.      No, no.

25    Q.      So I was just -- I'm confused by your

1  testimony that you called it something else because

2  there was some religious concern that certain

3  religious edicts or traditions had to be satisfied

4  by using a different terminology; is that what you

5  were saying?

6         A.        Somewhat, yeah.

7         Q.        What was, I think you used a Hebrew

8  word for it, what was the word that you used?

9         A.        H-e-t-e-r-i-s-k-a.

10        Q.        Heteriska.  Was that your concern or

11 was that a concern that Mr. Levine raised or

12 somebody else?

13        A.        It was both parts.

14        Q.        What's your understanding of that

15 doctrine?

16        A.        Which document?  Heteriska?

17        Q.        The doctrine, the doctrine of

18 heteriska, what's your understanding of that?

19        A.        The doctrine is that interest is not

20 to be paid by a borrower to a lender or lender

21 should not collect interest, but if they are -- call

22 it if they are partners or participants, then in

23 lieu of making payment of a percentage of the profit

24 of the earnings or the income that's going to be

25 done, then you pay a fixed interest.  We are sort of

1 partners, but I'll excuse you for giving me any of

2 the profits and I'll -- and just give me a fixed

3 interest, so that's sort of the fig leaf that is

4 used to enable that.  There is, I think, a separate

5 heteriska document signed as well.

6          Q.          In addition to this one?

7          A.          I believe so.  It may have been --

8 yeah.

9                    MR. MARGOLIN:  I believe it was

10 produced.

11                    MR. BOWEN:  You think that's in the

12 production?  We'll check.

13                    MR. MARGOLIN:  If it's not, I'm sure

14 it's there.  Every transaction always has one,

15 including JLS's.

16          Q.          So that explains why the disagreement

17 was set up as investors in participation, right?

18                    MR. MARGOLIN:  Objection, misstates

19 the previous testimony already answered.

20          Q.          Is that correct, Mr. Tepfer?

21          A.          Yes, it was not a very artfully drawn

22 agreement.  Again, I told you it was done, I

23 testified previously it was done on a rush basis

24 time of the essence, and an old form was taken.

25 There was some alterations and additions and

whatever, and it's not the thing I'm most proud of.

Q.      What was the urgency?

A.      There was a time of the essence for Mr. Levine to conclude his deal on the purchase of the mortgage.

Q.      When did you first start talking to him about this deal?

A.      Sort of probably very shortly before this.

Q.      Before the date of this agreement?

A.      Yeah, probably very shortly before the loan was transacted.

Q.      The date of this agreement is?

A.      January 15.

Q.      I'm looking at it.

        MR. MARGOLIN:  I'm pretty sure all the document --

A.      January 15.

Q.      It's January 15?

A.      Yeah.

Q.      That's the date this document was signed, January 15th?

A.      Yeah, what the notary shows, what the notary shows.

Q.      The date of the wire is January 16 --

```
 1  no, no, it was requested January 15 and it was
 2  requested the next day.  Does that sound right to
 3  you?
 4       A.       Yeah, I don't have it in front of me,
 5  but it sounds right.
 6       Q.       Given that this document was signed
 7  on January 15 and the requested fund transfer was
 8  that same day, when did you first start talking to
 9  Mr. Levine about this deal?
10       A.       It could have been very shortly
11  before, a day or two before.
12       Q.       January 14?
13       A.       I don't remember what day of the week
14  that was.  It might have been a Sunday or Saturday,
15  but it could have been just one or two business days
16  before that.
17       Q.       So January 15th was a Tuesday?
18       A.       Could have been that same week or
19  perhaps at the end of the previous week.
20       Q.       You don't have any specific memory if
21  it was a one-day turnaround or two-day turnaround or
22  something like that?
23       A.       It was a rush turnaround.  I don't
24  recall if it was, if it was that short exactly.  It
25  was a rush rush turnaround.
```

```
 1       Q.        How would we figure out when that
 2 first contact first started?
 3       A.        I don't know.
 4       Q.        Do you have documents that show
 5 emails with Mr. Levine or phone call with him?
 6       A.        I don't know.  Whatever --
 7                 MR. MARGOLIN:  The documents speak
 8 for themselves.
 9       Q.        So you don't know what document you
10 might have to be able to pinpoint when this deal
11 started?
12       A.        Right.
13       Q.        Mr. Tyrnauer brought this to you,
14 right?
15       A.        I believe so, yes.
16       Q.        Mr. Tyrnauer may have that
17 information, correct?
18                 MR. MARGOLIN:  I wouldn't bet on it.
19       A.        Not documentary wise.  He's not a big
20 document man.  It was certainly a rush, frantic
21 frantic rush type of situation.
22       Q.        All right, but going back to my
23 questions before about the heteriska.  The fact that
24 the participation agreement's referring to a 10
25 percent return of $75,000, that's not something that
```

1  was worded that way because of heteriska, right?

2              MR. MARGOLIN:   Objection,

3  mischaracterizes testimony.   He previously testified

4  about this.

5       Q.      Is the way I said it correct,

6  Mr. Tepfer, that the wording in the participation

7  agreement?

8       A.      It sort of had the heteriska

9  provisions levened into it somehow and in order to

10 soften the loan aspect of it in this participation

11 agreement.

12      Q.      Right.  My question is the fact that

13 the participation agreement refers to a 10 percent

14 return of $75,000, that wording wasn't required by

15 heteriska?

16             MR. MARGOLIN:   He just answered that

17 question.  I refer you to the previous answer.

18             MR. BOWEN:   Mr. Margolin, if you stop

19 interrupting him, we can get a clear question and

20 answer and I can move on.

21             MR. MARGOLIN:   You can be very clear.

22 You can look at his testimony.

23             MR. BOWEN:   Mr. Margolin, I'm going

24 to deem you objecting to this question, but this is

25 the question your objection is noted.  You don't

1 have to state it again.

2      Q.      Mr. Tepfer, is it the case that the

3 use of the phraseology in this participation

4 agreement of a 10 percent return $75,000, that

5 phraseology was not required by heteriska, right?

6              MR. MARGOLIN:  Asked and answered.

7 Refer to the previous question.

8      A.      This agreement was colored and

9 affected by the heteriska requirement in order to

10 give the appearance, the religious required

11 appearance of it being a return on an investment

12 rather than what it actually was, which was a loan

13 and a mortgage.

14      Q.      And interest, and interest on loan?

15      A.      An interest-bearing loan and a

16 mortgage, yeah.

17              MR. MARGOLIN:  Could we use the word

18 kosher?

19              THE WITNESS:  Kosher.

20      Q.      Finally this document itself, if you

21 go to paragraph eight, referring to the same

22 exhibit, will see that this document was meant to be

23 kept secret and not disclosed to anybody, right?

24      A.      That's just a standard

25 confidentiality agreement.  It's a boilerplate

1 paragraph that was in the agreement.

2      Q.      That's not required by heteriska, right?

4      A.      No.

5              MR. BOWEN:  I have nothing further. Thank you, Mr. Tepfer.

7              MR. MARGOLIN:  All right.  We are going to take a five-minute break.  I'm going to speak to counsel to see if we want to put any testimony on the record.  My gut says no.

11             (A brief recess is taken.)

12             MR. MARGOLIN:  We are good.

13             THE COURT REPORTER:  Mr. Margolin, will you be ordering a copy of the transcript?

15             MR. MARGOLIN:  Let me consult with local counsel and we will get back to you later in the week.

18             THE COURT REPORTER:  Ms. Klein, will you be ordering a copy of the transcript?

20             MS. KLEIN:  No, we don't need one.

21             THE COURT REPORTER:  Mr. Bowen, you had said that you were ordering a copy?

23             MR. BOWEN:  Yes.

24             (Whereupon the proceedings were concluded at 1:06 p.m.)

C E R T I F I C A T E

        I, DONNA BRUNCK, a Certified Court Reporter of
the State of New Jersey, authorized to administer
oaths pursuant to R.S.41:2-2, do hereby certify that
prior to the commencement of the examination,
HERBERT TEPFER was duly sworn by me to testify the
truth, the whole truth and nothing but the truth.

        I DO FURTHER CERTIFY that the foregoing is a
true and accurate transcript of the testimony that
was taken stenographically by and before me at the
time, place and on the date herein before set forth.

        I DO FURTHER CERTIFY that I am neither a
relative nor employee nor attorney nor counsel of
any of the parties or attorneys to this action, and
that I am not financially interested in the action.

        I DO FURTHER CERTIFY that the within
transcript format complies with Rule NJ ADC
13:43-5.9.


        Donna Brunck, CCR
        License No. 30XI00148700

Dated: April 8, 2022

## A

**a.m** 1:18  2:8
**ability** 9:13
  9:17  27:11
  50:14  91:22
  111:15
**able** 27:12,13
  51:1  107:7
  120:10
**above-enti...**
  2:4
**absolutely**
  14:9  49:22
  62:6
**accepted** 90:4
**accompanies**
  54:24
**account** 20:18
  52:11,17,18
  53:9
**accurate**
  124:10
**accurately**
  8:16  9:14
**acknowledge**
  20:11
**acquisition**
  29:3
**act** 93:6  96:7
**acting** 92:20
**action** 1:7
  7:11,12
  32:21  33:1
  39:25  81:10
  124:15,16
**actual** 18:13
  77:3  90:6
**ADC** 124:18
**added** 51:4,9
**addition** 117:6
**additional**
  29:13  63:11
  63:14,22
  66:23  67:6
  110:6,8

**additions**
  117:25
**addresses**
  22:18,19
  23:20
**administer**
  124:4
**affidavit** 95:9
**affidavits**
  14:23  91:19
**affirmation**
  95:10
**affirmative**
  86:25  87:11
  87:13,22
  88:16,21
  89:9,14
**afternoon** 86:4
**agent** 77:7,16
**ago** 12:8,8
  77:1  89:4,5
**AGRE** 4:18
**agree** 13:14
  81:11
**agreed** 44:21
  80:5,11
**agreement** 5:20
  5:22  14:23
  21:23  22:1,4
  37:13,15
  38:22  39:1,3
  40:15  41:4
  41:16  42:12
  44:5,5  45:3
  45:5  46:19
  47:2  50:1,10
  50:15  51:8
  53:3,20  54:1
  54:2,4  56:5
  56:8  69:2
  80:6,9  91:17
  92:24  98:7
  98:14,20
  99:1,13
  102:7  103:20
  106:16

  107:21
  109:19  112:8
  114:7,19
  117:22
  118:10,13
  121:7,11,13
  122:4,8,25
  123:1
**agreement's**
  46:9  120:24
**agreements**
  21:18  95:8
**ahead** 35:18
  86:1
**alive** 17:8
**allege** 88:2
**allocation**
  75:25
**allow** 8:14  9:3
**allowed** 47:10
  50:8  75:8
  84:19  90:6
**allows** 46:20
  50:6  54:10
  78:20
**alongside**
  37:16
**alterations**
  117:25
**ambiguity**
  82:25  83:1
**amount** 21:12
  51:12  63:9
  64:22  65:4,9
  105:13,14
  108:24
  109:21
  111:13
  115:18
**ancillary**
  38:10
**and-** 3:10  4:9
**and/or** 27:21
**Andrew** 23:22
**ANNEXED** 6:14
**annualized**

  50:16
**annum** 51:16,17
**answer** 8:16
  9:13  13:10
  13:24  14:11
  14:12  39:19
  41:14  42:7
  56:22  63:17
  64:16  67:15
  77:6,22
  79:16  80:12
  81:14  82:8
  82:16,24
  87:25  88:1
  89:2,25  93:3
  94:12  95:14
  95:23,25
  100:20  110:4
  111:8  113:25
  121:17,20
**answered** 62:4
  62:18  68:21
  74:9  77:1
  83:4,4  84:16
  103:22
  117:19
  121:16  122:6
**answers** 74:4
  74:15,18,19
  74:20,23
  75:1  76:16
  77:5  80:22
  80:23  82:1
  96:19
**anticipated**
  67:19,21
**anybody** 11:15
  15:11  122:23
**appear** 102:24
**appearance**
  122:10,11
**appearing** 3:1
  4:1
**appraisal**
  31:10
**appraisals**

31:12
**appropriate**
88:15 89:22
**approve** 30:2
**approximately**
12:7 46:13
**April** 72:15,23
73:1,2,4,8
83:8,9
124:25
**arrangement**
45:3
**arrangements**
18:25
**artfully**
117:21
**Ascend** 4:25
6:11 83:14
83:18 87:7
90:20 99:14
99:15,16
102:17
**aside** 91:20
103:7
**asked** 13:17
62:4 84:11
84:15 103:22
114:2 122:6
**asking** 19:7
33:20 40:5
44:1,3,6
50:9 57:8
58:2,19 63:5
69:21,23
82:4,7,14,19
83:20 89:23
89:23 93:3
94:13 95:11
95:12,22
96:19 97:25
103:5 109:8
**aspect** 121:10
**assets** 59:11
59:21
**assign** 41:18
47:1,15,20

**assigned** 47:23
47:24 48:1
**assignee** 41:3
**assignee's**
47:19
**assignees**
38:18,19
39:13 41:18
43:12 44:9
45:10 46:3
**assignment**
5:21 36:12
38:20 39:24
40:15 48:3,5
48:6 66:25
67:10
**Associates**
4:15 10:25
11:3
**assume** 8:23
71:19 76:22
**assuming** 83:14
**attached** 96:3
**attempt** 72:25
**attendant** 77:9
**attorney** 13:2
13:4,8,20
14:7,9,16
18:10 20:18
47:10 82:10
84:20,25
88:24 90:20
94:9 124:14
**attorney-c...**
13:12,15
82:10
**attorney/c...**
13:16
**attorneys** 3:18
4:15,25 7:23
83:25 84:2
124:15
**August** 50:20
110:1 114:6
**authority** 26:1
26:2 90:6,6

90:23 91:6
91:19 93:6
95:4 96:7
100:16
101:13 102:5
103:19,25
**authorized**
42:10,13
100:6 124:4
**available**
44:12
**Avenue** 4:11
16:16
**aware** 7:13,15
77:25 89:13
100:4,8,14
102:14,17

───────────
**B**
**B** 5:9 6:1
**back** 27:15
35:12,14
38:6 41:15
45:6 49:5
51:18,22,23
51:24 55:11
75:4 77:3,19
81:1 111:13
111:22
112:15,17
113:21
120:22
123:16
**background**
16:3 48:25
49:12
**balance** 7:23
18:6,7 37:2
**bank** 36:13,17
40:2 41:9
43:14,19
44:10,11
47:2 53:9
61:9,19
93:12
**Barry** 4:10

75:4
**based** 8:24
73:9 82:12
88:8
**basic** 14:19
**basically**
14:23 15:24
76:2
**basis** 20:22
22:5 77:9
87:13,16,21
88:18,20
89:6,8,15
117:23
**bathroom** 75:16
**Becker** 3:11
86:5
**bed** 29:25
**beginning**
33:11 83:7
**behalf** 24:25
30:14 32:24
39:3 90:3,7
90:7 91:23
92:20 93:6
96:7 102:16
**believe** 10:23
11:21 15:22
23:12 25:3
35:8 40:19
55:19,21
56:2,11
68:17 73:5,7
88:13 90:5
100:23
108:12 109:1
114:1 115:14
117:7,9
120:15
**Bergen** 102:15
103:9
**BERGMAN** 4:18
**best** 8:19
27:11 83:5
93:3
**bet** 120:18

biblical 54:7
big 27:1
  120:19
bigger 33:25
bind 42:12
bit 18:20
  26:17 31:1
  45:1 82:24
  93:7 101:1
  103:3
Bmiller@ba...
  4:14
boilerplate
  122:25
book 104:20
borrower 21:8
  23:17 27:21
  29:14 30:1
  30:25 64:11
  108:18
  116:20
borrowers
  22:22 31:9
  31:17 60:6
  65:23,25
borrows 66:2
bottom 10:17
  60:16
bought 17:14
Bowen 4:19 5:6
  75:19,22
  85:10,25
  90:14,18,19
  94:13 95:22
  98:11 100:12
  103:2 106:20
  106:24
  107:14 108:4
  109:8 110:17
  110:23 111:4
  112:18 113:1
  117:11
  121:18,23
  123:5,21,23
box 112:24,25
breach 114:7

break 9:6,8
  47:6,7,11
  48:12,16,17
  48:21,21
  74:22 75:3,5
  90:15,16
  123:8
breakdown
  106:10
breaks 47:9
breather 90:11
bridge 28:25
  29:1,4
brief 48:22
  75:18 90:17
  123:11
bring 76:22
brings 50:19
broke 113:12
broker 27:19
  28:3 30:16
  34:11,16
  35:17,24
  77:13,17
  93:23
broker's 21:6
  34:14
brokers 31:14
  104:5
Brooklyn 16:7
  16:9,16
brother 15:21
  15:25 27:20
  28:4
brought 120:13
Brunck 2:4
  124:3,22
buildings 23:1
bunch 86:16
burden 29:13
business 12:1
  18:11 24:16
  24:21 93:11
  113:15
  119:15
businesses

17:13
buy 30:6 40:24
  61:19
buyer 30:6
buyers 18:8
buying 36:11
  40:23

───────────
      C
───────────
C 1:15,15 3:1
  4:1 124:1,1
call 14:14
  54:16,19
  116:21 120:5
called 53:25
  54:9,11
  116:1
calls 33:16
  39:17 40:4
  42:6 43:4,15
  56:20 58:24
  60:11 61:10
  64:15 67:14
  88:23 109:5
  115:23
camera 10:13
  26:19,20
  75:11
capital 4:15
  4:16 10:25
  11:2,3 15:13
  15:18 19:4
  19:11,24
  20:16,21,25
  21:4,15,16
  27:16 28:16
  28:18 30:13
  30:15 31:17
  34:5 35:3,16
  37:3 38:1
  39:5,6,9
  41:11 54:17
  60:10 62:2
  62:15,24,25
  63:7 64:13
  69:16,16

78:3,4,5
  80:17 81:10
caption 25:17
  26:16
captions 33:4
care 30:7
case 6:9 10:6
  11:23,25
  12:1,4,22
  15:3 25:18
  26:12,14
  32:18 33:7
  33:21 37:5
  56:3 76:4,12
  76:15,17
  78:17,20
  80:23 81:12
  84:5 86:22
  88:24 122:2
cash 29:14
  43:3
casual 8:17
categories
  11:11 27:5
cause 85:18
CCR 124:22
certain 24:10
  24:10 75:9
  116:2
certainly 58:5
  93:9 97:4
  99:10 101:19
  120:20
Certificate
  6:11 99:16
Certified 2:5
  124:3
certify 124:5
  124:9,13,17
chain 71:3,8
change 106:25
  112:19
changes 53:23
changing 76:3
characteri...
  115:12

charged 54:10
charging 54:7
check 21:10
  112:11,21,21
  113:8,10
  117:12
checks 104:17
chief 79:24
child 59:3
choice 45:7
chronology
  70:8
circuit 67:4
City 16:7
CIVIL 1:7
claim 77:10
claimed 91:22
clarify 23:4
  95:24 101:20
clause 42:16
  44:9
clean 9:5
clear 61:25
  70:8 94:16
  108:17
  121:19,21
clerk 103:11
client 11:6
clients 18:23
  18:24 21:21
Clinton 4:11
cloaks 54:9
closed 68:8,21
  73:15 113:16
closing 20:19
  21:5 53:2
  70:11
co-counsel
  74:21 75:8
  84:4 86:5
co-sign 80:5
coaching 95:23
collateral
  22:19 36:7
  42:25 43:10
  48:4,5,6

63:11 64:8,8
64:18,20
66:23 67:6
79:5,9
110:14
111:16,19
collateralize
  63:14
collateral...
  51:5,9 65:9
collect 32:21
  110:13
  111:16,19
  116:21
collections
  35:11
college 16:4,6
  16:7,7
colored 122:8
combined 65:3
come 99:6
comfortable
  26:23
coming 75:9
commencement
  124:6
commencing
  1:18 2:7
comment 48:23
comments 53:22
commonly 30:20
communication
  49:3,15
communicat...
  49:23 77:19
  77:21 94:10
community 93:8
  93:9
companies 92:6
companion 7:12
company 1:6
  15:18 30:10
  71:9,12
complies
  124:18
comply 27:14

compound 100:9
computer 49:8
  72:6
Computer-a...
  2:2
concern 116:2
  116:10,11
concisely
  96:16
conclude 118:4
concluded
  123:25
conditional
  48:3
conditions
  9:17
conference
  49:4,14,18
confidence
  30:17
confidenti...
  122:25
confirm 91:22
  103:25
confirmation
  6:5 60:17,21
  105:2,6,12
confirms 67:10
confuse 95:21
confused
  100:13
  115:25
confusing 8:20
  8:21 100:11
connected
  19:21
connection
  11:23
consider 28:24
consideration
  79:13
construction
  29:3
constructive
  88:5,5
consult 74:21

123:15
contact 68:23
  68:24 120:2
contained
  73:18
contains 29:24
contend 34:6
contents 101:5
  101:6,7
context 56:22
  58:18 71:2
  78:16
contingent
  105:17
continue 46:20
  111:17
continued
  111:2
continues 53:3
contract 39:23
  41:18 47:15
  47:20 61:8
  61:11
contribution
  20:16
contributions
  20:21
control 27:9
conversation
  8:17 24:11
copies 21:24
  92:18,19
  104:17
copy 75:20
  123:14,19,22
Corporate 3:5
correct 15:25
  16:21 22:5
  28:4,16
  31:22 39:16
  45:15,22
  46:15,23
  50:14 51:2
  51:16,20
  52:6,8,13
  53:16 54:18

55:18  56:5
56:10  61:19
61:22  63:5
63:19,24
64:2,3,6,13
64:24  65:4
68:3  70:6
73:11  80:18
80:24  87:5,8
90:24  91:3
92:25  95:15
97:1,7,9,10
98:8  107:10
108:11,25
109:22  112:7
112:15  114:7
115:1,13,16
117:20
120:17  121:5
**correctly**
46:12
**counsel** 9:3
15:6  33:1
39:18  42:7
43:20  49:1
53:15  62:3
71:25  78:14
83:19,20
95:16,17
100:10,20
115:11  123:9
123:16
124:14
**counsel's**
41:13  90:25
100:21
101:16  109:6
**Counselor**
69:19
**county** 102:15
103:9,11
**couple** 67:17
101:21
**court** 1:1,21
2:5  7:8,12
7:13  8:3,15

33:1  44:3
75:19  123:13
123:18,21
124:3
**courtroom** 8:10
**coverage** 85:17
**covered** 85:22
**covering** 65:19
**covers** 33:5
**creates** 54:9
**credit** 31:25
78:22
**cross** 32:14
78:21
**cross-claim**
33:11  37:5
87:5
**cross-claims**
32:14  34:2
**cure** 68:2  69:1
**currently**
39:23  71:22
**cut** 38:5

─────────
**D**
**D** 1:15  5:1
**dash** 45:2
**date** 1:17
46:21  69:8
70:13  74:10
118:10,13,21
118:25
124:12
**dated** 46:9
73:2  99:23
102:13
124:25
**dates** 70:9
72:15  113:14
**day** 42:2  119:2
119:8,11,13
**days** 46:13,22
50:25  67:17
109:22  110:7
119:15
**days'** 68:1

**deadline** 45:4
45:4
**deal** 28:6
118:4,7
119:9  120:10
**dealings** 24:17
24:22
**deals** 24:8
28:3  59:5
**dealt** 77:7
**decided** 35:20
**deciding** 31:17
**declaration**
29:7,15,20
30:3,9,12
37:18
**declare** 114:9
**deem** 121:24
**deemed** 79:3
**default** 67:2
67:13,23
68:1,6,12
69:10  71:17
114:10
**defaulted**
111:19
113:15
**Defendants**
1:13
**defense** 87:12
87:14,22
88:17,21
89:9,15
**defenses** 87:1
**definitions**
107:24
**definitively**
57:3  81:3
**degree** 16:12
**degrees** 16:11
**delivered**
77:19
**demands** 72:4
**department**
30:23
**depends** 29:4

85:12
**deposed** 7:17
11:20
**deposit** 31:24
31:24  52:25
**deposition**
1:16  2:2
7:22,24
12:25  13:18
14:5  15:5
37:2  44:3
47:11  49:1
75:6,13,14
75:24  114:3
**depositions**
49:18  89:21
**deposits** 35:11
**describe** 31:6
**described** 34:2
37:4
**describes**
32:20
**description**
5:10  6:2,19
72:17
**designated**
11:17
**designed** 108:8
108:10
**details** 7:16
11:13
**determine** 91:6
95:3  96:6
**determined**
21:9,10
**difference**
105:14
**different** 23:1
23:1  49:14
49:21,23
62:18  69:25
76:2  83:19
83:21  84:10
84:12  85:18
116:4
**diligence**

30:14,20
35:7 90:22
98:15 99:6
100:1 101:23
103:18
**direct** 83:2,3
96:19 103:17
103:24
**directed** 79:8
**directing**
108:4 111:4
111:6
**directly** 27:22
28:4 83:4
93:19
**disagreement**
117:16
**disbursed**
106:2,3
**disbursement**
104:12,13
**disbursements**
20:19 104:7
104:15 105:5
105:10
**discharge**
108:19
**disclose** 13:1
13:3
**disclosed**
122:23
**discovery**
68:12 70:19
71:24 72:14
85:8
**discuss** 15:5
84:22
**discussed**
84:20
**discussing**
28:2 83:25
**discussion**
27:25 59:8
89:20
**discussions**
13:1,4 48:25

**disregard**
29:23
**distinction**
95:18
**distribution**
21:8,9
**district** 1:1,2
7:7 33:1
85:5,7
**Docket** 1:3
86:22
**doctrine**
116:15,17,17
116:19
**document** 5:11
5:12 6:4
10:19,22
26:6,9,24
27:10 29:8
30:5 32:9,12
32:20 33:4
33:20 37:9
37:11,25
38:2,8,10
40:18,21,22
42:17 43:25
45:17 50:7
53:16 54:24
55:12,14,22
56:21,21
60:4,20
61:12,16
64:15 65:5
65:10,12,16
65:18 66:12
66:14,17,20
66:22,24
69:8 71:6,7
74:1,4,16
82:18 86:23
88:6,9,11,14
99:5,20
100:1,5,15
100:21 101:3
101:4,6,11
101:13,14,23

102:13,24
104:14 107:8
107:17,24
108:14,16
115:5,12,23
116:16 117:5
118:17,21
119:6 120:9
120:20
122:20,22
**documentary**
120:19
**documentation**
19:8
**documents** 10:1
10:3,9 13:5
13:6,13,17
14:4,7,15,18
14:19,24,25
15:2 21:24
23:19 24:10
24:11 27:5,6
27:8 28:15
31:15 32:1
35:25 36:5
37:17 38:9
50:11 68:3
73:20 77:9
78:17,20
82:2 91:9,12
92:18,20
93:2 95:6,19
96:3,4 98:16
103:11,15
105:19 106:5
107:4,12
110:16
113:22,23
120:4,7
**doing** 13:25
48:12,16
94:11 110:19
110:22
**Donna** 2:4
124:3,22
**drafter** 44:4

**drafting** 106:4
**draftsmanship**
53:14
**drags** 28:22
**drawn** 117:21
**dressed** 54:22
**Drive** 3:6
**driver's** 17:18
**DSE** 4:25
**due** 30:14,20
35:6 45:21
50:23 90:22
98:14 99:6
100:1 101:23
103:18 112:6
112:7 114:24
**Duggan** 3:4 5:4
7:4,6,10
10:2,5,14
13:11,17
14:2,13 23:7
24:1 26:13
32:25 33:9
40:5 43:24
47:8 48:17
48:20,23
49:9,22 62:7
62:10,21
69:14,21
70:1,3,24
71:4 74:8,12
75:5,10 76:1
77:2 79:20
79:22 82:4
83:12,21
84:4,9,15,22
85:1,6 86:10
86:14,17
106:25 107:4
107:10
**Duggan's** 85:21
**duly** 7:1 124:7
**duplicative**
84:5,7,9
**duties** 100:6

**E** 1:15,15,15
1:15 3:1,1
4:1,1 5:1,9
6:1,18,18
124:1,1
**Eagle** 85:16
**earlier** 26:10
32:11 47:18
50:6 61:11
73:11 76:16
77:13 87:3,7
93:24 96:24
99:11 104:12
106:15
**early** 81:17
**earnings**
116:24
**East** 3:14
**edicts** 116:3
**educational**
16:2
**effect** 8:9
**effort** 73:3
**eight** 12:8
107:3 122:21
**either** 28:3
53:2 60:9
112:4
**email** 3:9,17
4:8,14,24
70:13 71:8
71:13 72:4
**emails** 6:7
14:25 69:20
69:25 70:18
70:20,23
71:11 73:9
99:9 120:5
**employed** 16:14
**employee**
124:14
**empowered**
42:10,20
**enable** 117:4
**enforce** 81:10
**enter** 21:22

42:11
**entered** 73:17
92:24 109:9
109:18
**entire** 50:22
79:17
**entities** 19:5
22:24,25
24:14,23
25:8 26:3
38:13 54:4
54:18 58:9
58:13,16,22
59:12,22
64:17 78:22
78:23 79:2,7
79:18,24
90:8,20
**entitled** 54:13
**entity** 19:22
23:8,16 32:1
36:22,24
37:1 42:4
43:8 48:2
52:21 61:3,4
61:7,18
64:20,20
78:21 79:6,6
92:21
**enunciation**
67:11
**envelope** 81:3
81:4,23
**Equities** 1:5
7:6,9,10,11
11:6 25:15
86:6
**escrow** 67:8,13
68:3 105:21
**ESQ** 3:4,12 4:4
4:10,19,20
**essence** 45:4
117:24 118:3
**essentially**
17:10
**estate** 12:5

17:15,16,24
58:13
**event** 46:21
67:2,13 68:1
71:17
**eventually**
107:17
**everybody** 9:23
10:6
**evidenced** 66:6
**exact** 62:13
104:7
**exactly** 43:22
68:10 69:9
99:12,12
112:12
113:18
119:24
**examination**
5:4,5,6 7:4
86:3 90:18
124:6
**example** 108:13
**exceeding** 26:1
**excuse** 89:7
108:9 117:1
**execute** 66:25
**executed** 81:8
91:11,18
**execution** 51:8
**executive**
93:12 94:8
**exhibit** 9:23
9:23 10:16
10:17,19
11:17,18
26:5,6 32:5
32:6 37:8,12
40:13,13,14
41:17 53:21
53:21 55:2,3
55:9 56:13
56:13,15
57:7,14,14
57:15,25
58:1,8 59:25

59:25 60:2
60:15,17
61:15 64:10
64:10 65:11
65:11,13
66:10,10,13
66:14 70:16
70:16,20
71:2 72:9,10
73:22,22,23
76:2,3,10,10
76:11,16,19
86:9,13,17
86:19,20
99:15,16
106:17 107:1
113:2 114:19
122:22
**EXHIBITS** 6:14
**exist** 7:15
**existence** 78:5
**expectation**
109:3,9,10
109:24
**expenses**
105:17
**explain** 18:17
87:17 96:18
96:20
**explains**
117:16
**extend** 51:2
**extended** 50:6
50:8
**extension**
50:14,17,19
**extent** 20:14
31:4 94:10
95:9
**extra** 72:4

___

**F**

**F** 1:15 124:1
**Face-to-face**
97:1
**fact** 13:12

32:12 40:11
42:20 61:22
79:1,2 82:24
84:20 87:16
114:5 120:23
121:12
**factual** 87:13
87:21 88:18
88:20 89:6,8
89:15
**failed** 115:6
**faith** 31:24
44:14,16
**familiar** 25:6
25:19 32:9
32:19 34:1,7
40:7
**familiarity**
30:17
**family** 15:16
21:21 22:2
78:21,23
97:8
**far** 13:24
**fashion** 88:3
**father** 93:9,12
93:17
**father's** 94:1
**FBI** 68:22
69:17 70:5
98:21 99:11
113:13,17
**February** 45:21
46:5,14
80:20 81:17
82:23 83:7,9
112:1 114:24
115:7
**fed** 86:10
**federal** 6:8,10
7:7,11 26:14
26:15 44:4
74:6 75:24
76:4,12,15
76:17 83:24
84:17 85:1,4

85:4 86:20
86:22
**FedEx** 73:9
81:3,4,23
**Feds** 85:7
**fee** 21:6,6
51:4 63:12
104:4,5,5,24
106:4,6
115:20,22
**feel** 33:25
**feeling** 9:20
**fees** 105:16
**fellow** 34:17
54:14
**fiction** 54:10
**fig** 54:12
117:3
**figure** 120:1
**file** 10:7
14:20 29:16
**filed** 7:12
12:18 32:18
32:23,24,25
33:4 37:5
87:3 96:2,4
102:14 109:4
109:11
**filing** 33:2
**filings** 15:15
**Finally** 122:20
**financial**
29:13 113:23
**financially**
124:16
**financing**
29:12 36:19
**find** 27:13
68:15
**finder's** 104:5
**fine** 10:14
26:21 75:17
76:5 85:25
86:2 110:19
110:22
**fingertips**

11:13 71:22
89:12
**finish** 8:14
47:6
**finishes** 67:18
**firm** 16:24
17:2 106:9
**first** 7:1
10:18 33:3
34:10 39:22
44:23 67:7
69:6 70:23
80:14 82:15
83:17 94:20
101:22
107:16 108:8
108:11,23
110:7 118:6
119:8 120:2
120:2
**firsthand** 8:24
59:10,13
69:21 82:12
82:19
**five** 14:23
48:18 107:8
**five-minute**
47:6 48:12
90:15 123:8
**fixed** 116:25
117:2
**Floor** 4:21
**flow** 29:14
**fly** 45:5
**focus** 96:14
**focusing** 45:24
**follow** 71:25
**follow-up**
106:14
**followed** 83:8
**follows** 7:2
**force** 8:9
**foreclose**
29:25
**foreclosure**
12:15 39:24

67:4
**foreclosures**
12:17
**foregoing**
124:9
**Forever** 17:4
**form** 20:15
28:24 44:2
77:9 117:24
**formal** 8:9
21:22 30:22
31:10 69:3
**format** 124:18
**formation** 6:11
99:17
**forth** 33:2
45:6 46:19
64:12 77:3
77:19 115:9
124:12
**forward** 26:17
**found** 69:4
78:11
**four** 48:19
107:8,9
**frantic** 120:20
120:21
**fraudulent**
93:16
**FREE** 1:24
**friend** 22:2
93:25,25
**friends** 21:21
**front** 8:10
10:13 88:11
119:4
**FUENTES** 4:18
**full** 21:22
46:4 105:14
110:12
**full-fledged**
21:25
**fully** 111:22
**fund** 119:7
**funded** 41:10
**funding** 1:9

4:16 36:13
36:15 38:14
41:19 43:13
44:10 60:13
**funds** 44:15,17
52:24 78:21
78:22 79:5
**further** 42:12
46:25 83:12
88:12 123:5
124:9,13,17

**G**

**GAO** 4:20
107:13
**general** 18:9
27:17 31:16
**generally**
17:22,24
19:3 20:18
21:20 31:9
31:16
**gentleman**
93:22
**getting** 43:3,8
**give** 16:2 19:1
21:23,24
30:2,24
38:11 42:20
67:2 87:17
98:13,19
100:16
110:19 117:2
122:10
**given** 54:6
119:6
**gives** 33:3
100:5
**giving** 34:22
90:11 117:1
**glad** 76:6
**GLENN** 4:18
**go** 9:11 11:9
16:6,8 18:16
29:21,24
32:13 33:2

35:18 37:22
39:22 41:15
42:9 43:11
45:9 46:8,25
48:2,14
49:25 51:25
55:11 74:25
77:5,6,20
78:18 79:11
80:12 81:1
83:17 85:23
85:25 99:19
103:6,7,15
105:15 107:7
107:16,16,23
107:25 108:2
108:6 114:19
122:21
**going** 8:15
9:18 10:1,9
10:10,12
14:2 15:9
27:15 28:11
32:18 35:18
36:11,23
38:20 40:23
41:8,10 43:7
44:19 47:18
48:19 49:4
49:12 57:13
60:14 62:9
62:10 64:22
67:22 74:22
75:2,3,14,16
75:20 76:6
76:22 85:13
86:18 96:15
101:8 106:23
107:25 108:6
110:5,17,24
111:3 114:2
116:24
120:22
121:23 123:8
123:8
**gonna** 93:15

**good** 9:20
31:24 44:14
44:16 76:8
86:4 93:25
93:25 123:12
**gotten** 104:18
**governing**
37:25
**graduated** 16:4
16:4
**granted** 110:5
**granting** 31:21
51:7
**grapevine**
69:11
**Great** 11:9
**Green** 3:13
**group** 19:9
39:9,11 79:7
79:17
**guarantee** 5:24
37:17 38:9
55:3,15,24
55:25 63:12
64:18,18
**guaranteeing**
56:4
**guarantor**
55:17
**guarantors**
56:10
**guess** 8:21
18:8 31:23
39:8,10
85:15 106:21
**gut** 123:10

**H**

**H** 5:9 6:1
**H-e-t-e-r-...**
116:9
**halt** 30:11
**HAMILTON** 1:23
**handful** 86:6
**hands** 27:12
**happen** 52:14

109:25
**happened** 25:23
67:21 80:20
110:11
111:25
**he'll** 30:6
**head** 58:3,23
58:25 113:14
**health** 9:16
**hear** 26:21
48:24 49:11
**heard** 25:12,15
78:15 94:25
**hearing** 25:14
**heart** 22:18,19
**Hebrew** 116:7
**held** 67:12
105:20,23
**helpful** 55:8
72:5
**Herb** 10:12
33:25
**Herbert** 1:16
2:3 4:16 5:3
7:1 124:7
**HERETO** 6:14
**hesitation**
102:12
**heteriska** 54:9
54:23 116:10
116:16,18
117:5 120:23
121:1,8,15
122:5,9
123:2
**HIGHWAY** 1:22
**history** 71:20
71:25 114:2
**hodgepodge**
18:7
**hold** 67:10,17
67:22
**Holdings** 38:14
40:3 41:6,8
42:3 52:4,11
57:24 59:4

```
59:18 60:25
61:5,7,17,18
61:22 63:23
holes 107:2
hope 46:17
85:11
Hudson 1:9
4:21

            I
ID 5:10 6:2
idea 101:3
identifica...
10:20 26:7
32:7 37:14
40:16 55:5
56:17 57:17
60:3,18
65:14 66:15
70:21 72:11
73:24 76:13
76:20 86:21
99:18
identified
27:9 42:14
66:13 72:22
identify 32:23
II 59:5
immediately
111:2
impair 9:12,17
implied 88:5
90:6
implosion
68:18 69:10
inappropriate
88:13 89:21
inaudible 38:3
included 65:9
73:13,14
92:17
includes 82:24
including
117:15
income 116:24
increase 55:6

55:7
independent
95:20 96:5
102:20
independently
91:21 92:4
95:3,13,14
indicated
63:10 64:4
90:2
indicates
27:21
individual
20:3,23,24
individually
36:4
information
89:23 120:17
initial 15:15
46:22
initiation
115:20
Initiator 21:2
injury 11:23
11:25
insisted
101:18
instances 19:6
instruction
111:2
insure 30:11
insurer 85:16
intent 53:12
interest 47:2
50:16,23
51:2 54:8,10
54:14 58:10
58:22 59:21
59:22 64:24
65:3 100:7
100:18 110:2
111:14,23
112:6,17
115:9 116:19
116:21,25
117:3 122:14

122:14
interest-b...
54:25 122:15
interested
124:16
interfaced
24:9 77:18
intermediary
27:18 93:18
interpret
87:20
interrogat...
5:13,14 6:8
73:21,23
76:3,11,14
76:17,19
82:12,13,15
interrogatory
74:18,19
80:22 81:25
interrupt
95:12
interrupting
121:19
intimate 11:12
introduced
34:24
introducing
34:21
introduction
34:11,15
invest 19:17
19:20 20:2
44:24,25
invested 51:12
51:13
investing
39:12
investment
39:15 54:17
122:11
investor 20:5
21:12 39:6,7
investors
18:19,22
20:2,5,8

21:19 25:25
39:10,12
44:23,24,25
46:14 47:3
47:15,24
48:3 53:1
117:17
invests 22:3
involved 17:12
18:13 24:12
27:19 30:16
34:11 77:14
involving 12:1
59:17
IOLA 20:18
issue 85:22
102:10
issues 75:9

            J
J-u-d-a-h
94:21
J&J 4:15 10:25
11:2,3,14
12:9,16
15:13,18
19:4,11,19
19:23 20:1,6
20:7,10,20
20:25 21:4
21:15,16
22:3,3 23:5
23:9 24:13
27:8,15,15
28:16,18
30:13,15
31:10,17
34:3,5 35:2
35:16 37:3
38:1 39:5,6
39:8 41:10
54:17 56:1
60:10 62:1
62:15,24,25
63:7 64:13
68:25 69:5
```

69:13,16,16
77:7,24,25
77:25 78:3,4
78:4 80:17
81:10 88:2
99:2 104:10
104:11
105:10,20,24
111:14
**J&J's** 12:18
28:7 33:1,6
87:4,8
**Jacob** 25:10
**January** 46:9
92:14,25
118:14,18,19
118:22,25
119:1,7,12
119:17
**Jersey** 1:2,23
2:6 3:7,15
4:12 7:13
36:8 44:3
78:20 124:4
**Jew** 54:6,6,14
**JF** 7:6
**JLS** 1:5 7:9,10
7:11 9:23
10:16 11:6,7
11:17 15:3
25:15 26:5
33:11 34:2
40:13 41:16
53:21 56:13
57:14 59:25
60:15 61:15
64:10 65:11
66:10,13
70:16 72:9
73:22 76:10
77:21,25
78:5,12,14
83:18 86:6
86:17,19
87:9 88:2,23
90:4 106:17

114:19
**JLS's** 87:5
117:15
**JLS-1** 5:11
10:19
**JLS-11** 5:20
37:8,12
**JLS-12** 5:21
40:14
**JLS-14** 5:23
65:13 107:13
**JLS-15** 5:24
55:2,3,9
**JLS-17** 6:3
60:2
**JLS-18** 6:4
66:14
**JLS-19** 6:5
60:17
**JLS-2** 5:12
26:6
**JLS-20** 6:6
72:10
**JLS-21** 6:7
70:20
**JLS-23** 6:8
76:11
**JLS-24** 6:10
86:20
**JLS-3** 5:13
73:23
**JLS-4** 5:14
76:19,24
**JLS-5** 5:15
32:5,6
**JLS-6** 5:16
56:15
**JLS-7** 5:18
57:15
**jointly** 19:18
**Joseph** 15:21
**Judah** 93:23
94:22
**judge** 8:10
14:13
**July** 99:23

102:13
**June** 73:8
**jurisdiction**
84:1,19
**jury** 8:10

_____
K
**keep** 75:10,11
109:12
110:23 115:7
**Ken** 94:9
**Kenneth** 94:3
**kept** 122:23
**kids** 97:12
**kind** 12:4
16:17 70:23
**Klein** 3:12 5:5
83:16 85:14
85:20 86:2,3
86:5,8,15,18
87:4,8 88:7
90:9 123:18
123:20
**knew** 88:2
93:18 94:22
108:22
**know** 7:16 8:15
9:9,11 11:14
18:12 21:7
22:7,8,11,12
22:20,22
23:18,19,22
23:23 24:7,8
25:10 27:19
28:12 29:3,4
30:1,11,14
30:23 31:1,1
31:12 34:20
34:22 36:24
38:17 39:8
41:23,24,25
42:8,8 43:16
43:18,22
44:7 45:1
47:9,23,25
48:1,8 49:12

49:13 53:25
54:5,11,22
57:1,3,5,8,9
57:23 58:2,4
58:4,6,7,9
58:12,15,21
61:1 66:23
68:22 69:9
69:24 70:10
71:16,18
73:12,13,17
78:14,14
80:19 81:21
81:22,22
83:8 84:23
85:15 86:15
88:10,17
89:1,15
93:11,13,16
93:17,19
98:2,3,23,23
98:24 104:20
107:6 108:15
110:20
112:14 113:4
120:3,6,9
**knowledge** 8:24
11:10,12
59:10,20
62:22 63:1,6
69:22 78:5
82:12,20
83:5 88:5,23
89:24
**known** 93:8
95:1
**knows** 20:13
40:5,9,10
62:6
**kosher** 122:18
122:19

_____
L
**land** 89:17
90:1
**larger** 10:11

```
10:11 71:3          25:7,25            79:2,7 81:16       57:15 72:6
late 78:8           lending 18:13      82:22 83:6         litigation
82:23 92:23         28:25 29:2         90:2,7,23          58:18 84:18
law 4:3 16:4,5      39:14              91:6,11,17         99:3
16:8,9,12,18        Lenox 1:9,10       91:21 92:5         little 8:8
16:19 17:18         3:6 5:16           92:20,25           18:20 26:17
17:22 78:20         6:11 38:21         93:7,21            26:18 31:1
89:4                56:16,19,25        94:22 95:3         45:1 82:24
Lawrenceville       57:1 59:17         95:13,20           85:7 93:7
3:7                 60:8,10 62:1       96:6,25 98:6       101:1
lawsuit 7:7         64:5,8 66:1        98:13 100:5        live 49:10
12:10 33:22         73:13 79:3,4       100:16             LLC 1:5,9,10
lawsuits 7:14       79:10,10           101:12,24          1:10,11 4:15
12:12,14,15         80:4 90:3,24       102:4 103:19       4:16 5:19
lawyer 16:21        91:7,23 95:4       103:25 104:6       6:12 10:25
24:3,12 25:4        96:8,8 98:7        109:19,21          11:6 20:16
82:8 89:22          98:14,21           111:13             25:16 41:6,8
105:23              99:1,17            112:14,20          42:12 57:6
lawyer's 7:20       100:7,17           113:4 114:6        57:16,19
7:25                101:13 102:5       116:11 118:4       60:10,25
lead 21:15,16       102:6 103:19       119:9 120:5        61:5,7,22
22:3                let's 85:3,12      Levine's 24:2      63:2 64:6
leaf 54:12          99:13 107:14       36:24 37:1         80:4,5 99:17
117:3               114:18             53:15 69:18        loan 13:13
lean 26:17          letter 21:23       92:18 94:25        14:19 18:16
learned 78:7        67:9               98:22              19:7,8,18
leave 49:17         levened 121:9      liability 1:6      20:1,2,8,10
leaving 91:20       Levine 1:11,12     15:18              20:23,24
103:6               5:25 22:7,24       license 2:5        23:10 27:16
legal 1:20,21       24:9,13,17         17:16,18,19        28:12 30:2
24:17,24            24:22,25           17:19,21           30:14,21
54:10 75:9          25:3,7,8,20        124:23             31:11,18,21
78:16 84:24         34:10,12,25        licenses 17:20     32:20 33:14
87:17,17,24         35:5,9,21,23       lien 108:19        34:1,5,7,8,9
88:14,25,25         38:14 39:3         lieu 116:23        34:25 35:3,7
94:10 105:16        40:23 41:24        liked 59:3         35:19,20
106:4,6             42:10 43:7         limited 1:5        36:7,10,19
Len 102:16          43:21,22           15:18              36:20,23
103:20 104:1        54:5,17 55:4       line 54:23         37:3,4,17
lender 19:6,8       55:16 56:3,7       81:2 85:16         38:1,9 39:15
19:13 24:25         57:4 58:4,10       list 84:11         39:21 40:24
25:1 36:20          58:22 59:12        107:11            41:9 42:23
54:11,13            61:3 62:20         listed 58:17       42:24 43:1,6
116:20,20           62:20 64:20        listing 5:16       43:10,17
lenders 17:25       67:1 72:18         5:18 56:15         44:25 46:8
18:3,5 19:9         73:16 77:8         56:23,24,24        46:13 48:4,9
```

50:25 51:5,7
54:1,5,21,21
54:22 55:16
55:17 56:4
60:22 61:9
61:19 64:18
65:1 66:5,24
67:19,20,22
71:21 77:24
77:25 78:1,3
78:4 79:17
80:16,21
81:19,21,22
98:15,15
101:18,24
102:3 104:15
105:6 108:20
108:23
109:10 110:1
110:6 111:13
112:15,20
113:5,6,9,20
113:23 115:7
118:12
121:10
122:12,14,15
loaned 109:19
loans 18:22
19:23 22:13
22:14,16,20
22:23 23:8
23:10,14,17
24:13,20
25:7 27:17
28:15,17,19
28:20 34:3,3
34:4,12,21
34:22,22,23
54:25 73:16
80:21 81:16
83:7 91:16
113:7,8
local 31:4,14
85:5,7
123:16
locations 7:23

locked 49:20
long 16:23
17:1 26:21
29:4 75:14
85:11 89:4
115:8
Longer 17:7
look 10:5
23:18 30:25
33:10 35:9
38:12,23
40:25 46:25
47:14 51:11
52:22 64:10
67:25 74:17
84:24 85:3
87:11 88:16
89:14 103:8
103:11,15
104:11
108:13
114:20
121:22
looked 13:12
41:18 66:3,7
66:9 73:10
looking 10:15
23:20 27:6
28:10 49:15
53:20 61:24
96:2 118:15
loose 113:13
Loosely 39:8

M

Madison 71:12
72:21 81:15
83:6 92:9,22
94:24 96:2
103:7
mailing 6:6
72:10,23
main 37:25
38:2,8
maintain
111:17

majority 100:7
100:17
making 20:8,20
31:10 40:23
116:23
man 90:12
93:10,10
94:18,19
120:20
management
35:10
manager 58:5
managerial
100:5
managing 42:11
58:6
March 1:17 2:7
112:5,7
Margolin 4:3,4
7:9 9:25
10:4,8,15
13:7,14,21
14:6 17:4,7
23:3,24
26:11,15
27:1,23
32:22 33:6
33:16,24
39:17 40:4,8
41:13 42:6
42:17 43:4
43:15,20
45:17 47:5
48:11,15,18
49:7,17
55:22 56:20
58:24 59:6
60:11 61:10
62:3,8,12,16
64:14 65:5
67:14 68:17
69:15,19,23
70:2,22 71:1
71:10 72:2
74:6,10,20
75:2,7,12,23

76:5,21,25
79:19,21
81:25 82:5,9
82:17 83:14
83:18,23
84:7,13,17
84:23 85:3
85:13,23
86:12 87:2,6
87:10,15,23
88:6,12,22
89:10,19
90:10,25
91:24 92:10
93:1 94:6,15
95:5,16,22
96:10 98:9
99:8 100:9
100:19
101:15
102:22 103:2
103:4,22
106:18,21
107:2,6,11
108:2 109:5
109:12 110:3
110:15,17,21
111:1,9
112:16,24
114:1 115:11
117:9,13,18
118:16 120:7
120:18 121:2
121:16,18,21
121:23 122:6
122:17 123:7
123:12,13,15
mark 86:18
99:14
marked 9:23
10:16,20
26:5,7 32:5
32:7 37:8,13
40:13,15
41:16 53:20
55:2,4 56:13

56:16 57:14
57:16 59:24
60:3,15,18
61:15 65:11
65:14 66:15
70:16,21
72:9,11
73:24 76:10
76:12,20
86:21 99:17
**marking** 10:17
**marriage** 17:19
**masters** 75:24
**matter** 2:4
11:24 90:20
114:5
**matters** 83:24
**Mbowen@gle...**
4:24
**mean** 23:5,5
28:9 36:2
43:14 44:11
78:25 104:10
112:17
**meaning** 105:10
111:14,22
**means** 18:17,18
43:16,19
44:6 79:1
82:20,21
**meant** 82:14
122:22
**mechanism**
18:21,23
**medications**
9:12
**meet** 54:20
111:21
**member** 15:16
19:15,20
22:2 42:11
58:6
**members** 5:16
5:18 15:20
20:3,20
21:21 56:15

56:24 57:1,5
57:15,19,23
67:1 97:9
100:18
**memory** 91:15
98:4 101:11
119:20
**mentioned**
93:23
**mentions** 80:25
**met** 14:8 22:9
23:23 24:5
94:23 96:25
97:6,8,11
**Michael** 4:19
83:17 85:8
**middle** 75:6
**Mike** 85:15
90:10,19
**MILLER** 4:10
**million** 108:25
**mind** 45:24
75:12
**mine** 97:20
**minute** 101:12
**minutes** 48:19
48:19
**mis** 53:6
**mischaract...**
98:9 121:3
**misleading**
103:1
**misread** 53:5
**missed** 112:10
114:15
**misstate**
113:10
**misstatement**
80:10 102:22
110:15
**misstates**
109:6 110:3
117:18
**misstating**
26:1 91:1
109:13

**moment** 25:13
58:4 59:1
98:18 100:2
**money** 18:15,19
18:20,24,24
20:2,4,17
21:17 36:19
39:14 40:24
44:12 61:21
62:19 63:1
64:1,5,12,19
102:11
105:15,20
106:12
112:15,17,20
**monitor** 49:20
**month** 70:11
77:1 80:16
81:19,20
87:3
**monthly** 21:7,8
111:18,23
112:4,22
115:8
**months** 50:20
51:2 81:8
109:25 110:9
110:13
111:14,23
113:11 115:8
**morning** 15:10
96:15
**Morristown**
3:15
**mortgage** 5:23
6:3 14:22
22:19 23:13
28:12,14,17
28:19 29:16
29:24 30:5,7
30:8,13
31:18 36:12
36:12,16
37:16 38:2,9
38:20 39:20
42:5,13,20

48:4 50:7
51:6,10
53:13 54:22
60:2,5 61:24
63:13 64:8
64:11 65:13
65:19,24
66:5 67:8,10
67:12,17,22
69:2,6,17
70:5 71:15
73:1,4,10,16
77:8 79:10
80:11 81:1,7
81:9,12,16
83:6 90:24
91:7,14 95:4
100:7,16
101:13 102:5
102:14,25
103:20 104:1
106:16,16
108:7,8,10
108:11,24
109:4,10
114:13,14
118:5 122:13
122:16
**mortgages**
28:15 34:6
73:14,15
80:17,19
81:2 82:22
91:15
**mortgaging**
96:8
**move** 10:10
100:25 105:1
121:20
**moved** 49:7,8
49:10
**movie** 59:2
**multiple** 25:24
25:25,25
43:21 84:2
**mutually** 44:21

**N**

**N** 1:15,15 3:1
  4:1 5:1
**name** 7:5 15:14
  15:15 16:23
  19:11 20:10
  21:16 22:8
  22:11,12
  23:23 25:12
  36:25,25
  40:7 59:1
  86:4 90:19
  94:4,20
**named** 12:11
  34:17
**names** 19:9
  58:15,21
**National** 4:16
  19:12,13,15
  19:17,19
  25:2 34:13
  93:25 94:1,2
  94:3,7,9
**National's**
  94:8
**nature** 84:8
**necessarily**
  90:13
**need** 9:6,8
  18:24 19:1
  43:12 44:9
  49:4 73:19
  74:21 75:5,9
  77:4 90:15
  107:11
  109:11
  123:20
**needed** 36:13
  36:14
**negotiate**
  27:20
**negotiated**
  28:3 35:2,21
  77:8
**negotiates**
  27:17

**negotiations**
  78:1
**neighborhood**
  18:12 31:2
  31:13 69:12
**neighborhoods**
  31:13
**neither** 64:11
  124:13
**net** 63:21
**never** 23:23
  48:6,6 68:25
  78:15 84:1
  84:19 96:25
  97:6,8,11,14
  109:4 112:14
**new** 1:2,5,23
  2:6 3:7,15
  4:6,6,12,22
  4:22 7:13
  29:22 30:1
  32:12 44:3
  78:20 107:12
  124:4
**Newark** 4:12
**nice** 103:3
**nine** 81:8
  107:9
**NJ** 124:18
**nominal** 12:11
**non-repayment**
  46:21
**Norse** 38:14
  39:4 40:2
  41:4,5,6,8
  42:11 47:1
  47:14,24
  52:3,11
  57:23 59:1,3
  59:4,4,4,4
  59:18 60:25
  61:5,7,12,17
  61:18,22
  63:4,23
  64:21 79:3,6
  79:8,9

**notary** 2:6
  17:21 18:11
  118:23,24
**notations**
  104:16,19
**note** 5:21 6:3
  14:22 37:16
  39:24 40:14
  42:4 51:6,9
  54:18 60:2,5
  60:7 61:24
  63:13 64:11
  64:12,23
  66:3,6,9
  69:2 77:8
  79:9 80:11
  105:6 106:20
  115:10
**noted** 96:10
  121:25
**notice** 30:10
  67:3 68:2,5
  68:11 69:1,3
**November**
  102:15
**number** 86:9,16
  106:23
**numbering**
  106:25,25
  107:1
**numbers** 107:3
  107:5

**O**

**O** 1:15,15
**oath** 98:1
**oaths** 124:5
**object** 44:2
  62:12 69:15
  76:6 84:15
  87:23 88:12
  89:2 102:23
**objecting**
  121:24
**objection** 9:2
  9:4 13:7,16

  13:19 14:3,6
  32:22 42:17
  43:4,20
  45:17 62:3
  64:14 69:19
  71:1,5 76:7
  82:9,17
  84:16 87:15
  88:22 89:20
  90:25 92:10
  93:1 95:5,16
  100:9,10,11
  100:19
  101:15 109:5
  112:16
  117:18 121:2
  121:25
**objection's**
  96:10
**objectionable**
  62:6
**objections**
  44:2 62:16
  89:10
**obligation**
  63:21,22
  64:23 109:21
**obligations**
  66:6
**observer** 54:14
**obtained** 92:4
**obviates** 76:7
**obviously**
  75:15 85:12
  94:11 111:3
**occasion** 18:18
  31:25
**occupied** 72:6
**occurred** 68:18
  114:16
**occurrence**
  68:20
**office** 7:20,25
  7:25 14:8
  16:15,17,18
  16:19 18:9

```
35:9 36:3,4          44:25 54:1          paid 21:4,5,7        78:15 116:22
37:20 68:8           option 51:1         51:18,22,23         participate
68:20,22             oral 22:3           51:24 104:4          20:24
69:18 97:16          orally 35:15        104:8,18            participated
97:19 98:22          order 121:9         112:15               35:23
OFFICES 4:3          122:9               113:11              participation
okay 8:3,18          ordering 75:20      114:24 115:3         5:20 20:14
 9:7 11:4,7,8        123:14,19,22        115:8 116:20         20:15,22
 18:20 20:6          original 50:25     papers 23:19          21:14,15,18
 26:15,15            63:11               24:25                21:23,25
 29:24 34:8          origination        paragraph             22:4 37:12
 36:14 37:5,7        21:6 51:4           40:25 41:17          39:1 41:16
 38:21 50:12         63:12 65:8          42:9 43:11           50:1,9,15
 55:20 61:14         115:21,22           45:9 46:1            53:19 54:1
 73:6 81:9           Orthodox 54:6       47:1,14              56:5,7 69:2
 83:1 90:10          54:6,14             48:14 49:25          80:5,8
 96:11 99:4          outside 24:17       50:5 51:25           107:21
 101:9 105:12        89:23               67:25 78:18          109:18 112:7
 107:25              owed 115:15         79:11,14             114:7,18
old 21:21,21         owner 15:13         82:16 108:7          117:17
 103:11              19:23 29:23         108:14,18            120:24 121:6
 117:24              owners 43:2         114:21               121:10,13
once 11:22           56:19               122:21 123:1         122:3
 28:6 68:18          ownership          parcel 51:5          particular
 68:18               59:11,21           parcels 65:20         34:25 35:7
one-day 119:21                          Park 3:5,14           88:8
one-year 28:21       ─────────────       4:16 19:12          parties 38:22
ones 19:1,1              P               19:13,15,17          69:1 78:15
 74:8,9 76:25        P 3:1,1,4 4:1       19:19 25:2           124:15
 79:4                4:1                 34:12 93:24          partners
ongoing 72:4         P.C 3:3             94:1,2,3,7,8         116:22 117:1
online 31:3,12       p.m 123:25          94:9                parts 116:13
operated 23:1        package 66:24      part 41:9 51:5       party 12:10,11
operating            73:18               54:19 66:24          12:22 39:2,3
 91:17 95:8          page 5:2,10         71:3,8 78:19         64:7 83:20
 98:7,13,20          6:2 10:18           79:7 92:6            84:1,3,8
 99:1,13             26:25 32:14         98:14 99:6           85:24
 102:6 103:20        33:3,10             100:1 101:23        passed 45:6
operation            37:22,23            112:12              PAUL 4:19
 35:10               38:24,25           partial 59:1        pay 44:16 51:6
opinions 87:17       39:1 44:19         participant          63:22 103:10
opportunities        55:10 74:14         20:12 54:12          104:24
 93:11 96:20         74:15 99:19         54:13               105:16 110:1
opportunity          99:20 107:17       participants         110:7 111:13
 68:2                107:24 108:1        20:5,6,11           111:22 112:3
opposed 8:17         108:6,7             28:10 54:3          112:3,20
                     PAGE-LINE 6:19
```

115:6 116:25
paying 111:23
payment 44:17
  45:20 71:20
  71:25 112:5
  112:10,22
  113:4,9,19
  113:19 114:2
  114:16,20
  115:8 116:23
payments 22:4
  44:13 111:18
  112:23 113:7
  113:20,20,23
pdf 108:6
pending 7:7
  67:13
people 22:13
  29:21 49:5
  49:10,17
percent 18:4,5
  45:13,21
  46:5,15
  50:18,23
  51:2,16,17
  51:19,21
  53:2 64:24
  65:2,3,7,8
  112:6 114:23
  120:25
  121:13 122:4
percentage
  18:2 116:23
percentages
  58:7
period 17:13
  50:17 110:6
  110:8
perjury 69:24
perpetrated
  25:20
person 27:16
  97:6
personal 5:24
  11:23,25
  55:3,15

personally
  14:4 18:15
  23:6 24:5
  77:7 91:5
  96:5
pertaining
  85:15
phone 24:11
  97:2,5,21
  120:5
phones 68:21
phraseology
  122:3,5
physical 49:18
piece 17:14
pinpoint
  120:10
place 3:14
  27:25 59:8
  100:21
  124:12
placed 67:8
placing 29:13
plaintiff 1:7
  3:18 12:13
Plaza 1:10
  5:19 38:21
  57:6,6,16,19
  59:17 60:8,9
  61:25 62:14
  62:23 63:2,7
  64:2 65:25
  80:5
pleading 5:15
  6:10 32:6,18
  32:23 33:6
  33:20 86:20
  87:3 88:14
pleadings
  89:20
please 8:14,21
  9:3 62:17
  70:2 87:11
  88:16 89:14
  95:25 96:14
  99:20 107:17

pledging 25:24
plenty 49:19
plus 50:23
  51:12,13
  65:3 109:22
point 54:16
  68:8 97:24
  102:3 106:2
  111:15 114:6
  115:19
Poliakoff 3:11
  86:5
policy 85:17
  102:23,24
poor 45:2,7
portion 106:12
position 26:2
  108:23
  110:13
possession
  27:9 82:3
possible
  105:17
possibly 12:15
  67:4
power 18:10
practice 17:10
  17:23 18:2
practicing
  16:5,20
preface 94:15
prefer 49:24
  84:24
premarked
  86:15 106:19
  106:22
preparation
  18:11 106:5
preparatory
  14:1
prepare 12:24
  13:5 28:14
  35:13 56:24
  65:16 66:17
  82:8,8
prepared 35:25

36:5 37:19
  43:25,25
  45:5 53:16
  53:19,24
  80:23
preparing 14:5
  53:18
present 13:23
presented
  93:11
presenting
  70:22,24
presently
  16:14,20
pretty 9:20
  18:8 83:2
  118:16
previous 80:21
  91:1 109:13
  111:12
  117:19
  119:19
  121:17 122:7
previously
  73:15,16
  91:10 92:19
  92:19 95:1
  117:23 121:3
price 41:1,10
Princeton 3:5
principal
  45:21 46:4
  46:23 50:22
  112:17
prior 34:13
  90:21 91:25
  108:23 113:7
  124:6
priority 108:8
  108:11,19
privilege
  13:12,15
pro 21:13 22:5
probably 30:10
  53:17 104:24
  107:24 118:8

118:11
**problem** 72:2
113:17
**proceed** 9:17
**proceedings**
123:24
**process** 31:6
31:16 67:5
82:22
**produce** 27:8
71:24 104:21
104:22,23
113:22 114:3
**produced** 15:3
55:25 68:12
68:14 69:20
70:19 71:24
72:14 92:13
93:2 98:17
105:1,13
117:10
**product** 13:8
13:13,20
14:1,7,10
82:10
**production**
72:22 99:2,2
117:12
**professionals**
17:20
**profit** 116:23
**profits** 117:2
**prohibitions**
54:7
**prominent**
93:10,10
**promissory**
66:3,6
**proof** 6:6
72:10,23
**proper** 84:16
**properties**
23:2 25:25
36:8 42:13
42:21,22,25
43:3,9 72:18

91:10
**property** 29:14
29:17,22
30:25 31:2,3
35:10,11
90:24 91:8
91:16 92:2
92:15 95:4
96:9 100:8
100:17 102:5
102:21 103:9
103:21 104:1
108:24
**protection**
30:4
**proud** 118:1
**provide** 30:4
68:15 74:4
87:16
**provided** 59:14
59:15 74:14
82:1 85:17
95:19
**Provident** 40:2
41:9 43:14
43:19 44:10
44:11 47:2
48:9 61:8,19
**providing**
36:19
**provision** 44:6
**provisions**
121:9
**public** 2:6
95:19 102:20
**publicly** 96:3
102:15 103:8
**pull** 60:15
85:1
**purchase** 36:16
36:19,20,23
39:24 41:1,9
41:10 43:9
43:17 44:17
44:18 53:13
54:18 61:8

61:21 118:4
**purchased** 48:8
**purpose** 36:9
38:11 41:22
41:24 42:16
43:13 53:1,6
53:12 66:22
71:13
**purposes** 7:22
8:22 29:3,4
**pursuant** 124:5
**put** 14:3 18:20
19:10 20:12
20:12,13
21:12 26:4
27:12 29:25
30:9 43:10
57:7 64:17
64:19 77:3
81:23 91:7
107:14
114:18 123:9
**putting** 18:19
28:7 64:7

---

## Q

**qualify** 43:13
43:19 44:10
44:11
**question** 8:14
8:16 13:10
13:24 31:5
38:6 45:23
47:6 48:13
62:5,11,13
62:17,18,19
62:20 63:6
63:16 64:16
66:13 74:21
81:5,6,11
82:7 83:2,3
83:4 84:13
87:12,24,24
88:1,1,25
94:7 95:17
96:1,15

98:12 100:10
100:11,14,22
101:20,21
102:2,4,8
103:6,6,18
110:4 111:7
111:8,10,11
111:12,20,20
112:19
121:12,17,19
121:24,25
122:7
**question's**
8:20
**questioning**
96:16
**questions** 8:13
9:13 70:1
74:3,19
75:15 77:3
83:13,15,16
83:20,25
84:2,11,25
85:11,14,21
86:6 88:13
89:22 96:1
96:20 106:15
110:21
120:23
**quick** 48:20
90:12
**quickly** 96:16

---

## R

**R** 1:15 3:1 4:1
6:18 124:1
**R.S.** 41:2-2
124:5
**raided** 68:22
69:18 70:6
98:21 99:11
113:13,18
**raised** 116:11
**rata** 21:13
22:5
**ratified** 90:3

**re-ask** 62:10
**re-verify**
  42:19
**read** 38:6
  46:12 80:1
  80:14 87:12
  88:17,19
  89:3 100:25
  101:11,17
**reading** 33:18
  45:24 74:24
  101:22
**real** 12:5
  17:14,16,24
  58:13
**really** 31:5
  85:22
**Realty** 4:15
  10:25 11:3
  28:18 63:8
**reason** 9:8
  59:2
**recall** 22:16
  22:17 23:16
  24:2 25:13
  25:14 27:5
  36:9,14,22
  52:20,21
  68:7 71:23
  78:11 80:20
  93:5 96:22
  99:8,11
  101:22,25
  102:3,9,18
  104:2,2,7
  112:12,23
  113:18,24
  119:24
**receive** 62:1
  64:19
**received** 10:19
  26:7 32:6
  35:17 37:13
  40:15 55:4
  56:16 57:16
  60:3,18

  62:23 63:7,9
  64:12,21
  65:13 66:14
  70:21 72:11
  73:24 76:12
  76:20 79:13
  86:21 99:17
  104:13
**recess** 48:22
  75:18 90:17
  123:11
**recipient**
  60:24
**recite** 22:18
  23:20
**recognize** 26:8
  37:9 55:11
  60:20 65:12
  71:7 74:1,23
  86:23
**recollection**
  57:18,21
  68:13 70:8
  91:25 93:4
  97:23 98:18
  109:1 113:12
**recommended**
  93:14,21
**recommending**
  34:22
**record** 9:5
  14:3 23:3
  27:23 28:1
  33:8 59:6,9
  62:17 67:23
  69:6,17 70:5
  70:11 72:3
  72:17,25
  73:4 80:17
  81:1,15
  95:19 103:11
  105:4 107:20
  110:25
  112:11,12,22
  114:13,14
  123:10

**recorded** 73:11
  81:7 91:10
  92:19,19
  102:15 103:8
  107:18
**recording**
  71:15 82:22
  83:6 105:18
**recordings**
  92:1 102:20
  106:4
**records** 89:18
  90:1
**refer** 11:2,7
  65:10 121:17
  122:7
**reference** 37:3
  72:17 104:12
**referenced**
  64:23
**referred** 30:21
  38:17 39:5,6
  39:9 94:17
  96:3
**referring**
  34:23 37:4
  38:25 39:11
  91:12 120:24
  122:21
**refers** 121:13
**refresh** 57:18
  68:13 69:7,8
**refreshes**
  57:21
**regarding**
  77:21 94:10
**related** 78:22
  104:25 105:6
**relates** 81:11
**relationship**
  78:8
**relative** 93:24
  124:14
**released** 68:3
**religious**
  54:16,20,20

  116:2,3
  122:10
**relying** 95:13
**remain** 52:25
**remember** 14:11
  36:25 53:23
  68:9 82:5
  89:1 91:24
  92:11 99:25
  100:2 101:4
  101:5 119:13
**remote** 7:23
**remotely** 3:1
  4:1 7:24
**rent** 35:10
**RENZI** 1:20
**repaid** 46:14
  65:2
**repay** 45:10,12
  46:3 109:21
**repayment**
  55:16 110:12
**repays** 67:18
**repeat** 45:23
**rephrase** 58:19
**rephrasing**
  109:12
**report** 31:25
  35:13,14,17
  92:8,23,23
  94:24 96:2
  103:7
**reported** 35:12
**reporter** 2:5
  8:3,15 38:7
  75:19 123:13
  123:18,21
  124:3
**Reporting** 1:21
**reports** 95:8
**represent** 7:6
  17:25 19:14
  32:17 57:10
  68:11 85:16
  98:25
**representa...**

46:16
representa...
10:25 11:17
represented
52:24 57:4,9
57:22
representing
84:8
represents
51:12 65:1
94:7
reputation
93:8 95:1
request 5:12
6:20 12:25
26:6,24
27:10 61:2
67:16 71:23
71:24
requested
119:1,2,7
require 31:24
required
105:18
121:14 122:5
122:10 123:2
requirement
54:20,21
111:22 122:9
requires
108:18
resignation
67:1
resolve 9:4
RESOURCES 1:20
respond 111:3
response 11:17
74:11,13
87:4,7,9
responses 8:23
responsible
28:7
restate 100:12
restrain
110:18
restrict 29:12

restriction
29:16,23
30:9
restrictions
29:7 30:4
retained 68:19
return 45:13
46:5,15,23
51:1,13 53:2
65:3 114:20
114:23
120:25
121:14 122:4
122:11
returned 53:1
65:7
review 13:6,18
14:5,15 15:1
15:2 74:3
82:2 102:20
reviewed 13:8
13:22,22
14:7,10 56:4
reviewing 27:5
59:17 95:18
99:25
reword 8:22
rider 14:22
right 22:6
23:19 32:13
39:2 48:18
50:13 51:19
53:7 69:1
73:3 81:10
86:2 92:9
96:25 97:6
97:14 100:15
102:9,21
103:14 105:7
105:8 106:12
107:18,21,25
108:8,20
109:4,11,16
110:2,14
111:8,16
112:2,5,10

114:8,10,16
115:3,23
117:17 119:2
119:5 120:12
120:14,22
121:1,12
122:5,23
123:3,7
River 1:9
38:14 39:4
41:19 42:3
42:11 47:20
47:24 48:1
59:18
rog 74:15,25
rogs 86:10
rolled 115:17
room 49:4,11
49:15,20
rooms 49:18
roughly 18:3
ruckus 85:18
rude 90:12
rule 83:24
124:18
rules 44:3,4
84:18 85:2,4
85:5,5,7,8
rumors 113:16
run 45:6
rush 117:23
119:23,25,25
120:20,21
rushed 53:14

─────────
S
─────────
S 3:1 4:1,10
5:9 6:1,18
6:18
S-c-h-a-u-m
94:5
sale 5:21
18:11 29:23
40:14
sanity 72:3
Sarah 3:12

85:23 86:1,5
satisfied 93:5
96:12 116:3
satisfy 96:6
Saturday
119:14
saw 26:10 59:3
saying 13:19
49:9 98:2
101:11,17
106:22 107:7
107:7 116:5
says 32:14
39:23 41:17
42:10 43:12
43:13 44:20
44:23 45:9
46:3 47:1,19
50:18 51:11
52:24 53:8
53:11 68:1
71:14 72:17
77:7,20 78:7
78:19 79:13
79:24 80:4
81:2 89:5
100:23 101:4
101:10,10
123:10
scandal 69:10
Schaum 94:3,7
94:9
Schedule 11:9
11:11
scheme 25:19
school 16:5,8
16:9 89:4
scouting 31:13
screen 10:10
10:11 26:5
55:7,7 76:23
86:7 108:5
108:15 113:2
scrolling
86:25
searches 92:7

27:24 41:19
47:19 59:7
67:25 76:23
78:19,19
79:22 83:24
**secondary**
29:12
**secret** 122:23
**secured** 34:6
**secures** 66:5
**security** 67:6
**see** 9:24 10:12
10:16,21
26:18,24
27:3,4 30:24
32:8,15
33:11 38:15
39:25 41:4
41:19 42:14
44:20 45:10
45:13 46:6,9
47:3,15,20
49:5 50:3,12
52:1,4,11,23
53:4,9,11
55:10 56:13
58:8 59:25
60:16 61:15
67:7,11 69:7
70:14 72:12
72:15 74:18
76:18,21
77:6,11,22
78:8,10,23
80:6 81:18
99:20 104:13
106:10
108:16
112:25 113:8
113:10,19
122:22 123:9
**seeks** 81:10
**seen** 10:22
40:18 59:5
73:25 74:2
84:1

**selected** 13:9
**Selevan** 23:22
23:24,25
24:1 35:22
37:21 53:23
**sell** 29:22
**sellers** 18:8
**send** 68:5,23
**sending** 71:9
71:14
**sense** 62:18
**sent** 24:10,10
52:20 61:3
68:17,25
72:20 78:21
78:22 83:5
**sentence** 44:23
51:15 52:16
52:23 53:4
67:7 78:19
79:16,23
80:1,14,25
82:16,20,21
**separate** 74:15
78:1 107:5
117:4
**separately**
14:10,16
**series** 6:7
70:18,20
71:10 84:2
**serious** 113:17
**servicer** 21:1
21:3
**Services** 1:21
**session** 14:1
**set** 33:1 46:19
50:11 51:12
64:12 115:9
117:17
124:12
**Seth** 1:11 5:24
22:7,24 24:9
24:13,22,25
25:3,7,20
34:10,12

38:13 39:3
40:22 41:23
42:10 43:7
54:4,17 55:4
55:15 58:4
59:11 62:20
62:20 64:20
67:1 73:16
79:2,7 82:22
83:6 90:2,7
90:23 93:21
94:22 95:13
95:19 101:24
109:19
**sets** 83:19
**seventh** 37:22
37:23
**share** 10:1,2,6
21:13 76:23
86:7
**shares** 66:25
67:3,10
**sharing** 10:9
**SHIRA** 1:11
**short** 67:4
75:13 119:24
**short-term**
28:20 46:13
67:19,19,21
**shorter** 28:22
**shortly** 16:2
68:9 118:8
118:11
119:10
**show** 9:22 26:4
32:4 37:7
40:12 44:14
55:1 56:12
57:13,25
59:24 61:12
61:14 66:12
70:15 72:8
73:19,20,21
74:12 76:9
99:14 101:3
101:8 106:16

108:3 120:4
**showed** 32:10
61:11 76:15
91:17
**showing** 71:6
76:1 81:5
113:23
**shown** 71:2,3
**shows** 70:13
104:14
118:23,24
**side** 10:10,12
28:7
**sign** 80:8,11
82:11 90:7
**signatory** 58:5
**signature**
37:23 38:23
38:25 55:10
66:19 74:14
74:15 92:1
92:18
**signatures**
45:7
**signed** 38:13
56:7 82:13
82:15 91:18
102:16 117:5
118:22 119:6
**signer** 44:5
**signing** 31:19
90:2
**simple** 96:1
**simply** 54:23
100:14
101:21
**single** 34:5
84:18 86:13
113:9
**sir** 86:4,23
**sits** 75:13
**sitting** 49:14
100:15 113:3
**situation**
120:21
**situations**

21:1
six 14:24
  50:20 51:2
  107:9 109:25
  110:8,12
  111:14,23
  115:7
six-month
  50:14 111:21
size 55:6
Sklein@bec...
  3:17
Skye 4:20
  108:16
slap 45:2
sloppy 53:14
smell 30:24
Sod 25:10
soften 121:10
sold 17:14
somebody
  116:12
Somewhat 116:6
sorry 45:23
  52:9 85:14
  95:11 97:18
  102:23 111:9
sort 37:15
  38:3,10,10
  45:5 51:3
  54:9 82:24
  98:4 116:25
  117:3 118:8
  121:8
sought 81:15
sound 119:2
sounds 40:7
  95:20 119:5
speak 47:10
  67:4 75:3
  82:1 95:6
  120:7 123:9
speaking 9:3
  31:13 44:1
  75:7 110:24
  111:2

speaks 42:18
  45:18 55:22
  56:21 64:15
  65:5 82:18
  88:7 115:12
special 75:24
specific 58:7
  63:5 64:17
  67:16 97:23
  119:20
specifically
  52:24 53:24
  70:7 96:12
  101:25
  103:18,23
specificity
  83:10,11
specify 52:18
  52:19 82:23
  89:17 95:17
  98:5
speculation
  33:16,19
  39:17 40:4,6
  42:6 43:5,15
  56:20 58:24
  60:11 61:10
  64:15 67:14
  109:6
spell 34:18
  94:4
spoke 24:21
  97:2,5,14
spoken 97:15
  97:17,24
  98:4
spouses 15:25
spreading
  69:11 113:16
SQUARE 1:23
squinting
  33:25
stamp 33:2
standard
  122:24
standing 26:2

STARK 3:3,3
start 79:22
  118:6 119:8
started 69:11
  82:21 83:5
  120:2,11
Starting 79:21
starts 44:9
  79:16 85:9
  107:24
state 1:22 2:6
  7:12 26:11
  74:7,9 122:1
  124:4
stated 62:5,5
statement
  40:10 91:18
states 1:1
  100:21
stating 91:19
stay 53:8
  75:15
stenograph...
  2:3 124:11
step 101:22
steps 101:21
  114:9,12
stood 63:12,13
stop 9:3 62:7
  62:7,8,9
  95:23 121:18
storefront
  18:9
straight
  113:14
stream 78:21
Street 4:5
struck 28:6
structure 20:7
  20:9 28:8,9
  28:11,12
  38:11
structured
  54:15
stuff 18:9,12
submitted

112:13
suggest 85:8
Suite 1:22
  3:14
sum 66:7
Sunday 119:14
super 72:5
Superior 7:12
support 69:24
supposed 52:13
sure 49:2,13
  114:3 117:13
  118:16
sworn 7:1
  124:7

------

**T**

T 5:9 6:1,18
  124:1,1
T-y-r-n-a-...
  34:19
take 8:16
  16:10 26:18
  30:8 42:4
  47:5,7,9
  48:16,17,21
  54:14 67:3
  74:17,22
  75:3 85:3,11
  87:11 88:16
  89:14 90:15
  90:21 95:14
  101:8 113:2
  123:8
taken 2:3
  26:22 48:22
  75:18 84:10
  90:17 91:16
  117:24
  123:11
  124:11
takes 27:25
  59:8
talking 13:23
  31:16 33:23
  50:6 91:15

118:6 119:8
Tduggan@st...
  3:9
Teaneck 1:10
  5:18 38:21
  57:6,6,16,19
  59:17 60:8,9
  61:25 62:14
  62:23 63:2,3
  63:6 64:1,9
  65:25 80:4
  93:9
Tel 1:24 3:8
  3:16 4:7,13
  4:23
tell 8:21 10:8
  60:13 81:2
  81:21 96:11
Temple 1:10
  5:17 6:12
  38:21 56:16
  56:19,25
  57:2 59:17
  60:8,10 62:1
  64:5 66:1
  73:13 79:4
  79:10,10
  80:4 90:3,24
  91:8,23 95:4
  96:8 98:7,14
  98:21 99:1
  99:17 100:8
  100:17
  101:14 102:5
  102:6 103:20
Temple's 96:8
ten 12:8,10,18
tend 48:21
Tepfer 1:16
  2:3 4:16 5:3
  7:1,5 11:21
  15:21 16:25
  16:25 47:9
  77:7 81:14
  91:3 94:8,11
  94:17 95:25

96:14 99:21
102:16 103:5
103:21 104:1
108:7 109:16
110:20 111:6
111:7 113:3
117:20 121:6
122:2 123:6
124:7
Tepfer's 109:9
term 28:21
  46:18,22
terminated
  102:25
terminology
  116:4
terms 27:17
  35:2,6,20,23
  38:1,4 45:16
  111:21
  114:20
test 30:24
testified 7:2
  12:21 43:21
  77:13 96:24
  115:19
  117:23 121:3
testify 33:8
  98:1 100:22
  124:7
testifying
  39:18 41:13
  42:7 62:4
  91:1 100:10
  100:20
  101:16 109:7
  109:14
testimony 2:3
  43:25 70:4
  90:21 91:1
  98:10 103:3
  106:15 109:6
  109:13 110:3
  110:16,19
  116:1 117:19
  121:3,22

123:10
124:10
text 107:23
Thank 7:5
  96:17 107:14
  123:6
theory 87:18
  88:25
thing 87:7
  118:1
things 18:12
  21:24 54:8
  95:11,12
think 7:18
  11:12 12:17
  12:23 15:14
  18:3 19:25
  24:19,19
  25:9,21,24
  30:9 34:12
  35:22 38:19
  43:16 45:2,3
  53:5 57:11
  61:12 68:7,8
  71:9 74:14
  78:13 83:23
  85:16,22
  86:11 88:4,6
  89:1 90:11
  91:14,18
  93:15 97:15
  99:10 103:10
  104:9,9,23
  105:11 106:9
  106:13,17
  113:15 116:7
  117:4,11
thinking 102:9
third 34:9
  44:19 79:16
  99:19
thought 13:9
  48:11,15
  84:20
three 11:22
  12:19 18:19

22:15,16,17
22:20,23
23:8 24:13
24:17,20
28:23 34:14
67:20 85:20
107:3,8
three-minute
  74:22 75:3
THURSDAY 1:17
TIAN 4:20
Tim 9:25 32:22
  40:9 48:11
  74:7 75:23
  76:22 86:8
  114:1
time 14:3
  17:13 29:9
  45:4 51:7,7
  59:23 68:8,9
  77:24 82:2
  89:13,20
  95:17 96:12
  96:23 98:21
  101:8 108:22
  109:9 110:6
  110:8 111:15
  115:6 117:24
  118:3 124:12
times 11:20,23
  43:21 49:21
Timothy 3:4
  7:6
title 30:10,11
  42:4 71:9,12
  81:15 92:6,7
  92:8,9,22
  94:24 95:8
  96:2 99:20
  102:23,24
  103:7 105:17
today 7:19 8:4
  9:18,20
  10:24 11:2
  11:16 23:11
  33:15,21

35:3  78:4
100:4,15
106:15  113:3
**today's** 8:22
12:25  13:18
75:20
**told** 15:9
91:21  117:22
**TOLL** 1:24
**top** 29:21
32:14  38:12
41:3  46:8
51:16,17
55:11  58:3
58:23,25
**topic** 84:12
85:14  104:25
**topics** 83:22
84:10
**totally** 13:15
**touches** 38:3
**traditions**
116:3
**transacted**
118:12
**transaction**
12:2,6  28:13
39:12  43:22
46:19  91:7
117:14
**transactions**
24:18  29:6
59:16  90:5
**transcript** 2:2
8:5  9:5
26:23  75:21
123:14,19
124:10,18
**transfer** 20:17
119:7
**trial** 12:21
**tried** 70:4,10
80:17
**true** 124:10
**truth** 124:8,8
124:8

**try** 8:22  69:5
69:6,17  73:3
87:19,20
101:20
110:18
**trying** 20:7
23:4  32:20
69:24  73:10
95:21  96:15
**Tuesday** 119:17
**turnaround**
119:21,21,23
119:25
**turned** 8:5  9:5
**twice** 11:22,24
**two** 11:22
12:19,19,20
17:6  18:18
19:19  23:13
28:23  34:3,6
34:10  36:8
42:21,22,24
43:2,9  54:18
65:19  70:11
73:17,20
79:24  80:21
83:18,19
107:8,9
112:22  113:7
113:11,20
119:11,15
**two-day** 119:21
**type** 12:1
17:22  45:2
120:21
**types** 31:15
**Tyrnauer** 34:17
34:20  35:5,8
93:23  94:18
94:22  103:13
103:17,24,24
104:4  106:11
120:13,16

---
**U**
---
**U** 6:18

**ultimately**
48:2  60:12
**umm** 51:21
**undergraduate**
16:11
**understand** 8:1
8:5,11,25
9:13  13:19
20:7  33:19
47:11  56:22
71:4  87:16
87:19  89:3
95:18,24
**understanding**
25:22  36:18
40:20  42:3
100:24
109:15,20
116:14,18
**understands**
32:24
**undertaking**
63:22
**underwriting**
30:21,23
31:4,6
**UNITED** 1:1
**untoward** 67:24
**updated** 92:23
**urgency** 118:2
**use** 29:7,15,19
29:20  44:24
86:12  122:3
122:17
**Usually** 28:21

---
**V**
---
**V** 1:15
**variations**
59:4
**various** 22:24
22:25  26:2
**Ventures** 1:11
5:19  57:6,16
57:19  60:9
61:25  62:14

62:23  63:2,7
64:2
**verbal** 35:17
**verification**
95:7
**verify** 42:19
**victim** 25:21
**video** 49:5,7
49:5,7
**video's** 49:10
**videoconfe...**
2:7  7:2
**Videography**
1:21
**videotaping**
26:22
**view** 54:16
**viewed** 13:5
**Viking** 59:2
**visit** 31:3
103:10
**visited** 35:8
**vote** 100:7,18
**vs** 1:8

---
**W**
---
**wait** 101:12
**want** 29:11,12
29:25  30:6
33:7,7  40:9
48:23  49:13
49:23  85:18
87:20,21
94:15  113:10
123:9
**wanted** 43:23
47:8  48:2
**wants** 75:16
**wasn't** 45:24
65:7  77:16
89:4  104:24
114:15
121:14
**watched** 59:2
**water** 48:19
**way** 10:15
19:21  33:24

wired 52:3,10
  60:13 61:22
  62:19 63:1,3
  64:1,3,5,7
  79:1,3,6,8
wise 21:16,17
  120:19
wish 106:22
withdraw 79:14
  96:25 98:11
withheld 27:13
witness 5:2
  11:10,14
  47:13 49:1
  49:16 70:25
  71:2 75:11
  75:13 82:2
  88:13 90:14
  95:21,23
  97:25 103:1
  108:5 110:19
  111:5,7
  122:19
woman 94:18
word 59:3
  116:8,8
  122:17
worded 121:1
wording 45:2,8
  121:6,14
words 43:18
  44:24 88:4
work 13:8,8,13
  13:20 14:1,7
  14:9 67:5
  82:10 94:11
  103:25
works 115:5
worry 26:20
worth 90:11
wouldn't 85:4
  120:18
written 26:22
  68:1,25 69:3
wrong 108:15
  113:1

54:15,23
98:20 115:5
121:1,5
we'll 8:23
  9:11 14:13
  47:7 48:20
  75:4 99:14
  114:3 117:12
we're 33:22
  53:20 76:7
we've 9:22
  10:16 32:4
  37:8 40:12
  55:1 56:12
  57:13 70:15
  72:8 76:9
  96:15
week 119:13,18
  119:19
  123:17
went 63:23
  81:3,4
  105:16 112:1
  113:15
weren't 68:21
  106:22
West 4:5
whatsoever
  49:3
whispering
  48:24 49:11
  49:24
wife 15:9,13
  15:22,22
  57:12 97:11
  97:24 98:4
willy-nilly
  29:22
wire 6:5 52:20
  52:22 60:13
  60:17,21,24
  63:9,10,20
  63:21,23
  64:21 79:5,8
  105:1,5,12
  118:25

www.RLReso...
  1:25

───────────
**X**
───────────
x 1:4,14 5:1,9
  6:1

───────────
**Y**
───────────
Yan 4:3,4
  13:18 62:7
  110:23
Yan@margol...
  4:8
Yards 4:21
yeah 7:18 8:2
  8:7,12 9:1
  9:21 10:4,21
  10:23 11:24
  14:1 15:14
  17:11 18:8
  19:25 20:5,5
  20:23 21:2,2
  21:3,11
  23:12 25:5
  26:10 27:7
  28:12,18,19
  31:8 32:16
  32:25 33:9
  33:13 34:7
  35:1 36:3,16
  37:6,10,24
  39:14,14
  40:7,19 41:2
  41:21 42:15
  44:22 45:11
  45:19 46:2,7
  46:11,17,21
  46:24 47:13
  50:2,4 51:14
  51:18 52:5,7
  52:12,15,15
  53:5,17 55:8
  55:19 56:6
  64:3 67:16
  68:4 70:12
  71:9 72:16

72:21 74:24
77:18 78:10
78:24 80:25
92:12,17
97:20 105:25
105:25
108:21 109:2
110:10
114:17
115:14,21,21
116:6 117:8
118:11,20,23
119:4 122:16
year 28:22
years 12:8,8
  12:10,18
  17:5,6,6,9
  34:23 67:20
  89:5 90:4
Yelling 62:8
yesterday 14:9
York 1:5 4:6,6
  4:22,22
young 90:12

───────────
**Z**
───────────
zoom 2:6 7:2
  38:5 49:5

───────────
**0**
───────────
07114 4:12
07960 3:15
08648 3:7
08690 1:23

───────────
**1**
───────────
1 6:11 9:23
  10:17 11:18
  40:25 99:14
  99:15,16
1,550,000 41:1
1:06 123:25
10 5:11 45:12
  45:21,21
  46:4,5,14,15
  50:20 53:1

65:2,7,8
114:23,24
115:7 120:24
121:13 122:4
**10,500** 105:15
106:1
**10:08** 1:18 2:8
**100,000** 20:13
**10001** 4:22
**10018** 4:6
**11** 41:17 53:21
77:20,22
89:15 114:19
**11204** 16:16
**12** 40:13 61:15
106:17,18,18
106:20
**13:43-5.9**
124:19
**14** 65:11
119:12
**15** 46:9 118:14
118:18,19
119:1,7
**15th** 118:22
119:17
**16** 78:18
118:25
**17** 59:25 64:11
66:10
**1776** 3:13
**18** 32:14 33:10
66:13
**18th** 16:15
**19** 60:15 79:11
79:19

**2**
**2** 26:5 45:9
46:1 77:6
107:25
114:21
**2:19-cv-17...**
1:3
**20** 27:4 50:18
50:23 51:2

51:15,17,19
51:21 64:24
65:3 72:9
112:6
**200,000** 20:13
**2013** 99:23
102:14,16
**2018** 92:14,22
92:24
**2019** 45:22
46:6,9,14
50:20 72:15
72:23 73:1,4
73:8,8 78:8
92:25 110:1
114:6,24
**2022** 1:17 2:7
124:25
**20th** 4:21
**21** 70:16 79:14
79:20
**212** 4:7,23
**2277** 1:22
**23** 72:15 76:10
86:11,11
**24** 1:17 2:7
80:12 81:6
81:11 82:16
83:11 86:17
86:19
**26** 5:12 46:13
46:22 50:25
109:22 110:7
**291** 86:23

**3**
**3** 73:22 99:23
102:13
**30XI00148700**
2:5 124:23
**315** 4:5
**32** 5:15
**33** 1:22
**358-5600** 4:23
**368-7652** 1:24
**36th** 4:5

**37** 5:20

**4**
**4** 47:1,14
76:16 108:7
108:14
**40** 5:22
**41** 17:6,6,9
**410** 1:22
**412** 107 1:25
**43** 17:5
**442** 16:15
**45** 89:5

**5**
**5** 48:14 49:25
87:12,22
**50** 18:4,5
**50,000** 20:12
**55** 4:21 5:25
**56** 5:17
**57** 5:19

**6**
**6** 56:13 88:17
89:9 108:6,7
108:24
**6,500** 106:10
**6/15** 26:16
**60** 6:3,5 18:4
18:5 68:1
**60-day** 68:25
**609** 1:24 3:8
**622-5297** 4:13
**65** 5:23
**66** 6:4
**67** 3:14

**7**
**7** 5:4 39:1
51:25 57:14
**7,500** 106:9
**70** 4:11 6:7
**71-23** 6:20
**72** 6:6
**73** 5:13

**739,500** 105:13
**75** 51:8,18
63:14,14,22
**75,000** 45:13
46:5,23
50:23 51:1,3
51:12,13
63:11 65:2
109:22
114:20,23
115:6,15,20
120:25
121:14 122:4
**750** 52:3 63:14
63:21
**750,000** 43:12
44:10 45:12
46:4 51:13
52:10 65:1
105:14
109:20
**76** 5:14 6:9

**8**
**8** 124:25
**800** 1:24 3:14
**825** 63:15,18
63:20 112:6
115:18
**825,000** 51:20
56:4 60:10
61:25 62:1
62:15,23
63:7 64:23
65:21 66:7
112:2
**86** 5:5 6:10
**875** 51:21
**896-9060** 3:8
**898-6502** 3:16

**9**
**90** 5:6
**964-6200** 4:7
**973** 3:16 4:13
**989-9199** 1:24

**99** 6:12
**993** 3:6